**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID N. BADAGLIACCO, | **)** | |
| | **)** | |
| Plaintiff, | **)** | |
| | **)** | |
| v. | **)** | No. 1:21-cv-2424 |
| | **)** | |
| SAFARILAND, LLC, a Limited Liability | **)** | Honorable Thomas M. Durkin |
| Company, | **)** | |
| | **)** | Magistrate Judge Beth W. Jantz |
| Defendant. | **)** | |

**PLAINTIFF'S RESPONSES IN OPPOSITION TO SAFARILAND, LLC'S MOTIONS IN
LIMINE NOS. 1, 2, 3, AND 5**

NOW COMES Plaintiff, DAVID N. BADAGLIACCO, by and through his attorneys, ANESI OZMON, LTD., and hereby submits the following Response in Opposition to Defendant Safariland, LLC's Motions in Limine Nos. 1, 2, 3, and 5.

**RESPONSE IN OPPOSITION TO MOTION IN LIMINE NO. 1**

Plaintiff should not be barred from introducing evidence, testimony, or arguments concerning the theories of liability he alleges in his complaint. Plaintiff's Complaint, attached as **Exhibit A.** At the outset, it must be noted that Defendant's statements as to Plaintiff being limited in scope by this Court's summary judgment ruling is inaccurate, as there is no language included therein which limits the scope of Plaintiff's actionable claims as arising solely from (a) Safariland's failure to provide a water source designed for simultaneous decontamination by multiple course participants; and (b) Safariland's alleged knowledge that the subject decontamination station was deficient. Memorandum Opinion and Order, attached as **Exhibit B**, p. 6. Rather, this Court merely held that said two claims were grounds for the denial of Defendant's

1

Motion for Summary Judgment, and never expressly stated that there was any "scope" limitation as Defendant suggests.

To the extent Defendant's motion is directed to allegations concerning the precise manner in which the OC spray was applied, those are not the focus of Plaintiff's case at trial. At this stage, Plaintiff does not contend that liability arises merely because OC spray was used during the training exercise, nor will Plaintiff rely on Paragraph 16(a), (b), or (c) as independent bases of negligence. Even still, Defendant's request to bar "any evidence, testimony, or argument concerning that and any other unsupported claims" is overbroad, and Defendant's Motion should be denied on that basis alone. Moreover, the remaining allegations in the complaint are nevertheless relevant to whether Defendant acted reasonably in its provision of the training course and providing adequate decontamination methods.

These allegations are supported by the expert testimony of Plaintiff's expert, Patrick Schuerman, whose opinions are necessary to assist the trier of fact in establishing the applicable standard of care. Federal Rule of Evidence 702 permits a qualified expert to offer opinion testimony when scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue. Fed. R. Evid. 702. The *Daubert* court identified a non-exhaustive list of reliability factors as it pertained to the inclusion of reliable expert testimony including: whether the theory or technique can be or has been tested; whether it has been subject to peer review and publication; the known or potential rate of error; the existence and maintenance of standards controlling its operation; and whether it has attracted widespread acceptance within a relevant scientific community. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 580 (1993). In *Lapsley*, the Seventh Circuit noted that the purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine if it has "the same level of

2

intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). District courts acting as gatekeepers of scientific technical, or specialized knowledge evidence retain significant discretion under flexible *Daubert* inquiry. *Id*. at 818.

In *Kumho*, the Supreme Court extended Daubert's gatekeeping obligation beyond scientific testimony to all expert testimony, including that based on "technical" and "other specialized" knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138, 148 (1999). *Daubert* and *Kumho* essentially established the standard for assessing both the qualification of the proposed expert and the reliability and relevance of the proposed opinion. The Seventh Circuit, for instance, has codified this as a three-part test requiring the proponent to demonstrate: (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony. *See Kirk v. Clark Equipment Company,* 991 F.3d 865, 872 (7th Cir. 2021).

Critically, not every deficiency in an expert's qualifications or methodology warrants exclusion. Furthermore, courts across circuits have consistently held, "determinations of admissibility, which fall within the gatekeeping role of the court, are separate from determinations of weight and credibility, which are within the province of the jury in a jury case." *Williams v. Sig Sauer, Inc.*, 799 F. Supp. 3d 470, 478 (E.D.N.C. 2025); *Moore v. Barnes*, 802 F.Supp. 3d 792, 817 (E.D.N.C. 2025); *Nix v. Chemours Co. FC, LLC*, 805 F. Supp. 3d 626, 641 (E.D.N.C. 2025). Further, the Seventh Circuit has noted "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *Lapsley*, 689 F.3d at 817.

As it pertains to the specific evidence in question here, *Carlson* is both irrelevant and inapplicable because Plaintiff's expert, Mr. Schuerman, is not a lay witness, but rather an expert

3

witness. See *Carlson v. Tactical Energetic Entry Systems, LLC*, No. 14-cv-248-wmc, 2015 U.S. Dist. LEXIS 83117, AT *16-19 (W.D. Wis. June 26, 2015). Furthermore, this Court has already qualified Mr. Schuerman to testify about the issue regarding the standard of care for provision of a decontamination station when training for use of a substance like pepper spray in their Summary Judgment Memorandum Opinion and Order. Ex. B, 7.

Additionally, *Schultz* precedent demonstrates that OSHA safety standards can be considered by the jury when they decide what the standard of care should be even for other agencies. See *Schultz v. N.E. Ill. Reg'l Commuter R.R. Corp.*, 201 Ill. 2d 260 (2002), as modified on denial of reh'g (Aug. 29, 2002). There, the Illinois Supreme Court reviewed a trial court's decision to exclude OSHA standards as evidence of the standard of care in a negligence action. *Id*. The plaintiff, injured in a workplace accident, sought to introduce OSHA standards through expert testimony from Eugene Holland, a structural engineer, to establish the standard of care. See *id*. at 265, 268. The defendant filed a motion in limine to "exclude any reference to OSHA at trial." *Id*. at 268. Specifically, defendant argued that these standards were not binding as to regulations in the area of walkways and working surfaces beside tracks in railroad yards on the theory that the Federal Railroad Administration (FRA) preempted OSHA regulations. *Id*. Further, defendant argued that OSHA, by its own terms, does not regulate the area of the retaining wall. *Id*. In relevant part, the trial court reserved ruling on whether Holland could testify that OSHA was evidence of the standard of care. *Id*. at 294. During trial, the court allowed such evidence, and Holland opined that standards promulgated by numerous governmental organizations recognize the necessity of a guardrail when there is a change in elevation. *Id*. In sum, the court ultimately held that Holland's testimony did not violate Rule 213 and was properly admitted as evidence of negligence. *Id*. at

299. Moreover, *Schultz* serves to cement the finding that OSHA standards are admissible as evidence of the standard of care, even if they are not binding on the defendant. *Id*. at 298-99.

As in *Schultz*, this Court would be consistent in determining that current Plaintiff's OSHA expert, Patrick Schuerman, should be allowed to testify as to OSHA standards to assist the jury in evaluating reasonable safety practices. Moreover, since the plaintiff in *Schultz* was permitted to offer their expert's knowledge of proper OSHA safety guidelines concerning the implementation of guardrails where there is a change in elevation, so too should Plaintiff at bar be allowed to utilize his OSHA expertise to opine on proper safety guidelines relevant to decontamination safety practices. Such testimony is in no way dispositive of legal duty. It would simply give the jury guidance as to their evaluation of whether Defendant Safariland failed to comply with the standard of care regarding improper decontamination procedures, and related breaches.

Further, in the context of a police tactical training course, an expert's reliance on OSHA decontamination standards is relevant to demonstrate recognized safety benchmarks. Patrick Schuerman Dep., 50:8-18; 52:23-24; 53:1-5, attached as **Exhibit C**. Mr. Schuerman's expertise and experience as a consultant for risk management and safety in the workplace, instructor of OSHA courses, and OSHA inspector for the State of Illinois qualifies him as a proper expert under Federal Rule of Evidence 702, and his opinions are valuable as informative evidence of reasonable decontamination protocols. Ex. C., 12:2-11; 22:8-11; 31:1-2. For example, Mr. Schuerman opines that OSHA 29 CFR 1910.151(c) would apply to any workplace where the employees at that workplace are exposed to injurious corrosive materials, and employers are required to provide suitable facilities for quick drenching or flushing of the eyes. Ex. C., 51:15-20; 52:12-24; 53:1-15. He further states that these general regulations apply to police station employees working with corrosive material. Ex. C., 52:23-24; 53:1-5. In accordance with the standard set forth in *Schultz*,

the jury may factor such opinions into their decision as to what the standard of care should be in the current case. Additionally, Defendant is not unduly prejudiced by the evidence in question, as they may cross-examine Mr. Schuerman as to any concern related to his supposed lack of credibility in opining on decontamination practices within the police tactical training industry.

Conclusively, Plaintiff should be allowed to introduce evidence, testimony, and arguments that would assist the jury in establishing the standard of care. Said evidence is necessary to provide the jury with information they may use to ultimately determine whether Defendant Safariland owed Plaintiff a duty, failed to meet the standard of care in compliance with that duty, and effectively committed a breach. The allegations in Plaintiff's complaint are tailored to such arguments and are supported by Mr. Schuerman's deposition testimony.

**RESPONSE IN OPPOSITION TO MOTION IN LIMINE NO. 2**

Plaintiff must be allowed to make his arguments concerning Safariland's negligence related to their decontamination procedures, and similar allegations, supported through the testimonial evidence from Cox, Dubay, Kappler, Badagliacco and Orchard. Defendant's reliance on *Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653 is misplaced. In that case, the nature of the appellants' claims that were dismissed focused on the reasonableness of defendants' conduct in providing training, that is, education provided to the pilot who crashed the aircraft, as well as an evaluation of the course instruction and the soundness of teaching methods. *Id*. at ¶¶ 3, 33. Whereas, in the current case, the crux of Plaintiff's argument regards Defendant Safariland's failure to provide proper decontamination protocols and practices centered on ordinary negligence, not educational malpractice.

Accordingly, Safariland's administering of its Less Lethal course – the course design, the sufficiency of Safariland's instructional materials, Safariland's training and oversight of Cox as an

6

instructor, the decision to expose police officers to OC spray as part of the training course, the topics covered in the course, the construction and execution of the OC obstacle course exercise, the adequacy of the amount of personnel provided, and Safariland's expectations as to the course material that Cox would cover during the Less Lethal course – support allegations deriving from the ordinary negligence count of Plaintiff's complaint, which are directed at improper decontamination methods not educational malpractice. Ex. A.

Next, the bulk of the testimony from Cox, DuBay, Kappler, Badagliacco and Orchard emphasize facts of consequence that are necessary to adequately inform the jury of the pivotal circumstances surrounding the current case. Moreover, this evidence is not only relevant to establishing general details of the occurrences that surround the date of the accident but also serve to aid the jury in ascertaining what reasonable care is in the context of the totality of events which took place on April 16, 2019. Without the testimony of said witnesses, the jury will lack crucial information related to whether Defendant breached their duty of reasonable care.

Alarmingly, Defendant broadly attempts to compel this honorable Court to prohibit the solicitation of testimony from any witness, including but not limited to Cox, DuBay, and Kappler, without specifically citing to any testimony in any of their transcripts regarding course presentation or instructional materials. Moreover, Defendant in no way specifies what it is about either the course presentation or instructional materials that are improper or inadmissible.

Conclusively, the aforementioned evidence, testimony, and arguments should not be barred at trial, as the same is indeed relevant to whether Safariland was negligent in its provision of the decontamination station in this case.

**RESPONSE IN OPPOSITION TO MOTION IN LIMINE NO. 3**

Defendant seeks a blanket order barring any evidence or testimony concerning Safariland's Less Lethal training materials on the basis that such materials do not create a legally binding duty and cannot be used to establish the standard of care. However, Plaintiff does not intend to use Safariland's course materials to create a new duty "independent of the common law" or to establish negligence *per se*. *See Tafoya-Cruz v. Temperance Beer Co., LLC*, 2020 IL App (1st) 190606, ¶ 71. Rather, Safariland's training materials and course documents are admissible to show what was feasible, what Defendant knew or should have known, what risks were recognized, and what precautions Safariland itself deemed appropriate.

Illinois courts repeatedly recognize that internal rules and policies may properly inform the standard-of-care inquiry. For example, in *Darling v. Charleston Community Memorial Hospital*, the Illinois Supreme Court held that a hospital's internal rules and regulations were admissible because they assisted the jury in determining what was feasible and what the defendant knew or should have known. *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 332, 211 N.E.2d 253, 257 (1965). The Court emphasized that, although internal policies do not conclusively establish the standard of care, they function like evidence of custom and practice and are relevant to whether the defendant acted reasonably under the circumstances. *Id.* Likewise, in *Ruffiner v. Material Service Corp.*, the Court held that relevant standards promulgated by industry, trade, or regulatory groups may be admitted to aid the trier of fact in determining the standard of care, even where those standards do not have the force of law. 116 Ill. 2d 53, 58 (1987).

The same is true here. While not conclusive, Defendant's training materials may assist the jury in determining whether Defendant exercised reasonable care in exposing participants to OC spray, pacing trainees through the course, and providing decontamination afterward. Plaintiff

alleges that Safariland failed to use adequate decontamination methods and failed to conduct the OC spray exercise safely. Safariland's course materials address how such training was to be performed and what safety measures were contemplated. Excluding that evidence would deprive the jury of relevant context concerning the manner in which Safariland itself believed the course should operate. Defendant should not be permitted to instruct employees and course participants on safety measures, then shield those same materials from the jury once those measures become relevant after an injury.

Defendant also seeks to exclude references to the PVC-pipe decontamination station shown in Safariland's materials because Plaintiff's expert, Pat Schuerman criticized it as inadequate. That argument fails. The fact that Plaintiff's expert opines the depicted station was insufficient does not render the evidence inadmissible. Any tension between the training materials and expert testimony goes to weight, not admissibility. Accordingly, for the reasons addressed herein, Defendant's Motion in Limine No. 3 should be denied in its entirety.

**RESPONSE IN OPPOSITION TO MOTION IN LIMINE NO. 5**

Defendant seeks to exclude portions of Plaintiff's safety expert, Patrick Schuerman, by characterizing his opinions as speculative and outside his area of expertise. However, Defendant's motion should be denied because Mr. Schuerman's opinions are grounded in his decades of workplace safety experience, his review of the case materials, and recognized safety standards and any disagreement regarding his conclusions goes to weight not admissibility.

Federal Rule of Evidence 702 permits a qualified expert to offer opinion testimony when scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue. Fed. R. Evid. 702. Defendant attempts to pigeonhole Schuerman solely as "an OSHA expert," arguing that "[a]ny opinion that Schuerman may provide

9

that strays from OSHA's requirements for eye wash stations should be barred, as it is outside of Schuerman's area of expertise." But Mr. Schuerman's qualifications extend well beyond merely reciting OSHA regulations. He has expertise in workplace safety, accident investigations, and state and federal occupational health and safety standards, and possesses more than thirty years of safety and risk management experience. *See* Plaintiff's Rule 26(a)(2)(B) disclosures, attached as **Exhibit D.** Moreover, this Court already determined that Mr. Schuerman is qualified to testify regarding "the standard of care for provision of a decontamination station when training for use of a substance like pepper spray." Ex. B, 7.

Additionally, Schuerman's opinion regarding the amount of time reasonably required for the exposure drill are not speculative, it is based on Defendant's own course materials, the number of participants, and accepted decontamination guidelines. There were 26 students participating in the course. Schuerman opined that the generally accepted guideline following OC exposure is 15 minutes of continuous water flushing. Ex. D., 6. Safariland's own training materials similarly instruct exposed participants to "wash for 15 minutes with clean potable water." Safariland OC Aerosol Projector Instructor Slide, attached as **Exhibit E**.

Even so, in performing his time analysis, Schuerman used a more conservative assumption of only eight minutes for decontamination, together with approximately three minutes for each participant to complete the course, resulting in a total estimated time of 286 minutes to process 26 participants. Ex. C., 108:1-23. Safariland's own agenda allotted only 210 minutes for the OC spray portion of the class. Ex. C., 106:6-11. Thus, Schuerman's opinion was that, even using assumptions more favorable to Defendant than the 15-minute flushing guideline, the allotted 210 minutes was insufficient to allow all participants to properly decontaminate.

Finally, contrary to Defendant's assertion, Schuerman did not opine that Plaintiff's injury was caused by failing to remove his clothing. Rather, he testified only that if OC residue remained on Plaintiff's clothing and somehow later entered his eye, it was feasible that such residue could have caused irritation. Ex. C., 150:13-151:9.

*/s/ Scott C. Sands*

Attorney for Plaintiff

Scott C. Sands
Julia L. Garlich
**Anesi Ozmon, Ltd.**
Attorney ID# 6353002
161 N. Clark St. Ste 2100
Chicago, IL 60601
ssands@anesilaw.com
jgarlich@anesilaw.com

11

FILED
3/31/2021 9:44 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
12777770

16777/PJB/CAT/ks

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| DAVID N. BADAGLIACCO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2021L003398 |
| v. | ) | |
| | ) | |
| SAFARILAND, LLC, a Limited Liability | ) | |
| Company, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S COMPLAINT AT LAW AND DEMAND FOR JURY TRIAL**

Now comes the Plaintiff, DAVID BADAGLIACCO, by his attorneys, ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., and complaining of the Defendant, SAFARILAND, LLC., and allege as follows:

**GENERAL ALLEGATIONS**

**NATURE OF THE CASE**

1. This is a civil action for personal injuries suffered by Plaintiff, DAVID BADAGLIACCO against Defendant, SAFARILAND, LLC, a Limited Liability Company. This action arises out of an incident on April 16, 2019, wherein Plaintiff was negligently, willfully, and wantonly sprayed with pepper spray to his eyes and face by Defendant's agents and/or employees during a training course. As a result of this incident, Plaintiff suffered severe and permanent injuries.

**VENUE AND JURISDICTION**

2. Plaintiff is an individual and citizen of the State of Illinois.

1



EXHIBIT

A

FILED DATE: 3/31/2021 9:44 AM    2021L003398

3. Defendant conducted and continues to conduct business in the State of Illinois, including Cook County.

4. Plaintiff was employed with the Village of Skokie, County of Cook as a police officer and member of the SWAT team.

5. Defendant was hired by Plaintiff's employer after advertising to, negotiations with and, agreement to a contract for services to be performed in Illinois.

6. Cook County and its residents have an interest in determining the rights and well-being of its police officers as well as the interest in holding those accountable for harm caused to their officers.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

7. On April 16th, 2019, Plaintiff was an employee and member of the Village of Skokie's Police Department and a member of the SWAT team.

8. Defendant manufactures, advertises, and sells for profit various equipment for military and police use, including Oleoresin Capsicum Aerosol Projectors, (hereinafter, "pepper spray"). Defendant also offers courses in exchange for monetary gain for the use and handling of such products, including pepper spray.

9. On or before April 16th, 2019, as a requirement of his employment, Plaintiff was ordered to participate and undergo a four-day (4) "Less Lethal" Instructor Training Course with 20-25 other police officers. At this course Plaintiff would receive instruction as to how to use and instruct other officers on the use of pepper spray.

10. The Training Course was organized, planned, managed, and conducted by Defendant, SAFARILAND, LLC., through its agents and/or employees.

11.     Defendant represented, advertised, and held itself out to the public as having the requisite and necessary knowledge and skill to safely provide such training so as not to cause serious injury to the participants, including the Plaintiff.

12.     On the aforesaid date, Defendant demanded all participants must be sprayed with pepper spray and then required to complete an obstacle course. Upon completion of the obstacle course, then and only then, would the Defendant provide any means for the Plaintiff to flush the pepper spray previously sprayed by the Defendant and their agents and/or employees.

13.     Defendant only provided Plaintiff with a garden hose to flush his eyes and face of the pepper spray. Plaintiff was only allowed one minute to flush his eyes and face. He was required to share the hose with the other participants.

## COUNT I - SAFARILAND, LLC

### (Negligence)

Now comes the Plaintiff, DAVID BADAGLIACCO, by his attorneys, ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., and complaining of the Defendant, SAFARILAND, LLC.

14.     Plaintiff hereby refers and incorporates by reference paragraphs 1-13 of the General Allegations into this cause of action against Defendant, SAFARILAND, LLC.

15.     On April 16, 2019 and prior thereto, the Defendant, SAFARILAND, LLC., individually and by its agents and/or employees, had a duty to use ordinary care for the safety of its customers, including the Plaintiff, DAVID BADAGLIACCO.

16.     Defendant, SAFARILAND, LLC., individually and through its agents and/or employees, breached its duty and was then and there guilty of one or more of the following careless and negligent acts and/or omissions:

a.     Carelessly and negligently sprayed Plaintiff with pepper spray;

3

FILED DATE: 3/31/2021 9:44 AM   2021L003398

b. Carelessly and negligently exposed Plaintiff to pepper spray for no legitimate instructive purpose;

c. Carelessly and negligently exposed Plaintiff to an unnecessary, dangerous, and harmful amount of pepper spray;

d. Carelessly and negligently exposed Plaintiff to pepper spray for a period of time without the opportunity to flush such from his eyes and face;

e. Carelessly and negligently failed to provide Plaintiff with a wash station and/or proper equipment to flush the pepper spray from his eyes and face;

f. Carelessly and negligently exposed Plaintiff to pepper spray without sufficient time to properly flush the pepper spray from his eyes and face;

g. Failed to properly train or qualify its agents and/or employees to have the requisite knowledge or to appreciate the effects of spraying a police officer with pepper spray;

h. Failed to properly train or qualify its agents and/or employees on safe practices and procedures related to safely instructing the effects and ramifications of pepper spray;

i. Failed to properly train or qualify its agents and/or employees on safe practices and procedures related to safely spraying an amount of pepper spray without causing serious harm;

j. Failed to properly train or qualify its agents and/or employees on safe practices and procedures on how to provide appropriate wash stations or any other effective means to safely flush pepper spray;

k. Failed to properly train or qualify its agents and/or employees relating to safe practices and procedures for the requisite time and methodology to flush pepper spray;

l. Failed to appreciate the exposure to pepper spray was not required for police officers to understand its intended use/effects; and/or

m. Failed to provide any alternatives for instruction for participants to understand the effects of pepper spray without putting the participates in danger and/or causing severe, permanent harm.

4

FILED DATE: 3/31/2021 9:44 AM 2021L003398

17.     As a direct and proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of the Defendant, SAFARILAND, LLC, individually and through its agents and/or employees, the Plaintiff sustained severe and permanent injuries, both externally and internally, including, but not limited to, the destruction of his cornea and the necessity to undergo multiple surgeries as a result. Plaintiff was hindered and prevented from attending to his usual duties and affairs as a police officer and lost the value of that time.  The Plaintiff further expended and became liable for large sums of money for medical care and services endeavoring to become healed and cured of said injuries.

WHEREFORE, the Plaintiff, DAVID BADAGLIACCO, demands judgment against the Defendant, SAFARILAND, LLC., in a dollar amount to satisfy the jurisdictional requirements of this Court and such additional amounts as the jury and the Court shall deem proper, and additional costs of said suit.

## COUNT II - SAFARILAND, LLC

### (Willful and Wanton Behavior)

Now comes the Plaintiff, DAVID BADAGLIACCO, by his attorneys, ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., and complaining of the Defendant, SAFARILAND, LLC.

18.     Plaintiff hereby refers and incorporates by reference paragraphs 1-13 of the General Allegations into this cause of action against Defendant, SAFARILAND, LLC.

19.     At the aforementioned time and prior thereto, the Defendant, SAFARILAND, LLC., individually and by its agents and/or employees, had a duty to refrain from willfully and wantonly acting and conducting its business in a manner that consciously disregarded the safety of others, including the Plaintiff.

5

FILED DATE: 3/31/2021 9:44 AM   2021L003398

20.     Defendant represented, advertised, and held itself out to the public as an entity that understood and appreciated the use and dangers of pepper spray and other less-lethal actions.

21.     Defendant knew and represented that after a person was sprayed with pepper spray, they should be able to "wash for 15 minutes with clean potable water".

22.     Despite its knowledge of the effects of pepper spray, with a conscious disregard for Plaintiff's safety, through its agents and/or employees, sprayed Plaintiff in his eyes and face with pepper spray.

23.     The Defendant, SAFARILAND, LLC., individually and through its agents and/or employees was then and there guilty of one or more of the following willful and wanton acts and/or omissions that were knowingly carried out in conscious regard for the safety of the Plaintiff:

a.      Willfully, wantonly and with conscious disregard for the safety and well-being of the Plaintiff, sprayed Plaintiff with pepper spray;

b.      Willfully, wantonly and with a conscious disregard for the safety and well-being of the Plaintiff, sprayed Plaintiff in the eyes and face with pepper spray with no instructive purpose;

c.      Willfully, wantonly and with a conscious disregard for the safety and well-being of the Plaintiff, sprayed Plaintiff in the face and eyes with a quantity of pepper spray that was more than what was required for an instructive purpose;

d.      Willfully, wantonly and with a conscious disregard for the safety and well-being of the Plaintiff, demanded Plaintiff complete an obstacle course while experiencing the effects of the pepper spray;

e.      Willfully, wantonly and with a conscious disregard for the safety and well-being of the Plaintiff, refused and prevented Plaintiff to flush his eyes and face;

f.      Willfully, wantonly and with a conscious disregard for the safety and well-being of the Plaintiff, failed to take into consideration and appreciate the necessity of the instructive purpose of spraying a police officer with pepper spray;

6

FILED DATE: 3/31/2021 9:44 AM 2021L003398

g.      Willfully, wantonly and with a conscious disregard for the safety and well-being of the Plaintiff, failed to provide the necessary and effective means to flush pepper spray from his eyes and face despite its knowledge of its own and/or recognized guidelines and standards;

h.      Willfully, wantonly and with a conscious disregard for the safety and well-being of the Plaintiff, prevented Plaintiff from having sufficient time to effectively flush the pepper spray from his eyes and face despite its knowledge of its own and/or recognized guidelines and standards;

i.      Willfully, wantonly and with a conscious disregard for the safety and well-being of the Plaintiff, prevented him from immediately seeking the necessary medical care to flush the pepper spray from his eyes and face, despite its knowledge of its own and/or recognized guidelines and standards;

j.      Willfully, wantonly and with a conscious disregard for the safety and well-being of the Plaintiff, failed to train or qualify its agents and/or employees how to safely instruct the effects of pepper spray;

k.      Willfully, wantonly and with a conscious disregard for the safety and well-being of the Plaintiff, failed to train or qualify its agents and/or employees as to how to remediate the effects of pepper spray; and/or

l.      Willfully, wantonly and with a conscious disregard for the safety and well-being of the Plaintiff, knowingly violated OSHA standards which required sufficient time to flush pepper spray after being exposed to such.

24.     As a direct and proximate result of one or more of the aforesaid willful and wanton acts and/or omissions of the Defendant, SAFARILAND, LLC., individually and through its agents and/or employees, the Plaintiff sustained severe and permanent injuries, both externally and internally, including, but not limited to, the destruction of his cornea and the necessity to undergo multiple surgeries as a result. Plaintiff was hindered and prevented from attending to his usual duties and affairs as a police officer and lost the value of that time.  The Plaintiff further expended

7

FILED DATE: 3/31/2021 9:44 AM    2021L003398

and became liable for large sums of money for medical care and services endeavoring to become healed and cured of said injuries.

WHEREFORE, the Plaintiff, DAVID BADAGLIACCO, demands judgment against the Defendant, SAFARILAND, LLC., in a dollar amount to satisfy the jurisdictional requirements of this Court and such additional amounts as the jury and the Court shall deem proper, and additional costs of said suit.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

By: ___*/s/ Patrick J. Blum*___
   Attorneys for the Plaintiff

Patrick J. Blum
Charles A. Terry
ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.
161 North Clark Street, Suite 2100
Chicago, IL 60601
Tel: (312) 372-3822
Fax: (312) 372-3833

16777/PJB/CAT/ks

Attorney ID# **35244**

FILED
3/31/2021 9:44 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

12777770

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

DAVID N. BADAGLIACCO, )
)
        Plaintiff, )
                           Case No.: 2021L003398
v. )
)
SAFARILAND, LLC, a Limited Liability )
Company, )
)
        Defendant.

**AFFIDAVIT**

I, Patrick J. Blum, being first duly sworn on oath, deposes and states that if I were called upon to testify, I would do so as follows:

1.      That I am an attorney at law licensed to practice in the State of Illinois.

2.      That I am an associate with the law firm of ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., attorneys of record for the Plaintiff, DAVID N. BADAGLIACCO.

3.      That based upon the information available to me at the present time, the total amount of money damages sought in this matter exceeds $50,000.00.

4.      That this Affidavit is submitted in compliance with Supreme Court Rule 222(b).

      FURTHER, Affiant sayeth not.

                                 _/s/ Patrick J. Blum_____
                                   Patrick J. Blum

Attorney ID# **35244**
**ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.**
161 North Clark Street - 21st Floor
Chicago, IL 60601
312/372-3822 / pblum@anesilaw.com

before me this ___22___ day
of _March_____ , 20_21_ .

*Karyn A. Smoter*
Notary Public

"OFFICIAL SEAL"
KARYN A. SMOTER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7/11/2023

SUBSCRIBED AND SWORN TO

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| DAVID BADAGLIACCO, | |
| Plaintiff, | No. 21 C 2424 |
| v. | Judge Thomas M. Durkin |
| SAFARILAND, LLC, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

David Badagliacco was a police officer for Skokie, Illinois. He alleges that he participated in a training course operated by Safariland, LLC, that involved his exposure to pepper spray. Since the exposure, Badagliacco has suffered from an eye infection necessitating cornea replacement surgery. He claims that Safariland caused his injuries through negligent and willful and wanton operation of the course.

Safariland has moved for summary judgment, arguing primarily that Badagliacco's claims are barred by the exculpatory clause in the waiver Badagliacco signed. Safariland also argues: that no reasonable jury could find that it acted in a willful and wanton manner; and Badagliacco's evidence of causation—specifically the expert testimony he relies on—is insufficient for a reasonable jury to find in his favor. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie if the dispute about a material fact



is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). That motion is denied.

## I.    Exculpatory Clause

Before participating in the training course, Badagliacco signed a waiver including the following exculpatory language:

> 2.    I fully understand that with any type of physical training the possibility always exists that an injury may occur, and I voluntarily and freely accept such risk that may occur to me or others participating in this course.
>
> *    *    *    *
>
> 5.    I agree that I am voluntarily attending this course and/or at the request of my department, and in no way will I hold any student and/or participant, Safariland's Training staff, or any agencies affiliated with this program responsible for injuries I may sustain during this course.

R. 81 at 4 (¶ 14).

Badagliacco argues that this language is too vague to be enforceable. To be enforceable under Illinois law, an exculpatory clause "must contain clear, explicit, and unequivocal language referencing the type of activity, circumstance, or situation that it encompasses and for which the plaintiff agrees to relieve the defendant from a duty of care." *Offord v. Fitness Int'l, LLC*, 2015 IL App (1st) 150879, ¶ 20, 44 N.E.3d 479, 484. Badagliacco argues that "the only reference within the waiver to the types of allegedly covered activity is 'any type of physical training.'" R. 83 at 3. According to Badagliacco "physical training" could "reasonably include such a broad range of activities so as to be functionally meaningless, rendering the exculpatory agreement unenforceably vague." *Id.*

2

The waiver also references "this course." R. 81 at 4 (¶ 14) ("I am voluntarily attending *this course* [and I will not hold anyone] affiliated with this program responsible for injuries I may sustain during *this course*." (emphases added)). But "this course" is no more definite than "physical activity." Neither term expressly states, in any sense, that the course includes being exposed to active pepper spray.

Safariland argues that because "Badagliacco's exposure to pepper spray occurred as part of the physical training session for pepper spray exposures," the references to "physical training" and "this course" clearly included exposure to active pepper spray. But bootstrapping from what occurred during the training course *after* Badagliacco signed the waiver is not a proper way to interpret the meaning and scope of the waiver's express terms. As discussed, the waiver does not mention pepper spray, whether active or not. Not even the title of the course—"4 Day [Instructor Certification Program] Less Lethal"—which Badagliacco hand wrote on the waiver form, expressly references active pepper spray. *See* R. 81 at 4. The parties do not discuss the meaning of the term "less lethal." And Safariland does not argue that the term "less lethal" implies training regarding active pepper spray. To the contrary, Safariland admits that "[t]raining regarding [pepper] spray does not always include exposure by the participants with active [pepper] spray." R. 89 at 7 (¶ 25). There is no evidence regarding whether Badagliacco was told that the training included active pepper spray exposure prior to signing the waiver. It is undisputed that Badagliacco signed the waiver before the training began, and it is undisputed that that classroom portion of the training informed that participants—including Badagliacco—that they

3

would be physically exposed to active pepper spray during the physical training portion of the course. In any case, Safariland does not argue that Badagliacco's knowledge beyond the four corners of the written waiver—including what he may have been orally told before signing—is relevant to the waiver's scope.

The express terms of the waiver do not mention the use of active pepper spray. While a valid waiver "need not list every single potential risk," it must clearly indicate the "possible dangers ordinarily accompanying the activity." *Munoz v. Nucor Steel Kankakee, Inc.,* 44 F.4th 595, 600-01 (7th Cir. 2022). Here, it is undisputed that pepper spray training does not always involve physical exposure to active pepper spray. In order to waive liability for exposure to active pepper spray, the waiver should have noted that "this course" and the contemplated "physical activity" included exposure to active pepper spray. Because the waiver lacked such a reference, it does not encompass injuries resulting from the use of active pepper spray.

## II.    Willful and Wanton

Safariland next argues that there is insufficient evidence for a reasonable jury to find that Safariland acted negligently or willfully and wantonly. To succeed on a claim for either negligent or willful and wanton conduct, a plaintiff must first establish that the defendant breached a duty to the plaintiff. Badagliacco claims that Safariland breached its duty to him in two different ways: (1) the manner in which he was exposed to the pepper spray; and (2) provision of an insufficient decontamination system to clean his eyes after.

4

Although Badagliacco's complaint includes allegations of negligence and willful and wanton conduct regarding the manner in which he was exposed to the pepper spray, he does not make any convincing argument in support of these allegations in his brief. He does not argue that exposure to active pepper spray during a training course is negligent per se. He admits that he was exposed to active pepper spray during a previous training at the police academy. The closest Badagliacco comes to arguing that application of the pepper spray was negligent is by pointing to the evidence that Safariland's trainer did not closely study or follow Safariland's instructions in teaching the course. *See* R. 83 at 10. But Badagliacco's does not argue that the trainer's failure to follow Safariland's instructions resulted in any mistake in the manner in which the trainer applied the pepper spray to Badagliacco's face. He does not point to any evidence that the manner in which Safariland exposed him to pepper spray breached any duty it had for conducting such a training.

Separately from his allegation that Safariland was negligent in how it sprayed him with pepper spray, Badagliacco claims that Safariland's provision of a decontamination station was negligent. Badagliacco's brief focuses on his allegation that Safariland failed to provide an adequate decontamination station for him to clean his eyes after exposure. The decontamination station consisted of a single garden hose left on the ground for simultaneous use by several course participants. Badagliacco and other witnesses testified that in previous trainings involving active pepper spray (i.e., trainings provided by an entity other than Safariland), the decontamination station consisted of water sources specially constructed for multiple

participants to wash their eyes simultaneously. Additionally, Safariland admits that Patrick Schuerman, an inspector for the Illinois Occupational Safety and Health Administration, testified in this case that the decontamination station provided in Safariland's course did not meet OSHA standards. *See* R. 81 at 13 (¶ 72). Safariland's failure to provide a water source specifically designed for simultaneous decontamination by multiple course participants is sufficient evidence for a reasonable jury to find that Safariland was negligent in its provision of a decontamination station.

Safariland argues that, even assuming the evidence of negligence is sufficient, summary judgment should be granted on Badagliacco's claim of willful and wanton conduct because there "is no evidence that Safariland . . . consciously disregarded Badagliacco's safety, or otherwise intended to harm him." R. 82 at 9. But Safariland's director of training testified that "a garden hose on the ground . . . . is not an appropriate way of decontamination." R. 81-2 at 35 (133:22–134:4). This testimony constitutes an admission that Safariland knew that the decontamination station it provided was deficient. The fact that Safariland knew that the decontamination station was deficient is sufficient evidence for a reasonable jury to find that Safariland "consciously disregarded" Badagliacco's safety. And an action committed with "conscious disregard" is "willful and wanton" action under Illinois law. *See Harris v. Thompson*, 976 N.E.2d 999, 1011 (Ill. 2012). These facts are sufficient for Badagliacco's claim of willful and wanton conduct regarding the decontamination

6

station to be decided by a jury. *See id.* ("the issue of willful and wanton conduct is usually a question of fact for the jury").

## III.     Expert Testimony

Lastly, Safariland argues that there is insufficient evidence for a reasonable jury to find that any breach of Safariland's duty with respect to provision of a decontamination station caused Badagliacco's injuries. Specifically, Safariland argues that neither: (1) the OSHA inspector, Patrick Schuerman; nor (2) Badagliacco's treating physician, Ali Djalilian, are qualified to offer an opinion regarding the causation of the injuries to Badagliacco's eyes.

The Court agrees that there is nothing about Schuerman's expertise that would qualify him to offer an opinion about the cause of an eye injury. But the Court does not understand Badagliacco to be offering Schuerman's testimony to prove causation. Rather, as discussed above, Badagliacco has called Schuerman to testify regarding the standard of care for provision of a decontamination station when training for use of a substance like pepper spray. Safariland has not challenged Schuerman in this regard, and the Court finds him qualified to testify about that issue. The causation of Badagliacco's eye injury, however, implicates the physiology of the human eye, and Badagliacco has not argued that Schuerman has any expertise in that subject area, so he is barred from testifying about it.

By contrast, Dr. Djalilian is the doctor who has treated Badagliacco's eye injuries. A treating physician's opinion about causation is admissible without disclosure as opinion evidence pursuant to Federal Rule of Civil Procedure 26(a)(2),

as long as the physician made the determination about the cause of the injury "in the course of providing treatment." *Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3d 729, 735 (7th Cir. 2010). Dr. Djalilian testified that in the course of his treatment of Badagliacco's injuries he determined that they were caused by the pepper spray. *See* R. 81-13 at 8 (pp. 24-25).

Safariland argues that because "Dr. Djalilian is an ophthalmologist and corneal specialist" and not "a toxicologist or epidemiologist," he is not "qualified to opine on whether the pepper spray, at the concentration and dose used, and the manner in which it was deployed, is capable of injuring the eye such that an . . . infection could develop." R. 88 at 9. This argument, however, goes to the weight of Dr. Djalilian's testimony, not its admissibility. As an expert in the functioning of the human eye, Dr. Djalilian is qualified to offer an opinion about whether pepper spray can cause the injury Badagliacco suffered. Safariland was of course free to retain a toxicologist or epidemiologist (who, in contrast to Dr. Djalilian, are generally not experts in the physiology of the eye) to rebut Dr. Djalilian's testimony, which might have required the Court to make a preliminary ruling about the balance of the two testimonies. Apparently, Safariland chose not to do this. In any event, Dr. Djalilian's testimony is competent and admissible on the issue of causation.

8

**Conclusion**

Therefore, Safariland's motion for summary judgment [80] is denied.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: May 9, 2025

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID N. BADAGLIACCO,           )
        Plaintiff,              )
  vs.                           ) No. 1:21-cv-02424
SAFARILAND, LLC, a Limited      )
Liability Company,              )
        Defendant.              )

    The deposition of PATRICK SCHUERMAN called for the examination pursuant to notice and the Rules of Civil Procedure for the United States District Courts, pertaining to the taking of depositions, taken before MARY KAY ANDRIOPOULOS, CSR, on the 13th of November, 2024, at the hour of 1:00 p.m., via videoconference.

REPORTED BY:  MARY KAY ANDRIOPOULOS, CSR
LICENSE NO.:  084-002248

1

APPEARANCES:

        ANESI OZMON, LTD.
        BY: MR. SCOTT C. SANDS
        161 North Clark Street
        21st Floor
        Chicago, Illinois 60601
        312.372.3822
        Ssands@anesilaw.com
            Representing the Plaintiff;

        JOHNSON & BELL, LTD.
        BY: MR. JOSEPH B. CARINI, III
        33 West Monroe Street
        Suite 2700
        Chicago, Illinois 60603
        312.372.0770
        Carinij@jbltd.com
            Representing the Defendants.

2

INDEX
WITNESS                                EXAMINATION
PATRICK SCHUERMAN
  BY MR. CARINI                          4, 171
  BY MR. SANDS                           167


EXHIBITS
NUMBER                              MARKED FOR ID
SCHUERMAN Deposition
  Exhibit No. 1 (attached)
  Exhibit No. 2 (attached)
  Exhibit No. 3 (retained)
  Exhibit No. 4 (attached)
(All exhibits marked by counsel)

3

        (whereupon, the witness was duly sworn.)
        PATRICK SCHUERMAN, having been first duly sworn, was examined and testified as follows:
            EXAMINATION
BY MR. CARINI:
    Q.   Pat, could you please state your full name, and please spell your last name for the record?
    A.   Patrick Schuerman, S-C-H-U-E-R-M-A-N.
    Q.   Thank you.
        Let the record reflect this is the deposition testimony of Patrick Schuerman taken in the Badagliacco versus Safariland case pursuant to all the applicable rules of the Federal Code of Civil Procedure.
        Mr. Schuerman, have you given deposition testimony before?
    A.   I have.
    Q.   Have you given tr
    A    I have not
    Q.   Okay. Well, we're
your testimony today via Z

2

**EXHIBIT**

tabbies®

C

tendency sometimes for the communication line to fade in and out, so I need to ask you to please just try to wait for me to get my whole question out before you answer so that you and I are speaking one at a time, okay?

A.   Fair enough.

Q.   Also, as you're doing, you need to keep your answers out loud and in verbal form, so you can't say ah-huh or uh-huh, but if you would say yes or no for the answer if you mean yes or no, that would also help us keep a clean record, all right?

A.   I understand.

Q.   All right.  And if you don't understand a question today, I need you to tell me that, because if you answer it, I'm going to assume you heard and understood it, okay?

A.   Yes.

Q.   Okay.  And where are you presently giving your deposition from?

A.   My home office.

Q.   And is that at 208 North Johnson Street in Newark, Illinois?

A.   It is.

Q.   Is anyone there in the room with you?

A.   No, I'm the only one home this afternoon.  I kicked everybody out.

Q.   Okay.  Can I get your date of birth please?

A.   July 12th, 1965.

Q.   Did you review anything to prepare for your testimony today?

A.   I reviewed the case file documentation, and that was about it.

Q.   Okay.  We're going to go through that in a moment.

A.   Okay.

Q.   I'm going to share my screen with you, and what I've marked as Exhibit No. 1 is a document called Plaintiff's Rule 26(a) Disclosures.

Can you see that on your screen now?

A.   I can, yes.

Q.   Thank you.

At the bottom -- at the start of Page 2, there's reference to a witness providing a written report, and it lists your name, your home address, and your phone number there,

right?

A.   That's correct.

Q.   And then under that, there's sections to include under sub small letter ii, data considered by the witness to form your opinions, and they include Answers to Interrogatories, and these deposition transcripts listed here, and then exhibits to those deposition transcripts.

When you said that in preparation for the deposition you reviewed file materials, is that what you're referencing?

A.   That is correct.

Q.   And then in fairness in another document, I think -- well, strike that.

Attached to this answer there's a report.

Did you review your report to prepare today?

A.   I did.

Q.   Okay.  And then --

MR. SANDS:  For the record, Joe -- sorry to interrupt -- for the record, that's a 12-page document, Exhibit 1?

MR. CARINI:  Yes, it includes -- it includes the attached report, and at the end of it, it includes his CV.

BY MR. CARINI:

Q.   And then I know I have another document that I'll show you in a moment that refers to -- let's see here -- I'll come back to that, but bear with me.

In one of the documents that you provided to me there was a reference to OSHA 1910 section.

A.   Okay.  Yes.

Q.   And there was reference to an ANSI standard.

Did you review the --

A.   Correct, I provided you the ANSI standard.

I don't know -- did I -- I don't believe I provided you with the 1910 book title.

Q.   No, no, you referenced it as part of the information that's part of your file and included the 1910 section of OSHA and ANSI 358.1.

A.   That's correct.

Q.   All right.  Was that also something

that you reviewed today prior to the deposition?

A. I did.

Q. Okay. Have we covered then, Pat, everything that you reviewed in preparation for the deposition today?

A. Pretty much so, yes, yeah.

MR. CARINI: Scott, I marked as Exhibit 2, and I have up on the screen, your response to our deposition rider for Pat Schuerman's deposition.

THE WITNESS: I think that's just a carbon of what was submitted to me in the file.

BY MR. CARINI:

Q. Okay. And here's where I got the reference to the two third-party documents.

A. Yeah, that basically covers the 1910 standard, and then also the ANSI standard, which I provided to you.

Q. Okay. In response to this request, I had asked you for a list of all cases in which you've testified at trial in the last four years.

You've told me already you have never testified at trial, correct?

9

A. Okay.

Q. Is that true?

A. That is.

Q. And then letter N, I asked for a list of cases in which you've given deposition testimony in the last four years, and you have none listed there as well; is that true?

A. That is correct.

Q. Okay. So although you have given depositions before, you haven't done any in the last four years?

A. That would be correct.

Q. Do you have any list of testimony that you've given that precedes the last four years, say, going back to 2020 and into the past?

A. No.

Q. Can you estimate for me how many times you've given a deposition?

A. Maybe six.

Q. Okay. And when you have given a deposition, was it all in connection with being retained as a consultant in some sort of litigated matter?

A. Some yes, some no.

10

Q. Okay. So let me go -- well, strike that.

What would you consider to be your role in this litigation that I'm here to ask you questions about?

A. I was asked early on for some direction and some help in determining where we needed to go and what to do, you know.

Early on, it was here's where we need -- this is the documents that we need to even determine if there's anything here.

I made some suggestions   Counsel went ahead and found those documents, or attempted to find everything, and later on, they asked me if I would formalize it, and we did, and I basically reviewed the documentation, and hence, my report.

Q. Okay. So I referred to consulting in litigated matters in my prior question when I was asking you about the types of depositions you gave -- you've given in the past, you said some are, and some aren't, right?

Would you consider your role in this case to be consultation in a litigation matter?

11

A. Yes.

Q. Okay. And what other type of work do you do beyond consultation in litigation matters?

A. I am a -- I'm a consultant for risk management working with insurance carriers and private companies to determine what exposures they have, and how to mitigate those in a workplace environment.

That can be everything from liability at a nursing home to workplace safety.

Q. We're going to get into your CV in a second, but what percentage of your time is spent in consulting in litigated matters versus the other type of consulting you described?

A. Very -- very minimal.

Q. Very minimal in litigation?

A. Meaning -- meaning for the last four years, I've been working for the State of Illinois, up until actually last month I resigned.

Because of that, I wasn't able to do a lot of litigation like I used to.

Q. Okay.

12



A. I am -- my expertise is in ---is liability, and at the work -- within the workplace.

Q. Okay. Do you have any currently pending open litigation consulting cases other than this one?

A. No.

Q. And so for the last four years your sole source of income was through your other career, not in litigation consulting; is that fair to say?

A. That is correct.

Q. Have you been retained by Anesi Ozmon firm before?

A. No.

Q. Have you ever worked with Scott Sands before?

A. No.

Q. Now, when you said you were initially contacted early -- well, strike that.

Let me try it this way.

A. I have no -- I have no idea when the initial consult -- it was months, -it was months prior and it was more, hey, I kind of gave them

13

some assistance, you know, hey, we need -- maybe you need to go down this path looking for documentation. They come back, well, we can't find this. Well, keep looking, it has to be there.

One of the things that I specifically asked -- told them they needed to obtain early on was your exposures and the SDS sheets, which they didn't have at the onset of our conversations.

Through that, and then, I think, you did some testimonies, you took some depositions, they called me back, and said, hey, we're to the point now where we need some -- we'd like to retain you, and I said fine, and we moved forward.

Q. Okay.

A. Pretty straight forward.

How they got my name, I can't recall. I know I've worked -- I know I've done some work with some other attorneys on some other profile safety -- you know, safety issues, workplace safety issues.

Q. Okay. Do you have as part of your file

14

a retention letter that sets forth when you were hired in this case?

A. I believe, we do.

It was shortly before I -- probably about a month before I composed the report, so it would have been -- I don't have it my -- I don't have it in front of me.

Q. That's fine.

I'm going to share a screen with you. One of the documents that was produced --

A. Yeah, that was my invoice. It was prior to that date.

Q. One of the documents that was produced in response to the rider I sent for your deposition is an invoice of the billing that you spent on the case, and before you here is an invoice dated October 8, 2024, correct?

A. Okay. Yes.

Q. And this documents -- and I can enlarge it if you need it -- but this documents all of the time that you put in on the case through the time that you finished your report, right?

A. Through that time period, yes.

It didn't include time that I spent --

15

it really wasn't a lot of time. It was more conversations prior to that.

Q. Okay. So this information about starting to review case documentation on August 7th of 2024, you would have already had some communication with counsel prior to this date?

A. Yeah, brief, yeah, maybe five, ten-minute conversations here and there.

Q. Okay.

A. But nothing with -- but no -- but no services had been requested. You know, it was more you and I having a conversation over the phone.

Q. Okay. So this lawsuit was filed in 2021.

Is it safe to say that you were not engaged in this case until shortly before you started working on the file in August of 2024?

A. That would be a fair -- a true statement.

Q. Okay. So you weren't guiding them in terms of talking to them about what they needed and how to move their case forward, you were

16



Case: 1:21-cv-02424 Document #: 118 Filed: 04/24/26 Page 34 of 96 PageID #:1122

Patrick Schuerman 11/13/2024

talking about very recently and --

A. Yeah, and I think -- I think our first conversations might have started the beginning, you know, January, February of this year, you know, off and on.

Q. But that was -- that was work you haven't billed for, and haven't put any time for?

A. Correct.

Q. All right. As I mentioned in here, in this 12-page document that's Exhibit 1, attached to it is a copy of a CV let's call Exhibit B to the Rule 26 Disclosure, and I just want to go through this with you for a moment.

I'll put it on the screen if it makes -- I'm happy to share it with you.

A. You can go ahead. I'm pretty familiar with it. Go ahead.

MR. CARINI: Scott, do you want it up on the screen or do you have it?

MR. SANDS: No, I'm fine. I have it right here. Thanks.

MR. CARINI: Okay.

MR. SANDS: Joe, if you need it up on

17

the screen for any reason, just let us know.

MR. CARINI: No, I have it. I can put it up here.

MR. SANDS: If you have a copy at your fingertips.

MR. CARINI: I do. I have a copy here. I'm good.

BY MR. CARINI:

Q. All right. So am I correct, Pat, that you are not a licensed engineer?

A. That is correct.

Q. You're not a professional engineer?

A. I do not have a PE stamp.

Q. And is it also true that you've never written any articles or publications of any kind?

HE COURT REPORTER: I think we lost him.

MR. CARINI: You're correct. He's frozen.

(Whereupon, a short recess was taken.)

MR. CARINI You're back? You were frozen.

18

MR. SANDS: Pat, you were frozen for a few moments.

Joe is going to reask the last question.

BY MR. CARINI:

Q. Have you authored any publications in the last ten years?

A. I do not believe so.

Q. Have you ever been published?

A. Not in a journal. I've written -- I've written articles that were published in insurance -- in newsletters for insurance carriers and so forth.

Q. Have you ever had an article peer reviewed --

A. No.

Q. -- prior to publication?

A. No.

Q. No?

A. No.

Q. Have you ever served in the military?

A. I have not.

Q. Have you ever served as a police officer?

19

A. I have not.

Q. Have you ever been trained as a paramedic or EMT?

A. I was an EMT for -- EMT for 22 years for the local service here.

Q. When you say local service, what are you referring to?

A. Local volunteer fire department I was a paramedic there, EMT paramedic there for 22 years.

Q. And that's in Newark, Illinois?

A. That is correct.

Q. Other than the EMT -- well, strike that.

What training did you undergo to attain the status of EMT?

A. Went through the DOT curriculum a couple times, and retained my certification powers for 22 years.

Q. When did that lapse?

A. I don't know. That would have been -- I gave it up -- my back was giving out -- so it had to be '17, 2017, '15, somewhere in there.

Q. Okay. Are you a member of any

20

Chicago, Illinois (312) 263-0052

professional associations?

A. No, not anymore.

MR. SANDS: I'm sorry, I didn't get that response.

THE WITNESS: No.

MR. SANDS: Thank you.

BY MR. CARINI:

Q. You said not anymore.

Were there associations that you used to be a member of?

A. Some national, you know, more for just camaraderie, nothing -- no -- no certification -- nothing like ASSE or so forth.

Q. Okay. And AASE that you were not a part of, that's the Association of Safety Engineers, right?

A. That is correct. No, I was not.

Q. You've never been certified as a safety professional?

A. No, I never took the test.

I should have 20 years ago, but I never did.

Q. Okay.

A. You know how that goes.

21

Q. I do.

All right. So it goes without saying then that you were never on the board of any association associated with your --

A. No.

Q. -- employment, correct?

A. Correct.

Q. You mention in your educational background you had -- you had the 10 and 30-hour OSHA courses, correct?

A. Actually, I'm an instructor for those.

Q. So then you had to -- you had to undergo and pass the train -- the trainer course to do that, right?

A. Yeah, three classes.

Q. Is that the 500 series, is that what it's referred to as?

A. Yes, it is, 510, 501, and 506, something -- one of the other ones, but yeah, I did all those.

Q. And do you presently maintain the instructor status?

A. I do.

Q. You got your associate's degree in farm

22

management and bachelor of science degree in agribusiness economics?

A. I did.

Q. Back in the eighties.

You took a Dale Carnegie course. What's that?

A. Oh, that was a fun class. It was a night class. It was more -- it's more on public speaking and listening skills.

Q. Okay.

A. You never took the class? He wrote the -- the book How to Win Friends and Influence People. You probably read it.

Q. Well, if I did, people might like me, but I didn't bother.

A. It's a great book.

Q. Okay. And then it says here you got a master's degree in industrial management with a specialty in occupational health and safety in 2007?

A. I did.

Q. And what does that entail; what does it mean to have a master's degree in industrial management with a specialty --

23

A. Well, the industrial management was just the certificate name.

It was mostly occupational health and safety through Northern.

It was a -- basically, it was a curriculum based on industrial hygiene, you know, workplace safety practices, ergonomics, reflects state and federal requirements, you know, ANSI 45 ISO 45000, and so forth.

Q. You're not an industrial hygienist, correct?

A. No, but I do do it.

Q. And have you ever been -- well, strike that.

Okay. When you say I do do industrial hygienist type work, what do you mean?

A. I'll do -- I ll do the -- well, I ll do clinical evaluations, noise sampling, dust sampling.

I used to do it when I worked -- when I had my -- under Midwest Safety Consultants on my CV.

Midwest Safety Consultants was actually my company, and I did industrial hygiene

24

services, and I did a lot of -- and mostly, I did a lot of consulting for workplaces, and on behalf of insurance carriers.

Q.   So if I caught your answer there -- first of all, Midwest Safety Consultants, that LLC is no longer in existence, right?

A.   It's dormant, yes.

Q.   And some of the things you explained that fell under sort of the umbrella of industrial hygienics, or hygienist-type work, one was -- I thought you said you do -- you did chemical assessments?

A.   I'll do -- I'll do my clinical assessments as it relates to PPE requirements, and also exposure control.

Q.   So just by way of example, you might be hired by a company to go into a facility, look the facility over, see what type of chemicals are at that facility, and then make recommendations on PPE, and controlling employee exposure to those chemicals?

A.   That is correct.

Q.   Would it be done in any other way other than what I just described; in other words, in any other setting other than going to a facility and evaluating that way?

A.   I don't understand.  Help me out. Expand on the question, please.

Q.   Sure.  So I had asked you as an example of doing a chemical assessment, you would go to a facility, look it over, see what chemicals were there, and then make recommendations on PPE, and protecting employees, and I think you said yes?

A.   That is correct.

Q.   Okay.  Did you do it in any other way other than that, do chemical assessments?

A.   If they sent me the documentation, I can look at it and give them, you know, here's where we're at, but you -- it really depends on air flow, and what type of ventilation system they have, and you can't -- it's hard to do that through e-mail.

Q.   Got it.  Okay.
And then I thought you said you did things like dust assessments?

A.   You can do dust, that's kind of in the same format, same area.

Q.   And your assessments would be done in sort of the same way?

A.   That is correct.

Q.   And then there was one you said in the middle there.  Did you say moisture or moist?

A.   No, I don't think I said moist.  Noise?

Q.   Oh, noise, you said noise with an N?

A   Noise.

Q.   Okay.  So you might go to a facility here, you know, and assess the type of exposure that workers would have to noise at that facility, and make recommendations about earplugs, headphones, et cetera?

A.   Yeah, and also other methods to -- that's really the last avenue that you want to use, it would be better if we were able to engineer out that noise.

Q.   Okay.

A.   Does that help?

Q.   It does, yeah.
Did you ever play a role in doing an assessment like that for a police department?

A.   Not for Midwest Safety, no.

Q.   In any capacity?

A.   I have done evaluations of police departments through my job at the Illinois Department of Labor where I've investigated numerous numbers of fatalities in workplace injuries.

Q.   And I'll come back to that, but in your role with Midwest Safety Consultants, did you ever design a police department building or holding --

A.   No.

Q.   -- facility?
Did you ever design any facilities, whether it was manufacturing facilities, chemical facilities?

A.   No.

Q.   Now, you said in your role with the Illinois Department of Labor, you would have visited police stations from time to time to investigate deaths?

A.   Deaths and injuries.

Q.   And give me an example of the type of death you would investigate at a police department.

A.   One was an exposure where the employee



-- it was a driving exposure, and the employee was killed in an automobile accident.

Another one was an injury resulting in -- due to improper maintenance of equipment.

Q.   So in terms of the employee killed in an automobile related accident, that had something to do with a police department or police station?

A.   It was.  It was a police officer.

Q.   And give me the -- tell me -- explain the circumstances to me, please.

A.   In that circumstance, the police officer was -- I don't want to say the word negligent -- but he basically killed himself, because he was driving erratically, and was killed when he hydroplaned, and hit a tree, and he wasn't wearing his seatbelt.

Q.   Okay.  So as part of the Illinois Department of Labor, you were asked to investigate that accident, and reach conclusions about what happened in the death?

A    It was.

Q.   Okay.  And then the second example you gave was an incident of an injury with improper

29

maintenance that resulted in --

A.   The police department failed to properly maintain their jail cells, and an inmate got out and injured an employee.

In another case an employer -- a police officer was injured, because he wasn't wearing a safety -- because of failure to enforce PPE.

Q.   Give me -- what was the circumstances of that last example?

A.   That one was he wasn't wearing -- the officer wasn't wearing a proper PPE when he was directing traffic.

Q.   And he was struck by a vehicle?

A.   She was.

Q.   And the PPE she should have been wearing would have been some sort of reflective vest or something that might have highlighted her presence in the roadway?

A.   In that case, yes.

Q.   Okay.  So in terms of -- well, in terms of your work as a public safety inspector with the Illinois Department of Labor, which you did from October of 2019 up until about a month ago, what were your job duties and responsibilities?

30

A.   That was -- basically, I was an OSHA inspector for the State of Illinois.

Q.   Did you only inspect public facilities or did you work for private industry?

A.   It was all government facilities.  Any taxpayer funded facilities.

So that could have been fire departments, that could have been police, public works, libraries, schools, any -- any agency or any taxpayer -- tax dollar funded facility.

Q.   Okay.  Did you have a geographical location where your work was focused?

A.   No.

Q.   You could do that all throughout the state?

A.   Yes.

Q.   And you did do that all throughout the state?

A.   Yes.  Customarily  it was northern Illinois.

Q.   Okay.

A.   But I could have gone anywhere in the state.

Q.   And at the time that you did that work,

31

it would have been out of your home in Newark?

A.   That, and I did have an -- I did have an office that I was at rarely, but downtown Chicago.

Q.   Okay.  Very good.

Now, in terms of public safety inspecting for the Illinois Department of Labor, in this role that we're talking about here, did you have like an obligation to visit facilities on a routine basis, and do routine inspections of them?

A.   Yes.

Q.   And in addition to that, you might be called out to respond to a complaint, or an accident, or an injury such as what you described to me a little bit ago, investigating a police officer getting hit by a car or something?

A.   That is correct.

Q.   And what dictated the need for routine inspections of public buildings?

A.   As they were assigned to me.  I was given a list, a computer list, and they said when time permits, this is what you do.

32



Q. Okay.

A. So if it was on that list, I went and saw them.

Q. Okay. It was my understanding -- perhaps I'm wrong -- but I didn't think OSHA applied to governmental agencies; isn't that true?

A. That -- that is -- federal government does not, however, state -- the State of Illinois has its own enforcement division for government entities.

There are about six states that have that; Illinois, New York, and a couple east coast and Puerto Rico have their own state enforcement.

Q. Okay. And so in your instance, you were following the Illinois OSHA state enforcement policies for Illinois public buildings and facilities?

A. That is correct, and for the most part, it was you use the 1910 -- was it -- 1910, 1926, and 1903 were adopted, so we're using the federal standards.

Q. 1926 is predominantly construction?

---

A. Construction.

Q. So 1910 would be the industry standards?

A. Or the police department that is correct.

Q. And then as a public safety inspector, did you have to report to like an area director or something above you?

A. Absolutely.

Q. Could you issue citations under this -- under Illinois OSHA to these facilities?

A. Yes.

Q. Would they have to be run through the area director and approved before it could actually be issued?

A. Yes

Q. And were there occasions in your career where you might have made a recommendation to an area director that you thought something was citable, and the area director said I'm not going to cite them on this?

A. Yes.

Q. There were differences of opinion about the --

---

A. There was a lot.

Q. I'm sorry, what did you say, there was --

A. That happened a few times, and we'd have a conversation about it, and we'd negotiate, and we'd take a look, and it's a census.

Q. Okay. In terms of the role as the public safety inspector, were you giving direction to facilities like police departments, training them, training their employees in safety, et cetera?

A. I could have done the -- I have in the past and I did, and they would -- more than not, the agency would call me, and say what's the answer to this, and I would say this is what you need to do.

Q. Okay. Have you ever taught a course on the use of pepper spray to anybody?

A. No, I have not.

Q. Have you ever taught any sort of less lethal course, like the courses that were being taught to the plaintiff in this case to anybody?

A. No, I have not.

---

Q. Have you, yourself, ever gone through exposure to OC pepper spray?

A. Can you repeat that?

Q. Have you, yourself, ever taken a course where you deliberately had yourself exposed to pepper spray?

A. No.

Q. You understood that several of the police officers who have testified in this case all stated that as part of their training to go through the police academy, they had to be exposed to pepper spray, right?

A. That is correct.

Q. And even Mr. Badagliacco, himself, had been exposed to pepper spray prior to the occasion that is the basis of this lawsuit, right?

A. That is correct, yes.

Q. And I just want to make sure, you've never gone through a similar course where you, as part of your job duties or responsibilities or training, required you to get exposed to pepper spray?

A. No.

Q. That's true what I said?

A. Yes.

Q. And you've never taught such a course where you exposed others to it?

A. That is correct.

Q. In terms of the sort of direction or advice provided to police department personnel -- and this is how I went down this path -- you were saying they might call you and ask for some insights, and then you would tell them something, but did you ever teach anything like the use of munitions to police personnel?

A. No.

Q. You didn't deal with them in terms of taking prisoners into custody, or how to handle prisoners taken into custody?

A. No.

Q. And I've limited it to police officers, but you haven't had that sort of exposure in training anybody in the municipal sector on pepper spray, munitions, things like that, correct?

A. That is correct.

Q. And is it -- did I understand you

37

correctly that you -- your sole employment between 2019 and up until about a month ago would have been in this role as a public safety inspector?

A. In addition to that, I was also, and still am, I am an instructor at Illinois Valley Community College where I've been an instructor since 2012, 2013.

I teach industrial safety with an emphasis on -- I teach industrial safety to the students in the trades.

Q. Okay. And give me an example of what falls under the purview of industrial safety.

A. Everything we've talked about.

It talks about ergonomics, and reviews proper PPE. It talks -- we discuss noise loss. We discuss exposure -- lung exposures, workplace exposures. We talk about recordkeeping.

It's a very fast moving course that basically touches base -- it's everything you would want a new employee to know, plus some.

Q. All right. So just at the end of the completion of your course, are the students that go through it provided with some sort of

38

certification or something like that?

A. Yeah, they do, they've got the course.

Part of the course -- well, the course, itself, it's an expanded -- they receive their OSHA 10-hour card, but it's an expanded 10-hour program -- curriculum.

I use -- I use a textbook, 250-page textbook, so yeah, it's just an expanded 10-hour curriculum where we spend a lot more time on the topics.

Q. And if someone were to enroll in this course, would it be a whole semester, is it a couple of weeks, describe it for me?

A. It's an eight-week course -- it's an eight-week class.

Q. And how frequently do you meet each week?

A. We teach one night a week right now.

Q. And how many hours is each class?

A. It's 100 minutes.

Q. Okay.

A. So the curriculum is an 800-minute course.

Q. And the goal at the conclusion of this

39

is that they'll be proficient in understanding work environment safety?

A. Correct.

Q. And in addition to that, they get certified with the OSHA 10-hour certification?

A. Correct.

Q. Okay. Going back up to this item in your CV that talks about the Illinois Department of Labor public safety inspections, you made a note here that it states, in addition to compliance and abatement process -- processes, worked with employers to help strengthen the overall safety program, hyphen, an average of eight citations per inspection, so --

A. That's actually kind of low.

Q. I'm trying to figure out, what do you mean by that description?

A. I have no idea. How is that -- I was that heavy hitter.

For the last year, I left enforcement, and I was in the consulting side, and I left -- and I basically -- it was a unique advancement. It was what I used to do, but a lot more money, but it -- employers would say call or e-mail and

40



say, hey, we need some help, and I'd go out, evaluate the private company, and say, okay, here's what we need, here's where we're going, this is what you need to put in place. I'll give them the boilerplates. I'll help them implement the procedures.

If they need training, I'd go back, and we do that training for the employer so that they would be, not only in compliance, but they would also -- with the ultimate goal of reducing the workplace injuries.

Q. So I'm generally familiar with federal OSHA and citations issued to private companies.

Are there fines associated with public safety inspector citations that are issued to state government, local government, et cetera?

A. There can be.

Q. There can be?

A. There can be.

Q. If I were to look up employers on the OSHA website, the Illinois OSHA website, do they have an itemization of the sort of public facilities that have been cited by the Illinois Department of Labor?

41

A. Yeah, you could find that on the federal website.

Q. Would the federal website keep track of Illinois public sector employers?

A It does.

Q. Okay.

A. We use the same database.

Q. All right. Now, on your resume there's a whole section on loss control consulting with Midwest Safety Consultants, and that was from 2012 to 2019.

Was that your sole employment other than teaching this course at Illinois Valley Community College between 2012 and 2019?

A. It was.

Q. And typically, if there was a typical client, who would hire you to do your services as a loss control consultant with Midwest Safety Consultants?

A. I worked for a number of insurance carriers as well as private companies.

Q. And I'm picturing as a consultant to an insurance company, they would want you to go out and look at a company that they insure, and try

42

to give some advice to that company to try to limit accidents at that company's facility?

A. That would be correct.

Q. All right. Were you ever hired to go on to a job site, say, where a company had employees, and observe that job site, and perform consulting services for the company, but not at the company's facility, but somewhere where the company was working?

A. I was.

Q. And did you also provide some of those companies with instruction to their employees so that they could gain the 10-hour or 30-hour OSHA certification?

A. Say that again.

Q. Would you also go to those companies that would hire you, and give OSHA training, and issue certificates that, after they completed your course, the employees would get a 10 or 30-hour, as the case may be?

A. In some cases, yes.

Q. Were you ever involved in redesigning or engineering facilities for these companies?

A. Facilities or pieces of equipment?

43

Q. Let's start with the facility.

A. No.

Q. And then with respect to equipment used at those facilities, would you be involved in designing, or redesigning equipment at these facilities?

A. I would make recommendations for corrections mostly dealing with ergonomics and machine guarding.

Q. Ergonomics is things like -- well, strike that.

Explain how you used that term, ergonomics.

A. Ergonomics is that -- is the unknown -- is the musculoskeletal; so it's twisting, bending, reducing of these twisting, bending. It's the work factors that cause musculoskeletal injuries, just like you twisting right now.

Q. So you're talking about facilities, see an operation in process, and say, you know, there's an easier or better way to do that so that person might not hurt their back or strain their shoulder, that sort of thing?

A. That is correct.

44



Q.   Okay.  And then guarding, that's pretty self-evident.  You might see some equipment in use, and see maybe someone's taking a guard off that shouldn't be off, and you could recommend that it go back on, or other ways to protect workers from engagement with that piece of equipment?

A.   That is correct.

Q.   Were you ever involved in consulting at a facility as it relates to eye wash stations at that facility?

A.   Yes, many times.

Q.   Can you give me an example of how -- strike that.

First, can you give me an example of your involvement as it relates to eye wash stations?

A.   That's a multi facet question, so it could be you have got them in close proximity, it was what happened in close proximity versus what happened -- is it the right type and style.

Q.   Okay.  So you might go do a tour of a facility -- well, first of all, let me ask you this.

45

Would your role include touring a facility and saying, hey, you guys, you don't have an eye station -- eye wash station here, and you need one under the code?

A.   I would think that would be one part, yes.

Q.   Did that ever happen while you were consulting with people?

A.   Yes.

Q.   All right.  And then in addition to identifying the need, would you tell them what they needed, what to buy, you know, where to install it, things like that?

A.   I would give them some recommendation.

I'm not going to tell anybody you have to purchase X, Y, Z.  I'm going to say it needs to be able to do A, B, C.  You go find one yourself.

Q.   Okay.

A.   So, in other words, an example would be  if they had bottles on the wall that said eye wash, well, that doesn't meet the state or the federal or ANSI standards.  It has to be continuous flow.

46

So we need to grade -- I don't care which one you get, but it has to have 15 minutes of continuous flush at a level.  So you need to -- and I'm not going to tell you go buy this brand, or this model, but does it meet the minimum -- does what you have meet the current standard; yes or no?

It would be no, and this is what style or design you would need.  Here's the benefits of this over this.  Whichever one you pick is up to you.

Q.   Okay.

A.   Does that make sense?

Q.   It does, but I want to elaborate on this a little bit.

So you reviewed a lot of the deposition testimony in this case in preparing your report, correct?

A.   That is correct.

Q.   And you understand that the Elgin Police Department does not have a built-in eye wash station at the facility, correct?

A.   Okay, if you say so.

Q.   I'm asking you, do you know?

47

A.   No.

Q.   Okay.  Does every police station in the State of Illinois have to have an eye wash station in it?

A.   Does it -- is there an exposure?

Q.   You tell me.  I'm asking you the questions.

A.   I have no idea what every police station has.

Do they have any -- do they have a chemical exposure that requires one?

If that is the case, then they need one.

Q.   So I want you to take me through that concept that you just said.

If they have a chemical exposure at the place, then they need to have an eye wash station, is that what you said?

A.   That is what I said.

A chemical -- yes, we can go with chemical.

It could be or a corrosive.  OSHA says it's a corrosive, but it depends on what your safety data sheets say.

48

Q. I want you to assume for the sake of this question that the police officers that work at police stations throughout the State of Illinois carry some sort of pepper spray on their person for subduing criminals, or whatever they need it for, dispersing crowds, okay, assume that's true, does that mean that every time those police officers come back to their police station, they need to have a built-in specific eye wash station for that facility?

A. Because they utilized it, or because they -- because they utilized it, or because they have it?

Q. My question was because they have it. They have it on their person, they wear it on their belt, and they have it available to them, do they need to have the station?

A. Once there was an exposure, and the -- and the officer was not able to get adequate eye wash, there is a very strong possibility that that employer would be cited for that hazard. Unfortunately, that's after the fact. In this case it was a known exposure in a controlled environment that they failed to have

the proper rinsing eye wash station, or they failed to have adequate flushing solutions.

Q. I'm going to go -- believe me, I'm going to go into your report and discuss the facts and your opinions here. I'm talking -- I want to talk about, and get a better understanding in general. Okay. So there is -- as far as you know, there's no rule that says police stations have to have eye wash stations; is that fair to say?

A. The rule is if you are a work -- the rule that applies at a police station is if there is a corrosive -- if you're working with corrosive materials, you are required to have an eye wash station, that's in the 1910 standard, however, believe it or not, it is not a corrosive.

Q. Pepper spray --

A. It --

Q. Hold on. Hold on. Pepper spray is not a corrosive?

A. It is, and it -- it is in higher percentages. It is considered a corrosive in

higher percentages than what was used at this, because your client, if we look at the higher concentrated versions, is considered a corrosive, and then it would be required to have an eye wash station.

Q. Okay. I'll come back to that, but I just want to make sure that I understand your answer. So let me go back to the exhibit I had up here, which, I think, I said was Exhibit No. 1, and attached to Exhibit No. 1 was your report, and in Paragraph 10 of your report you cite OSHA 29 CFR 1910.151(c)?

A. Okay. Then that's it.

Q. And so first -- the first premise is, it's your opinion that 1910.151(c) would apply to any workplace where the employees at that workplace are exposed to injurious corrosive materials?

A. That is correct.

Q. And you would agree with me that under 1910(a) -- I'm sorry, strike that. You would agree with me that under 29 CFR 1910.151(a), this applies to employers,

correct?

A. That is correct.

Q. The first line of 1910.151(a) says the employer shall ensure the readily -- the ready availability of medical personnel for advice and consultation on matters of plant health, correct?

A. That is correct.

Q. And 1910, in fact, OSHA specifically, are rules that govern employers; true?

A. That is correct, yes.

Q. The eyes or body of a person may be exposed to injurious corrosive materials, suitable facilities for quick drenching of flushing of the eyes and body shall be provided within the work area for immediate emergency use by the employer; true?

A. That is correct. That s a differentiation by employer or -- and employees.

Q. Got it, okay.

A. So they're moving that requirement away from the employee to the employer.

Q. Okay. And so when you were saying that if a police station has employees that are



exposed or working with corrosive material, then pursuant to 1910.151(c), the employer has to provide facilities for drenching or flushing of the eyes?

A.    Correct.

Q.    Now, OSHA, even in your report, refers to suitable facilities, correct?

A.    You'll have to explain what you mean by suitable facilities.

Q.    So in your report here, it says they have to supply suitable facilities for --

A.    Yeah.

Q.    -- quick drenching or flushing of the eyes?

A.    That's correct.

Q.    That doesn't necessarily mean that someone has to have a specific eye flush station, correct?

A.    No  but you are -- you are correct.

Q.    They would need to have something capable of providing, as you said, a steady stream --

A.    And that's where -- that's where the ANSI standard comes into play.

53

Q.    Okay.  So according to OSHA, in and of itself, OSHA just says, a suitable facility for flushing of the eyes, and it doesn't define --

A.    OSHA standards -- OSHA standards were developed back in the sixties -- actually, seventies -- so it hasn't been updated since, so yes, in this case, the ANSI standard would be more applicable.

Q.    All right.

A.    And it's considered the -- the ANSI standard is considered the best practice.

Q.    And the ANSI standard is not incorporated into OSHA, correct?

A.    That is correct.

Q.    As you said, this ANSI standard that you cite in your report -- is it still on the screen here or did I take it off?

A.    No.  Go ahead, I'm familiar with it.

Q.    The ANSI standard that you reference in your report, and you just referenced in your answer here, is contained in Paragraph 9 of your report on Page 3 --

A.    Right.

Q.    -- of the report --

54

A.    And I sent you --

Q.    Hold on.  Hold on.  On Page 6 of the exhibit is this Z358.1, right?

A.    Correct.

Q.    Okay.  Go ahead, you were going to say something?

A.    No, no.  I sent you the report.  You got it there, okay.

Q.    Yeah, okay.  And you said that this is evidence of best practice, but it is not part of OSHA itself, right?

A.    That is correct, and because this is considered best practices, we have to look -- and this is considered the industry best practices, so this is -- this is the -- this is the best practice for everybody, so -- and what really applies within that is -- if we go down here, it would be the -- where it talks about hoses, and where it applies under Section 5.

Q.    Okay.  So let me just ask -- let me just confirm this with you.

Because this isn't a part of OSHA, an employer can't be cited under 1910 for failure to comply with Z358.1; true?

55

A.    It could be used as -- it can be cited by reference.

Q.    But you can't cite someone for failing to comply with ANSI Z358.1 --

A.    That's correct.

Q.    -- because it was not adopted by OSHA, right?

A.    Correct.

Q.    Okay.  So ANSI provides some guidelines of good custom and practice in your opinion that eye wash stations need to be capable of delivering flushing fluid at least 1.5 liters per minute for 15 minutes, correct?

A.    Correct.

Q.    And they should be able to provide flushing of the eyes simultaneously, both eyes simultaneously, right?

A.    That would be correct.

Q.    And again, all of these recommendations are not --

A.    This is industry best practices.  This is a -- this is the standard that -- in criminal court, you would look at the OSHA standards.  In civil court, you look at the ANSI standards.

56



Q.   Well, I'm sorry, but what's the basis for your -- for that answer?

A.   Because this is the best practices.

Q.   Okay.  But there's no legal obligation to comply with it.

MR. SANDS:  Objection, calls for a legal conclusion.

BY MR. CARINI:

Q.   Right, is that correct?

A.   I'm not going to answer that, because I'm not a lawyer.

Q.   Okay.  So your expertise does not afford you the opportunity to comment on whether or not an employer is legally responsible to comply with Z358?

A.   I'm saying this is the best practice that all employers shall comply with.

Q.   When you say shall --

MR. SANDS:  Shall what?  Shall what, I'm sorry, I didn't hear the last --

HE WITNESS:  Shall work toward.

This is the standard -- this is the acceptable standard that is rec -- that is the generally accepted standard in the industry.

57

BY MR. CARINI:

Q.   Okay.  And again, you're not aware of any obligation imposed on employers to comply with ANSI Z358.1?

A.   For the federal government?

Q.   Or the State of Illinois.

A.   No.

Q.   That's true what I said?

A.   That is correct.

Q.   And we started the discussion on 1910.151 with your reference to 1910.151 applying when someone is working with corrosive materials; do you remember that?

A.   I do.

Q.   Does that same premise, working with corrosive materials, is that a premise to Z358.1 as well?

A.   No, Z358.1 can cover even dirt in your eyes, or a foreign substance.

Q.   So is it your opinion that if a police officer can get dirt in his eye, then the police station should have some sort of eye flush capacity for the police officers under Z358.1?

A    Yes.

58

Q.   And who decides whether a police officer can or can't get dirt in his eye at the police station; can you answer that, or no?

A.   I'm not going to answer it.

Q.   Why?

A.   Because it's not -- it's not --

THE COURT REPORTER:  I'm sorry.  Excuse me, I didn't hear that, because you cut out.

Can you repeat that?

THE WITNESS:  I understand.

It's not a -- it's not if, or it's not when, it's could.

Could an officer get a foreign object in their eye; yes or no?  Yes.

Q.   And if an officer can get a foreign object in their eye, then the police station needs to have an eye wash station capable of delivering flushing fluid to the eyes, at least 1.5 liters per minute, for 15 minutes?

A.   They need to have a method for washing their eye out.

The standard -- you're pushing two standards against themselves.

One is more broad than the other, and

59

in this application, the OSHA standard only deals with corrosives.

The emergency eye wash station falls in, because if you look under -- if you look, it says -- if you look at the eye wash -- most SDS sheets state that you need to flush your eyes, and then the eye wash station would -- should be available.

Q.   So the reason that I'm asking these questions is because I want to know why there isn't a rule in Illinois that police stations have eye wash stations consistent with Z358 at every single police station?

A.   Most -- most new police stations do.

Q.   Okay.  And if the new police stations --

A.   We don't know.  Elgin may have had one.

Q.   Okay.  So as we sit here today, we don't know that Elgin didn't have an eye wash station; true?

A.   That is correct.

Q.   You do know that they had showers and sinks and changing facilities there that were accessible to the attendees of the training

60



class, right?

A. We do not know if they were even offered those locker rooms or -- yes, they were there after the fact. We know that. Hindsight is 20/20, but we do not know whether or not your instructor informed them about those locker rooms.

Furthermore, your SDS sheets go on to say that they should have changed clothes.

Q. I want to talk about the locker rooms first.

If the attendees that were in this course were informed of the fact that there were sinks and showers and a locker room available to them prior to their exposure, would everyone have met their obligation with respect to informing the participants about eye wash and decontamination?

A. No, because eye wash, that's different than a shower.

An eye wash station or an emergency shower is different than a regular shower.

Q. Well --

A. And it wasn't within ten seconds of the

61

hazard. No, it was -- I don't believe it was. I don't know.

Q. Well, we're talking about --

A. Do you have a layout -- do you have a diagram of the police station?

Q. Do you have a --

A. I didn't see one.

Q. Okay. So you don't know whether it's within ten seconds or not?

A. No, I don't.

Q. And you don't know what the exact facilities were that were available to the participants in this class?

A. I know that there were, but I don't know -- from the transcripts, it showed you identified the locker rooms, but you did not identify that the employees knew about those locker rooms, or where they were located.

Q. So my question is a little different.

I asked you as you sit here today, you don't know what was offered or what was available to the participants in the locker room or the showers or the sinks, right?

A. That is correct.

62

Q. And as you sit here today, you don't know whether those sinks, locker room, shower facilities were within ten seconds of the classroom?

A. That is correct.

Q. And you don't know whether they were within ten seconds of the area where the exposure occurred?

A. That is correct.

Q. And I think you mentioned -- didn't we discuss the fact that OSHA doesn't specifically say you have to have a manufactured eye wash facility, you just have to have a suitable facility for quick flushing of the eyes, right?

A. That is correct.

Q. And you don't know whether what was available and built into this station in the form of those locker rooms, sinks, and showers was a suitable facility for quick flushing of the eyes?

A. At this point, no.

Now, you know what, it's 2:20   Do you mind if I take a five-minute break, and I'm going to use the restroom?

63

MR. CARINI: Not at all. Why don't we take ten. Start up again at 2:30.

(Whereupon, a short recess was taken.)

BY MR. CARINI:

Q. Before I get sidetracked here -- not before -- I already was sidetracked, so I just want to finish up a few things on your resume and then move back to your report.

A. Are we still on that?

Q. It looks like between 1992 and 2006 you were basically in the business of the sales of safety equipment?

A. That is correct. I was in sales of safety equipment just like this and so forth.

I sold a -- I sold a company to Cintas Corporation, and I worked for them for a couple years until I got my last paycheck, and then I knew that going into it, but no, I sold the company to Cintas Corporation, and then I had to devest from sales.

Q. My question was, did you sell pepper spray in these roles -- in any of these roles?

A. No. Eye wash stations I did, but not

64



pepper spray.

Q. And your -- strike that.

Okay. All right. Going back to Exhibit 1, this is the Rule 26 Disclosure, the 12-page Rule 26 Disclosure that has your report and the CV attached.

I'll put it on the screen in case you only have your report there, because I'm going to ask you about the actual answer to the document first.

So on Page 2 of 12 under sub small letter i, the heading is statement of all opinions they will express, and the basis and reasons for them, and that's in reference to you there; do you see that?

A. Yes.

Q. All right. And this says Mr. Schuerman is disclosed as a construction site safety expert -- or construction/site safety expert -- and is expected to testify as to the subject matter, facts, and opinions set forth in his report, which is attached hereto as Exhibit A and incorporated herein, and his discovery deposition, if taken.

65

And then attached as Exhibit A is a report that is -- it looks like six pages long -- and has your signature on the end, and is dated September 10th, 2024, correct?

A. Okay. Yes, that's correct.

Q. And are all of your opinions and the bases, therefore, contained within this report?

A. Say that again.

Q. Are all of your opinions and the basis for the opinions contained in this report?

A. Yes.

Q. Did you say yes?

A. I did.

Q. Okay. Thank you.

A. The only one that's not in there would be that the plaintiff failed to provide antidote wipes.

Q. Okay. So this says in sub --

MR. SANDS: I'm sorry, Joe, to interrupt.

Could I have that last answer read back, please?

(Whereupon, the record was read as requested.)

66

THE WITNESS: The defendant failed to provide antidote wipes, the common -- the common cleansing solution to neutralize the effects of pepper spray.

Other than that, I stand by what I wrote.

BY MR. CARINI:

Q. I'm going to get into -- well, let me ask you about this.

What are antidote wipes?

A. Well, their competitor manufactures a wipe that will neutralize the effects of pepper spray.

Q. Okay.

A. I don't believe Safariland offers that product, and this wasn't more of a -- this wasn't so much a training exercise as it was a product demonstration course.

Q. So we've talked fairly detailed about 1910.151, and the obligation of an employer with respect to providing suitable facilities for flushing of eyes when they're exposed to a corrosive material, right?

A Correct

67

Q. And there is no rule, requirement, regulation within OSHA that controls or dictates exposure to something less than corrosive materials, correct?

A. If there was an exposure, OSHA could and has issued a general duty clause, and then cited the ANSI standard under the general duty.

Q. Okay. But my question was, there's no specific OSHA standard that dictates providing suitable eye flushing facilities for something less than a corrosive material, right?

A. That is correct.

Q. Okay. And I think we've already covered the fact that according to OSHA, OSHA has not adopted ANSI Z358.1, correct?

A. To my knowledge, that is correct.

Q. Okay. So OSHA doesn't mandate the supply of antidote wipes to anybody for anything, correct?

A. That would be correct.

Q. And the best practices that you cited in ANSI Z358.1 also doesn't make any reference to decontamination wipes or antidote wipes, correct?

68

A.   That is correct.

Q.   Okay.  So where does your opinion come from that antidote wipes, or decontamination wipes, should have been provided here?

A.   That would be a good -- that would be a best practice.

Q.   Okay.  But what's the basis for saying that that is a best practice if it's not in OSHA, and it's not in ANSI, where does it come from?

A.   If you were working with chemicals in your home, and they were acidic, you'd want to have protection, maybe gloves, and if you had that -- and if you had it -- and if there was a -- if there was a tissue that neutralized it, that would be a best practice to have them. That's common sense.

Q.   So it's fair to say that the opinion that isn't in your report, but that you're adding here today, that decontamination wipes, or as you called them antidote wipes, should have been provided is just common sense?

A.   It's a best practice, yes.

Q.   Okay.  Yes, it's common sense?

69

A.   Yes, it's common sense.  Yes, it's common sense, and yes, it's a best -- that would be considered a best -- a best practice.

Q.   Right, and so you keep using that term best practice, and I'm wondering where does it come from?

It's not in OSHA, and it's not in ANSI, and it's common sense, but where does best practice come from?

A.   Best practice is a process -- is any process that reduces the exposure, reduces or minimizes an employee's exposure or a person's exposure.

That would be assessed when your -- when your client failed to do a hazard assessment of the training or a job -- an assessment of the hazards associated with your training.

Show me the -- you didn't -- I didn't see that in the documentation where you did a formal assessment of the hazards.

That's common sense when you develop a training program.

Q.   You didn't see any evidence that a

70

hazard assessment was not done either, did you?

A.   No, but it didn't show that it was, so we must assume that your client never did it.

Q.   Well, isn't that really the jury's job to decide based upon the facts presented to them to assume whether it did or didn't happen?

MR. SANDS:  Objection, it's argumentative.

You don't have to answer that question.

MR. CARINI:  Are you going to tell him he doesn't have to answer that question?

MR. SANDS:  I can tell him --

THE WITNESS:  I'm not going to answer the question.

MR. SANDS:  Why don't you ask him a more appropriate acceptable question, Joe, because I don't think that is one.

MR. CARINI:  Well, I disagree with you, Sco .

I mean, he's going so off script here on his disclosure and his report, that you stated in this Answer to Interrogatory was his full complete report, so I'm asking him questions where this stuff comes from, and he --

71

it sounds to me, Pat, like you're saying it's your opinion that the best practice would be to have antidote wipes there.

THE WITNESS:  That would be a good -- that would be great.  I would accept that.

BY MR. CARINI:

Q.   Okay.  All right.  And again, just a yes or no; you don't know one way or the other whether a hazard analysis was done?

A.   That is correct.

Q.   You understood that every participant in this class that agreed to participate in the OC exposure, voluntarily participated in that class, right?

MR. SANDS:  Objection, calls for --

THE WITNESS:  I disagree with that statement.

MR. CARINI:  Okay.

MR. SANDS:  I'm sorry, I didn't hear the answer.

I had an objection, calls for a legal conclusion.

What did you -- what was your response, Pat?

72



THE WITNESS: I disagree with that statement.

BY MR. CARINI:

Q. Would you agree that Safariland did not force anybody to participate in the OC exposure?

A. I would agree with that.

Q. So your issue is whether Mr. Badagliacco voluntarily participated in the OC exposure or he was forced to by his employer?

A. I disagree with -- I disagree with how you stated that.

Q. Okay.

A. Would you like me to expand?

Q. Yeah, go ahead, tell me what you disagree with.

A. My deal is with this, and it goes back to the core of this, especially, dealing with your waiver, is that, you know, if I was an employee of the Skokie Police Department, and the Skokie Police Department says, hey, you're going to training this next week, okay, I guess, I'm going to training next week, sign me up.

So he shows -- so the employee shows up at your training the next week   I don't know if it was voluntary or not, yeah, he drove himself, but he was basically told to show up, and you throw this waiver in front of him that basically excludes anything under the sun, and he basically has a choice; I sign this, or I go home, and get yelled at for not signing this waiver, so he signs it, and continues with the course.

Q. Did you see any testimony in this case that Mr. Badagliacco stated, I felt that I had to sign this, because I didn't want to go home and get in trouble from my employer?

A. No, but the question wasn't asked.

Q. Right. So you're deriving that from him signing the thing that it must have been under duress?

A. I didn't say that either.

Q. Yeah, no, you just said that he had to sign it, because he didn't want to go back to the office and get yelled at by his boss?

A. Because your waiver is so minuscule, because it said right on there, are you taking any medication, so what it says is -- it didn't say was I taking any heart medication, or was I taking any respiratory medication, it said any medication, so if I took two aspirin on the way to there, because I had a headache because I was in traffic, excluded from the class.

Q. So would you answer honestly or not honestly, Pat; how would you answer it, honest or --

A. Well, knowing that my boss would probably yell at me, I'd sign the dang thing and continue on unfortunately.

Q. Okay. Anyway, this wasn't discussed at all in Mr. Badagliacco's testimony, right?

A. Correct.

Q. Okay. In fact, I didn't really see anything in your disclosure that talked about that -- that talked about that with --

A. You brought up, so I --

MR. SANDS: That talked about what, Joe? I didn't here the end of the question, Joe.

MR. CARINI: I said you didn't mention the waiver in your report.

THE WITNESS: Actually, I did.

MR. SANDS: That's not correct, Joe. That's not correct.

THE WITNESS: I did   I did, I believe, it's the last -- in one of the last one or two items on there I did discuss the waiver.

MR. SANDS: It's Page 6, Paragraph 20.

MR. CARINI: Right, but this issue that's talking about here, about being compelled to say it, and that it was insufficient content, and that Mr. Badagliacco signed it, because he didn't want to get yelled at by his boss; none of that's in your report right, Pat?

MR. SANDS: Well, about it being incomplete, that would be --

MR. CARINI   Let him answer the question, Scott. Don't answer the question for him.

I asked him a question about whether or not any of this commentary he's throwing in here right now is in his report, and I want an answer.

Is it there or not?

MR. SANDS: I object to the question as being compound.

If you want to break it down, he can

answer it.

BY MR. CARINI:

Q.   Can you answer this question?

MR. SANDS:  Can you repeat the question, please, Kiki?

THE COURT REPORTER:  Sure.

(Whereupon, the record was read as requested.)

MR. SANDS:  And that's my objection, Joe.  That's a compound question.

BY MR. CARINI:

Q.   Can you answer the question?

MR. SANDS:  The compound question?

MR. CARINI:  Yes, can he answer it or not?

THE WITNESS:  Repeat the question.

(Whereupon, the record was read as requested )

THE WITNESS:  You know, Joe, just do this, rephrase the question.

BY MR. CARINI:

Q.   You do not mention in this report that Mr. Cox was compelled to sign this release; true?

77

MR. SANDS:  Joe, you misspoke.  Not Mr. Cox.

BY MR. CARINI:

Q.   You did not mention in this report that Mr. Badagliacco was compelled to sign the waiver, correct?

A.   Correct.

Q.   You did not mention in this report that Mr. Badagliacco signed the waiver, because he was afraid of getting yelled at by his boss, correct?

A.   Correct.

Q.   You did not mention in this report that you felt that there were deficiencies in the waiver sheet, itself, because it didn't talk about specific medications, correct?

A.   Correct.

Q.   All of that is stuff that you're offering at testimony right now today; true?

A    True.

Q.   Okay.  Now, let me go back to the beginning of this.

Was there any evidence in this case that Mr. Badagliacco asked any questions about

78

that document that he signed?

A.   No, that is correct, however --

Q.   There's no question pending.

If Scott wants to ask a follow up later, he can do that.

A.   Okay.

Q.   So my question started with the premise that Mr. Badagliacco was not forced to participate in the OAC class, correct?

That's what I started with.

A.   That is correct.

Q.   But you understood that Mr. Badagliacco went to this training knowing that he was going to take the OC spray portion of the course; true?

A.   That is correct.

Q.   And at the time that he participated in this course, he was an employee of the Skokie Police Department; true?

A.   That appears to be true.

Q.   Okay.  And as the employer of the plaintiff, Skokie Police Department had a duty to make sure that their employees were -- if they were going to be exposed to injurious

79

corrosive materials, they had to be at suitable facilities for quick flushing of the eyes within the work area for immediate emergency use; true?

MR. SANDS:  Objection.

HE WITNESS:  False.

MR. SANDS:  Calls for legal conclusion.

Go ahead  if you can, sir.

BY MR. CARINI:

Q.   Why is that false?

A.   Because the employer sent them to a class that actually is accredited through southern -- through the university, and because it was an accredited program, they should have had all of the safety mechanisms in place.

If you go take a class -- a college credited class, you should have -- you expect for that to be a safe environment.

Q.   So in your opinion then -- I just want to make sure I'm clear -- 1910.151(c) did not apply to the Skokie Police Department for this class on this date that he was exposed to OC?

A.   False.  I'm not -- in OSHA's ideas, yes, they would have cited with Skokie Police Department, because they were the employer, but

80

as the employer, to their defense, they sent them to an accredited training program that failed to have the appropriate safeguards in place.

Q. As the employer --

A. That's why we're in this mess.

Q. As the employer, Skokie Police Department could have provided antidote wipes to their employees knowing that they were sending them to an OC spray exposure class, correct?

A. That should through that hazard assessment that your client failed to do, should have been identified.

Q. Hold on a minute. That's not my question.

A. I know what your question was.

Q. My question was, whether the employer, knowing that they were sending their employee to OC exposure, could have provided them with the antidote wipes; true?

A. True, but was that a requirement of the class to bring those?

Q. You also said you don't know whether there was a hazard analysis done or not; true?

81

A. Show me the hazard analysis.

Q. You don't know, as you sit here, you haven't seen one, so you don't know, correct?

A. Correct.

Q. Because you haven't seen one, your assumption is it wasn't done?

A. The assumption is it wasn't done because of the poor factors that took place during this training.

We haven't even got to that section yet.

Q. Okay. So going back to Exhibit 1. I'm going to put up the answer again.

When you say the defendants retain control of the work, what are you talking about?

A. Safariland controlled the environment. It was their responsibility to maintain the safe work environment. It was their curriculum, their class, their instruction.

Q. So do you want to change this answer from controlling the work to what you just said?

A. It says the same thing.

Q. What work?

A. The facts at hand, the work was

82

participation in that curriculum.

Q. Okay. So they failed to retain control of participation in their curriculum on the training site?

A. That's correct.

The thing of it is, is Safariland issued this -- whatever you want to call it -- master trainer certificate, and they've never -- they never followed up to ensure that the quality was there.

Q. What's the basis for that; again, you haven't seen documents of it?

A. No. It's in the deposition -- in your depositions.

He didn't even understand the slides that he was presented.

Q. Okay. We'll get into that. I know that's in your report, and I'm going to ask you about that, but -- so your opinion is that Mr. Cox didn't understand the material?

A. Absolutely. He's --

Q. He's what?

A. Well, the thing of it is, is if he understood the -- you know, let me ask this

83

question.

I don't know the answer to this, but I never saw this DVD neither, what the material was on it.

Has every -- when this trainer goes back, do they sign this waiver for every class -- for every student that they trained at Skokie Police Department?

Q. So you don't know what's on the DVD?

A. I do not.

Q. And you don't know what Mr. Badagliacco has been training to the employees of the Skokie Police Department?

A. Because it's - it's apparent it's not what you submitted, because he was not even -- he was -- he didn't -- he couldn't even explain his PowerPoint slides.

Q. My question is this, you don't know what Mr. Badagliacco is training, how he's training the Skokie Police Department when he trains them in the less lethal course that he learned in April of 2019, correct?

A. Say that again.

Q. You understood that Mr. Badagliacco

84

went to this course to become a trainer so that he could train Skokie Police Department employees in less lethal tactics, right?

A. Correct.

Q. You have no idea what he is teaching to the Skokie Police Department that he's teaching less lethal training to, correct?

A. That is correct.

Q. You don't know what's on the DVD that he has, correct?

A. I'm assuming it's all the associated files that was presented -- given to me.

Q. By you've never seen a DVD?

A. That is correct. I'm assuming it's everything that you sent to me, which was missing pertinent information.

Q. Okay. Again, I just -- this doesn't have to be, you know, onerous here. It's a simple question. I don't know --

A. It isn't -- I'm not --

Q. You don't know, correct?

A. Correct.

Q. And you don't know what materials he has that he's training off of; true?

85

A. I want to know -- that's not what I said.

Q. You don't know what -- I'm asking you, do you know what Mr. Badagliacco has that he's training other employees at Skokie Police Department?

A. No. What my question was --

Q. I just want an answer to my question.

A. No.

Q. Thank you.

A. My question is, if we go back to what Mr. Badagliacco was training on, he didn't understand the slide presentation that's associated with this proceeding.

Q. And we'll get into that.

You make a very specific citation to testimony in this case that you think supports that opinion, okay, so I'll ask you about it, but right now --

A. It's in the deposition.

Q. -- right now I'm going through your answers here.

Okay. In sub I you state the defendants fail to properly inspect the work.

86

When you say inspect the work, what are you talking about?

A. Failed to properly inspect the work, and see to it that necessary safety measures were taken.

He didn't do that, because we had -- you have propositioned it to show that there was only one garden hose, and that there was a line to wait for that garden hose.

Q. Okay. So when you used the term inspect the work, what are you talking about when you use the term the work?

A. The work area. The training site.

Q. Okay. And when you say that he failed to properly inspect the training site, which you call the work here, you're saying he failed to properly inspect it because of the conclusion you've reached that there was only one hose there, and that there was a line of people waiting for that hose; is that what you're saying?

A. Correct, and he did not have -- and he didn't have a -- he did not have emergency water.

87

Q. Okay.

A. Did he even have a checklist to go -- to prove that anything -- that he even inspected it

Q. You have not seen one?

A. If I was training -- if I was training, I always have a checklist.

Q. You never trained this course.

A. I've done a lot of training in my days.

Q. You haven't trained on OC, correct?

A. That is correct, but I've always in -- whatever the training mechanism is, I've always had a documentation of training, and a checklist to make sure everything was in place.

Q. All right. Whether he had that or not, you don't know?

A. He said he didn't. He said he didn't use the checklist that was provided by Safariland.

Q. All right. Well, you're going to have to show me that, and what checklist you're referring to.

A. It was in his deposition.

Q. Did you make any notes of the

88

depositions that you read?

A. No, I did not.

Q. Because all --

A. I think I did -- I think I did, but I threw them away when I was done with them.

Q. All of the deposition transcripts that were sent to me as part of the file looked like just clean depositions.

You didn't write in them, did you?

A. No.

Q. And you don't have any separate notes of anything that you highlighted or took out of them?

A. I do not.

Q. Okay. When we get into the report that's Exhibit A to Exhibit 1, you indicate under sub 3 that the plaintiff was asked to attend this training session by his employer, Skokie Police Department, right?

A. I believe so, yes.

Q. Okay. So under Paragraph 5 here you say, Mr. Cox has been working for Safariland training since 2007, and is considered a master instructor. It was never disclosed when last --

89

when the last retraining took place for Mr. Cox. Did I read that correctly?

A. That is correct.

Q. As a result of the fact that you don't know when he was last trained, you assume he wasn't trained since 2007?

A. That is correct

Q. You don't know whether he had the training or not after 2007?

A. That is correct.

Q. You don't know how many classes Mr. Cox has taught on OC exposure; true?

A. He said -- he said he does, approximately, eight a month -- I mean, eight a year. So that's less than one a month, so that doesn't make someone proficient.

Q. Okay. So eight a year from 2007 to 2019 is inadequate in your opinion?

A. I would say so.

I would -- you know, if they put that much emphasis on that, there has to be a checks and balance system in place for an accredited course.

I always have all my courses evaluated.

90

Q. Okay. So when you teach the -- you teach the course at --

A. Illinois Valley Community College.

Q. Yeah, when you teach that, who evaluates your course?

A. The director does, the dean does.

Q. Does the dean sit in on the course?

A. You know, they've sat in, and there's a -- the students do a survey every semester. I get flying reviews.

Q. Did you see the surveys of this course by those who participated in the course?

A. Say that again.

Q. Did you see the surveys of the course participants that were distributed by Mr. Cox and signed off by attendees?

A. No.

Q. You have no idea what type of review he got for giving this course, correct?

A. My concern is --

Q. Is it correct?

A. -- that in the deposition --

Q. Is it correct -- then you can tell me your concern -- you don't know what his reviews

91

were?

A. Yes, correct.

Q. You don't know what his reviews were at any of the eight courses a year he's taught since 2007?

A. Correct.

Q. So you don't know whether he's been reviewed or not, correct?

A. You didn't show any, so I take it he hasn't -- he wasn't.

Q. And you don't know that, right?

A. I assume.

Q. I don't want you to assume. I want to ask you if you know or not.

You don't know?

A. No, I don t.

Q. Okay.

A. But on the other hand, it's very apparent through the depositions that they don't retain the information.

Even your -- even your client said they didn't retain it very well.

That tells me he wasn't that good of an instructor if they can't retain the most basic

92

concepts.

Q. Mr. Badagliacco couldn't retain basic concepts, is that what you're saying?

A. I didn't -- I didn't say that.

I said you had multiple instructors -- I mean, multiple students.

Q. Where do you get that from?

A. It was in -- I read it in some of the transcripts where they -- they couldn't recall a lot, so I would take it they forgot.

Q. Okay. So because I take a deposition in 2024 of very specific details of 2019, and they can't remember those details, that's as a result of poor training?

A. If they're -- if they're key components to the training, yes.

Q. Okay. All right. You stated in here under sub 5 that Mr. Cox did not know some of the terminology used, and was unaware of pertinent documentation, and you referred to a specific page and line number of his deposition testimony.

A. Okay.

Q. Correct?

93

A. Correct.

Q. Is this what you were alluding to when you answered before that you were critical of him?

A. That is correct.

Q. Okay. So let's go and see what he says at that page.

Do you have it available, or I can share it on the screen here?

A. I don't. I'm looking for it. I've got a bunch of them here.

Have you got it handy?

Q. I think so. Let's see.

A. I'm sure you do.

Q. 89, Lines 5 through 24. I'm showing you the transcript here. Here's Page 89.

MR. SANDS: I think it's Paragraph 5, it's Page 88, Joe.

MR. CARINI: Okay. Sorry.

MR. SANDS: At least per the report, Line 8.

MR. CARINI: Oh, yes. I'm sorry. Paragraph 5 is 88, Line 8 to 24.

So here's 88 down here. Do you see

94

that in the lower right-hand corner?

THE WITNESS: I do not.

BY MR. CARINI:

Q. Actually, it's Line 8.

A. Yeah. The part that bothers me is -- the part that bothers me is that this is an eight-hour class, and his own testimony said that they spent about -- they went to the first break, which if we use -- that was probably -- that was 9:00, they did introductions until 9:00, so they only had three hours to cover six hours worth of material.

Q. Okay. So it was your understanding --

A. And in here he doesn't know what his PowerPoint presentation is even. He couldn't even explain his PowerPoint presentation.

Q. Well, you can't understand his interpretation of this, is that what you're saying?

A. It flat out says he doesn't know what those terms mean.

They're in his PowerPoint presentation, or so we should say PowerPoint presentation he should have been using.

95

Q. What terms are you referring to? Read this for yourself.

A. Okay. Hang on.

Q. I'm going to zoom in. You said Line 8 to 24 there's terms in here he doesn't know, so tell me what those are.

A. That's what the document says.

Again, I didn't create that document, and I don't have it -- and I haven't read it.

Q. Okay.

A. Because I teach from a PowerPoint, and not necessarily miss something, this is something that they're given on a DVD. So he doesn't teach the PowerPoint that's presented.

Hold on.

Q. That's your interpretation of what that says there?

A. That's my interpretation, yes.

Q. All right. And then on 89 -- sorry -- in Exhibit 1, sub 6, you say the organization appears to have set standards that were not followed, 89, Lines 5 through 24, so we can refer to 89.

A. Was this 89? Which one is 89?

96



Q. Right here is 89, the top left, and I can scroll if you need me to.

A. I -- do you teach it in such a -- yeah, he doesn't even teach the modules that are set forth by the organization. He does his own thing.

Q. He doesn't teach the -- your interpretation of this is that he doesn't teach the four modules that were on the document that were shown to him by the attorney in this dep; is that what you're saying?

A. That's what it's saying there, but the thing of it is, is how are you supposed to know if a student is supposed to teach it properly if he's not taught properly?

Q. Okay.

A. You can't go ride your horse off and do what you want when you're teaching a national curriculum.

Q. All right. So your opinion here is that Mr. Cox was -- you don't know whether he was retrained or not since 2007, so you assume that he wasn't, correct?

A. Correct.

97

Q. And you state that Mr. Cox didn't know some of the terminology used, and was unaware of pertinent documents on the slide presentation; true?

A. Correct.

Q. So when you say here it would appear that this was not the slide set that Mr. Cox used in training on the day in question, you don't know what slide set Mr. Cox used at the training on the day in question; true?

A. That is correct.

Q. Now, you say here in Paragraph 6 it's well documented that the instructor did not provide multiple garden hoses for the decon area, correct?

A. That is correct. That's based off the depositions.

Q. Okay. Mr. Cox stated he had multiple hoses; true?

A. I know he said that, but there wasn't, because it's well documented that there was not.

Q. Okay.

A. He can't remember -- he couldn't remember anything from that day. His memory was

98

very shot.

Q. Mr. Cox --

A. All he remembers -- he remembers they go this is what's supposed to happen. He couldn't remember anything from that day.

Q. Mr. Cox testified that he has never run this course without multiple hoses, correct?

A. So he said. I don't believe him.

Q. Okay. So your -- did you --

A It's the --

Q. Hold on a minute. Did you see the testimony of Sergeant Lalley, Jim Lalley?

A. Yeah.

Q. And Sergeant Jim Lalley was with the Elgin Police Department, correct?

A. Correct.

Q. And he said he has never had that course taught at Elgin without multiple hoses, correct?

MR. SANDS: I believe there was an objection.

There may have been an objection to that question based on foundation, but go ahead,

99

if you can, sir.

THE WITNESS: No, I'm not going to answer that one, because that's impartial, because he has -- if he didn't, that puts -- if he answered that correctly. Possibly, if he didn't answer it correctly, that gives -- that pushes liability on to the Elgin Police Department.

BY MR. CARINI:

Q. So --

A. Might he --

Q. Hold on a minute --

A. Might --

Q. Can you just answer my questions and then you can --

A. I'm more than happy to.

Q. And then you can get out whatever you want to get, okay? I just want to ask this. You are not believing Mr. Cox's testimony that he had multiple hoses, correct?

A. Correct.

Q. And you do not accept Sergeant Lalley's testimony that there were multiple hoses, because you believe that he might have had

100



self-serving motives for saying that, correct?

A. Correct.

Q. You are believing Mr. Orchard and Mr. Badagliacco that there were not multiple hoses, correct?

A. Correct.

Q. So you are deciding the credibility of the witnesses of Cox, Lalley, Orchard, and Badagliacco, correct?

A. Based on what I read, correct.

Q. And you don't feel that the jury should be entitled to make that determination on who they want to believe in this case?

MR. SANDS: Objection, it's argumentative.

BY MR. CARINI:

Q. Is that your position?

A. I'll let the jury decide, but they're going to hear that, and then they're going to hear me.

Which one is more believable?

Q. Do you have any specific training, experience, education, work history that puts you in a better position to judge the

101

credibility of the witnesses in this case than a juror?

A. I do.

MR. SANDS: Objection, it's argumentative.

BY MR. CARINI:

Q. And what is that specific training that puts you in a better position to judge the credibility of witnesses than a -- than a juror?

A. Not a jury, but I have had training at the National OSHA Training Center on how to conduct an interview, and how to investigate serious fatalities.

Q. Okay. So I think you started your answer by saying not a jury, but you've had experience in investigating accidents; true?

A. That is correct, and how to disseminate the truth out of witness statements.

Q. Okay. Now, and so -- so are you saying that you believe you're a better judge of the truth of witness statements than the average person, because you've been taught how to investigate accidents?

A. I would hope so.

102

Q. Okay. Sub B here under 6 says that Mr. Cox would watch to see if there were too many students running through the course, and that if the decon area was getting full, he would stop the course, and this did not occur, right?

A Correct.

Q. So again, Mr. Cox said that he didn't allow it to get backed up; true?

A Correct.

Q. Do you remember reading the testimony of Officer Ranken, that he had no recollection of having any issues getting to the decontamination station?

MR. SANDS: Same objections. I believe there were foundation objections that were raised during the course of that testimony.

BY MR. CARINI:

Q. Do you have a recollection of reading that?

A. I do, but I remember another witness saying that they had to wait.

Q. Who was that, Mr. Orchard?

A. Again, I read it, and then I couldn't find it again. My apologies.

103

Q. When you make the conclusion this did not occur, once again, you're weighing the testimony of Cox and others against the testimony of Badagliacco and Orchard, and coming to the conclusion that the decon area was full, correct?

A. Correct.

Q. You're weighing the testimony, and taking the side that indicates you believe the decon station was full?

A. Correct. You err on the side of caution?

Q. With respect to Paragraph 7, I didn't understand this. It says from the documentation provided, 26 students took the one-day course, it was difficult to determine as multiple class attendances were on the form.

So what do you mean by that?

A. The attendance sheet had multiple -- some attended the first class, and the attendance sheet that I received was for the whole week. Some only attended the second day, some attended the third day, some attended all four days, so I went through that and

104

disseminated, and the best -- the best way I came up -- from this list, the best way I came was there was 26 students in the class.

It takes three minutes to get through the obstacle course, and then you have so many minutes, and you did the math -- and you did the math, and you came up with the answer. That's how I did it.

Q. Okay. So what I put up here --

A. Mr. Cox did not have an attendance sheet for every day.

Q. So what I put up here is Exhibit 21 from Mr. Cox's deposition. This was part of the exhibits that you had as part of your file in response to our request to produce your file.

This is the sheet from which you derived there was likely 26 students in the pepper spray portion?

A. That's where it was, yes.

Q. Okay.

MR. SANDS: What's the exhibit on that from Cox?

MR. CARINI: 21.

MR. SANDS: Thank you.

105

BY MR. CARINI:

Q. Okay.

A. He got done with it  He got -- in my preparation for today, he did all that in 45 minutes.

Q. So according to 8, you say the agenda calls for 210 minutes for the range portion of the class.

So when you say the range portion, are you talking about the decon -- the OC portion?

A. That is correct.

Q. Not the range portion where they're doing munitions or the range portion where they're doing gas exposures or anything like that?

A. That is correct

Q. Okay. So when you refer to the range here in 8, the range is the outdoor section of Elgin Police Department where the OC training and fight through and exposure and decontamination occurred?

A. Correct, and it should have took 286 minutes, best guess, however, he ran it through so fast, that he had about 45 minutes,

106

he did it in about 1.7 minutes per student.

Q. Okay. So when you say -- when you say --

MR. SANDS: Did you finish your answer, sir?

THE WITNESS: Yeah, I did  Thank you.

BY MR. CARINI:

Q. So first of all, say that again. You said that --

A. There's two parts to this. There's the part that's in my report, and then there's another part.

The part in my report says it takes three minutes to go through the range, and then you spend another eight minutes in decontamination, it should have took a total of 286 minutes to properly do this curriculum based on 26 students. Now --

Q. Based upon -- let me just ask you before you move on to what's not in the report if -- is that based upon the premise that there's only one hose?

A. No, it has no -- that's -- that's based on the premise of time only.

107

If it takes three minutes to go through the course, I just pulled three minutes as a -- I don't know if it took five minutes or one minute. It just -- I said, okay, what's going to be the clocked time to run through this course -- the potential course, and I pulled -- and I gave it three minutes.

Q. So that number, three minutes, is not contained in the file materials?

A. It is not.

Q. It's your estimate of how long it would take to get from exposure through the fight through drill and over -- and through the decontamination station?

A. Through the decontamination station.

Q. Okay.

A. And then I -- and then I allowed another 8 minutes for the contamination station, so 11 minutes total, and you take that, and you multiply it times 26, that's where you come up with the 200 -- what -- 286 minutes, I believe.

Q. I see.

A. Does that make sense?

Q. I'm --

108



A.    You may not like the math, but that's how I arrived at it.

Q.    Okay.  So on the -- based upon the assumption that 26 students went through the course, and based upon the assumption that each student would have gotten -- well, strike that.

Is it your opinion that each student should have gotten 11 minutes to complete that course?

A.    No.

Q.    All right.  Just using that as an example --

A.    I --

MR. SANDS:  Hold on.

Could we get an answer to the question, please?

MR. CARINI:  He said no.

THE WITNESS:  I said no, because I already answered that question, and I said I assumed that it was three minutes to complete the course, and 8 minutes in the decontamination station.

It could be longer or it could be shorter, but if we used that scenario, it should

109

have taken over 280 minutes.

In other words, the instructor was rushed.

Now, what bothers me is that in the testimony I was reading yesterday, that they were done by 2:00 for this whole training.  They were leaving around 2:00.

If the range portion started at 1:00 after lunch  and they spent 15 minutes doing the discussion and doing the walk through of the range, like Mr. Cox said he did, that allows 15 minutes to -- that allows 45 minutes to conduct a training of all 26 students and decontamination.  That allows every student had 1.7 minutes to complete the training and decon - and the decontamination station.

BY MR. CARINI:

Q.    First, the premise of my question is this, do you have an opinion on what the appropriate amount of time would be for a student to go through this less lethal training in Elgin that day?

A.    One to three minutes.

Q.    And what is that based upon?

110

A.    Based off the number -- based off of a course of, approximately, probably 20 yards long and 15 yards wide.

Q.    And where do you get the dimensions of the course?

A.    I just -- it's a yard.  I mean, it's a -- it's a grass area, and you have four -- you have the stations outright, you know, just randomly selected, but it's not so much the time that it takes to go through the course is the issue.  It's the time that they -- that you allowed them in the decontamination area.

If every -- if there was -- let's take -- you say there was multiple hoses.  Let's take two hoses, and we take two hoses, and we know for a fact the whole course -- the whole thing was done in 60 minutes, so we'll even go as much as we'll take 40 -- we'll take 50 minutes; 10 minutes to explain the range, and 50 minutes to do it, so we take 50 minutes divided by 26 students  that's 1.9 minutes per student to do the decontamination and do the range.

They couldn't possibly disinfect themselves in less than a minute, you know, and

111

your own documentation says it should be at least, you know, 15 to 20 minutes in decontamination area.

Q.    Did you read any --

A.    So the numbers -- the numbers don't line up.

Q.    Okay.  So let me ask you this.

You recall the testimony of Deputy Ranken.  He said he didn't use the hose at all, he preferred to just use wet paper towels, and do his face that way, right?

A.    Right.

Q.    Correct?

A    Correct.

Q.    We don't know how long it took him to decontaminate; true?

A.    I don't know.

Q.    We don't know how long it took any of the participants to decontaminate to their satisfaction, correct?

A.    That is correct.

Q.    We know Mr. Badagliacco claimed that he felt rushed; true?

A.    Correct.

112


McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

Q. And he claimed that he didn't feel like he had enough time to decontaminate?

A. How many students did you not -- how many -- there were 26 students. You did not interview all 26 students.

Q. I'm asking about Mr. Badagliacco. He said he didn't feel like he had enough time, right?

A. Correct.

Q. As you sit here today, the only testimony you've heard about there being inadequate time for participants to decontaminate came from Mr. Badagliacco and Mr. Orchard?

A. But I also looked at the set up, and I looked at the time that was spent, and it doesn't -- the time doesn't add up.

Q. Okay. The time that you selected of 11 minutes per person doesn't add up?

A. Or even if I take your -- you're telling me -- what you're telling me is any number of individuals can go through this course, complete the course, and decontaminate in less than two minutes.

113

Q. And I'm saying to you that you don't have any evidence of anybody else saying that they didn't feel that they had adequate time to decontaminate that took this course, correct?

A. That is correct.

Q. So coming back to this timing issue, if we use whatever time you want to use for your opinion here, whether it's a three, an eight, or whether it's some other number, it's your opinion based upon the math that you've conducted, that the instructor was rushed?

A. Absolutely.

Q. Did Mr. Cox testify that he was rushed?

A. No, he did not.

Q. So again, your opinion is, because of the way you do the math, you don't believe the instructor?

A. The math -- math is never wrong.

Q. Right, but you pulled these numbers out of thin air, Pat, with all due respect, so math could be made to say whatever it wants to say; would you agree with me?

MR. SANDS: Object to the form of the question. It's vague, and also argumentative.

114

Go ahead, if you can, sir.

THE WITNESS: No, I'm not going to answer it.

Math doesn't lie.

BY MR. CARINI:

Q. No. You can times 3 times 26, you can times 3 times 100, it's always going to come to the same answer, right; right, 3 times 100 is always going to be 300, isn't it, Pat?

A. You're correct, and in this case --

Q. Math doesn't lie?

A. In this case, you know, if you told me that it takes 45 seconds to go through this course on average, you would use the 45 seconds.

If you told me you took 3 minutes to go through this course on average, I would plug those numbers in, and I guarantee you my numbers would be proven.

It's going to show that there's no feasible way 26 students can get through this class and properly decontaminate.

Q. Okay. So you don't know how long it took to go through the course, all you know is that not -- that all 26 of the people that went

115

through this course, didn't properly decontaminate?

A. Let's look at it this way.

Q. Hold on. Is that right; it's your opinion that none of the 26 people that went through this course, had time to properly decontaminate?

MR. SANDS: Objection --

THE WITNESS: It did not have appropriate time --

MR. SANDS: Go ahead, Pat.

THE COURT REPORTER: Excuse me, you're talking on top of each other.

MR. SANDS: Hold on, Pat. Start over, please, because I raised an objection. Start your answer over, please.

THE WITNESS: Even if it took zero time to go through the course, I'm showing if we use zero time, and we know for a fact that this course took about 50 minutes, they had about 50 minutes, divided by 26, that gives them 2 minutes -- not even 2 minutes to decontaminate.

BY MR. CARINI:

Q. And my question was --

116



A.  The numbers --

Q.  Your opinion then, based upon that, is that none of the 26 people that went through this course had appropriate time to properly decontaminate, that's your opinion?

A.  Absolutely.

Q.  Okay.  And can you account for how only 1 of those 26 people has contended that they were injured as a result of not having enough time to properly decontaminate?

A.  You didn't -- we don't know about -- you only -- how many witnesses -- how many did you interview?

Q.  My question is, you don't know about anybody else being injured other than him, correct?

A.  No, correct.

Q.  Okay.  And you've never seen the reviews of the participants that commented on the course that was put on by Mr. Cox, correct?

MR. SANDS:  Objection, asked and answered.

HE WITNESS:  Correct.

117

BY MR. CARINI:

Q.  And do you recall that -- do you recall anything contained in the deposition testimony of Derek Ranken or Officer Andrew Stein concerning they're going through the process, and their decontamination after going through this exposure?

A.  No.

Q.  So whatever they said is not impacting your testimony here; true?

A.  That is correct.

Q.  Okay.  All right.  Let me go to section -- I'm going to go to -- strike that.

Paragraph 9 and 10 we talked about already, right, Z358.1 and 1910.151; true, we already covered those opinions, Pat?

A.  I did.  Unless you want to go -- rehash all, but I think we're good.

We haven't talked about -- go ahead.

Q.  Haven't talked about what?

A.  No, go ahead.

Q.  Do you have more opinions on Section Z358.1 other than what's contained in this Paragraph 9 and what we've discussed?

118

A.  I think we discussed it pretty well.

Q.  Let me ask -- I want to ask you about this section here, about eye wash being accessible for no more than 10 seconds to reach, right?

MR. SANDS:  You mean, Paragraph 9, Joe?

MR. CARINI:  Yeah, Paragraph 9.

BY MR. CARINI:

Q.  I want you to assume that Mr. Badagliacco was apprehending a criminal, and to do so, he uses less lethal techniques, including spraying that criminal with pepper spray in the field.  Is his employer in violation of 1910 -- strike that.

Is his employer in violation of Z358.1 if Mr. Badagliacco gets exposed during that subduing the criminal, and can't decontaminate within ten seconds?

A.  That's hard to say.

MR. SANDS:  It's an improper hypothetical.

MR. CARINI:  I can ask a hypothetical.

MR. SANDS:  I said it's an improper hypothetical.

119

BY MR. CARINI:

Q.  I want you to assume for the sake of my argument that if Mr. Badagliacco, in apprehending a criminal, sprays that criminal with pepper spray, and gets contaminated himself, is his employer in violation of any rule or regulation if he's not able to get to a station and decontaminate within ten seconds?

MR. SANDS:  I object.  It's an improper hypothetical, and it's also irrelevant.

Go ahead, if you can, sir.

THE WITNESS:  Most -- you know, whenever I did inspections of police cars, they all had first aid kits in the trunk, so we got an eye wash.  We have portable eye wash.

BY MR. CARINI:

Q.  What's a portable eye wash?

A.  A bottle of eye wash solution  until you can get to a hose or another water source.

Q.  Okay.  Do you know whether Skokie Police Department has portable eye washes in their cars?

A.  That's immaterial to this conversation.

Q.  Okay.  If they don't, wouldn't that be

120

a violation of this provision?

MR. SANDS: Same objections.

THE WITNESS: I'm not going to go down that road, because that's not -- that has no bearing on this case.

BY MR. CARINI:

Q. Well, I mean, I think the judge can decide whether it has bearing on the case or not.

My question is, if the employer doesn't provide a portable eye wash station in all of their vehicles, are they in violation of any rule or regulation?

MR. SANDS: Same objections, improper hypothetical, also irrelevant.

BY MR. CARINI:

Q. Are they in violation of any rule or regulation?

A. I'm not even going to answer the question, because it's immaterial. It has no bearing on what we're discussing.

Q. Do you know if they would be in violation?

MR. SANDS: Same objection.

121

THE WITNESS: It would go back -- yeah, it goes back to the -- what was -- what was accessible.

If they had an eye -- if they had portable eye wash, that would be -- that would meet the minimum standards, but that doesn't apply in this case.

BY MR. CARINI:

Q. I get that, but if they don't have it, then it wouldn't --

A. You're going down paths that we don't need to go down.

Q. Well, you might not want to go down them, but I'm going to explore this.

My daughter can buy this spray online, and spray a potential predator in the face with it. Does she have to have an eye wash station nearby for that guy?

A. Is she an employer?

Q. No.

A. Then I guess, that these standards don't apply to her.

Q. Okay. And Mr. Cox wasn't an employer of Mr. Badagliacco either, was he?

122

MR. SANDS: Objection.

BY MR. CARINI:

Q. Was he?

MR. SANDS: Calls for a legal conclusion.

MR. CARINI: It does not. Was he --

THE WITNESS: Now, wait a second. You're saying --

BY MR. CARINI:

Q. Hold on.

Was he the employer of Mr. Badagliacco or not?

MR. SANDS: He's the agent of Skokie PD, so it does apply. It is relevant.

MR. CARINI: Scott that's bullshit, and you want to start talking about agency here now?

I'm asking him a straight-up question. Did Mr. Cox employ Mr. Badagliacco? That's a pretty simple premise given this report that he's given.

Yes or no?

THE WITNESS: He was not an employer. The Skokie Police Department entrusted him with

123

his -- with his safety through Mr. Cox.

BY MR. CARINI:

Q. Okay. What did you say about Mr. Cox?

A. I said --

MR. SANDS: Through Mr. Cox.

THE WITNESS: The Skokie Police Department entrusted his safety through Mr. Cox.

BY MR. CARINI:

Q. Okay. Do you have any knowledge -- strike that.

You know that Mr. Badagliacco had been exposed to pepper spray before this day, right?

A. That is correct.

Q. All right. Was there anything that he didn't know about exposure to pepper spray that you feel that he should have been informed by Mr. Cox?

MR. SANDS: Objection, calls for speculation, lacks foundation.

Go ahead, if you possibly can, sir.

THE WITNESS: I would -- repeat -- repeat the question.

BY MR. CARINI:

Q. Was there anything Mr. Badagliacco did

124



not know about being exposed to pepper spray that you believe Mr. Cox should have told Mr. Badagliacco about?

MR. SANDS: Objection.

THE WITNESS: Oh, absolutely.

MR. SANDS: Calls for speculation, lacks foundation as to what somebody else knew.

Go ahead, if you can, sir.

BY MR. CARINI:

Q. What's your answer then?

A. Absolutely.

Q. What didn't Mr. Badagliacco not know that Mr. Cox should have told him?

A. Oh, wait a second. Not know or -- let's go back to what Mr. Cox should have informed him of. Let's answer that question.

Q. Well, I want you to answer my question. I want to know what Mr. Badagliacco did not know about being --

A. It's not about what he did know or didn't know.

Q. Okay. Very good. Very good.

A. What he should have been told is the hazards associated with the --

125

Q. With what?

A. Well, he should have been informed of all the hazards associated with this product.

MR. SANDS: What was the last word?

THE WITNESS: All the hazards associated with this product.

MR. SANDS: Thank you.

BY MR. CARINI:

Q. And I think in section -- are you talking about Section 15 of your report that the SDS shows --

A. Yeah, that's one -- that's one of the components, absolutely.

Q. What's your understanding of the percentage of OC that was in the spray that was used for this class, was it a 2 percent --

A. Yeah, this was the low one, correct.

Q. And the 2 percent solution would not be considered a corrosive, right?

A. That is correct.

he other -- the next one above is considered a corrosive.

Q. Okay. And we're not talking about that, because we're talking about 2 percent?

126

A. Wait a second. Hang on.

The only reason it's not considered a corrosive is because of volume. It still has corrosive components in it.

Q. Okay. So --

MR. SANDS: I'm sorry, Joe, corrosive components or elements?

THE WITNESS: Either/or, elements, because it's --

MR. SANDS: Elements, thank you.

THE WITNESS: Because it didn't come to that -- it didn't have -- if you look at the SDS sheets, it's still a Category 3 on a 4 point scale, so it's not even low, the low lowest, it's the second one.

BY MR. CARINI:

Q. So the 2 percent solution based upon your interpretation of the SDS is the second level of what?

A. Of the hazard of the GHS, you know, there's one through four; one being the most severe, four being very -- dish soap, and this -- and we are -- depending on which category we're looking at, it's a two or a three.

127

Q. Okay. So I'm going to put up this document that was in your file, also identify it as Cox Exhibit 18.

Let me see. Is this the OC sheet -- I am the SDS sheet --

A. Is this -- is this the original one, because there was a -- you provided -- originally, you provided me with the incorrect one, so what's the --

Q. I'm going to put this up here, and show you, and then you tell me.

A. 544 -- is this the most recent one you sent me?

Yeah, I think it is.

Q. And just so you can see on here, Scott, we're talking Exhibit 18 from Cox's dep.

A. But I don't believe that was the correct one.

Q. Okay. All right. I'm trying to find stuff in your --

A. I'll be right back.

(Whereupon, a discussion was had off the record.)

HE WITNESS: It was forwarded to me

128



later on.

BY MR. CARINI:

Q. I put this one up here. It's not marked as an exhibit, and it is dated a little later than --

A. Okay.

Q. -- the other one.

A. You're correct.

Q. You tell me, because I'm going through this file, and there's a lot of materials here, so I'm just trying to make -- find it, but does this look like the way --

A. Okay. So if we go back up, and if we -- can you pull up the shipping invoice for the product that was shipped to the -- to Elgin, please?

Q. Bear with me. I think that would be considered one of the deposition exhibits. Bear with me here. I think it's Cox 13.

MR. SANDS: I'm not sure -- okay. Go ahead. Go ahead.

THE WITNESS: Just scroll down for me.

BY MR. CARINI:

Q. Tell me when to stop.

129

A. Stop. Can you go up one a little bit, please?

Q. Hold on. Let me get a couple others.

A. We're on the right spot. I'm just -- there it is right there. Aerosol 56185, do you see where I'm pulling the part number?

Q. Yes, right here?

A. Yeah. Now, go back to that SDS sheet.

Q. Okay.

MR. SANDS: 56185.

THE WITNESS: So we got the right one -- no, we've got the wrong one.

BY MR. CARINI:

Q. This isn't it, and this isn't. Hold on a minute.

MR. SANDS: This was provided, Joe, somewhat recently. Well after Cox's deposition.

MR. CARINI: Yeah, yeah, I'm just trying to find it in the file here.

THE WITNESS: Do you see where -- that's where all the confusion was, I was looking at all this, and all of a sudden it --

BY MR. CARINI:

Q. It's in here. I know -- I know it's in

130

here.

A. But it's pretty close, so just -- if we pull up my report, we can continue.

Q. It wouldn't be an exhibit, because it's something newer.

Let me just open these two.

MR. SANDS: Joe, can we take a fast break?

MR. CARINI: Yeah, sure.

(Whereupon, a short recess was taken.)

BY MR. CARINI:

Q. I've asked my assistant to mark this as Exhibit 4.

So what I've done is I've marked the 26 disclosure as 1.

I think I marked the answer to the request to produce as 2.

I'm going to mark just the entire download of the file you sent me, Scott, as 3, just like as not every individual thing within it, but because this wasn't in -- I couldn't find this in here, I'm going to mark this as Exhibit 4.

131

So what I'm putting up here now is a copy of a safety data sheet for Item 56185, which is a 2 percent MK stream OC aerosol, and I think you mentioned based upon our review of Cox 13, that the M6185 is the product, right?

A. To the best of my reading that, that's the best - that's the best I can come up with, and that's what I assumed.

Q. Okay. And then when you -- when you made offered opinions in this case --

A. It's based off of this document.

Q. Got it, okay.

Is it up on the screen for you now?

A. Yes.

Q. Okay. So when you were talking about this level of one through four on the hazard level, is that in this document somewhere?

A. It is. If you look at number two, hazard identifiers, right where you're at, if we go down to about the fourth line, see eye irritant, or skin irritant is a number two.

Q. I see.

A. May cause respiratory irritation is a number three.

132

Q. Okay. And those compare to the levels that you described in your report with one being the worst and four being the least?

A. That is correct.

Q. Okay. And I take it by the way these are lined up, that 2A is somewhere between a 2 and a 3, is that correct?

A. That is correct.

Q. On this next page, 2 of 11 --

A. So if we go back up -- can we go back where we were?

Q. Yes.

A. Perfect. Let's just go down just a little bit. Put the little triangles at the top. Okay. Perfect.

The signal is warning. If it was very severe, it would be a danger, but if we look down here under the hazard statements, and these are not hazard statements that -- these are hazard statements that were deemed important by Safariland and they're manufactured, contains gas -- yeah, it says -- causes skin irritation. Causes serious eye irritation. May cause respiratory irritation.

133

Did your waiver -- did your employer -- Safariland and Mr. Cox did not explain these to the students before they signed the waivers.

Q. Do you know, as you sit here today, whether Mr. Badagliacco was aware of the fact from prior exposure to AC spray, that it can cause skin irritation?

MR. SANDS: Objection, calls for speculation, lacks foundation as to what somebody else knew.

MR. CARINI: That's why I'm asking him.

BY MR. CARINI:

Q. Do you know if Mr. Badagliacco knew from prior exposures, that this could cause skin irritation?

A I do not.

Q. Hold on.

A. However, that -- what happened prior to the class is immaterial.

This is a training class that should have articulated all of these hazards to their -- to the participants.

Q. Okay. Do you know whether Mr. Badagliacco knew that this could cause serious

134

eye irritation?

MR. SANDS: Same objections.

BY MR. CARINI:

Q. Same answer, you don't know?

A. Correct.

Q. And you don't know whether Mr. Badagliacco knew this could cause respiratory irritation, correct?

A. Correct.

Q. And your criticism that you just espoused was that these things here weren't contained in the waiver form, correct?

A. Incorrect.

Q. Are you saying that there was no discussion during any part of this class where Mr. Cox explained to the participants that pepper spray causes eye and skin and respiratory irritation?

A. My concern is that Mr. Cox failed to review this document with him.

Q. Okay. And again, just so --

A. Because -- because if -- because your client is supposed to articulate these hazards before they're exposed to them.

135

Q. Okay. So that's two different things, and I want to break that down, and ask you a question about that.

Can you explain these hazards without showing them the SDS?

A. Yes.

Q. And do you have an opinion that the hazards of skin irritation, eye irritation, and respiratory irritation were not discussed prior to the exposure?

A. It was not -- it's my opinion based off reviewing the PowerPoint presentation, it was not discussed --

Q. Okay. And then you would agree with me?

A. -- satisfactorily.

Q. I'm sorry?

A. It was not discussed satisfactorily based off of the PowerPoint presentation that I reviewed.

Q. What is it that you are trying to explain to your satisfaction about these three topics; in other words --

A. If this --

136



Q. Go ahead.

A. Did they explain -- your waiver talks about -- you know, asks -- I believe, it asks about heart condition, but it didn't talk about respiratory.

Q. I'm not talking about the waiver. I'm talking about the training.

A. Okay.

Q. Okay. And you said -- you have criticisms that based upon what you've reviewed, you don't think that these topics were discussed, or adequately discussed?

A. That is correct.

Q. Which is it; not discussed at all, or not adequately discussed?

A. Not adequately discussed.

Q. And what is the purpose of the discussion?

A. See, if they would have done it properly, and reviewed this, they would have understood the chemical make up. They would also have understood the gravity of not -- of this, and most -- and in most cases, they would have -- students would have had an educated

137

decision, and they would have said, hey, where's our --

Q. Where's our what?

A. We don't have enough.

Q. Where's our what?

MR. SANDS: Where's our what?

BY MR. CARINI:

Q. You broke up.

A. They didn't have enough eye care.

You had the -- you had the, quote, safety officer going through the course without safety glasses.

They did not discuss the items in this, because if they did  they would have all had safety glasses on.

Q. Who?

A. The employee -- the -- the safety officers in the course.

It says right here that safety glasses and safety goggles and face shields are required.

Q. And what testimony do you have as to whether anyone was or was not wearing --

A. Mr. Cox himself says he didn't -- it

138

doesn't apply.

Q. Mr. Cox was asked about the safety observers, and whether they needed to wear safety glasses or not?

A. He -- he said right in the testimony, yeah, that doesn't apply to this when you were going through the bullet points of the -- of the material.

Q. All right. I'm not sure what you're referring to, but be that as it may, you would agree with me that the people who are participating in the class were not going to wear glasses for the people in the class, right?

A. Wrong. The individual getting sprayed would not get -- everyone else should.

Q. Okay. And again, the purpose of -- the criticism you have is that if this was explained more thoroughly, then you believe that the participants may have taken a different course of action in response to that information?

A. And the instructor would have, yes.

He bypassed all the safety mechanisms that are in place set forth by the -- by the organization.

139

Q. Right. Again, because he didn't have enough hoses, and he didn't have enough time?

A. And he didn't -- and he didn't require safety glasses.

Q. Okay. How is the lack of safety glasses in any way correlated to the injuries claimed by Mr. Badagliacco?

A. It's not, but we could have prevented additional -- we could have -- it would have reduced the potential of further injury by other employees.

Again, this goes back to an adequate hazard assessment of the training program.

Q. Okay. Now, do you have any opinion as to whether or not Mr. Badagliacco knew before he was exposed to spray on the day of this indent, that he should avoid breathing in these vapors?

MR. SANDS: Objection, same objection, calls for speculation, and lacks foundation.

Go ahead, if you can, sir.

THE WITNESS: I have not -- I have nothing, but it's immaterial, because this training is supposed to train them on the proper use of the material, and they did not --

140

BY MR. CARINI:

Q.   No, I get it.  I get it now.

So you can say in confidence that the lack of this effected what Mr. Badagliacco knew, but your attorney won't let you opine on what he knew, is that right?

A.   It's immaterial why --

MR. SANDS:  Objection, it's argumentative.

Go ahead, if you can.

THE WITNESS:  This training session basically says you will -- it's training you on the proper way to do it, not what you had in the past.

MR. SANDS:  And I'm not his attorney, Joe, just for the record.

BY MR. CARINI:

Q.   So are you critical of the fact that in your opinion, based upon what you've reviewed in this case, and the testimony you're relying upon to form these opinions, that Mr. Badagliacco wasn't trained the proper way to train other people if Mr. Cox didn't pull out this SDS sheet and go through it with him?

141

A.   Correct.

Q.   Okay.  You would agree with me that it's an employer's responsibility to review SDS sheets with their employees; true?

MR. SANDS:  I'm going to object to the question as vague.

I don't know the circumstances we're talking about.

THE WITNESS:  Mr. Cox went to this training session to become knowledgeable, and to be able to do the training.

If he went -- it's immaterial what he knew beforehand.

It's imperative that your organization basically said, you come here, we will train him to be a trainer, and you failed that.

BY MR. CARINI:

Q.   Okay.  And let me ask you this.

Do you have an opinion that it was failed as to all of the presumed 26 participants?

A.   Absolutely.

Q.   Okay.  And the basis for that is because it failed Mr. Badagliacco?

142

A.   No.  It's trained on basis of the -- if you review the material that he covered, he didn't cover anything that was -- I'm going off the training component, and only the training component.

Q.   Okay.

A.   You look at that training presentation, and then you -- and it does not state the hazards associated with it, and, you know, I have no idea what he talked about.

He pushed -- he jammed six hours of training into three hours.

The course was well -- was designed with specific timeframes and specific topics to be covered, and through his own deposition, he didn't follow those standards.

Q.   Let me ask you this question.

Do you believe that, and is it your opinion that every person that went through the decontamination station should have decontaminated for 15 minutes, whether that person personally believed they needed it or not?

A.   Repeat the last half of that question,

143

please.

MR. CARINI:  Could you read that back for me, Kiki, the whole thing?

(Whereupon, the record was read as requested.)

THE WITNESS:  Fifteen minutes is what is the general accepted standard for eye wash.

You may not need it, however, your own -- I believe, your SDS sheet says so.  Most do say -- most SDS sheets say right in there flush your eyes for 15 minutes.

Q.   Do you believe that every participant should have flushed for 15 minutes whether that participant personally believed they needed to or not?

A.   I don't know, because I don't know the hazards associated with it, however, the standard is straight forward.  It says you must have that opportunity.

Q.   Okay.  So the reason that I'm asking --

A.   Hold on.  Let me grab it here.

Pull up the SDS sheet for me.

Q.   This one that we're talking about, right?

144

A.   Yes, please.

Q.   Okay.  So tell me what section.

A.   Hold on.  Go up slowly.  A little bit more.  Stop right there.  Keep going.  Keep going, keep going.  There's that safety glasses, and keep going.  Stop.  Keep going.

Q.   Actually, I think I know where it is. Hold on a minute.  Maybe I'm wrong, but you can tell me if I am.

A.   Yeah, you just passed it.

Q.   Wash thoroughly after handling?

A.   No.  Keep going.  About skin, inhaled -- skin irritation, keep going down.  First page.  There you go.  Keep going down.  Eye contact, remove lenses -- in this space it's saying for several minutes.

Most SDS sheets say it's for 15 minutes.

Q.   So in any event, is it up to the person who's decontaminating when to stop decontaminating?

A.   In this case, yes, it says rinse for several minutes under running water, but the thing of it is, is the running water that was

145

provided -- provided in this case was not acceptable, because the student had to hold the -- had to hold the hose while flushing his or her own eye.

An eye wash station should be to where it's coming up, and you can actually -- because the idea is, is in an -- when we utilize -- when we're flushing the eye, we need to be able to pull the eyelids up and down, because we want that -- we want that water to go behind the eyeball, and we want it -- we want copious amounts of water to flush that entire socket out, and we can't do that if you're holding one -- holding the hose, and one eye trying to hold the bottom lid, and the top lid opened at the same time.  It's physically impossible.

Q.   Okay.  Did Mr. Badagliacco say that he didn't feel like he could adequately clear his eye out, or that he didn't have time to stay there long enough to adequately clear his eye out?

A.   He was rushed.

Q.   Okay.  So he didn't say I couldn't do it, because it was physically impossible; he

146

said he couldn't do it, because I didn't have time to do it?

A.   Was he -- I don't show that you properly -- your documentation, the training records didn't show how to properly decontaminate your eye.

Q.   Did he --

A.   You didn't do that -- you didn't do that adequate training in your course.

Q.   Okay.  So it's your opinion that Mr. Badagliacco did not know how to adequately decontaminate?

A   Correct.

Q.   Okay.

A.   He didn't teach them.

Oh, there's some water over there, use what you need, blot it -- you know, you didn't teach -- you did not articulate the proper ways to decontaminate.

Q.   Okay.  And because of that, it's your opinion Mr. Badagliacco didn't know how to decontaminate properly?

A.   Because you didn't train him.

Q.   That's right, right?  It's a yes or no.

147

A.   Correct, you didn't train him.

Q.   Okay.  Did you see any testimony from Mr. Badagliacco that he felt he didn't know how to decontaminate?

A.   No.

Q.   I want to go to the Section 11 on this thing, the toxicological information.

A.   Okay.

Q.   LD50 oral 3,000, and LD50 dermal, greater than 2,500 for rat and mouse; what does that mean?

A.   That's the lethal dose of 50 percent of the population.

So in this case for this product, we -- for oral, we fed it to rats, at which point in time, 50 percent of the rat population died.  So the milligram per kilogram, if you're -- if you're not metric, you're not a metric wiz, that's equivalent to like ounces to pounds.

So it's milligrams of product to milligrams of body weight, or in other words, ounces of product to pounds of body weight.

Q.   So this exposure, the lethal dose of 50 percent of a population of mice would be

148



greater than 2,500 milligrams per kilogram?

A. That is correct.

Q. Okay.

A. That comes into -- that falls in -- according to Pennsylvania department -- University of Pennsylvania, falls into Category 3.

It's right -- it's right on the borderline. They cut off -- I believe it's a category -- one says 3, one says 4, but it's right on the borderline, it's 2,000 to 5,000, so it's the more --

Q. And when you're referring to that -- and I want to make sure I have the right one up here -- that goes back to that hierarchy of one through four that we were discussing?

A. Where are you looking? I'm lost here.

Q. You said that --

A. When we were talking one through four, yes.

Q. When you referred to a three, you were talking on that same scale?

A. That's the one, you are correct.

Q. Okay. Bear with me here.

149

Was there any indication in any of the testimony you reviewed that Mr. Badagliacco sought any medical attention?

A. No.

Q. And, in fact, he finished the course the next three days, right?

A. Correct, but if you go back to the SDS sheet, your actions compounded the problem, because the -- because it flat out says -- and this should have been articulated in the training -- is that you need to remove your clothing. He didn't remove his clothing.

Q. Do you have an opinion, sir, that somehow he got this on his clothes, and that irritated his eye?

A. Well, if it's on his clothes, and you go like this multiple times, it's going to -- I have no documentation, but is it feasible? Absolutely.

Q. Has there been any testimony in this case that Mr. Badagliacco wiped his clothes on his eye?

A. No.

Q. So it's completely speculative that he

150

had it on his clothes in the first place; true?

A. Okay.

Q. And it's speculative that he somehow injured his eye by not changing his clothes?

A. I didn't say that.

It could have -- it could have been a contributing factor.

Q. You don't know as you sit here?

A. That is correct.

Q. And you believe that the better way to clean -- decontaminate rather -- from this sort of pepper spray exposure that Mr. Badagliacco underwent on April 16th, 2019 should include using soap in the eye?

A. I believe -- the reason I'm laughing is because your own Safariland procedures calls for baby soap, baby soap, and even their competitor's documentation shows that you need to wash and clean with soap and water.

Soap actually is a -- has a -- the composition actually helps remove -- remove those oils or de -- or reduce those oils.

So the reason they said baby soap is because it doesn't have that tearing, you know,

151

that burning effect on the eyes, that's a component of baby soap versus regular soap that, you know, shampoo that we would use.

Q. Right.

A. You get it in the eye, it burns.

So with that, you know, basically, what you're -- what happened here is Mr. Cox disregarded experts at Safariland, and did his own thing.

Q. So again, my question was, you believe that they should have been provided soap, and decontaminated with soap in addition to water?

A. Absolutely. That's what -- that's what the chemist -- Mr. Cox -- that's what the chemist says to do.

Do you argue with a chemist? No.

Your own documentation says you're supposed to use soap and water.

Q. Okay. And that's in the documents that were provided to you as part of your file review?

A. Absolutely, yes.

Q. Okay. Now, on this next -- Paragraph 14, you say that eye station shown in

152

the photos was not used at this location, and it should be noted that that does not meet the minimum standards for approved eye wash station.

So the one where there's a plastic tube with water sprouting out of it, you don't think that should have been used either, correct?

A. That doesn't meet the standards, that is correct.

Q. So the fact --

A. You could have -- you could have very easily used that same style, and built one very reasonable, that would meet that standard.

Q. But the one in the -- in the documents did not meet the standard?

A. That is correct.

Q. And you have no criticism of it not being used?

A. I do not, because it was -- the standard says that both eyes must be cleaned at the same -- that was just kind of -- oh, here's a little stream -- he did not provide copious amounts of water needed.

Q. Okay. Do you know how the volume of water --

153

A. Now, wait a second.

That would have been better than what you had, but it wasn't -- it still doesn't meet the minimum requirements.

Q. Do you know how much water volume was supplied through the hose, or hoses, if there were more than one?

A. I'm not arguing the quantity. I'm positive it -- it provided ample flow. It did not provide ample temperature, and it did not provide ample -- and it -- but it did not provide free flowing water without holding the hose.

Q. Okay. I think -- correct me if I'm wrong -- we've talked about Section 15 of your report already, we went through the subsets of the SDS, itself, right?

A. That is correct.

Q. And your explanation of one through four we discussed, right, part of the hazard; one being the most, and four being the least, we've talked about that?

A. Yes.

Q. Okay. And then under 16, I think, we

154

talked about the first aid measures?

A. Absolutely.

Q. Okay. And you've already told me about your criticism and the lack of documentation of classroom audits, right?

A. Absolutely.

You know, you've got to have a sign-in sheet even in college. I have a sign-in sheet every day whether or not I teach courses at manufacturing facilities, I teach continuing education, I always have a sign-in sheet. Sometimes I have a sign-in sheet in the morning and night -- afternoon.

Q. Is there any question that Mr. Badagliacco attended this course?

A. No.

Q. Do you have any question in your mind whether Mr. Orchard attended the course?

A. No.

Q. Do you have any question as to whether Officer Ranken or Officer Stein attended the course?

A. No  I do have a question on the other ones that you haven't interviewed, whether or

155

not they were, so I don't know if we had 26 students or not.

Q. Okay. Back to your opinions here, Page 6, Line 18, and that's under a heading of conclusion that's at the very bottom of 5, and you said, based upon my review, as discussed in this report, it's my opinion that Safariland did not provide the instructor with the tools to complete the training safely, and in that regard, the tools you're talking about are the hoses, or the water, the decontamination station?

A. Decontamination station. He didn't even know about some of the -- he didn't even have knowledge of the slides -- slide set.

Q. Okay. So it's your opinion that he didn't have the proper slides, and he didn't have the proper water?

A. Correct, and he didn't have decontamination wipes, he didn't have -- and he -- he was really rushed.

He was more concerned about going to the baseball game than he was teaching this class, getting free tickets to the baseball

156



game.

Q. That's your opinion?

A. That's my opinion.

Q. Okay. And then you also criticized the fact that he didn't have the sign-in sheets, we've talked about that.

A. Mm-hmm.

Q. And that he didn't ensure the safety of the overall -- this should be policies and procedures?

A. Yes.

Q. And we've talked about that?

A. He just didn't -- yeah, we talked about that already.

You want to rehash it? We can, but --

Q. All right. And then in 19, you say that someone who instructs less than ten classes per year was rushed, and didn't provide adequate training to the safety team?

A. What we're doing here is there was no safety team. He didn't follow Safariland's procedures. There was no safety person at each station.

What he did -- what he did is in the

157

e-mail he said, does your points department have a copy of EMTs or paramedics on staff?

He never -- he didn't ask for them to be present that day. There was no --

Q. Do you have --

A. What?

Q. Do you have any evidence in this case whether they were or were not --

A. There was no safety team there at the decontamination station.

Q. According to who?

A. All the -- all the -- he never discussed in any of the depositions. Nobody was there. It was -- it was a free for all.

Q. So it there -- if there's testimony to the contrary, it's not something that's on your radar; is that fair to say?

A. That is correct.

Q. Okay.

A. And I read through it, I didn't see it, and if I -- and I'm confident I didn't read it.

Q. And in terms of -- do you know what first aid training any of the police officers that attended this class had?

158

A. No.

Q. Do you have any idea whether it's custom and practice for police officers as part of their training to be trained --

A. It is not.

Q. -- to be trained in first aid?

A. I've got a lot of police officers that don't have first aid training.

Q. Okay. So is it your opinion --

A. So it's my opinion that they did not have adequate first aid. They didn't have someone watching that decontamination. They didn't have a safety officer at each one of the locations. They only had another student walking them through.

They failed to set the course up properly.

Q. Okay.

A. According to your own policies and procedures.

Q. And according to your interpretation of the testimony that there weren't EMT or paramedic staff assigned to the safety of the students?

159

A. That is correct.

Q. Now, let me ask you this.

Was there anything that prevented Mr. Badagliacco after completing this course from asking for assistance for something if he felt the need for assistance?

A. I have no -- I can't answer that.

Q. Okay. Do you have any -- is there any indication that he did ask anyone for anything?

A. I can't answer that.

Q. Did you see any testimony that he did ask anyone for anything?

A. I did not

Q. And then let me ask you this.

Did you see any evidence that Mr. Badagliacco complained that his eyes were bothering him after he finished the exposure portion of the course to anybody associated with the course?

A. I don't recall.

Q. You don't recall seeing that testimony?

A. No.

Q. Tell me then, sir, how would an EMT or paramedic on staff have impacted the incident

160

with Mr. Badagliacco?

A. They would have held the hose so they could actually have done a proper flushing.

Q. Do you need to have an EMT to hold the hose?

A. They had nobody.

Q. Do you need to have an EMT to hold a hose?

A. No.

Q. Do you need a paramedic --

A. They had nobody.

Q. Do you need to have a paramedic to hold a hose?

A. No, but they had nobody.

Q. If Mr. Badagliacco asked Mr. Orchard to hold the hose for him, would that have been okay?

A. Yeah.

Q. Okay.

A. I guess, but you still -- but they -- the process required -- but the procedures in place by Safariland calls for those medics to be there. They weren't. They failed to follow their own protocols.

161

Q. I appreciate that. Now, do you know whether --

A. You're welcome.

Q. -- the EMTs and paramedics on staff are there in the event of an emergency so that they can lend medical care and treatment to someone that's having an issue?

A. Okay.

Q. Do they --

A. And they could - and they could have ensured that they all stayed at that -- at that decontamination station for an acceptable period of time.

Q. My question is this.

Do you know whether the intent of having an EMT or a paramedic on staff is to lend medical care or treatment that someone needs?

A. Say that again.

Q. Do you know whether the intent of having an EMT or a paramedic present in the decontamination station, or as you said, throughout the course, is there to lend aid in the event of an emergency?

A. I would assume that was -- is the case.

162

Q. Is there any other reason for them to be there?

A. No.

Q. Okay. Was there any emergency that needed the attention of an EMT or paramedic that afternoon?

A. I don't know.

Q. Did Mr. Badagliacco ask for the care and treatment of an EMT or paramedic?

A. There was not one there.

Q. Did he ask for help?

A. I can't answer that.

Q. Okay. So whether there's an EMT or paramedic on staff, you can't say had one impact or another on Mr. Badagliacco's claims in this case?

A. In this case it would have been -- they would have -- a common practice would be to ensure him to assist in the decontamination.

I've done plenty of decontaminations in my life.

Q. Okay. My question is a little different.

Do you have any opinion -- strike that.

163

Can you say that the lack of an EMT or paramedic on this -- strike that.

If we assume you're right, and there was no EMT or paramedic manning the decontamination station; if you assume that would be true, because that's part of your opinion, is it your opinion that that somehow impacted Mr. Badagliacco's injuries in this case?

A. Yes.

Q. All right. How so?

A. Because that EMT/paramedic would have assisted in getting him appropriate treatment in terms of flushing the eyes.

Q. Okay. So you're saying that because an EMT and paramedic was not there, that's why Mr. Badagliacco didn't rinse his eyes properly?

A. That increased -- that increased the exposure, yes.

Q. When you say increased the exposure, what do you mean?

A. Because he had to hold the hose, and try and get his eyes open.

If he would have had an attendant there

164



holding the hose, he could have used both hands to open the eye properly and properly decontaminate.

Q. Do you have an opinion as to whether use of the shower or sink in the locker room would have afforded him the opportunity to spend more time under water, and use both hands to decontaminate?

A. Actually it would have --

MR. SANDS: Objection, calls for speculation, lacks foundation.

Go ahead, if you can, sir.

THE WITNESS: It would probably -- a sink doesn't have running water. It comes up, it goes down, so how are you going to use a sink to rinse your head -- your eye?

Q. Is it your opinion that a sink would not have afforded him an opportunity to continue flushing his eye out?

A. It would have, but I don't know how you would have used it. You'd have to kind of toss it up with, you know -- it's not the best situation.

Q. Okay. Then you say here -- have we

165

covered -- have we covered 19 and your criticisms of 19?

A. Yeah, we talked about that, I believe.

Q. And then 20, you already told me that you feel like Mr. Cox didn't explain the contents of the waiver before it was signed to the --

A. Yeah, because it didn't address the hazards.

And the part that really bothers me about this waiver is, was it just -- it was changed ten months before this training. I don't even know if Mr. Cox was even trained on the new form.

Q. Was there any indication to you that David Badagliacco, the plaintiff in this case, was not capable of reading and understanding what he signed?

A. No.

Q. Okay. You've been patient with me. I appreciate that. I don't have any other questions.

Have we covered all of your opinions now, and the basis for your opinions?

166

A. I believe so.

Q. Okay. That's all I have.

A. We had a nice -- we had a nice conversation.

EXAMINATION

BY MR. SANDS:

Q. Pat, just a couple of topics, sir.

With respect to the water that was provided, is it the standard that the water should actually run up?

A. It is. You know, it comes up, so you can actually come up and hit your eye.

I mean, it should be -- ideally, it would be between 60 and 100 degrees. Ground water is at about -- regular tap water is about 50 degrees after a little bit of flow.

Q. What's meant by the water should be crescent or in a half-circle, what is meant by that?

A. So when the water comes up, it should actually come up as -- come together at the top kind of like a half-moon or crescent where it comes up, and touches together, so when you put your eyes there, when it comes in, it's going to

167

be directly at your eyes, so as you go down, you're going to get adjusted to the right width of your eyes.

Q. All right. If you hold your upper eyelid up with one hand, and your lower eyelid with the other hand --

A. Lower and get -- yeah, it provides adequate flushing with the aeration of that -- of those nozzles in an appropriate eye wash provides enough aerobic air within it to aerate it, so it's a soft -- it's not like a hose coming right after you. It's more of a soft, gentle water flow.

Q. And water flowing from either a sink or from a showerhead, does not provide that upward water flow; would that be fair?

A. That is correct.

Q. So water from a sink or from a showerhead would not meet that standard of providing water that flows upward toward the eye; would that be fair?

A. That is correct.

Q. Secondly, with respect to the waiver, you mentioned just a moment ago that the waiver

168



did not address the hazards, or certain hazards, that Mr. Badagliacco was, as it turned out, was exposed to.

Can you -- can you expound on those hazards, and amplify those hazards that you're talking about, sir, that Mr. Badagliacco was exposed to that was not articulated or not expressed in the waiver that he signed?

A. Yeah. Joe, can you pull up the waiver again, please?

MR. CARINI   That was Cox Exhibit No. 19.

THE WITNESS: I might have it here.

MR. CARINI: I have it   That's fine.

THE WITNESS: Go down.  Start there.

You know, the concern I have here was it talked about heart conditions, but it did not talk about respiratory concerns, and my other concern is that it basically said, if I took an aspirin, I'm disqualified from this course, so it's promoting -- it's promoting something that's impossible.

There's no grounds for some of the questions, and it misses other areas.

169

BY MR. SANDS:

Q. From your report in Paragraph 20 on Page 6, you state that the instructor, Steven Cox, did not explain the hazards completely before requiring students to sign the waiver, which did not address all of the hazards outlined in Sections 15 and 16 above, and can you amplify for us the hazards outlined in Sections 15 and 16 that you are referring to there with respect to the waiver?

A. Yeah, that's basically -- well, 15 and 16 deal with the hazards and the precaution statements that are outlined in the SDS sheet.

None of these precaution statements were listed in the PowerPoint presentation.

Q. All right. Anything else you want to -- you want to mention in that regard on that subject?

A. I think we got it.

Q. All right. Sir, that's all the questions I have.  Thank you.

Joe, do you have anything further?

MR. CARINI: I think so.  Bear with me one second.

170

FURTHER EXAMINATION
BY MR. CARINI:

Q. This document he signed indicated that he was going to look out, and be responsible for the safety of others, and that they were going to watch out for each other, right?

A. That's -- and you know what -- where in this -- where in the training did it discuss that in detail?

Q. Okay. So you don't know whether that was discussed or not, you didn't see it?

A. I don't, and in the -- and, you know, you can't push safety off on the students.  It's the instructor's responsibility to ensure the safety of the course.

A fee was paid for attendance.  That means that your instructor was responsible for the safety of every student in that curriculum, period.

Q. Let me ask you this under No. 3.

Do you think that Mr. Badagliacco needed to be discussed in a PowerPoint presentation, the fact that he agreed to report all injuries immediately to the instructor?

171

A. I believe you need -- what should have been articulated is what type of injuries could have occurred.

He may have not known the ramifications of the eye injuries of the eye.  He may not have known what the pre -- what would happen four -- three hours after the training session adjourned.

Those are the -- those are the types of concerns that should have been articulated in this training course.

Q. Okay. And again, based upon the documents that you've reviewed, you didn't see that those specific hazards were discussed?

A. That is correct.

Q. All right. I don't have anything else.

I appreciate your time here today, your patience with me.

Thanks, Scott.

I'll order this, Kiki.

(Whereupon, a discussion was had off the record.)

(FURTHER DEPONENT SAITH NOT.)

(Deposition concluded at 4:43 p.m.)

172

STATE OF ILLINOIS      )
                       )   SS:
COUNTY OF C O O K      )

I, MARY KAY ANDRIOPOULOS, CSR, an Officer of the Court, within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on November 13, 2024, personally appeared before me, via Zoom videoconference, PATRICK SCHUERMAN, in a cause now pending and undetermined in the United States District Court for  the Northern District of Illinois, Eastern Division, wherein DAVID N. BADAGLIACCO is the Plaintiff, and SAFARILAND, LLC, a Limited Liability Company is the Defendant.

I further certify that the said PATRICK SCHUERMAN was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript

173

of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to notice and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my verified digital signature this 17th day of December, 2024.

MARY KAY AND IOPOULOS, CSR
LICENSE NO. 084-002248

174





Patrick Schuerman 11/13/2024



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052



Patrick Schuerman 11/13/2024

















16777/SCS                                        Attorney ID# 6192996

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| DAVID N. BADAGLIACCO | ) | |
| Plaintiff, | ) | Case No.: |
| | ) | 1:21-cv-02424 |
| vs. | ) | |
| | ) | |
| SAFARILAND, LLC, a Limited Liability | ) | |
| Company | ) | |
| Defendant | ) | |

### PLAINTIFF'S RULE 26(a) DISCLOSURES

NOW COMES the Plaintiff, DAVID N. BADAGLIACCO, by and through his

counsel, ANESI OZMON, LTD and pursuant to Rule 26 of the Federal Rules of Civil Procedure,

hereby submits the following Disclosure: Plaintiff discloses the following witnesses who may be

called at trial to testify regarding the subject matter of the instant case.

**Rule 26(a)(2)(A): witness Plaintiff may use at trial to present evidence under Federal Rule**

**of Evidence 702, 703, or 705.:**

1. David Badagliacco
2. Kileigh Badagliacco
3. Bobby Steven Cox;
4. Coleman Daryl Kim;
5. Derek Ranken;
6. Edward Kappler;
7. Officer Andrew Stein;
8. Officer Matthew Orchard
9. Sergeant Jim Lally
10. Tina Romero;
11. Dr. Ali Djalilian M.D.;
12. Dr. Joshua B. Herz;
13. Dr. James Saul, M.D.;
14. Dr. Elmer Tu

**Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure: Witnesses Who Must Provide a**



EXHIBIT

tabbies®

D

**Written Report.**

Patrick Schuerman
208 N. Johnson Street
Newark, IL 60541
815-219-5049

**(i)** **Statement of all opinions they will express and the basis and reasons for them:**

Mr. Schuerman is disclosed as a construction\site safety expert and is expected to testify as to the subject matters, facts and opinions set forth in his report, which is attached hereto as Exhibit A and incorporated herein, and his discovery deposition, if taken. His opinions are as stated in his report and are further that the Defendants retained control of the work on the training site and failed to exercise their control with reasonable care, thereby causing and contributing to the injury at issue in this case. The Defendants failed to properly inspect the work and see to it that necessary safety measures were taken under the circumstances, including inspections of the decontamination stations, and other safety measures. They failed in their responsibilities as the company administering the training, and as a result contributed to the cause of the incident and injuries.

He will base his opinions and testimony, which will be stated to a reasonable degree of certainty within his field of specialty, on his background, education, training, and experience in his field of expertise of safety as well as his review of all the fact witnesses' depositions, deposition exhibits, pictures, statements/reports, and discovery responses relative to the training site and incident at issue in this case and as listed in the report. His C.V. is also attached hereto as B.

**(ii)** **Facts or data considered by the witness in forming them:**
   a. Plaintiff's Answers to Interrogatories
   b. Deposition Transcripts, including:
      i. David N. Badagliacco;
      ii. Bobby Steven Cox;
      iii. Coleman Daryl Kim;
      iv. Derek Ranken;
      v. Edward Kappler;
      vi. Officer Andrew Stein;
      vii. Officer Matthew Orchard
      viii. Sergeant Kim Lally
      ix. Tina Romero
   c. Deposition Exhibits, including:
      i. Cox Ex. 4 CV;
      ii. Cox Ex. 9 1.0C.ICP.4;
      iii. Cox Ex 12 4.OC.ICP.4;
      iv. Cox Ex 13 training order Munitions;
      v. Cox Ex 14 Area Decontamination and First Aid Info;
      vi. Cox Ex 15 Mk-3 360 Aerosol spec sheet;
      vii. Cox Ex 16 Mk-3 360 Product Description;
      viii. Cox Ex 17 OC Aerosol model types;

      ix.   Cox Ex 18 OC Aerosol Safety Data Sheet;
      x.   Cox Ex 19 Training Class Waiver;
      xi.   Cox Ex 21 Class Roster;
      xii.   Cox Ex 25 Email 4-11-19(2);
      xiii.   Cox Ex 26 Email;
      xiv.   Cox Ex 27 Gas Mask Group Photo (1);
      xv.   Cox Ex 28 Badagliacco Group Photo Request

**(iii)**     **Any exhibits that will be used to summarize or support them;**

Plaintiff's counsel has not determined what exact exhibits may be used at trial to explain Mr. Schuerman's opinions, however, Plaintiff will use photographs of the training site to explain to the jury the manner in which the training site and decontamination station were provided and situated and the deficiencies therein. All exhibits intended to be used will be provided to Defendant well before trial.

**(iv)**     **Qualifications and publications;**

Mr. Schuerman is a member of Midwest Safety Consultants LLC. He has expertise in workplace safety, accident investigations, and State and Federal Standards as it relates to Occupational Health and Safety. He has had 30 years of Safety and Risk Management Experience. In addition, He has been an instructor at Illinois Valley Community College, teaching industrial safety since 2012.

**(v)**     **List of other cases he has testified as an expert in past 4 years;**

A list Mr. Schuerman's testimony will be provided upon receipt.

**(vi)**     **Statement of compensation paid for the study and testimony;**
Mr. Schuerman's professional compensation rates are as follows:
Research time $125/hour
Deposition and trial $200/hour.

By: */s/Scott C. Sands*
Attorneys for Plaintiff(s)

Scott C. Sands
**ANESI OZMON, Ltd.**
Attorneys for Plaintiff(s)
161 North Clark Street - 21st Floor
Chicago, IL 60601
312/372-3822 / ssands@anesilaw.com

**Midwest Safety Consultants LLC**

1. I am Pat Schuerman, Member of Midwest Safety Consultants LLC; I have expertise in workplace safety, accident investigations, and State and Federal Standards as it relates to Occupational Health and Safety. I have had 30 years of Safety and Risk Management Experience. In addition, I have been an instructor at Illinois Valley Community College, teaching industrial safety since 2012. My address is 208 N Johnson, Newark, Illinois

**Assignment:**

2. I was retained by ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD to review and provide expert opinions as it relates to the emergency eye washing station, safe guards in place, and general interpretation of the Safety Data Sheets (SDS) understanding based on the information provided in the following documentation:

    i. DEP TRANS Bobby Steven Cox
    ii. DEP TRANS Coleman Darryl Kim
    iii. DEP TRANS David N Badagliacco
    iv. DEP TRANS Derek Ranken
    v. DEP TRANS Edward Kappler
    vi. DEP TRANS Officer Andrew Stein
    vii. DEP TRANS Officer Matthew Orchard
    viii. DEP TRANS Sergant Kim Lally
    ix. DEP TRANS Tina Romero
    x. Ex. 4 Cox CV
    xi. Ex. 9 Cox 1.0C.ICP.4
    xii. Ex. 12 Cox 4.OC.ICP.4
    xiii. Ex. 13 Cox training order Munitions
    xiv. Ex. 14 Cox Area Decontamination and First Aid Info
    xv. Ex. 15 Cox Mk-3 360 Aerosol spec sheet

xvi.   Ex. 16 Cox Mk-3 360 Product description
xvii.   Ex. 17 Cox OC Aerosol model types
xviii.   Ex. 18 Cox OC Aerosol Safety Data Sheet
xix.   Ex. 19 Cox training class waiver
xx.   Ex. 21 Cox Class Roster
xxi.   Ex. 25 Co Cox Email 4-11-19(2)
xxii.   Ex. 26 Cox  Cox Email
xxiii.   Ex. 27 Cox Gas Mask Group Photo (1)
xxiv.   Ex. 28 Cox Badagliacco group photo request
xxv.   INTS Pltf Answers to Interrogatories – Initial – Emailed 93021

## Background

3.  It is my understanding that David N. Badagliacco was asked to attend this training session by his current employer, the Skokie Police Department.
4.  The event took place on Tuesday, April 16, 2019.

## Review of the Documentation

5.  Mr. Cox has been working for the Safariland training group since 2007 and is considered a Master Instructor for the organization. It was never disclosed when the last retraining took place for Mr. Cox. So one must assume that Mr. Cox has never been retrained since 2007. Mr. Cox did not know some of the terminology used and was unaware of pertinent documentation (88:8-24) as well as the formal slide presentation. Based on this It would appear that this was not the slide set that Mr. Cox used in the training on the day in question.

6.  Based on the depositions, it is well documented that the instructor did not provide multiple garden hoses for the decon area. Further, the organization appears to have set standards that were not followed (89:5-24).
    a.  Mr. Cox stated he had multiple hoses; however, they did not (Orchard 33:12-15)
    b.  Mr. Cox stated in the class that you have to watch to see if you are running to many students through the course, and that if the decon area is getting full he would stop the course, this did not occur.

2

7.  From the documentation provided, 26 students took the one-day course. It was difficult to determine as multiple class attendances were on the form.

8.  The agenda calls for 210 minutes for the range portion of the class. If a student completes the range in three minutes and the decon area for the single hose is allowed only eight minutes, the class would require 286 minutes to complete. This indicates that the instructor was rushed and had to keep the class moving quickly. The generally accepted guideline for washing eyes is continuous water for 15 minutes.

9.  **American National Standard for Emergency Eyewash and Shower Equipment Z358.1-2014(R2020)** Section 5.1.4 of the standard states that the individual using the eyewash should not require the use of the eyewash station without the use of hands. In addition, section 5.1.6 states that Eyewashes shall be capable of delivering flushing fluid to the eyes at least 1.5 liters per minute (0.4 gpm) for 15 minutes. Section 5.1.7 of the standard goes on to explain that eyewashes shall be designed to provide enough room to allow the eyelids to be held open with the hands while the eyes are in the flushing fluid stream. Because Safariland only allowed for a garden hose, they prohibited the student from properly opening the eyelid to properly wash the eyes out. Allowing the chemical reactants to remain in the eye for an extended period of time. Further, the standard also stipulates that in 5.1.8, eyewashes shall provide flushing fluid to both eyes simultaneously. 5.4.2 states that eyewash must be accessible for no more than 10 seconds to reach. The range control was poorly managed. Per the policies set forth by Safariland, there was to be separate safety officers at each station, that should have been trained to the hazards associated with the event, and specific exposure of that location. It appears that no individual with first aid training was positioned in the rehab area. Rather the instructor paired the students up and provided limited to no training on the requirements of being a safety officer. From the testimony, there was no indication from Mr. Cox, the instructor, that he stopped the range activities due to excessive students waiting to get their eyes washed.

10. OSHA 29 CFR 1910.151(c) Where the eyes or body of any person may be exposed to injurious corrosive materials, suitable facilities for quick drenching or flushing of the eyes and body shall be provided within the work area for immediate emergency use.

3

11. The SDS states that individuals exposed to this chemical should (P362, P364) remove contaminated clothing and wash it before reuse. (H335) This may cause respiratory Irritation. (H319) Causes serious eye irritation. If eye irritation persists: Get medical advice/attention. It was not included in the training that students should seek medical attention if the irritation persists. Students should wash skin & eyes with water and soap and rinse their skin thoroughly.

12. The trainer did not provide soap inform the students to bring a second set of clothing or offer a changing room to remove the contaminated clothing.  Changing clothing is essential as the Dermal LD50 (Lethal Dose of 50%) factor is >2500 mg/kg.: irritating to the eyes, irritating to the respiratory system, gastric or intestinal disorders when ingested, and irritating to the skin. The training metrics did not cover these health effects.

13. The product contains up to 40% ethanol. With a TLV of 1880 mg/m³, 1000 ppm. The ingredient Propylene Glycol is also in the formula at a rate of 5 – 10% and has a maximum exposure of 10 mg/m³. Based on the spray pattern used at this event, it is unknown if this was exceeded. Safariland did not provide documentation of testing to ensure that students were not overexposed. One should note that the same ingredients in the higher-grade sprays are considered corrosive and require immediate eye-washing. Neither the labeling nor the course lecture discussed these measures.

14. The eyewash station shown in the photos was not used at this location. It should be noted that it does not meet the minimum standards for an approved eyewash station, as the steam does not provide adequate flushing of both eyes. Per Z358.1

15. **Section 2 of the SDS shows that the Classification of the substance or mixture**

   Press. Gas H280 Contains gas under pressure; may explode if heated.

   Skin Irrit. 2 H315 Causes skin irritation.

   Eye Irrit. 2A H319 Causes serious eye irritation.

   STOT SE 3 H335 May cause respiratory irritation.

To understand these numbers 1 is the most hazardous a 4 is the least hazardous so if a one would represent an acid that might burn the arm off then a two is a little less harmful to the eyes, and a four would be the least. In the above the eye irritant is a two.

16. **Section 4 of the SDS shows the required First-aid measures required to be provided:**

> **4 First-aid measures**
> · **Description of first aid measures**
> · **General information: Take affected persons out into the fresh air.**
> · **After inhalation: Supply fresh air; consult doctor in case of complaints**
> **After skin contact:**
> Immediately wash with water and soap and rinse thoroughly.
> If skin irritation or rash occurs: Get medical advice/attention.
> · **After eye contact:**
> Remove contact lenses if worn.
> Rinse opened eye for several minutes under running water. If symptoms persist, consult a doctor.
> · **After swallowing:**
> Unlikely route of exposure.
> Rinse out mouth and then drink plenty of water.
> Do not induce vomiting; immediately call for medical help.
> · **Most important symptoms and effects, both acute and delayed:**
> Coughing
> Dizziness
> Irritant to skin and mucous membranes.
> Irritant to eyes.
> May cause respiratory irritation.
> Gastric or intestinal disorders when ingested.
> · **Danger:** No relevant information available.
> · **Indication of any immediate medical attention and special treatment needed:**
> Medical supervision for at least 48 hours.
> If necessary oxygen respiration treatment.

17. Safariland provided no documentation of classroom audits to ensure that instructors and Master Training are following the organization's basic guidelines.

**Conclusion**

5

18. Based on my review as discussed in this report it is my opinion that Safariland did not provide the instructor with the tools to complete the training safely, did not require signed attendance sheets, and did no ensure the safety of the overall polices and procedures.

19. Mr. Cox, the instructor who instructs less than 10 classes per year, was rushed, did not provide adequate training to the safety team, and did not ensure that an employee trained in first aid was present at the rehab area. As he only asked the department if they had an EMT/Paramedic on staff. Mr. Cox did not require them to be present at the event. Mr. Cox did not follow the minimum standards set forth within Safariland policies and procedures.

20. The instructor, Steven Cox, did not explain the hazards completely before requiring students to sign the waiver, which did not address all of the hazards outlined in sections 15 and 16 above.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness, would testify competently thereto.

Dates September 10, 2024

_____

Pat Schuerman

# PATRICK SCHUERMAN

**208 N. Johnson Street • Newark, IL  60541 • 815-219-5049**
**pschuerman@outlook.com**

---

## PROFESSIONAL EXPERIENCE

**Occupational Health & Safety – Risk Management – OSHA Inspector**

***Loss Control Consultant,*** **Overland Solutions,** Overland Park, KS                        2006–2013
I specialize in performing underwriting inspections of commercial properties, conducting Workers' Compensation inspection reviews, and formulating recommendations that ensure loss reduction and risk management. My work primarily focuses on these areas:

- **Worker's Compensation**
- **Inspections of property >500MM**
- **Extensive Travel**
- **Commercial Auto, Fleet reviews**
- **Life Safety Requirements**
- **Ergonomic evaluations**

***Safety Equipment Representative,*** **Cintas Corporation,** Bensenville, IL                        2003–2006
After Cintas Corporation purchased P & L Services, I regularly facilitated consumer safety training meetings on key topics that included: Respirator Protection, Proper Lifting, Preventing Back Injuries, and Industrial Safety for Truck Operations, CPR, and First Aid.

***Owner,*** **P&L Services,** Newark, IL                        1999–2003
As founder and manager of this first aid and safety supply company, I assisted customers in driving OSHA and MSHA compliance by providing safety meetings. Before selling P&L Services to Cintas,  I drove sales from $0 to $250,000, developed a base of 250 customers, and achieved profitability within 3 months.

***Regional Sales Manager,*** **Afassco First Aid,** Carson City, NV                        1997–1999
I drove sales in 18 states by collaborating with 20 distributors and 50 dealers. In a span of 18 months, I expanded the sales region by adding 12 new distributors. I implemented a new packaging program that drove profitability and let dealers efficiently offer more products and training.

***Sales Service Representative,*** **Respond First Aid Systems,** Woodridge, IL                        1992–1997
At Respond First Aid Systems, I established my career by pursuing and closing sales of industrial first aid, safety supplies and related training. Here are key benchmarks and achievements met while with Respond:

- **Ranked among top 20 sales reps nationwide and member of Master Association for 4 years.**
- Earned multiple national honors, including **Highest Training Dollars in One Year, Most New Accounts, Largest New Sales,** and **Most Growth.**

## EDUCATION & PROFESSIONAL DEVELOPMENT

**Master's Degree in Industrial Management, specialty in Occupational Health & Safety**
Northern Illinois University, DeKalb, IL, 2007

**Dale Carnegie Course**
Downers Grove, IL, 1998

**Bachelor of Science in Agribusiness Economics**
Southern Illinois University, Carbondale, IL, 1988

**Associates of Applied Science – Farm Management**
Muscatine Community College, Muscatine, Iowa, 1986

**Manufacture Skill Standards Council**
**CPT – Authorized Instructor – 2013**

**OSHA 10 & 30 Hour Authorized Instructor**

# OC Aerosol Projector Instructor





In Custody Handling:
After a subject has been sprayed and secured:
Ensure person is breathing normally
Be cognizant of issues / positions that may hinder the suspect's ability to breathe
Subjects should be monitored for medical distress



INHALATION:
For symptoms of lung irritation occur (coughing, wheezing or breathing difficulty), remove from exposure area to fresh air immediately. If breathing has stopped, perform artificial respiration. Keep affected person warm and at rest. Get medical attention.
EYES:
Remove contact lenses, then wash for 15 minutes with clean potable water lifting upper and lower lids occasionally. Seek medical attention if irritation persists.
SKIN:
Wash with plenty of soap and water. Seek medical attention if delayed dermatitis develops. For contact with burning (ignited) particles, medical treatment may be needed for thermal burns.
INGESTION:
Contact medical authorities immediately. Do not induce vomiting unless directed to do so by medical personnel. If vomiting occurs naturally, have victim lean forward to avoid aspiration of regurgitate.  Give 1-2 glasses of water to victim if victim is conscious and able to swallow and seek immediate medical assistance. Never give anything by mouth to an unconscious person.



Recontamination of Face/Eyes with use of bucket
Contaminated water allowed to run down onto additional body parts
Use of Milk / sugar VERY DANGEROUS
No paper towels for blotting
Physiological effects allowed to continue
Myths, misconceptions and misinformation are prevalent and can lead to complaints of eye injuries



EXHIBIT

E

Version 4.1