**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID N. BADAGLIACCO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-2424 |
| | ) | |
| SAFARILAND, LLC, a Limited Liability Company, | ) | Honorable Thomas M. Durkin |
| | ) | |
| | ) | Magistrate Judge Beth W. Jantz |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO BAR
PLAINTIFF'S PREVIOUSLY DISCLOSED EXPERT OPINION AND PRESENTATION
OF MEDICAL BILLS**

NOW COMES Plaintiff, DAVID BADAGLIACCO, by and through his attorneys, ANESI OZMON LTD., and hereby submits this Response in Opposition to Defendant's Motion to bar portions of the previously disclosed opinions of Patrick Schuerman and the presentation of Plaintiff's medical bills. In support, Plaintiff states as follows:

**Patrick Schuerman's Reliance on ANSI Z358.1**

Defendant's attempt to exclude previously disclosed opinion should be denied. Plaintiff is not attempting to introduce any new opinion or undisclosed basis through Mr. Schuerman. Rather, Plaintiff intends to use limited introductory language from the exact ANSI Z358.1-2014 (R2020) standard Mr. Schuerman identified in his report, disclosed in response to Defendant's deposition rider, and testified about during his deposition. Exhibit A.

Defendant's deposition rider for Schuerman requested "[a]ll standards, guidelines, ordinances he is relying upon for his opinions in connection with this lawsuit." Exhibit B, 2. In response, Plaintiff expressly identified "Ansi/358.1-2024 (R2020)." Exhibit B, 2. That

1

disclosure was not limited to isolated provisions or subsections of the standard. Plaintiff's Rule 26 disclosure further provides that Schuerman is expected to testify to the subject matters, facts, and opinions set forth in his report and in his discovery deposition. Exhibit C, 3.And paragraph 9 of Mr. Schuerman's report specifically cites ANSI Z358.1-2014 (R2020), the American National Standard for Emergency Eyewash and Shower Equipment, as a basis for his opinions. Exhibit C.

Plaintiff's Rule 26 disclosures further state that Schuerman is expected to testify to the subject matters, facts, and opinions set forth in his report and in his discovery deposition. Defense counsel questioned Mr. Schuerman repeatedly about ANSI Z358.1 throughout his deposition. Patrick Schuerman Dep., 8:8-23; 55-56:2-5; 58:2-24; 68-69:21-1, attached as Exhibit D. Defendant's attempt to characterize this as a surprise on the eve of trial is therefore unfounded. Defense counsel had every opportunity to examine Mr. Schuerman regarding ANSI Z358.1 and in fact did. *See Gicla v. United States*, 572 F.3d 407, 411 (7th Cir. 2009) ( "Rule 26 is designed to avoid surprise and give the opposing party a full opportunity to evaluate the expert's methodology and conclusions and to respond appropriately"). Defendant cannot now claim unfair surprise merely because Plaintiff intends to reference introductory language of the very standard Plaintiff disclosed.

Nor is the "Scope" or "Purpose" language of ANSI Z358.1 a new opinion. This case concerns exposure to pepper spray and the adequacy of Defendant's decontamination procedures following that exposure. The fact that the introduction references "hazardous materials" does not transform its use into an undisclosed opinion simply because the word "hazardous" does not appear in Mr. Schuerman's report. Exhibit E. *See Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009) (explaining that the purpose of expert reports "is not to

2

replicate every word that the expert might say on the stand" but to "convey the substance of the expert's opinion"). Moreover, defense counsel specifically questioned Mr. Schuerman about whether Z358.1 was limited to corrosive materials, and Mr. Schuerman explained that it was broader and could apply to exposure involving foreign substances. Ex. D, 58:10–19; 59:15–24. Defendant therefore cannot credibly argue that the applicability or scope of ANSI Z358.1 was somehow concealed or undisclosed during discovery. Accordingly, Defendant's motion must be denied.

### **Plaintiff's Presentation of Medical Bills**

Defendant's Motion *in limine* 14 asks that Plaintiff make no mention of any medical bills without evidence the same has been paid in full OR that the costs were reasonable and necessary. Plaintiff's initial disclosures expressly state that Plaintiff David Badagliacco will testify "that his medical bills have been paid and they were incurred solely due to the subject incident." Plaintiff's initial disclosures state, in part, that Plaintiff will testify "that the medical bills have been paid and they were incurred solely due to the injury." Exhibit F, 1. That disclosure establishes the requisite prima facie showing of reasonableness under *Arthur v. Catour. See* 216 Ill. 2d 72, 833 N.E.2d 847 (2005).

The disclosure on behalf of Dr. Ali Djalilian states, in part, "that there is a causal connection between the subject incident and Plaintiff's injuries…." and further that he  will testify to the existence of past medical care cost and future medical care cost." Exhibit F, 3. A further disclosure that the costs of said treatment were reasonable and necessary was not required, as that opinion is fairly encompassed within Dr. Djalilian's disclosed opinions regarding Plaintiff's past and future medical care costs and causally related treatment.

**/s/ Scott C. Sands**

Anesi Ozmon, Ltd.
Attorney ID# 6353002
161 N. Clark St. Ste 2100
Chicago, IL 60601
ssands@anesilaw.com
jgarlich@anesilaw.com

5

## CERTIFICATE OF SERVICE

I do hereby certify that on May 16, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

**/s/ Scott C. Sands**

Anesi Ozmon, Ltd.
Attorney ID# 6353002
161 N. Clark St. Ste 2100
Chicago, IL 60601
ssands@anesilaw.com
jgarlich@anesilaw.com

.

 Outlook

<span style="color:red">EXHIBIT A</span>

---

**Re: Updated: Jury Instructions and Juror Questionnaire (draft)**

---

**From** Julia Garlich <jgarlich@anesilaw.com>

**Date** Fri 5/15/2026 9:27 AM

**To** Joseph B. Carini III <carinij@jbltd.com>; Scott Sands <SSands@anesilaw.com>; Ava L. Caffarini <caffarinia@jbltd.com>

**Cc** Andrew Pagan <apagan@anesilaw.com>; DAVIDNBADAGLIACCOvSAFARILANDLLCaLimitedLiZ11674290@anesilaw.filevineapp.com <DAVIDNBADAGLIACCOvSAFARILANDLLCaLimitedLiZ11674290@anesilaw.filevineapp.com>; Christine A. Walker <walkerc@jbltd.com>

📎 1 attachment (615 KB)
Exhibit 2.pdf;

Hi Joe,

Regarding the ANSI document, I do intend to discuss and/or show some of the introductory material on page 1 and 2. This is not undisclosed opinions or basis for opinions as Pat cites ANSI standard 358.1-2014 (2020) at the outset of paragraph 9 of his report. Additionally, in 1(h) of the rider (attached), when asked what "standards, guidelines, ordinances he is relying upon for his opinions in connection with this lawsuit" he cites "Ansi/358.1-2024 (R2020)" as a whole. Finally, we disclosed in our R 26 report that Schuerman is expected to testify to the subject matters, facts, and opinions set forth in his report and in his discovery deposition. He testifies and is asked about Z358.1 multiple times, and it appears, based on page 55 of his deposition, that this standard was already provided.

For the letter of interpretation, I do not intend to publish this to the jury or go into the specifics of that, I was just sending pursuant to our duty to supplement because Pat sent it to me.

Thanks,

**Julia Garlich**

**Attorney at Law**

# ANESI <span style="color:orange">OZMON,</span> LTD.

161 North Clark Street, Suite 2100
Chicago, IL 60601
Phone:  312-372-3822
Fax:      312-372-3833
Jgarlich@anesilaw.com
www.anesilaw.com

Confidentiality Note: This message and any accompanying attachments contain information from the law firm Anesi Ozmon, Ltd., which is confidential or privileged. The information is intended for the individual(s) or organization(s) named above. If you are not the intended recipient, be aware that any review, disclosure, copying, distribution or use of the contents of this message is prohibited. If you have received this message in error, please notify the sender by replying to the e-mail or contact our offices at 312-372-3822 and delete this message. Thank you.

---

**From:** Joseph B. Carini III <carinij@jbltd.com>
**Date:** Thursday, May 14, 2026 at 6:00 PM
**To:** Julia Garlich <jgarlich@anesilaw.com>, Scott Sands <SSands@anesilaw.com>, Ava L. Caffarini <caffarinia@jbltd.com>
**Cc:** Andrew Pagan <apagan@anesilaw.com>, DAVIDNBADAGLIACCOvSAFARILANDLLCaLimitedLiZ11674290@anesilaw.filevineapp.com <DAVIDNBADAGLIACCOvSAFARILANDLLCaLimitedLiZ11674290@anesilaw.filevineapp.com>, Christine A. Walker <walkerc@jbltd.com>
**Subject:** RE: Updated: Jury Instructions and Juror Questionnaire (draft)

Julia and Scott:  I compared the ANSI Standard document you sent to the Schuerman disclosure and I do not object to you showing the jury the cover page and paragraphs specifically referenced in his report, 5.1.4, 5.1.6, 5.1.7, 5.1.8 and 5.4.2.

I do object to any other sections/paragraphs in the document from being discussed or shared with the jury as I think that constitutes previously undisclosed opinions or basis for opinions.

Similarly, as mentioned in our call I also object to Mr. Schuerman relying on the attached letter of interpretation attached that was sent over to on Monday morning for the same reason.

Let me know if you object to my position and / or want to discuss any of this with Judge Durkin.

Thanks

---

**From:** Julia Garlich <jgarlich@anesilaw.com>
**Sent:** Thursday, May 14, 2026 4:50 PM
**To:** Scott Sands <SSands@anesilaw.com>; Joseph B. Carini III <carinij@jbltd.com>; Ava L. Caffarini <caffarinia@jbltd.com>
**Cc:** Andrew Pagan <apagan@anesilaw.com>; DAVIDNBADAGLIACCOvSAFARILANDLLCaLimitedLiZ11674290@anesilaw.filevineapp.com; Christine A. Walker <walkerc@jbltd.com>
**Subject:** Re: Updated: Jury Instructions and Juror Questionnaire (draft)

**Julia Garlich**

**Attorney at Law**

# ANESI OZMON, LTD.

161 North Clark Street, Suite 2100
Chicago, IL 60601
Phone:  312-372-3822
Fax:     312-372-3833

Jgarlich@anesilaw.com
www.anesilaw.com

Confidentiality Note: This message and any accompanying attachments contain information from the law firm Anesi Ozmon, Ltd., which is confidential or privileged. The information is intended for the individual(s) or organization(s) named above. If you are not the intended recipient, be aware that any review, disclosure, copying, distribution or use of the contents of this message is prohibited. If you have received this message in error, please notify the sender by replying to the e-mail or contact our offices at 312-372-3822 and delete this message. Thank you.

---

**From:** Julia Garlich <jgarlich@anesilaw.com>
**Sent:** Thursday, May 14, 2026 4:46 PM
**To:** Scott Sands <SSands@anesilaw.com>; Joseph B. Carini III <carinij@jbltd.com>; Ava L. Caffarini <caffarinia@jbltd.com>
**Cc:** Andrew Pagan <apagan@anesilaw.com>; DAVIDNBADAGLIACCOvSAFARILANDLLCaLimitedLiZ11674290@anesilaw.filevineapp.com <DAVIDNBADAGLIACCOvSAFARILANDLLCaLimitedLiZ11674290@anesilaw.filevineapp.com>; Christine A. Walker <walkerc@jbltd.com>
**Subject:** Re: Updated: Jury Instructions and Juror Questionnaire (draft)

**Julia Garlich**

**Attorney at Law**

# ANESI OZMON, LTD.

161 North Clark Street, Suite 2100

Chicago, IL 60601

Phone:  312-372-3822

Fax:     312-372-3833

Jgarlich@anesilaw.com

www.anesilaw.com

Confidentiality Note: This message and any accompanying attachments contain information from the law firm Anesi Ozmon, Ltd., which is confidential or privileged. The information is intended for the individual(s) or organization(s) named above. If you are not the intended recipient, be aware that any review, disclosure, copying, distribution or use of the contents of this message is prohibited. If you have received this message in error, please

notify the sender by replying to the e-mail or contact our offices at 312-372-3822 and delete this message. Thank you.

---

**From:** Julia Garlich <jgarlich@anesilaw.com>
**Sent:** Thursday, May 14, 2026 2:27 PM
**To:** Scott Sands <SSands@anesilaw.com>; Joseph B. Carini III <carinij@jbltd.com>; Ava L. Caffarini <caffarinia@jbltd.com>
**Cc:** Andrew Pagan <apagan@anesilaw.com>; DAVIDNBADAGLIACCOvSAFARILANDLLCaLimitedLiZ11674290@anesilaw.filevineapp.com <DAVIDNBADAGLIACCOvSAFARILANDLLCaLimitedLiZ11674290@anesilaw.filevineapp.com>; Christine A. Walker <walkerc@jbltd.com>
**Subject:** Re: Updated: Jury Instructions and Juror Questionnaire (draft)

Hi All,
Below is a link to Plaintiff's medical bills, as well as an MEI. The bills folder also includes Plaintiff's eye drop bills from the last six months (Walgreens), which we intend to use in support of future medical expenses. We would like to add the bills to our Exhibit List (Ex. 37).

Additionally, during the direct examination of Pat Schuerman, Plaintiff intends to display portions of the ANSI standards relied upon by Mr. Schuerman in forming his opinions. I believe these materials were previously produced with Mr. Schuerman's rider in advance of his deposition. I've attached the document here. We'd like to add the ANSI standards to the Exhibit list as well (Ex. 38). I only anticipate using pages 1–2, 4–5, and 15.

We can discuss during the conference as well.

Plaintiff's Medical Bills and MEI

Thanks,

**Julia Garlich**

**Attorney at Law**

# ANESI OZMON, LTD.

161 North Clark Street, Suite 2100

Chicago, IL 60601

Phone:  312-372-3822

Fax:     312-372-3833

Jgarlich@anesilaw.com

www.anesilaw.com

<span style="color:red;">EXHIBIT B</span>

16777/SCS/CAT/np                                                          Attorney ID# 6192996

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DAVID N. BADAGLIACCO

                           Plaintiff,        Case No.: 1:21-cv-02424

        vs.

SAFARILAND, LLC, a Limited Liability
Company

                    Defendant

### PLAINTIFF'S RESPONSES TO THE DEPOSITION RIDER OF PAT SCHUERMAN

1. Patrick Schuerman's entire file in connection with the David N. Badagliacco v. Safariland, LLC lawsuit, including but not limited to the following:

   a. All statements of billings;

**RESPONSE: Billing statement attached.**

   b. All correspondence and emails received, reviewed or prepared;

**RESPONSE: See attached.**

   c. All investigative materials he has prepared or reviewed;

**RESPONSE: Investigative Materials provided to me to review:**

> **i. DEP TRANS Bobby Steven Cox**
>
> **ii. DEP TRANS Coleman Darryl Kim**
>
> **iii. DEP TRANS David N Badagliacco**
>
> **iv. DEP TRANS Derek Ranken**
>
> **v. DEP TRANS Edward Kappler**
>
> **vi. DEP TRANS Officer Andrew Stein**
>
> **vii. DEP TRANS Officer Matthew Orchard**
>
> **viii. DEP TRANS Sergant Kim Lally**
>
> **ix. DEP TRANS Tina Romero**
>
> **x. Ex. 4 Cox CV**
>
> **xi. Ex. 9 Cox 1.0C.ICP.4**

1

> xii. Ex. 12 Cox 4.OC.ICP.4
>
> xiii. Ex. 13 Cox training order Munitions
>
> xiv. Ex. 14 Cox Area Decontamination and First Aid Info
>
> xv. Ex. 15 Cox Mk-3 360 Aerosol spec sheet
>
> xvi. Ex. 16 Cox Mk-3 360 Product description
>
> xvii. Ex. 17 Cox OC Aerosol model types
>
> xviii. Ex. 18 Cox OC Aerosol Safety Data Sheet
>
> xix. Ex. 19 Cox training class waiver
>
> xx. Ex. 21 Cox Class Roster
>
> xxi. Ex. 25 Co Cox Email 4-11-19(2)
>
> xxii. Ex. 26 Cox Cox Email
>
> xxiii. Ex. 27 Cox Gas Mask Group Photo (1)
>
> xxiv. Ex. 28 Cox Badagliacco group photo request
>
> xxv. INTS Pltf Answers to Interrogatories – Initial – Emailed 93021

d. All records, documents, videos and photographs he has created or reviewed;

**RESPONSE: Only items that were provided above.**

e. All documents he has prepared;

**RESPONSE: Copy attached.**

f. All abstracts of all depositions and notes he has prepared;

**RESPONSE: None.**

g. All literature he is relying upon for his opinions in connection with this lawsuit;

**RESPONSE: None.**

h. All standards, guidelines, ordinances he is relying upon for his opinions in connection with this lawsuit;

**RESPONSE: Two third-party documents:**

> **i. OSHA.gov.**
>
> **ii. Ansi/358.1-2024 (R2020)**

i. All drafts of all notes and reports he has prepared;

**RESPONSE: None.**

j. All notes and reports he has prepared;

**RESPONSE: None.**

2

k.   All reference material relied upon in formulating his opinions;

**RESPONSE: See item h.**

l.   His curriculum vita;

**RESPONSE: See attached.**

m.   A list of all cases in which he has testified to at trial in the last 4 years; and

**RESPONSE: None.**

n.   A list of all cases in which he has given deposition testimony in the last 4 years.

**RESPONSE: None.**

/s/Scott C. Sands

Attorneys for Plaintiff(s)

Scott C. Sands
Charles A. Terry
**Anesi Ozmon, Ltd.**
161 N. Clark St. Ste 2100
Chicago, IL 60601
ssands@anesilaw.com
cterry@anesilaw.com

3

EXHIBIT C

16777/SCS                                                    Attorney ID# 6192996

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| DAVID N. BADAGLIACCO | ) | |
| Plaintiff, | ) | Case No.: |
| vs. | ) | 1:21-cv-02424 |
| | ) | |
| SAFARILAND, LLC, a Limited Liability Company | ) | |
| Defendant | ) | |

**PLAINTIFF'S RULE 26(a) DISCLOSURES**

NOW COMES the Plaintiff, DAVID N. BADAGLIACCO, by and through his counsel, ANESI OZMON, LTD and pursuant to Rule 26 of the Federal Rules of Civil Procedure, hereby submits the following Disclosure: Plaintiff discloses the following witnesses who may be called at trial to testify regarding the subject matter of the instant case.

**Rule 26(a)(2)(A): witness Plaintiff may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.:**

1. David Badagliacco
2. Kileigh Badagliacco
3. Bobby Steven Cox;
4. Coleman Daryl Kim;
5. Derek Ranken;
6. Edward Kappler;
7. Officer Andrew Stein;
8. Officer Matthew Orchard
9. Sergeant Jim Lally
10. Tina Romero;
11. Dr. Ali Djalilian M.D.;
12. Dr. Joshua B. Herz;
13. Dr. James Saul, M.D.;
14. Dr. Elmer Tu

**Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure: Witnesses Who Must Provide a**

**Written Report.**

> Patrick Schuerman
> 208 N. Johnson Street
> Newark, IL 60541
> 815-219-5049

> **(i)     Statement of all opinions they will express and the basis and reasons for them:**

Mr. Schuerman is disclosed as a construction\site safety expert and is expected to testify as to the subject matters, facts and opinions set forth in his report, which is attached hereto as Exhibit A and incorporated herein, and his discovery deposition, if taken. His opinions are as stated in his report and are further that the Defendants retained control of the work on the training site and failed to exercise their control with reasonable care, thereby causing and contributing to the injury at issue in this case. The Defendants failed to properly inspect the work and see to it that necessary safety measures were taken under the circumstances, including inspections of the decontamination stations, and other safety measures. They failed in their responsibilities as the company administering the training, and as a result contributed to the cause of the incident and injuries.

He will base his opinions and testimony, which will be stated to a reasonable degree of certainty within his field of specialty, on his background, education, training, and experience in his field of expertise of safety as well as his review of all the fact witnesses' depositions, deposition exhibits, pictures, statements/reports, and discovery responses relative to the training site and incident at issue in this case and as listed in the report. His C.V. is also attached hereto as B.

> **(ii)     Facts or data considered by the witness in forming them:**
> a.  Plaintiff's Answers to Interrogatories
> b.  Deposition Transcripts, including:
>     i.  David N. Badagliacco;
>     ii.  Bobby Steven Cox;
>     iii.  Coleman Daryl Kim;
>     iv.  Derek Ranken;
>     v.  Edward Kappler;
>     vi.  Officer Andrew Stein;
>     vii.  Officer Matthew Orchard
>     viii.  Sergeant Kim Lally
>     ix.  Tina Romero
> c.  Deposition Exhibits, including:
>     i.  Cox Ex. 4 CV;
>     ii.  Cox Ex. 9 1.0C.ICP.4;
>     iii.  Cox Ex 12 4.OC.ICP.4;
>     iv.  Cox Ex 13 training order Munitions;
>     v.  Cox Ex 14 Area Decontamination and First Aid Info;
>     vi.  Cox Ex 15 Mk-3 360 Aerosol spec sheet;
>     vii.  Cox Ex 16 Mk-3 360 Product Description;
>     viii.  Cox Ex 17 OC Aerosol model types;

    ix.   Cox Ex 18 OC Aerosol Safety Data Sheet;
    x.   Cox Ex 19 Training Class Waiver;
    xi.   Cox Ex 21 Class Roster;
    xii.   Cox Ex 25 Email 4-11-19(2);
    xiii.   Cox Ex 26 Email;
    xiv.   Cox Ex 27 Gas Mask Group Photo (1);
    xv.   Cox Ex 28 Badagliacco Group Photo Request

**(iii)    Any exhibits that will be used to summarize or support them;**

Plaintiff's counsel has not determined what exact exhibits may be used at trial to explain Mr. Schuerman's opinions, however, Plaintiff will use photographs of the training site to explain to the jury the manner in which the training site and decontamination station were provided and situated and the deficiencies therein. All exhibits intended to be used will be provided to Defendant well before trial.

**(iv)    Qualifications and publications;**

Mr. Schuerman is a member of Midwest Safety Consultants LLC. He has expertise in workplace safety, accident investigations, and State and Federal Standards as it relates to Occupational Health and Safety. He has had 30 years of Safety and Risk Management Experience. In addition, He has been an instructor at Illinois Valley Community College, teaching industrial safety since 2012.

**(v)    List of other cases he has testified as an expert in past 4 years;**

A list Mr. Schuerman's testimony will be provided upon receipt.

**(vi)    Statement of compensation paid for the study and testimony;**
Mr. Schuerman's professional compensation rates are as follows:
Research time $125/hour
Deposition and trial $200/hour.

By: */s/Scott C. Sands*
Attorneys for Plaintiff(s)

Scott C. Sands
**ANESI OZMON, Ltd.**
Attorneys for Plaintiff(s)
161 North Clark Street - 21st Floor
Chicago, IL 60601
312/372-3822 / ssands@anesilaw.com

**Midwest Safety Consultants LLC**

1. I am Pat Schuerman, Member of Midwest Safety Consultants LLC; I have expertise in workplace safety, accident investigations, and State and Federal Standards as it relates to Occupational Health and Safety. I have had 30 years of Safety and Risk Management Experience. In addition, I have been an instructor at Illinois Valley Community College, teaching industrial safety since 2012. My address is 208 N Johnson, Newark, Illinois

**Assignment:**

2. I was retained by ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD to review and provide expert opinions as it relates to the emergency eye washing station, safe guards in place, and general interpretation of the Safety Data Sheets (SDS) understanding based on the information provided in the following documentation:

    i.   DEP TRANS Bobby Steven Cox
   ii.   DEP TRANS Coleman Darryl Kim
  iii.   DEP TRANS David N Badagliacco
  iv.   DEP TRANS Derek Ranken
   v.   DEP TRANS Edward Kappler
  vi.   DEP TRANS Officer Andrew Stein
 vii.   DEP TRANS Officer Matthew Orchard
viii.   DEP TRANS Sergant Kim Lally
  ix.   DEP TRANS Tina Romero
   x.   Ex. 4 Cox CV
  xi.   Ex. 9 Cox 1.0C.ICP.4
 xii.   Ex. 12 Cox 4.OC.ICP.4
xiii.   Ex. 13 Cox training order Munitions
xiv.   Ex. 14 Cox Area Decontamination and First Aid Info
 xv.   Ex. 15 Cox Mk-3 360 Aerosol spec sheet

1

xvi.  Ex. 16 Cox Mk-3 360 Product description
xvii.  Ex. 17 Cox OC Aerosol model types
xviii.  Ex. 18 Cox OC Aerosol Safety Data Sheet
xix.  Ex. 19 Cox training class waiver
xx.  Ex. 21 Cox Class Roster
xxi.  Ex. 25 Co Cox Email 4-11-19(2)
xxii.  Ex. 26 Cox  Cox Email
xxiii.  Ex. 27 Cox Gas Mask Group Photo (1)
xxiv.  Ex. 28 Cox Badagliacco group photo request
xxv.  INTS Pltf Answers to Interrogatories – Initial – Emailed 93021

## Background

3.  It is my understanding that David N. Badagliacco was asked to attend this training session by his current employer, the Skokie Police Department.

4.  The event took place on Tuesday, April 16, 2019.

## Review of the Documentation

5.  Mr. Cox has been working for the Safariland training group since 2007 and is considered a Master Instructor for the organization. It was never disclosed when the last retraining took place for Mr. Cox. So one must assume that Mr. Cox has never been retrained since 2007. Mr. Cox did not know some of the terminology used and was unaware of pertinent documentation (88:8-24) as well as the formal slide presentation. Based on this It would appear that this was not the slide set that Mr. Cox used in the training on the day in question.

6.  Based on the depositions, it is well documented that the instructor did not provide multiple garden hoses for the decon area. Further, the organization appears to have set standards that were not followed (89:5-24).
    a.  Mr. Cox stated he had multiple hoses; however, they did not (Orchard 33:12-15)
    b.  Mr. Cox stated in the class that you have to watch to see if you are running to many students through the course, and that if the decon area is getting full he would stop the course, this did not occur.

2

7. From the documentation provided, 26 students took the one-day course. It was difficult to determine as multiple class attendances were on the form.

8. The agenda calls for 210 minutes for the range portion of the class. If a student completes the range in three minutes and the decon area for the single hose is allowed only eight minutes, the class would require 286 minutes to complete. This indicates that the instructor was rushed and had to keep the class moving quickly. The generally accepted guideline for washing eyes is continuous water for 15 minutes.

9. **American National Standard for Emergency Eyewash and Shower Equipment Z358.1-2014(R2020)** Section 5.1.4 of the standard states that the individual using the eyewash should not require the use of the eyewash station without the use of hands. In addition, section 5.1.6 states that Eyewashes shall be capable of delivering flushing fluid to the eyes at least 1.5 liters per minute (0.4 gpm) for 15 minutes. Section 5.1.7 of the standard goes on to explain that eyewashes shall be designed to provide enough room to allow the eyelids to be held open with the hands while the eyes are in the flushing fluid stream. Because Safariland only allowed for a garden hose, they prohibited the student from properly opening the eyelid to properly wash the eyes out. Allowing the chemical reactants to remain in the eye for an extended period of time. Further, the standard also stipulates that in 5.1.8, eyewashes shall provide flushing fluid to both eyes simultaneously. 5.4.2 states that eyewash must be accessible for no more than 10 seconds to reach. The range control was poorly managed. Per the policies set forth by Safariland, there was to be separate safety officers at each station, that should have been trained to the hazards associated with the event, and specific exposure of that location. It appears that no individual with first aid training was positioned in the rehab area. Rather the instructor paired the students up and provided limited to no training on the requirements of being a safety officer. From the testimony, there was no indication from Mr. Cox, the instructor, that he stopped the range activities due to excessive students waiting to get their eyes washed.

10. OSHA 29 CFR 1910.151(c) Where the eyes or body of any person may be exposed to injurious corrosive materials, suitable facilities for quick drenching or flushing of the eyes and body shall be provided within the work area for immediate emergency use.

3

11. The SDS states that individuals exposed to this chemical should (P362, P364) remove contaminated clothing and wash it before reuse. (H335) This may cause respiratory Irritation. (H319) Causes serious eye irritation. If eye irritation persists: Get medical advice/attention. It was not included in the training that students should seek medical attention if the irritation persists. Students should wash skin & eyes with water and soap and rinse their skin thoroughly.

12. The trainer did not provide soap inform the students to bring a second set of clothing or offer a changing room to remove the contaminated clothing.  Changing clothing is essential as the Dermal LD50 (Lethal Dose of 50%) factor is >2500 mg/kg.: irritating to the eyes, irritating to the respiratory system, gastric or intestinal disorders when ingested, and irritating to the skin. The training metrics did not cover these health effects.

13. The product contains up to 40% ethanol. With a TLV of 1880 mg/m$^3$, 1000 ppm. The ingredient Propylene Glycol is also in the formula at a rate of 5 – 10% and has a maximum exposure of 10 mg/m$^3$. Based on the spray pattern used at this event, it is unknown if this was exceeded. Safariland did not provide documentation of testing to ensure that students were not overexposed. One should note that the same ingredients in the higher-grade sprays are considered corrosive and require immediate eye-washing. Neither the labeling nor the course lecture discussed these measures.

14. The eyewash station shown in the photos was not used at this location. It should be noted that it does not meet the minimum standards for an approved eyewash station, as the steam does not provide adequate flushing of both eyes. Per Z358.1

15. **Section 2 of the SDS shows that the Classification of the substance or mixture**

   Press. Gas H280 Contains gas under pressure; may explode if heated.

   Skin Irrit. 2 H315 Causes skin irritation.

   Eye Irrit. 2A H319 Causes serious eye irritation.

   STOT SE 3 H335 May cause respiratory irritation.

4

To understand these numbers 1 is the most hazardous a 4 is the least hazardous so if a one would represent an acid that might burn the arm off then a two is a little less harmful to the eyes, and a four would be the least. In the above the eye irritant is a two.

16. **Section 4 of the SDS shows the required First-aid measures required to be provided:**

> **4 First-aid measures**
> · **Description of first aid measures**
> · **General information: Take affected persons out into the fresh air.**
> · **After inhalation: Supply fresh air; consult doctor in case of complaints**
> **After skin contact:**
> Immediately wash with water and soap and rinse thoroughly.
> If skin irritation or rash occurs: Get medical advice/attention.
> · **After eye contact:**
> Remove contact lenses if worn.
> Rinse opened eye for several minutes under running water. If symptoms persist, consult a doctor.
> · **After swallowing:**
> Unlikely route of exposure.
> Rinse out mouth and then drink plenty of water.
> Do not induce vomiting; immediately call for medical help.
> · **Most important symptoms and effects, both acute and delayed:**
> Coughing
> Dizziness
> Irritant to skin and mucous membranes.
> Irritant to eyes.
> May cause respiratory irritation.
> Gastric or intestinal disorders when ingested.
> · **Danger:** No relevant information available.
> · **Indication of any immediate medical attention and special treatment needed:**
> Medical supervision for at least 48 hours.
> If necessary oxygen respiration treatment.

17. Safariland provided no documentation of classroom audits to ensure that instructors and Master Training are following the organization's basic guidelines.

**Conclusion**

18. Based on my review as discussed in this report it is my opinion that Safariland did not provide the instructor with the tools to complete the training safely, did not require signed attendance sheets, and did no ensure the safety of the overall polices and procedures.

19. Mr. Cox, the instructor who instructs less than 10 classes per year, was rushed, did not provide adequate training to the safety team, and did not ensure that an employee trained in first aid was present at the rehab area. As he only asked the department if they had an EMT/Paramedic on staff. Mr. Cox did not require them to be present at the event. Mr. Cox did not follow the minimum standards set forth within Safariland policies and procedures.

20. The instructor, Steven Cox, did not explain the hazards completely before requiring students to sign the waiver, which did not address all of the hazards outlined in sections 15 and 16 above.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness, would testify competently thereto.

Dates September 10, 2024

_____

Pat Schuerman

# PATRICK SCHUERMAN

**208 N. Johnson Street • Newark, IL  60541 • 815-219-5049**
**pschuerman@outlook.com**

---

## PROFESSIONAL EXPERIENCE

**Occupational Health & Safety – Risk Management – OSHA Inspector**

*Public Safety Inspector,* **Illinois Department of Labor – Illinois OSHA**          October 2019 – Present
Responsible for safety inspections of public employers (state government, local government, fire department etc.). In addition to compliance and abatement processes worked with employers to help strengthen the overall safety program—an average of eight citations per inspection.

*Loss Control Consultant,* **Midwest Safety Consultants**          2012 – October 2019
Safety and health instructor teaching safety classes at industrial facilities on behalf of third parties.  Topics include Fire and evacuation, Bloodborne, Hazard Communications, Confined Space, Lockout tagout, Machine Guarding, Personal Protective Equipment (PPE), Forklifts, Hearing conservation, Respirator compliance with fit testing, etc.  I also can instruct the OSHA 10 & 30, hour classes.

Multi-line loss control consulting services contracted by major property and casualty insurance carriers. Serviced accounts up to $800,000 plus in premium size.

Evaluation of risk management programs concerning GL, Products, Fleet, WC, Professional Liability, and Property loss exposures. Utilizing risk management process to identify/analyze exposures and controls, implement and monitor control solutions.

I have worked with public/private educational risks and municipal entities, as well as various manufacturing, retail/wholesale, habitational, service and construction operations.

Will work to Identify needs for specialized Industrial Hygiene services and made appropriate recommendations.

Products accounts included work with multi-product/location manufacturers/importers with annual sales of 100mm dollars plus.

Assisted WC accounts in reduction of incidents rates through "Best Practices" reviews; submission of and follow-up on recommendations.

Regular and frequent utilization of NFPA, OSHA 1910/1926, DOT and other applicable statutory, consensus and industry standards.

*Adjunct Instructor,* **Illinois Valley Community College    2013 - Present**
Instructor for the MSSC Introduction to manufacturing and Safety program, in this course we teach basic health and safety practices, principles that would be needed in a general work environment.  In addition to the overall core curriculum we have expanded the outline to include public speaking, understanding of basic manufacturing concepts, Understanding quality control, customer relations, work place safety.

*Loss Control Consultant,* **Overland Solutions,** Overland Park, KS                    2006–2013

I specialize in performing underwriting inspections of commercial properties, conducting Workers' Compensation inspection reviews, and formulating recommendations that ensure loss reduction and risk management. My work primarily focuses on these areas:

- **Worker's Compensation**
- **Inspections of property >500MM**
- **Extensive Travel**
- **Commercial Auto, Fleet reviews**
- **Life Safety Requirements**
- **Ergonomic evaluations**

*Safety Equipment Representative,* **Cintas Corporation,** Bensenville, IL                    2003–2006

After Cintas Corporation purchased P & L Services, I regularly facilitated consumer safety training meetings on key topics that included: Respirator Protection, Proper Lifting, Preventing Back Injuries, and Industrial Safety for Truck Operations, CPR, and First Aid.

*Owner,* **P&L Services,** Newark, IL                    1999–2003

As founder and manager of this first aid and safety supply company, I assisted customers in driving OSHA and MSHA compliance by providing safety meetings. Before selling P&L Services to Cintas, I drove sales from $0 to $250,000, developed a base of 250 customers, and achieved profitability within 3 months.

*Regional Sales Manager,* **Afassco First Aid,** Carson City, NV                    1997–1999

I drove sales in 18 states by collaborating with 20 distributors and 50 dealers. In a span of 18 months, I expanded the sales region by adding 12 new distributors. I implemented a new packaging program that drove profitability and let dealers efficiently offer more products and training.

*Sales Service Representative,* **Respond First Aid Systems,** Woodridge, IL                    1992–1997

At Respond First Aid Systems, I established my career by pursuing and closing sales of industrial first aid, safety supplies and related training. Here are key benchmarks and achievements met while with Respond:

- **Ranked among top 20 sales reps nationwide and member of Master Association for 4 years.**
- Earned multiple national honors, including **Highest Training Dollars in One Year, Most New Accounts, Largest New Sales,** and **Most Growth.**

## EDUCATION & PROFESSIONAL DEVELOPMENT

**Master's Degree in Industrial Management, specialty in Occupational Health & Safety**
Northern Illinois University, DeKalb, IL, 2007

**Dale Carnegie Course**
Downers Grove, IL, 1998

**Bachelor of Science in Agribusiness Economics**
Southern Illinois University, Carbondale, IL, 1988

**Associates of Applied Science – Farm Management**
Muscatine Community College, Muscatine, Iowa, 1986

**Manufacture Skill Standards Council**
**CPT – Authorized Instructor – 2013**

**OSHA 10 & 30 Hour Authorized Instructor**

EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

DAVID N. BADAGLIACCO,          )

    Plaintiff,                )

  vs.                         ) No. 1:21-cv-02424

SAFARILAND, LLC, a Limited )

Liability Company,            )

    Defendant.                )

    The deposition of PATRICK SCHUERMAN called for the examination pursuant to notice and the Rules of Civil Procedure for the United States District Courts, pertaining to the taking of depositions, taken before MARY KAY ANDRIOPOULOS, CSR, on the 13th of November, 2024, at the hour of 1:00 p.m., via videoconference.

REPORTED BY:  MARY KAY ANDRIOPOULOS, CSR

LICENSE NO.:  084-002248

1

APPEARANCES:

    ANESI OZMON, LTD.

    BY: MR. SCOTT C. SANDS

    161 North Clark Street

    21st Floor

    Chicago, Illinois 60601

    312.372.3822

    Ssands@anesilaw.com

        Representing the Plaintiff;

    JOHNSON & BELL, LTD.

    BY: MR. JOSEPH B. CARINI, III

    33 West Monroe Street

    Suite 2700

    Chicago, Illinois 60603

    312.372.0770

    Carinij@jbltd.com

        Representing the Defendants.

2

I N D E X

WITNESS                    EXAMINATION

PATRICK SCHUERMAN

  BY MR. CARINI              4, 171

  BY MR. SANDS                 167

E X H I B I T S

NUMBER                      MARKED FOR ID

SCHUERMAN Deposition

  Exhibit No. 1 (attached)

  Exhibit No. 2 (attached)

  Exhibit No. 3  retained)

  Exhibit No. 4 (attached)

(All exhibits marked by counsel)

3

        (Whereupon, the witness was duly sworn.)

        PATRICK SCHUERMAN, having been first duly sworn, was examined and testified as follows:

        EXAMINATION

BY MR. CARINI:

    Q.   Pat, could you please state your full name, and please spell your last name for the record?

    A.   Patrick Schuerman, S-C-H-U-E-R-M-A-N.

    Q.   Thank you.

        Let the record reflect this is the deposition testimony of Patrick Schuerman taken in the Badagliacco versus Safariland case pursuant to all the applicable rules of the Federal Code of Civil Procedure.

        Mr. Schuerman, have you given deposition testimony before?

    A.   I have.

    Q.   Have you given trial testimony before?

    A.   I have not.

    Q.   Okay.  Well, we're going to be taking your testimony today via Zoom.  There has a

4

Patrick Schuerman 11/13/2024

tendency sometimes for the communication line to fade in and out, so I need to ask you to please just try to wait for me to get my whole question out before you answer so that you and I are speaking one at a time, okay?

A.   Fair enough.

Q.   Also, as you're doing, you need to keep your answers out loud and in verbal form, so you can't say ah-huh or uh-huh, but if you would say yes or no for the answer if you mean yes or no, that would also help us keep a clean record, all right?

A.   I understand.

Q.   All right.  And if you don't understand a question today, I need you to tell me that, because if you answer it, I'm going to assume you heard and understood it, okay?

A.   Yes.

Q.   Okay.  And where are you presently giving your deposition from?

A.   My home office.

Q.   And is that at 208 North Johnson Street in Newark, Illinois?

A.   It is.

Q.   Is anyone there in the room with you?

A.   No, I'm the only one home this afternoon.  I kicked everybody out.

Q.   Okay.  Can I get your date of birth please?

A.   July 12th, 1965.

Q.   Did you review anything to prepare for your testimony today?

A.   I reviewed the case file documentation, and that was about it.

Q.   Okay.  We're going to go through that in a moment.

A.   Okay.

Q.   I'm going to share my screen with you, and what I've marked as Exhibit No. 1 is a document called Plaintiff's Rule 26(a) Disclosures.

Can you see that on your screen now?

A.   I can, yes.

Q.   Thank you.

At the bottom -- at the start of Page 2, there's reference to a witness providing a written report, and it lists your name, your home address, and your phone number there,

right?

A.   That's correct.

Q.   And then under that, there's sections to include under sub small letter ii, data considered by the witness to form your opinions, and they include Answers to Interrogatories, and these deposition transcripts listed here, and then exhibits to those deposition transcripts.

When you said that in preparation for the deposition you reviewed file materials, is that what you're referencing?

A.   That is correct.

Q.   And then in fairness in another document, I think -- well, strike that.

Attached to this answer there's a report.

Did you review your report to prepare today?

A.   I did.

Q.   Okay.  And then --

MR. SANDS:  For the record, Joe -- sorry to interrupt -- for the record, that's a 12-page document, Exhibit 1?

MR. CARINI:  Yes, it includes -- it

includes the attached report, and at the end of it, it includes his CV.

BY MR. CARINI:

Q.   And then I know I have another document that I'll show you in a moment that refers to -- let's see here -- I'll come back to that, but bear with me.

In one of the documents that you provided to me there was a reference to OSHA 1910 section.

A.   Okay.  Yes.

Q.   And there was reference to an ANSI standard.

Did you review the --

A.   Correct, I provided you the ANSI standard.

I don't know -- did I -- I don't believe I provided you with the 1910 book title.

Q.   No, no, you referenced it as part of the information that's part of your file and included the 1910 section of OSHA and ANSI 358.1.

A.   That's correct.

Q.   All right.  Was that also something

that you reviewed today prior to the deposition?

A. I did.

Q. Okay. Have we covered then, Pat, everything that you reviewed in preparation for the deposition today?

A. Pretty much so, yes, yeah.

MR. CARINI: Scott, I marked as Exhibit 2, and I have up on the screen, your response to our deposition rider for Pat Schuerman's deposition.

THE WITNESS: I think that's just a carbon of what was submitted to me in the file.

BY MR. CARINI:

Q. Okay. And here's where I got the reference to the two third-party documents.

A. Yeah, that basically covers the 1910 standard, and then also the ANSI standard, which I provided to you.

Q. Okay. In response to this request, I had asked you for a list of all cases in which you've testified at trial in the last four years.

You've told me already you have never testified at trial, correct?

A. Okay.

Q. Is that true?

A. That is.

Q. And then letter N, I asked for a list of cases in which you've given deposition testimony in the last four years, and you have none listed there as well; is that true?

A. That is correct.

Q. Okay. So although you have given depositions before, you haven't done any in the last four years?

A. That would be correct.

Q. Do you have any list of testimony that you've given that precedes the last four years, say, going back to 2020 and into the past?

A. No.

Q. Can you estimate for me how many times you've given a deposition?

A. Maybe six.

Q. Okay. And when you have given a deposition, was it all in connection with being retained as a consultant in some sort of litigated matter?

A. Some yes, some no.

Q. Okay. So let me go -- well, strike that.

What would you consider to be your role in this litigation that I'm here to ask you questions about?

A. I was asked early on for some direction and some help in determining where we needed to go and what to do, you know.

Early on, it was here's where we need -- this is the documents that we need to even determine if there's anything here.

I made some suggestions. Counsel went ahead and found those documents, or attempted to find everything, and later on, they asked me if I would formalize it, and we did, and I basically reviewed the documentation, and hence, my report.

Q. Okay. So I referred to consulting in litigated matters in my prior question when I was asking you about the types of depositions you gave -- you've given in the past, you said some are, and some aren't, right?

Would you consider your role in this case to be consultation in a litigation matter?

A. Yes.

Q. Okay. And what other type of work do you do beyond consultation in litigation matters?

A. I am a -- I'm a consultant for risk management working with insurance carriers and private companies to determine what exposures they have, and how to mitigate those in a workplace environment.

That can be everything from liability at a nursing home to workplace safety.

Q. We're going to get into your CV in a second, but what percentage of your time is spent in consulting in litigated matters versus the other type of consulting you described?

A. Very -- very minimal.

Q. Very minimal in litigation?

A. Meaning -- meaning for the last four years, I've been working for the State of Illinois, up until actually last month I resigned.

Because of that, I wasn't able to do a lot of litigation like I used to.

Q. Okay.

A.   I am -- my expertise is in ---is liability, and at the work -- within the workplace.

Q.   Okay.  Do you have any currently pending open litigation consulting cases other than this one?

A.   No.

Q.   And so for the last four years your sole source of income was through your other career, not in litigation consulting; is that fair to say?

A.   That is correct.

Q.   Have you been retained by Anesi Ozmon firm before?

A.   No.

Q.   Have you ever worked with Scott Sands before?

A.   No.

Q.   Now, when you said you were initially contacted early -- well, strike that.

Let me try it this way.

A.   I have no -- I have no idea when the initial consult -- it was months, -it was months prior, and it was more, hey, I kind of gave them some assistance, you know, hey, we need -- maybe you need to go down this path looking for documentation.  They come back, well, we can't find this.  Well, keep looking, it has to be there.

One of the things that I specifically asked -- told them they needed to obtain early on was your exposures and the SDS sheets, which they didn't have at the onset of our conversations.

Through that, and then, I think, you did some testimonies, you took some depositions, they called me back, and said, hey, we're to the point now where we need some -- we'd like to retain you, and I said fine, and we moved forward.

Q.   Okay.

A.   Pretty straight forward.

How they got my name, I can't recall. I know I've worked -- I know I've done som  work with some other attorneys on some other profile safety -- you know, safety issues, workplace safety issues.

Q.   Okay.  Do you have as part of your file a retention letter that sets forth when you were hired in this case?

A.   I believe, we do.

It was shortly before I -- probably about a month before I composed the report, so it would have been -- I don't have it my -- I don't have it in front of me.

Q.   That's fine.

I'm going to share a screen with you. One of the documents that was produced --

A.   Yeah, that was my invoice.  It was prior to that date.

Q.   One of the documents that was produced in response to the rider I sent for your deposition is an invoice of the billing that you spent on the case, and before you here is an invoice dated October 8, 2024, correct?

A.   Okay.  Yes.

Q.   And this documents -- and I can enlarge it if you need it -- but this documents all of the time that you put in on the case through the time that you finished your report, right?

A.   Through that time period, yes.

It didn't include time that I spent -- it really wasn't a lot of time.  It was more conversations prior to that.

Q.   Okay.  So this information about starting to review case documentation on August 7th of 2024, you would have already had some communication with counsel prior to this date?

A.   Yeah, brief, yeah, maybe five, ten-minute conversations here and there.

Q.   Okay.

A.   But nothing with -- but no -- but no services had been requested.  You know, it was more you and I having a conversation over the phone.

Q.   Okay.  So this lawsuit was filed in 2021.

Is it safe to say that you were not engaged in this case until shortly before you started working on the file in August of 2024?

A.   That would be a fair -- a true statement.

Q.   Okay.  So you weren't guiding them in terms of talking to them about what they needed and how to move their case forward, you were

talking about very recently and --

A. Yeah, and I think -- I think our first conversations might have started the beginning, you know, January, February of this year, you know, off and on.

Q. But that was -- that was work you haven't billed for, and haven't put any time for?

A. Correct.

Q. All right. As I mentioned in here, in this 12-page document that's Exhibit 1, attached to it is a copy of a CV let's call Exhibit B to the Rule 26 Disclosure, and I just want to go through this with you for a moment.

I'll put it on the screen if it makes -- I'm happy to share it with you.

A. You can go ahead. I'm pretty familiar with it. Go ahead.

MR. CARINI: Scott, do you want it up on the screen or do you have it?

MR. SANDS: No, I'm fine. I have it right here. Thanks.

MR. CARINI: Okay.

MR. SANDS: Joe, if you need it up on

17

the screen for any reason, just let us know.

MR. CARINI: No, I have it. I can put it up here.

MR. SANDS: If you have a copy at your fingertips.

MR. CARINI: I do. I have a copy here. I'm good.

BY MR. CARINI:

Q. All right. So am I correct, Pat, that you are not a licensed engineer?

A. That is correct.

Q. You're not a professional engineer?

A. I do not have a PE stamp.

Q. And is it also true that you've never written any articles or publications of any kind?

THE COURT REPORTER: I think we l st him.

MR. CARINI: You're correct. He s frozen.

(Whereupon, a short recess was taken.

MR. CARINI: You're back? You were frozen.

18

MR. SANDS: Pat, you were frozen for a few moments.

Joe is going to reask the last question.

BY MR. CARINI:

Q. Have you authored any publications in the last ten years?

A. I do not believe so.

Q. Have you ever been published?

A. Not in a journal. I've written -- I've written articles that were published in insurance -- in newsletters for insurance carriers and so forth.

Q. Have you ever had an article peer reviewed --

A. No.

Q. -- prior to publication?

A. No.

Q. No?

A. No.

Q. Have you ever served in the military?

A. I have not.

Q. Have you ever served as a police officer?

19

A. I have not.

Q. Have you ever been trained as a paramedic or EMT?

A. I was an EMT for -- EMT for 22 years for the local service here.

Q. When you say local service, what are you referring to?

A. Local volunteer fire department. I was a paramedic there, EMT paramedic there for 22 years.

Q. And that's in Newark, Illinois?

A. That is correct.

Q. Other than the EMT -- well, strike that.

What training did you undergo to attain the status of EMT?

A. Went through the DOT curriculum a couple times, and retained my certification powers for 22 years.

Q. When did that lapse?

A. I don't know. That would have been -- I gave it up -- my back was giving out -- so it had to be '17, 2017, '15, somewhere in there.

Q. Okay. Are you a member of any

20



professional associations?

A. No, not anymore.

MR. SANDS: I'm sorry, I didn't get that response.

THE WITNESS: No.

MR. SANDS: Thank you.

BY MR. CARINI:

Q. You said not anymore.

Were there associations that you used to be a member of?

A. Some national, you know, more for just camaraderie, nothing -- no -- no certification -- nothing like ASSE or so forth.

Q. Okay. And AASE that you were not a part of, that's the Association of Safety Engineers, right?

A. That is correct. No, I was not.

Q. You've never been certified as a safety professional?

A. No, I never took the test.

I should have 20 years ago, but I never did.

Q. Okay.

A. You know how that goes.

21

Q. I do.

All right. So it goes without saying then that you were never on the board of any association associated with your --

A. No.

Q. -- employment, correct?

A. Correct.

Q. You mention in your educational background you had -- you had the 10 and 30-hour OSHA courses, correct?

A. Actually, I'm an instructor for those.

Q. So then you had to -- you had to undergo and pass the train -- the trainer course to do that, right?

A. Yeah, three classes.

Q. Is that the 500 series, is that what it's referred to as?

A. Yes, it is, 510, 501, and 506, something -- one of the other ones, but yeah, I did all those.

Q. And do you presently maintain the instructor status?

A. I do.

Q. You got your associate's degree in farm

22

management and bachelor of science degree in agribusiness economics?

A. I did.

Q. Back in the eighties.

You took a Dale Carnegie course. What's that?

A. Oh, that was a fun class. It was a night class. It was more -- it's more on public speaking and listening skills.

Q. Okay.

A. You never took the class? He wrote the -- th ook How to Win Friends and Influence People. You probably read it.

Q. Well, if I did, people might like me, but I didn't bother.

A. It's a great book.

Q. Okay. And then it says here you got a master's degree in industrial management with a specialty in occupational health and safety in 2007?

A. I did.

Q. And what does that entail; what does it mean to have a master's degree in industrial management with a specialty --

23

A. Well, the industrial management was just the certificate name.

It was mostly occupational health and safety through Northern.

It was a -- basically, it was a curriculum based on industrial hygiene, you know, workplace safety practices, ergonomics, reflects state and federal requirements, you know, ANSI 45 ISO 45000, and so forth.

Q. You're not an industrial hygienist, correct?

A. No, but I do do it.

Q. And have you ever been -- well, strike that.

Okay. When you say I do do industrial hygienist type work, what do you mean?

A. I'll do -- I'll do the -- well, I'll do clinical evaluations, noise sampling, dust sampling.

I used to do it when I worked -- when I had my -- under Midwest Safety Consultants on my CV.

Midwest Safety Consultants was actually my company, and I did industrial hygiene

24



Patrick Schuerman 11/13/2024

services, and I did a lot of -- and mostly, I did a lot of consulting for workplaces, and on behalf of insurance carriers.

Q. So if I caught your answer there -- first of all, Midwest Safety Consultants, that LLC is no longer in existence, right?

A. It's dormant, yes.

Q. And some of the things you explained that fell under sort of the umbrella of industrial hygienics, or hygienist-type work, one was -- I thought you said you do -- you did chemical assessments?

A. I'll do -- I'll do my clinical assessments as it relates to PPE requirements, and also exposure control.

Q. So just by way of example, you might be hired by a company to go into a facility, look the facility over, see what type of chemicals are at that facility, and then make recommendations on PPE, and controlling employee exposure to those chemicals?

A. That is correct.

Q. Would it be done in any other way other than what I just described; in other words, in

25

any other setting other than going to a facility and evaluating that way?

A. I don't understand. Help me out. Expand on the question, please

Q. Sure. So I had asked you as an example of doing a chemical assessment, you would go to a facility, look it over, see what chemicals were there, and then make recommendations on PPE, and protecting employees, and I think you said yes?

A. That is correct.

Q. Okay. Did you do it in any other way other than that, do chemical assessments?

A. If they sent me the documentation, I can look at it and give them, you know, here's where we're at, but you -- it really depends on air flow, and what type of ventilation system they have, and you can't -- it's hard to do that through e-mail.

Q. Got it. Okay.
And then I thought you said you did things like dust assessments?

A. You can do dust, that's kind of in the same format, same area.

26

Q. And your assessments would be done in sort of the same way?

A. That is correct.

Q. And then there was one you said in the middle there. Did you say moisture or moist?

A. No, I don't think I said moist. Noise?

Q. Oh, noise, you said noise with an N?

A. Noise.

Q. Okay. So you might go to a facility here, you know, and assess the type of exposure that workers would have to noise at that facility, and make recommendations about earplugs, headphones, et cetera?

A. Yeah, and also other methods to -- that's really the last avenue that you want to use, it would be better if we were able to engineer out that noise.

Q. Okay.

A. Does that help?

Q. It does, yeah.
Did you ever play a role in doing an assessment like that for a police department?

A. Not for Midwest Safety, no.

Q. In any capacity?

27

A. I have done evaluations of police departments through my job at the Illinois Department of Labor where I've investigated numerous numbers of fatalities in workplace injuries.

Q. And I'll come back to that, but in your role with Midwest Safety Consultants, did you ever design a police department building or holding --

A. No.

Q. -- facility?
Did you ever design any facilities, whether it was manufacturing facilities, chemical facilities?

A. No.

Q. Now, you said in your role with the Illinois Department of Labor, you would have visited police stations from time to time to investigate deaths?

A. Deaths and injuries.

Q. And give me an example of the type of death you would investigate at a police department.

A. One was an exposure where the employee

28



-- it was a driving exposure, and the employee was killed in an automobile accident.

Another one was an injury resulting in -- due to improper maintenance of equipment.

Q. So in terms of the employee killed in an automobile related accident, that had something to do with a police department or police station?

A. It was. It was a police officer.

Q. And give me the -- tell me -- explain the circumstances to me, please.

A. In that circumstance, the police officer was -- I don't want to say the word negligent -- but he basically killed himself, because he was driving erratically, and was killed when he hydroplaned, and hit a tree, and he wasn't wearing his seatbelt.

Q. Okay. So as part of the Illinois Department of Labor, you were asked to investigate that accident, and reach conclusions about what happened in the death?

A. It was.

Q. Okay. And then the second example you gave was an incident of an injury with improper

29

maintenance that resulted in --

A. The police department failed to properly maintain their jail cells, and an inmate got out and injured an employee.

In another case an employer -- a police officer was injured, because he wasn't wearing a safety -- because of failure to enforce PPE.

Q. Give me -- what was the circumstances of that last example?

A. That one was he wasn't wearing -- the officer wasn't wearing a proper PPE when he was directing traffic.

Q. And he was struck by a vehicle?

A. She was.

Q. And the PPE she should have been wearing would have been some sort of reflective vest or something that might have highlighted her presence in the roadway?

A. In that case, yes.

Q. Okay. So in terms of -- well, in terms of your work as a public safety inspector with the Illinois Department of Labor, which you did from October of 2019 up until about a month ago, what were your job duties and responsibilities?

30

A. That was -- basically, I was an OSHA inspector for the State of Illinois.

Q. Did you only inspect public facilities or did you work for private industry?

A. It was all government facilities. Any taxpayer funded facilities.

So that could have been fire departments, that could have been police, public works, libraries, schools, any -- any agency or any taxpayer -- tax dollar funded facility.

Q. Okay. Did you have a geographical location where your work was focused?

A. No.

Q. You could do that all throughout the state?

A. Yes.

Q. And you did do that all throughout the state?

A. Yes. Customarily, it was northern Illinois.

Q. Okay.

A. But I could have gone anywhere in the state.

Q. And at the time that you did that work,

31

it would have been out of your home in Newark?

A. That, and I did have an -- I did have an office that I was at rarely, but downtown Chicago.

Q. Okay. Very good.

Now, in terms of public safety inspecting for the Illinois Department of Labor, in this role that we're talking about here, did you have like an obligation to visit facilities on a routine basis, and do routine inspections of them?

A. Yes.

Q. And in addition to that, you might be called out to respond to a complaint, or an accident, or an injury such as what you described to me a little bit ago, investigating a police officer getting hit by a car or something?

A. That is correct.

Q. And what dictated the need for routine inspections of public buildings?

A. As they were assigned to me. I was given a list, a computer list, and they said when time permits, this is what you do.

32

Q. Okay.

A. So if it was on that list, I went and saw them.

Q. Okay. It was my understanding -- perhaps I'm wrong -- but I didn't think OSHA applied to governmental agencies; isn't that true?

A. That -- that is -- federal government does not, however, state -- the State of Illinois has its own enforcement division for government entities.

There are about six states that have that; Illinois, New York, and a couple east coast and Puerto Rico have their own state enforcement.

Q. Okay. And so in your instance, you were following the Illinois OSHA state enforcement policies for Illinois public buildings and facilities?

A. That is correct, and for the most part, it was you use the 1910 -- was it -- 1910, 1926, and 1903 were adopted, so we're using the federal standards.

Q. 1926 is predominantly construction?

A. Construction.

Q. So 1910 would be the industry standards?

A. Or the police department, that is correct.

Q. And then as a public safety inspector, did you have to report to like an area director or something above you?

A. Absolutely.

Q. Could you issue citations under this -- under Illinois OSHA to these facilities?

A. Yes.

Q. Would they have to be run through the area director and approved before it could actually be issued?

A. Yes.

Q. And were there occasions in your career where you might have made a recommendation to an area director that you thought something was citable, and the area director said I'm not going to cite them on this?

A. Yes.

Q. There were differences of opinion about the --

A. There was a lot.

Q. I'm sorry, what did you say, there was --

A. That happened a few times, and we'd have a conversation about it, and we'd negotiate, and we'd take a look, and it's a census.

Q. Okay. In terms of the role as the public safety inspector, were you giving direction to facilities like police departments, training them, training their employees in safety, et cetera?

A. I could have done the -- I have in the past, and I did, and they would -- more than not, the agency would call me, and say what's the answer to this, and I would say this is what you need to do.

Q. Okay. Have you ever taught a course on the use of pepper spray to anybody?

A. No, I have not.

Q. Have you ever taught any sort of less lethal course, like the courses that were being taught to the plaintiff in this case to anybody?

A. No, I have not.

Q. Have you, yourself, ever gone through exposure to OC pepper spray?

A. Can you repeat that?

Q. Have you, yourself, ever taken a course where you deliberately had yourself exposed to pepper spray?

A. No.

Q. You understood that several of the police officers who have testified in this case all stated that as part of their training to go through the police academy, they had to be exposed to pepper spray, right?

A. That is correct.

Q. And even Mr. Badagliacco, himself, had been exposed to pepper spray prior to the occasion that is the basis of this lawsuit, right?

A. That is correct, yes.

Q. And I just want to make sure, you've never gone through a similar course where you, as part of your job duties or responsibilities or training, required you to get exposed to pepper spray?

A. No.

Q. That's true what I said?

A. Yes.

Q. And you've never taught such a course where you exposed others to it?

A. That is correct.

Q. In terms of the sort of direction or advice provided to police department personnel -- and this is how I went down this path -- you were saying they might call you and ask for some insights, and then you would tell them something, but did you ever teach anything like the use of munitions to police personnel?

A. No.

Q. You didn't deal with them in terms of taking prisoners into custody, or how to handle prisoners taken into custody?

A. No.

Q. And I've limited it to police officers, but you haven't had that sort of exposure in training anybody in the municipal sector on pepper spray, munitions, things like that, correct?

A. That is correct.

Q. And is it -- did I understand you

37

correctly that you -- your sole employment between 2019 and up until about a month ago would have been in this role as a public safety inspector?

A. In addition to that, I was also, and still am, I am an instructor at Illinois Valley Community College where I've been an instructor since 2012, 2013.

I teach industrial safety with an emphasis on -- I teach industrial safety to the students in the trades.

Q. Okay. And give me an example of what falls under the purview of industrial safety.

A. Everything we've talked about.

It talks about ergonomics, and reviews proper PPE. It talks -- we discuss noise loss. We discuss exposure -- lung exposures, workplace exposures. We talk about recordkeeping.

It's a very fast moving course that basically touches base -- it's everything you would want a new employee to know, plus some.

Q. All right. So just at the end of the completion of your course, are the students that go through it provided with some sort of

38

certification or something like that?

A. Yeah, they do, they've got the course.

Part of the course -- well, the course, itself, it's an expanded -- they receive their OSHA 10-hour card, but it's an expanded 10-hour program -- curriculum.

I use -- I use a textbook, 250-page textbook, so yeah, it's just an expanded 10-hour curriculum where we spend a lot more time on the topics.

Q. And if someone were to enroll in this course, would it be a whole semester, is it a couple of weeks, describe it for me?

A. It's an eight-week course -- it's an eight-week class.

Q. And how frequently do you meet each week?

A. We teach one night a week right now.

Q. And how many hours is each class?

A. It's 100 minutes.

Q. Okay.

A. So the curriculum is an 800-minute course.

Q. And the goal at the conclusion of this

39

is that they'll be proficient in understanding work environment safety?

A. Correct.

Q. And in addition to that, they get certified with the OSHA 10-hour certification?

A. Correct.

Q. Okay. Going back up to this item in your CV that talks about the Illinois Department of Labor public safety inspections, you made a note here that it states, in addition to compliance and abatement process -- processes, worked with employers to help strengthen the overall safety program, hyphen, an average of eight citations per inspection, so --

A. That's actually kind of low.

Q. I'm trying to figure out, what do you mean by that description?

A. I have no idea. How is that -- I was that heavy hitter.

For the last year, I left enforcement, and I was in the consulting side, and I left -- and I basically -- it was a unique advancement. It was what I used to do, but a lot more money, but it -- employers would say call or e-mail and

40



say, hey, we need some help, and I'd go out, evaluate the private company, and say, okay, here's what we need, here's where we're going, this is what you need to put in place. I'll give them the boilerplates. I'll help them implement the procedures.

If they need training, I'd go back, and we do that training for the employer so that they would be, not only in compliance, but they would also -- with the ultimate goal of reducing the workplace injuries.

Q. So I'm generally familiar with federal OSHA and citations issued to private companies.

Are there fines associated with public safety inspector citations that are issued to state government, local government, et cetera?

A. There can be.

Q. There can be?

A. There can be.

Q. If I were to look up employers on the OSHA website, the Illinois OSHA website, do they have an itemization of the sort of public facilities that have been cited by the Illinois Department of Labor?

41

A. Yeah, you could find that on the federal website.

Q. Would the federal website keep track of Illinois public sector employers?

A. It does.

Q. Okay.

A. We use the same database.

Q. All right. Now, on your resume there's a whole section on loss control consulting with Midwest Safety Consultants, and that was from 2012 to 2019.

Was that your sole employment other than teaching this course at Illinois Valley Community College between 2012 and 2019?

A. It was.

Q. And typically, if there was a typical client, who would hire you to do your services as a loss control consultant with Midwest Safety Consultants?

A. I worked for a number of insurance carriers as well as private companies.

Q. And I'm picturing as a consultant to an insurance company, they would want you to go out and look at a company that they insure, and try

2

to give some advice to that company to try to limit accidents at that company's facility?

A. That would be correct.

Q. All right. Were you ever hired to go on to a job site, say, where a company had employees, and observe that job site, and perform consulting services for the company, but not at the company's facility, but somewhere where the company was working?

A. I was.

Q. And did you also provide some of those companies with instruction to their employees so that they could gain the 10-hour or 30-hour OSHA certification?

A. Say that again.

Q. Would you also go to those companies that would hire you, and give OSHA training, and issue certificates that, after they completed your course, the employees would get a 10 or 30-hour, as the case may be?

A. In some cases, yes.

Q. Were you ever involved in redesigning or engineering facilities for these companies?

A. Facilities or pieces of equipment?

43

Q. Let's start with the facility.

A. No.

Q. And then with respect to equipment used at those facilities, would you be involved in designing, or redesigning equipment at these facilities?

A. I would make recommendations for corrections mostly dealing with ergonomics and machine guarding.

Q. Ergonomics is things like -- well, strike that.

Explain how you used that term, ergonomics.

A. Ergonomics is that -- is the unknown -- is the musculoskeletal; so it's twisting, bending, reducing of these twisting, bending. It's the work factors that cause musculoskeletal injuries, just like you twisting right now.

Q. So you're talking about facilities, see an operation in process, and say, you know, there's an easier or better way to do that so that person might not hurt their back or strain their shoulder, that sort of thing?

A. That is correct.

44



Q.   Okay.  And then guarding, that's pretty self-evident.  You might see some equipment in use, and see maybe someone's taking a guard off that shouldn't be off, and you could recommend that it go back on, or other ways to protect workers from engagement with that piece of equipment?

A.   That is correct.

Q.   Were you ever involved in consulting at a facility as it relates to eye wash stations at that facility?

A.   Yes, many times.

Q.   Can you give me an example of how -- strike that.

First, can you give me an example of your involvement as it relates to eye wash stations?

A.   That's a multi-facet question, so it could be you have got them in close proximity, it was what happened in close proximity versus what happened -- is it the right type and style.

Q.   Okay.  So you might go do a tour of a facility -- well, first of all, let me ask you this.

45

Would your role include touring a facility and saying, hey, you guys, you don't have an eye station -- eye wash station here, and you need one under the code?

A.   I would think that would be one part, yes.

Q.   Did that ever happen while you were consulting with people?

A.   Yes.

Q.   All right.  And then in addition to identifying the need, would you tell them what they needed, what to buy, you know, where to install it, things like that?

A.   I would give them some recommendation.

I'm not going to tell anybody you have to purchase X, Y, Z.  I'm going to say it needs to be able to do A, B, C.  You go find one yourself.

Q.   Okay.

A.   So, in other words, an example would be, if they had bottles on the wall that said eye wash, well, that doesn't meet the state or the federal or ANSI standards.  It has to be continuous flow.

6

So we need to grade -- I don't care which one you get, but it has to have 15 minutes of continuous flush at a level.  So you need to -- and I'm not going to tell you go buy this brand, or this model, but does it meet the minimum -- does what you have meet the current standard; yes or no?

It would be no, and this is what style or design you would need.  Here's the benefits of this over this.  Whichever one you pick is up to you.

Q.   Okay.

A.   Does that make sense?

Q.   It does, but I want to elaborate on this a little bit.

So you reviewed a lot of the deposition testimony in this case in preparing your report, correct?

A.   That is correct.

Q.   And you understand that the Elgin Police Department does not have a built-in eye wash station at the facility, correct?

A.   Okay, if you say so.

Q.   I'm asking you, do you know?

47

A.   No.

Q.   Okay.  Does every police station in the State of Illinois have to have an eye wash station in it?

A.   Does it -- is there an exposure?

Q.   You tell me.  I'm asking you the questions.

A.   I have no idea what every police station has.

Do they have any -- do they have a chemical exposure that requires one?

If that is the case, then they need one.

Q.   So I want you to take me through that concept that you just said.

If they have a chemical exposure at the place, then they need to have an eye wash station, is that what you said?

A.   That is what I said.

A chemical -- yes, we can go with chemical.

It could be or a corrosive.  OSHA says it's a corrosive, but it depends on what your safety data sheets say.

48

Patrick Schuerman 11/13/2024

Q.   I want you to assume for the sake of this question that the police officers that work at police stations throughout the State of Illinois carry some sort of pepper spray on their person for subduing criminals, or whatever they need it for, dispersing crowds, okay, assume that's true, does that mean that every time those police officers come back to their police station, they need to have a built-in specific eye wash station for that facility?

A.   Because they utilized it, or because they -- because they utilized it, or because they have it?

Q.   My question was because they have it. They have it on their person, they wear it on their belt, and they have it available to them, do they need to have the station?

A.   Once there was an exposure, and the -- and the officer was not able to get adequate eye wash, there is a very strong possibility that that employer would be cited for that hazard.

Unfortunately, that's after the fact. In this case, it was a known exposure in a controlled environment that they failed to have

49

the proper rinsing eye wash station, or they failed to have adequate flushing solutions.

Q.   I'm going to go -- believe me, I'm going to go into your report and discuss the facts and your opinions here.

I'm talking -- I want to talk about, and get a better understanding in general.

Okay.  So there is -- as far as you know, there's no rule that says police stations have to have eye wash stations; is that fair to say?

A.   The rule is if you are a work -- the rule that applies at a police station is if there is a corrosive -- if you're working with corrosive materials, you are required to have an eye wash station, that's in the 1910 standard, however, believe it or not, it is not a corrosive.

Q.   Pepper spray --

A.   It --

Q.   Hold on.  Hold on.  Pepper spray is not a corrosive?

A.   It is, and it -- it is in higher percentages.  It is considered a corrosive in

50

higher percentages than what was used at this, because your client, if we look at the higher concentrated versions, is considered a corrosive, and then it would be required to have an eye wash station.

Q.   Okay.  I'll come back to that, but I just want to make sure that I understand your answer.

So let me go back to the exhibit I had up here, which, I think, I said was Exhibit No. 1, and attached to Exhibit No. 1 was your report, and in Paragraph 10 of your report you cite OSHA 29 CFR 1910.151(c)?

A.   Okay.  Then that's it.

Q.   And so first -- the first premise is, it's your opinion that 1910.151(c) would apply to any workplace where the employees at that workplace are exposed to injurious corrosive materials?

A.   That is correct.

Q.   And you would agree with me that under 1910(a) -- I'm sorry, strike that.

You would agree with me that under 29 CFR 1910.151(a), this applies to employers,

51

correct?

A.   That is correct.

Q.   The first line of 1910.151(a) says the employer shall ensure the readily -- the ready availability of medical personnel for advice and consultation on matters of plant health, correct?

A.   That is correct.

Q.   And 1910, in fact, OSHA specifically, are rules that govern employers; true?

A.   That is correct, yes.

Q.   The eyes or body of a person may be exposed to injurious corrosive materials, suitable facilities for quick drenching of flushing of the eyes and body shall be provided within the work area for immediate emergency use by the employer; true?

A.   That is correct.  That's a differentiation by employer or -- and employees.

Q.   Got it, okay.

A.   So they're moving that requirement away from the employee to the employer.

Q.   Okay.  And so when you were saying that if a police station has employees that are

52



exposed or working with corrosive material, then pursuant to 1910.151(c), the employer has to provide facilities for drenching or flushing of the eyes?

A. Correct.

Q. Now, OSHA, even in your report, refers to suitable facilities, correct?

A. You'll have to explain what you mean by suitable facilities.

Q. So in your report here, it says they have to supply suitable facilities for --

A. Yeah.

Q. -- quick drenching or flushing of the eyes?

A. That's correct.

Q. That doesn't necessarily mean that someone has to have a specific eye flush station, correct?

A. No, but you are -- you are correct.

Q. They would need to have something capable of providing, as you said, a steady stream --

A. And that's where -- that's where the ANSI standard comes into play.

53

Q. Okay. So according to OSHA, in and of itself, OSHA just says, a suitable facility for flushing of the eyes, and it doesn't define --

A. OSHA standards -- OSHA standards were developed back in the sixties -- actually, seventies -- so it hasn't been updated since, so yes, in this case, the ANSI standard would be more applicable.

Q. All right.

A. And it's considered the -- the ANSI standard is considered the best practice

Q. And the ANSI standard is not incorporated into OSHA, correct?

A. That is correct.

Q. As you said, this ANSI standard that you cite in your report -- is it still on the screen here or did I take it off?

A. No. Go ahead, I'm familiar with it.

Q. The ANSI standard that you reference in your report, and you just referenced in your answer here, is contained in Paragraph 9 of your report on Page 3 --

A. Right.

Q. -- of the report --

5

A. And I sent you --

Q. Hold on. Hold on. On Page 6 of the exhibit is this Z358.1, right?

A. Correct.

Q. Okay. Go ahead, you were going to say something?

A. No, no. I sent you the report. You got it there, okay.

Q. Yeah, okay. And you said that this is evidence of best practice, but it is not part of OSHA itself, right?

A. That is correct, and because this is considered best practices, we have to look -- and this is considered the industry best practices, so this is -- this is the -- this is the best practice for everybody, so -- and what really applies within that is -- if we go down here, it would be the -- where it talks about hoses, and where it applies under Section 5.

Q. Okay. So let me just ask -- let me just confirm this with you.

Because this isn't a part of OSHA, an employer can't be cited under 1910 for failure to comply with Z358.1; true?

55

A. It could be used as -- it can be cited by reference.

Q. But you can't cite someone for failing to comply with ANSI Z358.1 --

A. That's correct.

Q. -- because it was not adopted by OSHA, right?

A. Correct.

Q. Okay. So ANSI provides some guidelines of good custom and practice in your opinion that eye wash stations need to be capable of delivering flushing fluid at least 1.5 liters per minute for 15 minutes, correct?

A. Correct.

Q. And they should be able to provide flushing of the eyes simultaneously, both eyes simultaneously, right?

A. That would be correct.

Q. And again, all of these recommendations are not --

A. This is industry best practices. This is a -- this is the standard that -- in criminal court, you would look at the OSHA standards. In civil court, you look at the ANSI standards.

56

Q.   Well, I'm sorry, but what's the basis for your -- for that answer?

A.   Because this is the best practices.

Q.   Okay.  But there's no legal obligation to comply with it.

MR. SANDS:  Objection, calls for a legal conclusion.

BY MR. CARINI:

Q.   Right, is that correct?

A.   I'm not going to answer that, because I'm not a lawyer.

Q.   Okay.  So your expertise does not afford you the opportunity to comment on whether or not an employer is legally responsible to comply with Z358?

A.   I'm saying this is the best practice that all employers shall comply with.

Q.   When you say shall --

MR. SANDS:  Shall what?  Shall what, I'm sorry, I didn't hear the last --

THE WITNESS:  Shall work toward.

This is the standard -- this is the acceptable standard that is rec -- that is the generally accepted standard in the industry.

57

BY MR. CARINI:

Q.   Okay.  And again, you're not aware of any obligation imposed on employers to comply with ANSI Z358.1?

A.   For the federal government?

Q.   Or the State of Illinois.

A.   No.

Q.   That's true what I said?

A.   That is correct.

Q.   And we started the discussion on 1910.151 with your reference to 1910.151 applying when someone is working with corrosive materials; do you remember that?

A.   I do.

Q.   Does that same premise, working with corrosive materials, is that a premise to Z358.1 as well?

A.   No, Z358.1 can cover even dirt in your eyes, or a foreign substance.

Q.   So is it your opinion that if a police officer can get dirt in his eye, then the police station should have some sort of eye flush capacity for the police officers under Z358.1?

A.   Yes.

58

Q.   And who decides whether a police officer can or can't get dirt in his eye at the police station; can you answer that, or no?

A.   I'm not going to answer it.

Q.   Why?

A.   Because it's not -- it's not --

THE COURT REPORTER:  I'm sorry.  Excuse me, I didn't hear that, because you cut out.

Can you repeat that?

THE WITNESS:  I understand.

It's not a -- it's not if, or it's not when, it's could.

Could an officer get a foreign object in their eye; yes or no?  Yes.

Q.   And if an officer can get a foreign object in their eye, then the police station needs to have an eye wash station capable of delivering flushing fluid to the eyes, at least 1.5 liters per minute, for 15 minutes?

A.   They need to have a method for washing their eye out.

The standard -- you're pushing two standards against themselves.

One is more broad than the other, and

59

in this application, the OSHA standard only deals with corrosives.

The emergency eye wash station falls in, because if you look under -- if you look, it says -- if you look at the eye wash -- most SDS sheets state that you need to flush your eyes, and then the eye wash station would -- should be available.

Q.   So the reason that I'm asking these questions is because I want to know why there isn't a rule in Illinois that police stations have eye wash stations consistent with Z358 at every single police station?

A.   Most - most new police stations do.

Q.   Okay.  And if the new police stations --

A.   We don't know.  Elgin may have had one.

Q.   Okay.  So as we sit here today, we don't know that Elgin didn't have an eye wash station; true?

A.   That is correct.

Q.   You do know that they had showers and sinks and changing facilities there that were accessible to the attendees of the training

60

class, right?

A. We do not know if they were even offered those locker rooms or -- yes, they were there after the fact. We know that. Hindsight is 20/20, but we do not know whether or not your instructor informed them about those locker rooms.

Furthermore, your SDS sheets go on to say that they should have changed clothes.

Q. I want to talk about the locker rooms first.

If the attendees that were in this course were informed of the fact that there were sinks and showers and a locker room available to them prior to their exposure, would everyone have met their obligation with respect to informing the participants about eye wash and decontamination?

A. No, because eye wash, that's different than a shower.

An eye wash station or an emergency shower is different than a regular shower.

Q. Well --

A. And it wasn't within ten seconds of the

61

hazard. No, it was -- I don't believe it was. I don't know.

Q. Well, we're talking about --

A. Do you have a layout -- do you have a diagram of the police station?

Q. Do you have a --

A. I didn't see one.

Q. Okay. So you don't know whether it's within ten seconds or not?

A. No, I don't.

Q. And you don't know what the exact facilities were that were available to the participants in this class?

A. I know that there were, but I don't know -- from the transcripts, it showed you identified the locker rooms, but you did not identify that the employees knew about those locker rooms, or where they were located.

Q. So my question is a little different.

I asked you as you sit here today, you don't know what was offered or what was available to the participants in the locker room or the showers or the sinks, right?

A. That is correct.

62

Q. And as you sit here today, you don't know whether those sinks, locker room, shower facilities were within ten seconds of the classroom?

A. That is correct.

Q. And you don't know whether they were within ten seconds of the area where the exposure occurred?

A. That is correct.

Q. And I think you mentioned -- didn't we discuss the fact that OSHA doesn't specifically say you have to have a manufactured eye wash facility, you just have to have a suitable facility for quick flushing of the eyes, right?

A. That is correct.

Q. And you don't know whether what was available and built into this station in the form of those locker rooms, sinks, and showers was a suitable facility for quick flushing of the eyes?

A. At this point, no.

Now, you know what, it's 2:20. Do you mind if I take a five-minute break, and I'm going to use the restroom?

63

MR. CARINI: Not at all. Why don't we take ten. Start up again at 2:30.

(Whereupon, a short recess was taken.

BY MR. CARINI:

Q. Before I get sidetracked here -- not before -- I already was sidetracked, so I just want to finish up a few things on your resume and then move back to your report.

A. Are we still on that?

Q. It looks like between 1992 and 2006 you were basically in the business of the sales of safety equipment?

A. That is correct. I was in sales of safety equipment just like this and so forth.

I sold a -- I sold a company to Cintas Corporation, and I worked for them for a couple years until I got my last paycheck, and then I knew that going into it, but no, I sold the company to Cintas Corporation, and then I had to devest from sales.

Q. My question was, did you sell pepper spray in these roles -- in any of these roles?

A. No. Eye wash stations I did, but not

64

pepper spray.

Q. And your -- strike that.

Okay. All right. Going back to Exhibit 1, this is the Rule 26 Disclosure, the 12-page Rule 26 Disclosure that has your report and the CV attached.

I'll put it on the screen in case you only have your report there, because I'm going to ask you about the actual answer to the document first.

So on Page 2 of 12 under sub small letter i, the heading is statement of all opinions they will express, and the basis and reasons for them, and that's in reference to you there; do you see that?

A. Yes.

Q. All right. And this says Mr. Schuerman is disclosed as a construction site safety expert -- or construction/site safety expert -- and is expected to testify as to the subject matter, facts, and opinions set forth in his report, which is attached hereto as Exhibit A and incorporated herein, and his discovery deposition, if taken.

65

And then attached as Exhibit A is a report that is -- it looks like six pages long -- and has your signature on the end, and is dated September 10th, 2024, correct?

A. Okay. Yes, that's correct.

Q. And are all of your opinions and the bases, therefore, contained within this report?

A. Say that again.

Q. Are all of your opinions and the basis for the opinions contained in this report?

A. Yes.

Q. Did you say yes?

A. I did.

Q. Okay. Thank you.

A. The only one that's not in there would be that the plaintiff failed to provide antidote wipes.

Q. Okay. So this says in sub --

MR. SANDS: I'm sorry, Joe, to interrupt.

Could I have that last answer read back, please?

(Whereupon, the record was read as requested.)

66

THE WITNESS: The defendant failed t provide antidote wipes, the common -- the common cleansing solution to neutralize the effects of pepper spray.

Other than that, I stand by what I wrote.

BY MR. CARINI:

Q. I'm going to get into -- well, let me ask you about this.

What are antidote wipes?

A. Well, their competitor manufactures a wipe that will neutralize the effects of pepper spray.

Q. Okay.

A. I don't believe Safariland offers that product, and this wasn't more of a -- this wasn't so much a training exercise as it was a product demonstration course.

Q. So we've talked fairly detailed about 1910.151, and the obligation of an employer with respect to providing suitable facilities for flushing of eyes when they're exposed to a corrosive material, right?

A. Correct.

67

Q. And there is no rule, requirement, regulation within OSHA that controls or dictates exposure to something less than corrosive materials, correct?

A. If there was an exposure, OSHA could and has issued a general duty clause, and then cited the ANSI standard under the general duty.

Q. Okay. But my question was, there's no specific OSHA standard that dictates providing suitable eye flushing facilities for something less than a corrosive material, right?

A. That is correct.

Q. Okay. And I think we've already covered the fact that according to OSHA, OSHA has not adopted ANSI Z358.1, correct?

A. To my knowledge, that is correct.

Q. Okay. So OSHA doesn't mandate the supply of antidote wipes to anybody for anything, correct?

A. That would be correct.

Q. And the best practices that you cited in ANSI Z358.1 also doesn't make any reference to decontamination wipes or antidote wipes, correct?

68

A.   That is correct.

Q.   Okay.  So where does your opinion come from that antidote wipes, or decontamination wipes, should have been provided here?

A.   That would be a good -- that would be a best practice.

Q.   Okay.  But what's the basis for saying that that is a best practice if it's not in OSHA, and it's not in ANSI, where does it come from?

A.   If you were working with chemicals in your home, and they were acidic, you'd want to have protection, maybe gloves, and if you had that -- and if you had it -- and if there was a -- if there was a tissue that neutralized it, that would be a best practice to have them. That's common sense.

Q.   So it's fair to say that the opinion that isn't in your report, but that you're adding here today, that decontamination wipes, or as you called them antidote wipes, should have been provided is just common sense?

A.   It's a best practice, yes.

Q.   Okay.  Yes, it's common sense?

69

A.   Yes, it's common sense.  Yes, it's common sense, and yes, it's a best -- that would be considered a best -- a best practice.

Q.   Right, and so you keep using that term best practice, and I'm wondering where does it come from?

It's not in OSHA, and it's not in ANSI, and it's common sense, but where does best practice come from?

A.   Best practice is a process -- is any process that reduces the exposure, reduces or minimizes an employee's exposure or a person's exposure.

That would be assessed when your -- when your client failed to do a hazard assessment of the training or a job -- an assessment of the hazards associated with your training.

Show me the -- you didn't -- I didn't see that in the documentation where you did a formal assessment of the hazards.

That's common sense when you develop a training program.

Q.   You didn't see any evidence that a

70

hazard assessment was not done either, did you?

A.   No, but it didn't show that it was, so we must assume that your client never did it.

Q.   Well, isn't that really the jury's job to decide based upon the facts presented to them to assume whether it did or didn't happen?

MR. SANDS:  Objection, it's argumentative.

You don't have to answer that question.

MR. CARINI:  Are you going to tell him he doesn't have to answer that question?

MR. SANDS:  I can tell him --

THE WITNESS:  I'm not going to answer the question.

MR. SANDS:  Why don't you ask him a more appropriate acceptable question, Joe, because I don t think that is one.

MR. CARINI:  Well, I disagree with you, Scott.

I mean, he's going so off script here on his disclosure and his report, that you stated in this Answer to Interrogatory was his full complete report, so I'm asking him questions where this stuff comes from, and he --

71

it sounds to me, Pat, like you're saying it's your opinion that the best practice would be to have antidote wipes there.

THE WITNESS:  That would be a good -- that would be great.  I would accept that.

BY MR. CARINI:

Q.   Okay.  All right.  And again, just a yes or no; you don't know one way or the other whether a hazard analysis was done?

A.   That is correct.

Q.   You understood that every participant in this class that agreed to participate in the OC exposure, voluntarily participated in that class, right?

MR. SANDS:  Objection, calls for --

THE WITNESS:  I disagree with that statement.

MR. CARINI:  Okay.

MR. SANDS:  I'm sorry, I didn't hear the answer.

I had an objection, calls for a legal conclusion.

What did you -- what was your response, Pat?

72

THE WITNESS:  I disagree with that statement.

BY MR. CARINI:

Q.   Would you agree that Safariland did not force anybody to participate in the OC exposure?

A.   I would agree with that.

Q.   So your issue is whether Mr. Badagliacco voluntarily participated in the OC exposure or he was forced to by his employer?

A.   I disagree with -- I disagree with how you stated that.

Q.   Okay.

A.   Would you like me to expand?

Q.   Yeah, go ahead, tell me what you disagree with.

A.   My deal is with this, and it goes back to the core of this, especially, dealing with your waiver, is that, you know, if I was an employee of the Skokie Police Department, and the Skokie Police Department says, hey, you're going to training this next week, okay, I guess, I'm going to training next week, sign me up.

So he shows -- so the employee shows up at your training the next week.  I don't know if it was voluntary or not, yeah, he drove himself, but he was basically told to show up, and you throw this waiver in front of him that basically excludes anything under the sun, and he basically has a choice; I sign this, or I go home, and get yelled at for not signing this waiver, so he signs it, and continues with the course.

Q.   Did you see any testimony in this case that Mr. Badagliacco stated, I felt that I had to sign this, because I didn't want to go home and get in trouble from my employer?

A.   No, but the question wasn't asked.

Q.   Right.  So you're deriving that from him signing the thing that it must have been under duress?

A.   I didn't say that either.

Q.   Yeah, no, you just said that he had to sign it, because he didn't want to go back to the office and get yelled at by his boss?

A.   Because your waiver is so minuscule, because it said right on there, are you taking any medication, so what it says is -- it didn't say was I taking any heart medication, or was I taking any respiratory medication, it said any medication, so if I took two aspirin on the way to there, because I had a headache because I was in traffic, excluded from the class.

Q.   So would you answer honestly or not honestly, Pat; how would you answer it, honest or --

A.   Well, knowing that my boss would probably yell at me, I'd sign the dang thing and continue on unfortunately.

Q.   Okay.  Anyway, this wasn't discussed at all in Mr. Badagliacco's testimony, right?

A.   Correct.

Q.   Okay.  In fact, I didn't really see anything in your disclosure that talked about that -- that talked about that with --

A.   You brought up, so I --

MR. SANDS:  That talked about what, Joe?  I didn't here the end of the question, Joe.

MR. CARINI:  I said you didn't mention the waiver in your report.

THE WITNESS:  Actually, I did.

MR. SANDS:  That's not correct, Joe.  That's not correct.

THE WITNESS:  I did.  I did, I believe, it's the last -- in one of the last one or two items on there I did discuss the waiver.

MR. SANDS:  It's Page 6, Paragraph 20.

MR. CARINI:  Right, but this issue that's talking about here, about being compelled to say it, and that it was insufficient content, and that Mr. Badagliacco signed it, because he didn't want to get yelled at by his boss; none of that's in your report right, Pat?

MR. SANDS:  Well, about it being incomplete, that would be --

MR. CARINI:  Let him answer the question, Scott.  Don't answer the question for him.

I asked him a question about whether or not any of this commentary he's throwing in here right now is in his report, and I want an answer.

Is it there or not?

MR. SANDS:  I object to the question as being compound.

If you want to break it down, he can



answer it.

BY MR. CARINI:

Q. Can you answer this question?

MR SANDS: Can you repeat the question, please, Kiki?

THE COURT REPORTER: Sure.

(Whereupon, the record was read as requested.)

MR SANDS: And that's my objection, Joe. That's a compound question.

BY MR. CARINI:

Q. Can you answer the question?

MR. SANDS: The compound question?

MR. CARINI: Yes, can he answer it or not?

THE WITNESS: Repeat the question.

(Whereupon, the record was read as requested.)

THE WITNESS: You know, Joe, just do this, rephrase the question.

BY MR. CARINI:

Q. You do not mention in this report that Mr. Cox was compelled to sign this release; true?

77

MR. SANDS: Joe, you misspoke. Not Mr. Cox.

BY MR. CARINI:

Q. You did not mention in this report that Mr. Badagliacco was compelled to sign the waiver, correct?

A. Correct.

Q. You did not mention in this report that Mr. Badagliacco signed the waiver, because he was afraid of getting yelled at by his boss, correct?

A. Correct.

Q. You did not mention in this report that you felt that there were deficiencies in the waiver sheet, itself, because it didn't talk about specific medications, correct?

A. Correct.

Q. All of that is stuff that you're offering at testimony right now today; true?

A. True.

Q. Okay. Now, let me go back to the beginning of this.

Was there any evidence in this case that Mr. Badagliacco asked any questions about

78

that document that he signed?

A. No, that is correct, however --

Q. There's no question pending.

If Scott wants to ask a follow up later, he can do that.

A. Okay.

Q. So my question started with the premise that Mr. Badagliacco was not forced to participate in the OAC class, correct?

That's what I started with.

A. That is correct.

Q. But you understood that Mr. Badagliacco went to this training knowing that he was going to take the OC spray portion of the course; true?

A. That is correct.

Q. And at the time that he participated in this course, he was an employee of the Skokie Police Department; true?

A. That appears to be true.

Q. Okay. And as the employer of the plaintiff, Skokie Police Department had a duty to make sure that their employees were -- if they were going to be exposed to injurious

79

corrosive materials, they had to be at suitable facilities for quick flushing of the eyes within the work area for immediate emergency use; true?

MR. SANDS: Objection.

THE WITNESS: False.

MR. SANDS: Calls for legal conclusion.

Go ahead, if you can, sir.

BY MR. CARINI:

Q. Why is that false?

A. Because the employer sent them to a class that actually is accredited through southern -- through the university, and because it was an accredited program, they should have had all of the safety mechanisms in place.

If you go take a class -- a college credited class, you should have -- you expect for that to be a safe environment.

Q. So in your opinion then -- I just want to make sure I'm clear -- 1910.151(c) did not apply to the Skokie Police Department for this class on this date that he was exposed to OC?

A. False. I'm not -- in OSHA's ideas, yes, they would have cited with Skokie Police Department, because they were the employer, but

80

as the employer, to their defense, they sent them to an accredited training program that failed to have the appropriate safeguards in place.

Q. As the employer --

A. That's why we're in this mess.

Q. As the employer, Skokie Police Department could have provided antidote wipes to their employees knowing that they were sending them to an OC spray exposure class, correct?

A. That should through that hazard assessment that your client failed to do, should have been identified.

Q. Hold on a minute. That's not my question.

A. I know what your question was.

Q. My question was, whether the employer, knowing that they were sending their employee to OC exposure, could have provided them with the antidote wipes; true?

A. True, but was that a requirement of the class to bring those?

Q. You also said you don't know whether there was a hazard analysis done or not; true?

A. Show me the hazard analysis.

Q. You don't know, as you sit here, you haven't seen one, so you don't know, correct?

A. Correct.

Q. Because you haven't seen one, your assumption is it wasn't done?

A. The assumption is it wasn't done because of the poor factors that took place during this training.

We haven't even got to that section yet.

Q. Okay. So going back to Exhibit 1. I'm going to put up the answer again.

When you say the defendants retain control of the work, what are you talking about?

A. Safariland controlled the environment. It was their responsibility to maintain the safe work environment. It was their curriculum, their class, their instruction.

Q. So do you want to change this answer from controlling the work to what you just said?

A. It says the same thing.

Q. What work?

A. The facts at hand, the work was

participation in that curriculum.

Q. Okay. So they failed to retain control of participation in their curriculum on the training site?

A. That's correct.

The thing of it is, is Safariland issued this -- whatever you want to call it -- master trainer certificate, and they've never -- they never followed up to ensure that the quality was there.

Q. What's the basis for that; again, you haven't seen documents of it?

A. No. It's in the deposition -- in your depositions.

He didn't even understand the slides that he was presented.

Q. Okay. We'll get into that. I know that's in your report, and I'm going to ask you about that, but -- so your opinion is that Mr. Cox didn't understand the material?

A. Absolutely. He s --

Q. He's what?

A. Well, the thing of it is, is if he understood the -- you know, let me ask this

question.

I don't know the answer to this, but I never saw this DVD neither, what the material was on it.

Has every -- when this trainer goes back, do they sign this waiver for every class -- for every student that they trained at Skokie Police Department?

Q. So you don't know what's on the DVD?

A. I do not.

Q. And you don't know what Mr. Badagliacco has been training to the employees of the Skokie Police Department?

A. Because it's -- it's apparent it's not what you submitted, because he was not even -- he was -- he didn't -- he couldn't even explain his PowerPoint slides.

Q. My question is this, you don't know what Mr. Badagliacco is training, how he's training the Skokie Police Department when he trains them in the less lethal course that he learned in April of 2019, correct?

A. Say that again.

Q. You understood that Mr. Badagliacco

went to this course to become a trainer so that he could train Skokie Police Department employees in less lethal tactics, right?

A.   Correct.

Q.   You have no idea what he is teaching to the Skokie Police Department that he's teaching less lethal training to, correct?

A.   That is correct.

Q.   You don't know what's on the DVD that he has, correct?

A.   I'm assuming it's all the associated files that was presented -- given to me.

Q.   By you've never seen a DVD?

A.   That is correct.  I'm assuming it's everything that you sent to me, which was missing pertinent information.

Q.   Okay.  Again, I just -- this doesn't have to be, you know, onerous here.  It's a simple question.  I don't know --

A.   It isn't -- I'm not --

Q.   You don't know, correct?

A.   Correct.

Q.   And you don't know what materials he has that he's training off of; true?

85

A.   I want to know -- that's not what I said.

Q.   You don't know what -- I'm asking you, do you know what Mr. Badagliacco has that he's training other employees at Skokie Police Department?

A.   No.  What my question was --

Q.   I just want an answer to my question.

A.   No.

Q.   Thank you.

A.   My question is, if we go back to what Mr. Badagliacco was training on, he didn't understand the slide presentation that's associated with this proceeding.

Q.   And we'll get into that.

You make a very specific citation to testimony in this case that you think supports that opinion, okay, so I'll ask you about it, but right now --

A.   It's in the deposition.

Q.   -- right now I'm going through your answers here.

Okay.  In sub I you state the defendants fail to properly inspect the work.

86

When you say inspect the work, what are you talking about?

A.   Failed to properly inspect the work, and see to it that necessary safety measures were taken.

He didn't do that, because we had -- you have propositioned it to show that there was only one garden hose, and that there was a line to wait for that garden hose.

Q.   Okay.  So when you used the term inspect the work, what are you talking about when you use the term the work?

A.   The work area.  The training site.

Q.   Okay.  And when you say that he failed to properly inspect the training site, which you call the work here, you're saying he failed to properly inspect it because of the conclusion you've reached that there was only one hose there, and that there was a line of people waiting for that hose; is that what you're saying?

A.   Correct, and he did not have -- and he didn't have a -- he did not have emergency water.

87

Q.   Okay.

A.   Did he even have a checklist to go -- to prove that anything -- that he even inspected it.

Q.   You have not seen one?

A.   If I was training -- if I was training, I always have a checklist.

Q.   You never trained this course.

A.   I've done a lot of training in my days.

Q.   You haven't trained on OC, correct?

A.   That is correct, but I've always in -- whatever the training mechanism is, I've always had a documentation of training, and a checklist to make sure everything was in place.

Q.   All right.  Whether he had that or not, you don't know?

A.   He said he didn't.  He said he didn't use the checklist that was provided by Safariland.

Q.   All right.  Well, you're going to have to show me that, and what checklist you're referring to.

A.   It was in his deposition.

Q.   Did you make any notes of the

88

Patrick Schuerman 11/13/2024

depositions that you read?

A. No, I did not.

Q. Because all --

A. I think I did -- I think I did, but I threw them away when I was done with them.

Q. All of the deposition transcripts that were sent to me as part of the file looked like just clean depositions.

You didn't write in them, did you?

A. No.

Q. And you don't have any separate notes of anything that you highlighted or took out of them?

A. I do not.

Q. Okay. When we get into the report that's Exhibit A to Exhibit 1, you indicate under sub 3 that the plaintiff was asked to attend this training session by his employer, Skokie Police Department, right?

A. I believe so, yes.

Q. Okay. So under Paragraph 5 here you say, Mr. Cox has been working for Safariland training since 2007, and is considered a master instructor. It was never disclosed when last --

89

when the last retraining took place for Mr. Cox. Did I read that correctly?

A. That is correct.

Q. As a result of the fact that you don't know when he was last trained, you assume he wasn't trained since 2007?

A. That is correct.

Q. You don't know whether he had the training or not after 2007?

A. That is correct.

Q. You don't know how many classes Mr. Cox has taught on OC exposure; true?

A. He said -- he said he does, approximately, eight a month -- I mean, eight a year. So that's less than one a month, so that doesn't make someone proficient.

Q. Okay. So eight a year from 2007 to 2019 is inadequate in your opinion?

A. I would say so.

I would -- you know, if they put that much emphasis on that, there has to be a checks and balance system in place for an accredited course.

I always have all my courses evaluated.

90

Q. Okay. So when you teach the -- you teach the course at --

A. Illinois Valley Community College.

Q. Yeah, when you teach that, who evaluates your course?

A. The director does, the dean does.

Q. Does the dean sit in on the course?

A. You know, they've sat in, and there's a -- the students do a survey every semester. I get flying reviews.

Q. Did you see the surveys of this course by those who participated in the course?

A. Say that again.

Q. Did you see the surveys of the course participants that were distributed by Mr. Cox and signed off by attendees?

A. No.

Q. You have no idea what type of review he got for giving this course, correct?

A. My concern is --

Q. Is it correct?

A. -- that in the deposition --

Q. Is it correct -- then you can tell me your concern -- you don't know what his reviews

91

were?

A. Yes, correct.

Q. You don't know what his reviews were at any of the eight courses a year he's taught since 2007?

A. Correct.

Q. So you don't know whether he's been reviewed or not, correct?

A. You didn't show any, so I take it he hasn't -- he wasn't.

Q. And you don't know that, right?

A. I assume.

Q. I don't want you to assume. I want to ask you if you know or not.

You don't know?

A. No, I don't.

Q. Okay.

A. But on the other hand, it's very apparent through the depositions that they don't retain the information.

Even your -- even your client said they didn't retain it very well.

That tells me he wasn't that good of an instructor if they can't retain the most basic

92



concepts.

Q. Mr. Badagliacco couldn't retain basic concepts, is that what you're saying?

A. I didn't -- I didn't say that.

I said you had multiple instructors -- I mean, multiple students.

Q. Where do you get that from?

A. It was in -- I read it in some of the transcripts where they -- they couldn't recall a lot, so I would take it they forgot.

Q. Okay. So because I take a deposition in 2024 of very specific details of 2019, and they can't remember those details, that's as a result of poor training?

A. If they're -- if they're key components to the training, yes.

Q. Okay. All right. You stated in here under sub 5 that Mr. Cox did not know some of the terminology used, and was unaware of pertinent documentation, and you referred to a specific page and line number of his deposition testimony.

A. Okay.

Q. Correct?

93

A. Correct.

Q. Is this what you were alluding to when you answered before that you were critical of him?

A. That is correct.

Q. Okay. So let's go and see what he says at that page.

Do you have it available, or I can share it on the screen here?

A. I don't. I'm looking for it. I've got a bunch of them here.

Have you got it handy?

Q. I think so. Let's see.

A. I'm sure you do.

Q. 89, Lines 5 through 24. I'm showing you the transcript here. Here's Page 89.

MR. SANDS: I think it's Paragraph 5, it's Page 88, Joe.

MR. CARINI: Okay. Sorry.

MR. SANDS: At least per the report, Line 8.

MR. CARINI: Oh, yes. I'm sorry. Paragraph 5 is 88, Line 8 to 24.

So here's 88 down here. Do you see

9

that in the lower right-hand corner?

THE WITNESS: I do not.

BY MR. CARINI:

Q. Actually, it's Line 8.

A. Yeah. The part that bothers me is -- the part that bothers me is that this is an eight-hour class, and his own testimony said that they spent about -- they went to the first break, which if we use -- that was probably -- that was 9:00, they did introductions until 9:00, so they only had three hours to cover six hours worth of material.

Q. Okay. So it was your understanding --

A. And in here he doesn't know what his PowerPoint presentation is even. He couldn't even explain his PowerPoint presentation.

Q. Well, you can't understand his interpretation of this, is that what you're saying?

A. It flat out says he doesn't know what those terms mean.

They're in his PowerPoint presentation, or so we should say PowerPoint presentation he should have been using.

95

Q. What terms are you referring to? Read this for yourself.

A. Okay. Hang on.

Q. I'm going to zoom in. You said Line 8 to 24 there's terms in here he doesn't know, so tell me what those are.

A. That's what the document says.

Again, I didn't create that document, and I don t have it -- and I haven't read it.

Q. Okay.

A. Because I teach from a PowerPoint, and not necessarily miss something, this is something that they're given on a DVD. So he doesn't teach the PowerPoint that's presented.

Hold on.

Q. That's your interpretation of what that says there?

A. That's my interpretation, yes.

Q. All right. And then on 89 -- sorry -- in Exhibit 1, sub 6, you say the organization appears to have set standards that were not followed, 89, Lines 5 through 24, so we can refer to 89.

A. Was this 89? Which one is 89?

96



Q. Right here is 89, the top left, and I can scroll if you need me to.

A. I -- do you teach it in such a -- yeah, he doesn't even teach the modules that are set forth by the organization. He does his own thing.

Q. He doesn't teach the -- your interpretation of this is that he doesn't teach the four modules that were on the document that were shown to him by the attorney in this dep; is that what you're saying?

A. That's what it's saying there, but the thing of it is, is how are you supposed to know if a student is supposed to teach it properly if he's not taught properly?

Q. Okay.

A. You can't go ride your horse off and do what you want when you're teaching a national curriculum.

Q. All right. So your opinion here is that Mr. Cox was -- you don't know whether he was retrained or not since 2007, so you assume that he wasn't, correct?

A. Correct.

Q. And you state that Mr. Cox didn't know some of the terminology used, and was unaware of pertinent documents on the slide presentation; true?

A. Correct.

Q. So when you say here it would appear that this was not the slide set that Mr. Cox used in training on the day in question, you don't know what slide set Mr. Cox used at the training on the day in question; true?

A. That is correct.

Q. Now, you say here in Paragraph 6 it's well documented that the instructor did not provide multiple garden hoses for the decon area, correct?

A. That is correct. That's based off the depositions.

Q. Okay. Mr. Cox stated he had multiple hoses; true?

A. I know he said that, but there wasn't, because it's well documented that there was not.

Q. Okay.

A. He can't remember -- he couldn't remember anything from that day. His memory was

very shot.

Q. Mr. Cox --

A. All he remembers - he remembers they go this is what's supposed to happen. He couldn't remember anything from that day.

Q. Mr. Cox testified that he has never run this course without multiple hoses, correct?

A. So he said. I don't believe him.

Q. Okay. So your -- did you --

A. It's the --

Q. Hold on a minute.
Did you see the testimony of Sergeant Lalley, Jim Lalley?

A. Yeah.

Q. And Sergeant Jim Lalley was with the Elgin Police Department, correct?

A. Correct.

Q. And he said he has never had that course taught at Elgin without multiple hoses, correct?

MR. SANDS: I believe there was an objection.
There may have been an objection to that question based on foundation, but go ahead,

if you can, sir.

THE WITNESS: No, I'm not going to answer that one, because that's impartial, because he has -- if he didn't, that puts -- if he answered that correctly. Possibly, if he didn't answer it correctly, that gives -- that pushes liability on to the Elgin Police Department.

BY MR. CARINI:

Q. So --

A. Might he --

Q. Hold on a minute --

A. Might --

Q. Can you just answer my questions and then you can --

A. I'm more than happy to.

Q. And then you can get out whatever you want to get, okay? I just want to ask this.
You are not believing Mr. Cox's testimony that he had multiple hoses, correct?

A. Correct.

Q. And you do not accept Sergeant Lalley's testimony that there were multiple hoses, because you believe that he might have had



self-serving motives for saying that, correct?

A. Correct.

Q. You are believing Mr. Orchard and Mr. Badagliacco that there were not multiple hoses, correct?

A. Correct.

Q. So you are deciding the credibility of the witnesses of Cox, Lalley, Orchard, and Badagliacco, correct?

A. Based on what I read, correct.

Q. And you don't feel that the jury should be entitled to make that determination on who they want to believe in this case?

MR. SANDS: Objection, it's argumentative.

BY MR. CARINI:

Q. Is that your position?

A. I'll let the jury decide, but they're going to hear that, and then they're going to hear me.

Which one is more believable?

Q. Do you have any specific training, experience, education, work history that puts you in a better position to judge the

101

credibility of the witnesses in this case than a juror?

A. I do.

MR. SANDS: Objection, it's argumentative.

BY MR. CARINI:

Q. And what is that specific training that puts you in a better position to judge the credibility of witnesses than a -- than a juror?

A. Not a jury, but I have had training at the National OSHA Training Center on how to conduct an interview, and how to investigate serious fatalities.

Q. Okay. So I think you started your answer by saying not a jury, but you've had experience in investigating accidents; true?

A. That is correct, and how to disseminate the truth out of witness statements.

Q. Okay. Now, and so -- so are you saying that you believe you're a better judge of the truth of witness statements than the average person, because you've been taught how to investigate accidents?

A. I would hope so.

102

Q. Okay. Sub B here under 6 says that Mr. Cox would watch to see if there were too many students running through the course, and that if the decon area was getting full, he would stop the course, and this did not occur, right?

A. Correct.

Q. So again, Mr. Cox said that he didn't allow it to get backed up; true?

A. Correct.

Q. Do you remember reading the testimony of Officer Ranken, that he had no recollection of having any issues getting to the decontamination station?

MR. SANDS: Same objections. I believe there were foundation objections that were raised during the course of that testimony.

BY MR. CARINI:

Q. Do you have a recollection of reading that?

A. I do, but I remember another witness saying that they had to wait.

Q. Who was that, Mr. Orchard?

A. Again, I read it, and then I couldn't find it again. My apologies.

103

Q. When you make the conclusion this did not occur, once again, you're weighing the testimony of Cox and others against the testimony of Badagliacco and Orchard, and coming to the conclusion that the decon area was full, correct?

A. Correct.

Q. You're weighing the testimony, and taking the side that indicates you believe the decon station was full?

A. Correct. You err on the side of caution?

Q. With respect to Paragraph 7, I didn't understand this. It says from the documentation provided, 26 students took the one-day course, it was difficult to determine as multiple class attendances were on the form.

So what do you mean by that?

A. The attendance sheet had multiple -- some attended the first class, and the attendance sheet that I received was for the whole week. Some only attended the second day, some attended the third day, some attended all four days, so I went through that and

104



Patrick Schuerman 11/13/2024

disseminated, and the best -- the best way I came up -- from this list, the best way I came was there was 26 students in the class.

It takes three minutes to get through the obstacle course, and then you have so many minutes, and you did the math -- and you did the math, and you came up with the answer. That's how I did it.

Q. Okay. So what I put up here --

A. Mr. Cox did not have an attendance sheet for every day.

Q. So what I put up here is Exhibit 21 from Mr. Cox's deposition. This was part of the exhibits that you had as part of your file in response to our request to produce your file.

This is the sheet from which you derived there was likely 26 students in the pepper spray portion?

A. That's where it was, yes.

Q. Okay.

MR. SANDS: What's the exhibit on that from Cox?

MR. CARINI: 21.

MR. SANDS: Thank you.

105

BY MR. CARINI:

Q. Okay.

A. He got done with it. He got -- in my preparation for today, he did all that in 45 minutes.

Q. So according to 8, you say the agenda calls for 210 minutes for the range portion of the class.

So when you say the range portion, are you talking about the decon -- the OC portion?

A. That is correct.

Q. Not the range portion where they're doing munitions or the range portion where they're doing gas exposures or anything like that?

A. That is correct.

Q. Okay. So when you refer to the range here in 8, the range is the outdoor section of Elgin Police Department where the OC training and fight through and exposure and decontamination occurred?

A. Correct, and it should have took 286 minutes, best guess, however, he ran it through so fast, that he had about 45 minutes,

106

he did it in about 1.7 minutes per student.

Q. Okay. So when you say -- when you say --

MR. SANDS: Did you finish your answer, sir?

THE WITNESS: Yeah, I did. Thank you.

BY MR. CARINI:

Q. So first of all, say that again. You said that --

A. There's two parts to this. There's the part that's in my report, and then there's another part.

The part in my report says it takes three minutes to go through the range, and then you spend another eight minutes in decontamination, it should have took a total of 286 minutes to properly do this curriculum based on 26 students. Now --

Q. Based upon -- let me just ask you before you move on to what's not in the report if -- is that based upon the premise that there's only one hose?

A. No, it has no -- that's -- that's based on the premise of time only.

107

If it takes three minutes to go through the course, I just pulled three minutes as a -- I don't know if it took five minutes or one minute. It just -- I said, okay, what's going to be the clocked time to run through this course -- the potential course, and I pulled -- and I gave it three minutes.

Q. So that number, three minutes, is not contained in the file materials?

A. It is not.

Q. It's your estimate of how long it would take to get from exposure through the fight through drill and over -- and through the decontamination station?

A. Through the decontamination station.

Q. Okay.

A. And then I -- and then I allowed another 8 minutes for the contamination station, so 11 minutes total, and you take that, and you multiply it times 26, that's where you come up with the 200 -- what -- 286 minutes, I believe.

Q. I see.

A. Does that make sense?

Q. I'm --

108

Patrick Schuerman 11/13/2024

A. You may not like the math, but that s how I arrived at it.

Q. Okay. So on the -- based upon the assumption that 26 students went through the course, and based upon the assumption that each student would have gotten -- well, strike that.

Is it your opinion that each student should have gotten 11 minutes to complete that course?

A. No.

Q. All right. Just using that as an example --

A. I --

MR. SANDS: Hold on.

Could we get an answer to the question, please?

MR. CARINI: He said no.

THE WITNESS: I said no, because I already answered that question, and I said I assumed that it was three minutes to complete the course, and 8 minutes in the decontamination station.

It could be longer or it could be shorter, but if we used that scenario, it should

109

have taken over 280 minutes.

In other words, the instructor was rushed.

Now, what bothers me is that in the testimony I was reading yesterday, that they were done by 2:00 for this whole training. They were leaving around 2:00.

If the range portion started at 1:00 after lunch, and they spent 15 minutes doing the discussion and doing the walk through of the range, like Mr. Cox said he did, that allows 15 minutes to -- that allows 45 minutes to conduct a training of all 26 students and decontamination. That allows every student had 1.7 minutes to complete the training and decon -- and the decontamination station.

BY MR. CARINI:

Q. First, the premise of my question is this, do you have an opinion on what the appropriate amount of time would be for a student to go through this less lethal training in Elgin that day?

A. One to three minutes.

Q. And what is that based upon?

110

A. Based off the number -- based off of a course of, approximately, probably 20 yards long and 15 yards wide.

Q. And where do you get the dimensions of the course?

A. I just -- it's a yard. I mean, it's a -- it's a grass area, and you have four -- you have the stations outright, you know, just randomly selected, but it's not so much the time that it takes to go through the course is the issue. It's the time that they -- that you allowed them in the decontamination area.

If every -- if there was -- let's take -- you say there was multiple hoses. Let's take two hoses, and we take two hoses, and we know for a fact the whole course -- the whole thing was done in 60 minutes, so we'll even go as much as we'll take 40 -- we'll take 50 minutes; 10 minutes to explain the range, and 50 minutes to do it, so we take 50 minutes divided by 26 students, that's 1.9 minutes per student to do the decontamination and do the range.

They couldn't possibly disinfect themselves in less than a minute, you know, and

111

your own documentation says it should be at least, you know, 15 to 20 minutes in decontamination area.

Q. Did you read any --

A. So the numbers -- the numbers don't line up.

Q. Okay. So let me ask you this.

You recall the testimony of Deputy Ranken. He said he didn t use the hose at all, he preferred to just use wet paper towels, and do his face that way, right?

A. Right.

Q. Correct?

A. Correct.

Q. We don't know how long it took him to decontaminate; true?

A. I don't know.

Q. We don't know how long it took any of the participants to decontaminate to their satisfaction, correct?

A. That is correct.

Q. We know Mr. Badagliacco claimed that he felt rushed; true?

A. Correct.

112

Q. And he claimed that he didn't feel like he had enough time to decontaminate?

A. How many students did you not -- how many -- there were 26 students. You did not interview all 26 students.

Q. I'm asking about Mr. Badagliacco. He said he didn't feel like he had enough time, right?

A. Correct.

Q. As you sit here today, the only testimony you've heard about there being inadequate time for participants to decontaminate came from Mr. Badagliacco and Mr. Orchard?

A. But I also looked at the set up, and I looked at the time that was spent, and it doesn't -- the time doesn't add up.

Q. Okay. The time that you selected of 11 minutes per person doesn't add up?

A. Or even if I take your -- you're telling me -- what you're telling me is any number of individuals can go through this course, complete the course, and decontaminate in less than two minutes.

113

Q. And I'm saying to you that you don't have any evidence of anybody else saying that they didn't feel that they had adequate time to decontaminate that took this course, correct?

A. That is correct.

Q. So coming back to this timing issue, if we use whatever time you want to use for your opinion here, whether it's a three, an eight, or whether it's some other number, it's your opinion based upon the math that you've conducted, that the instructor was rushed?

A. Absolutely.

Q. Did Mr. Cox testify that he was rushed?

A. No, he did not.

Q. So again, your opinion is, because of the way you do the math, you don't believe the instructor?

A. The math -- math is never wrong.

Q. Right, but you pulled these numbers out of thin air, Pat, with all due respect, so math could be made to say whatever it wants to say; would you agree with me?

MR. SANDS: Object to the form of the question. It's vague, and also argumentative.

114

Go ahead, if you can, sir.

THE WITNESS: No, I'm not going to answer it.

Math doesn't lie.

BY MR. CARINI:

Q. No. You can times 3 times 26, you can times 3 times 100, it's always going to come to the same answer, right; right, 3 times 100 is always going to be 300, isn't it, Pat?

A. You're correct, and in this case --

Q. Math doesn't lie?

A. In this case, you know, if you told me that it takes 45 seconds to go through this course on average, you would use the 45 seconds.

If you told me you took 3 minutes to go through this course on average, I would plug those numbers in, and I guarantee you my numbers would be proven.

It's going to show that there's no feasible way 26 students can get through this class and properly decontaminate.

Q. Okay. So you don't know how long it took to go through the course, all you know is that not -- that all 26 of the people that went

115

through this course, didn't properly decontaminate?

A. Let's look at it this way.

Q. Hold on. Is that right; it's your opinion that none of the 26 people that went through this course, had time to properly decontaminate?

MR. SANDS: Objection --

THE WITNESS: It did not have appropriate time --

MR. SANDS: Go ahead, Pat.

THE COURT REPORTER: Excuse me, you're talking on top of each other.

MR. SANDS: Hold on, Pat. Start over, please, because I raised an objection. Start your answer over, please.

THE WITNESS: Even if it took zero time to go through the course, I'm showing if we use zero time, and we know for a fact that this course took about 50 minutes, they had about 50 minutes, divided by 26, that gives them 2 minutes -- not even 2 minutes to decontaminate.

BY MR. CARINI:

Q. And my question was --

116



A.    The numbers --

Q.    Your opinion then, based upon that, is that none of the 26 people that went through this course had appropriate time to properly decontaminate, that's your opinion?

A.    Absolutely.

Q.    Okay.  And can you account for how only 1 of those 26 people has contended that they were injured as a result of not having enough time to properly decontaminate?

A.    You didn't -- we don't know about -- you only -- how many witnesses -- how many did you interview?

Q.    My question is, you don't know about anybody else being injured other than him, correct?

A.    No, correct.

Q.    Okay.  And you've never seen the reviews of the participants that commented on the course that was put on by Mr. Cox, correct?

MR. SANDS:  Objection, asked and answered.

THE WITNESS:  Correct.

117

BY MR. CARINI:

Q.    And do you recall that -- do you recall anything contained in the deposition testimony of Derek Ranken or Officer Andrew Stein concerning they're going through the process, and their decontamination after going through this exposure?

A.    No.

Q.    So whatever they said is not impacting your testimony here; true?

A.    That is correct.

Q.    Okay.  All right.  Let me go to section -- I'm going to go to -- strike that.

Paragraph 9 and 10 we talked about already, right, Z358.1 and 1910.151; true, we already covered those opinions, Pat?

A.    I did.  Unless you want to go -- rehash all, but I think we're good.

We haven't talked about -- go ahead.

Q.    Haven't talked about what?

A.    No, go ahead.

Q.    Do you have more opinions on Section Z358.1 other than what's contained in this Paragraph 9 and what we've discussed?

118

A.    I think we discussed it pretty well.

Q.    Let me ask -- I want to ask you about this section here, about eye wash being accessible for no more than 10 seconds to reach, right?

MR. SANDS:  You mean, Paragraph 9, Joe?

MR. CARINI:  Yeah, Paragraph 9.

BY MR. CARINI:

Q.    I want you to assume that Mr. Badagliacco was apprehending a criminal, and to do so, he uses less lethal techniques, including spraying that criminal with pepper spray in the field.  Is his employer in violation of 1910 -- strike that.

Is his employer in violation of Z358.1 if Mr. Badagliacco gets exposed during that subduing the criminal, and can't decontaminate within ten seconds?

A.    That's hard to say.

MR. SANDS:  It's an improper hypothetical.

MR. CARINI:  I can ask a hypothetical.

MR. SANDS:  I said it's an improper hypothetical.

119

BY MR. CARINI:

Q.    I want you to assume for the sake of my argument that if Mr. Badagliacco, in apprehending a criminal, sprays that criminal with pepper spray, and gets contaminated himself, is his employer in violation of any rule or regulation if he's not able to get to a station and decontaminate within ten seconds?

MR. SANDS:  I object.  It's an improper hypothetical, and it's also irrelevant.

Go ahead, if you can, sir.

THE WITNESS:  Most -- you know, whenever I did inspections of police cars, they all had first aid kits in the trunk, so we got an eye wash.  We have portable eye wash.

BY MR. CARINI:

Q.    What's a portable eye wash?

A.    A bottle of eye wash solution, until you can get to a hose or another water source.

Q.    Okay.  Do you know whether Skokie Police Department has portable eye washes in their cars?

A.    That's immaterial to this conversation.

Q.    Okay.  If they don't, wouldn't that be

120



a violation of this provision?

MR. SANDS: Same objections.

THE WITNESS: I'm not going to go down that road, because that's not -- that has no bearing on this case.

BY MR. CARINI:

Q. Well, I mean, I think the judge can decide whether it has bearing on the case or not.

My question is, if the employer doesn't provide a portable eye wash station in all of their vehicles, are they in violation of any rule or regulation?

MR. SANDS: Same objections, improper hypothetical, also irrelevant.

BY MR. CARINI:

Q. Are they in violation of any rule or regulation?

A. I'm not even going to answer the question, because it s immaterial. It has no bearing on what we're discussing.

Q. Do you know if they would be in violation?

MR. SANDS: Same objection.

121

THE WITNESS: It would go back -- yeah, it goes back to the -- what was -- what was accessible.

If they had an eye -- if they had portable eye wash, that would be -- that would meet the minimum standards, but that doesn't apply in this case.

BY MR. CARINI:

Q. I get that, but if they don t have it, then it wouldn't --

A. You're going down paths that we don't need to go down.

Q. Well, you might not want to go down them, but I'm going to explore this.

My daughter can buy this spray online, and spray a potential predator in the face with it. Does she have to have an eye wash station nearby for that guy?

A. Is she an employer?

Q. No.

A. Then, I guess, that these standards don't apply to her.

Q. Okay. And Mr. Cox wasn't an employer of Mr. Badagliacco either, was he?

122

MR. SANDS: Objection.

BY MR. CARINI:

Q. Was he?

MR. SANDS: Calls for a legal conclusion.

MR. CARINI: It does not. Was he --

THE WITNESS: Now, wait a second. You're saying --

BY MR. CARINI:

Q. Hold on.

Was he the employer of Mr. Badagliacco or not?

MR. SANDS: He's the agent of Skokie PD, so it does apply. It is relevant.

MR. CARINI: Scott, that's bullshit, and you want to start talking about agency here now?

I'm asking him a straight-up question. Did Mr. Cox employ Mr. Badagliacco? That's a pretty simple premise given this report that he's given.

Yes or no?

THE WITNESS: He was not an employer. The Skokie Police Department entrusted him with

123

his -- with his safety through Mr. Cox.

BY MR. CARINI:

Q. Okay. What did you say about Mr. Cox?

A. I said --

MR SANDS: Through Mr. Cox.

THE WITNESS: The Skokie Police Department entrusted his safety through Mr. Cox.

BY MR. CARINI:

Q. Okay. Do you have any knowledge -- strike that.

You know that Mr. Badagliacco had been exposed to pepper spray before this day, right?

A. That is correct.

Q. All right. Was there anything that he didn't know about exposure to pepper spray that you feel that he should have been informed by Mr. Cox?

MR. SANDS: Objection, calls for speculation, lacks foundation.

Go ahead, if you possibly can, sir.

THE WITNESS: I would -- repeat -- repeat the question.

BY MR. CARINI:

Q. Was there anything Mr. Badagliacco did

124



not know about being exposed to pepper spray that you believe Mr. Cox should have told Mr. Badagliacco about?

MR SANDS: Objection.

THE WITNESS: Oh, absolutely.

MR. SANDS: Calls for speculation, lacks foundation as to what somebody else knew.

Go ahead, if you can, sir.

BY MR. CARINI:

Q. What's your answer then?

A. Absolutely.

Q. What didn't Mr. Badagliacco not know that Mr. Cox should have told him?

A. Oh, wait a second. Not know or -- let's go back to what Mr. Cox should have informed him of. Let's answer that question.

Q. Well, I want you to answer my question. I want to know what Mr. Badagliacco did not know about being --

A. It's not about what he did know or didn't know.

Q. Okay. Very good. Very good.

A. What he should have been told is the hazards associated with the --

125

Q. With what?

A. Well, he should have been informed of all the hazards associated with this product.

MR. SANDS: What was the last word?

THE WITNESS: All the hazards associated with this product.

MR. SANDS: Thank you.

BY MR. CARINI:

Q. And I think in section -- are you talking about Section 15 of your report that the SDS shows --

A. Yeah, that's one -- that's one of the components, absolutely.

Q. What's your understanding of the percentage of OC that was in the spray that was used for this class, was it a 2 percent --

A. Yeah, this was the low one, correct.

Q. And the 2 percent solution would not be considered a corrosive, right?

A. That is correct. The other -- the next one above is considered a corrosive.

Q. Okay. And we're not talking about that, because we're talking about 2 percent?

126

A. Wait a second. Hang on. The only reason it's not considered a corrosive is because of volume. It still has corrosive components in it.

Q. Okay. So --

MR. SANDS: I'm sorry, Joe, corrosive components or elements?

THE WITNESS: Either/or, elements, because it s --

MR. SANDS: Elements, thank you.

THE WITNESS: Because it didn't come to that -- it didn't have -- if you look at the SDS sheets, it's still a Category 3 on a 4 point scale, so it's not even low, the low lowest, it's the second one.

BY MR. CARINI:

Q. So the 2 percent solution based upon your interpretation of the SDS is the second level of what?

A. Of the hazard of the GHS, you know, there's one through four; one being the most severe, four being very -- dish soap, and this -- and we are -- depending on which category we're looking at, it's a two or a three.

127

Q. Okay. So I'm going to put up this document that was in your file, also identify it as Cox Exhibit 18. Let me see. Is this the OC sheet -- I am the SDS sheet --

A. Is this -- is this the original one, because there was a -- you provided -- originally, you provided me with the incorrect one, so what's the --

Q. I'm going to put this up here, and show you, and then you tell me.

A. 544 -- is this the most recent one you sent me? Yeah, I think it is.

Q. And just so you can see on here, Scott, we're talking Exhibit 18 from Cox's dep.

A. But I don't believe that was the correct one.

Q. Okay. All right. I'm trying to find stuff in your --

A. I'll be right back.

(Whereupon, a discussion was had off the record.)

THE WITNESS: It was forwarded to me

128



later on.

BY MR. CARINI:

Q.   I put this one up here.  It's not marked as an exhibit, and it is dated a little later than --

A.   Okay.

Q.   -- the other one.

A.   You're correct.

Q.   You tell me, because I'm going through this file, and there's a lot of materials here, so I'm just trying to make -- find it, but does this look like the way --

A.   Okay.  So if we go back up, and if we -- can you pull up the shipping invoice for the product that was shipped to the -- to Elgin, please?

Q.   Bear with me.  I think that would be considered one of the deposition exhibits.  Bear with me here.  I think it's Cox 13.

MR. SANDS:  I'm not sure -- okay.  Go ahead.  Go ahead.

THE WITNESS:  Just scr ll down for me.

BY MR. CARINI:

Q.   Tell me when to stop.

129

A.   Stop.  Can you go up one a little bit, please?

Q.   Hold on.  Let me get a couple others.

A.   We're on the right spot.  I'm just -- there it is right there.  Aerosol 56185, do you see where I'm pulling the part number?

Q.   Yes, right here?

A.   Yeah.  Now, go back to that SDS sheet.

Q.   Okay.

MR. SANDS:  56185.

THE WITNESS:  So we got the right one -- no, we've got the wrong one.

BY MR. CARINI:

Q.   This isn't it, and this isn't.  Hold on a minute.

MR. SANDS:  This was provided, Joe, somewhat recently.  Well after Cox's deposition.

MR. CARINI:  Yeah, yeah, I'm just trying to find it in the file here.

THE WITNESS:  Do you see where -- that's where all the confusion was, I was looking at all this, and all of a sudden it --

BY MR. CARINI:

Q.   It's in here.  I know -- I know it's in

130

here.

A.   But it's pretty close, so just -- if we pull up my report, we can continue.

Q.   It wouldn't be an exhibit, because it's something newer.

Let me just open these two.

MR. SANDS:  Joe, can we take a fast break?

MR. CARINI:  Yeah, sure.

(Whereupon, a short recess was taken.)

BY MR. CARINI:

Q.   I've asked my assistant to mark this as Exhibit 4.

So what I've done is I've marked the 26 disclosure as 1.

I think I marked the answer to the request to produce as 2.

I'm going to mark just the entire download of the file you sent me, Scott, as 3, just like as not every individual thing within it, but because this wasn't in -- I couldn't find this in here, I'm going to mark this as Exhibit 4.

131

So what I'm putting up here now is a copy of a safety data sheet for Item 56185, which is a 2 percent MK stream OC aerosol, and I think you mentioned based upon our review of Cox 13, that the M6185 is the product, right?

A.   To the best of my reading that, that's the best -- that's the best I can come up with, and that's what I assumed.

Q.   Okay.  And then when you -- when you made offered opinions in this case --

A.   It's based off of this document.

Q.   Got it, okay.

Is it up on the screen for you now?

A.   Yes.

Q.   Okay.  So when you were talking about this level of one through four on the hazard level, is that in this document somewhere?

A.   It is.  If you look at number two, hazard identifiers, right where you're at, if we go down to about the fourth line, see eye irritant, or skin irritant is a number two.

Q.   I see.

A.   May cause respiratory irritation is a number three.

132

Q. Okay. And those compare to the levels that you described in your report with one being the worst and four being the least?

A. That is correct.

Q. Okay. And I take it by the way these are lined up, that 2A is somewhere between a 2 and a 3, is that correct?

A. That is correct.

Q. On this next page, 2 of 11 --

A. So if we go back up -- can we go back where we were?

Q. Yes.

A. Perfect. Let's just go down just a little bit. Put the little triangles at the top. Okay. Perfect.

The signal is warning. If it was very severe, it would be a danger, but if we look down here under the hazard statements, and these are not hazard statements that -- these are hazard statements that were deemed important by Safariland and they're manufactured, contains gas -- yeah, it says -- causes skin irritation. Causes serious eye irritation. May cause respiratory irritation.

133

Did your waiver -- did your employer -- Safariland and Mr. Cox did not explain these to the students before they signed the waivers.

Q. Do you know, as you sit here today, whether Mr. Badagliacco was aware of the fact from prior exposure to AC spray, that it can cause skin irritation?

MR. SANDS: Objection, calls for speculation, lacks foundation as to what somebody else knew.

MR. CARINI: That's why I'm asking him.

BY MR. CARINI:

Q. Do you know if Mr. Badagliacco knew from prior exposures, that this could cause skin irritation?

A. I do not.

Q. Hold on.

A. However, that -- what happened prior to the class is immaterial.

This is a training class that should have articulated all of these hazards to their -- to the participants.

Q. Okay. Do you know whether Mr. Badagliacco knew that this could cause serious

134

eye irritation?

MR. SANDS: Same objections.

BY MR. CARINI:

Q. Same answer, you don't know?

A. Correct.

Q. And you don't know whether Mr. Badagliacco knew this could cause respiratory irritation, correct?

A. Correct.

Q. And your criticism that you just espoused was that these things here weren't contained in the waiver form, correct?

A. Incorrect.

Q. Are you saying that there was no discussion during any part of this class where Mr. Cox explained to the participants that pepper spray causes eye and skin and respiratory irritation?

A. My concern is that Mr. Cox failed to review this document with him.

Q. Okay. And again, just so --

A. Because -- because if -- because your client is supposed to articulate these hazards before they're exposed to them.

135

Q. Okay. So that's two different things, and I want to break that down, and ask you a question about that.

Can you explain these hazards without showing them the SDS?

A. Yes.

Q. And do you have an opinion that the hazards of skin irritation, eye irritation, and respiratory irritation were not discussed prior to the exposure?

A. It was not -- it's my opinion based off reviewing the PowerPoint presentation, it was not discussed --

Q. Okay. And then you would agree with me?

A. -- satisfactorily.

Q. I'm sorry?

A. It was not discussed satisfactorily based off of the PowerPoint presentation that I reviewed.

Q. What is it that you are trying to explain to your satisfaction about these three topics; in other words --

A. If this --

136



Q. Go ahead.

A. Did they explain -- your waiver talks about -- you know, asks -- I believe, it asks about heart condition, but it didn't talk about respiratory.

Q. I'm not talking about the waiver. I'm talking about the training.

A. Okay.

Q. Okay. And you said -- you have criticisms that based upon what you've reviewed, you don't think that these topics were discussed, or adequately discussed?

A. That is correct.

Q. Which is it; not discussed at all, or not adequately discussed?

A. Not adequately discussed.

Q. And what is the purpose of the discussion?

A. See, if they would have done it properly, and reviewed this, they would have understood the chemical make up. They would also have understood the gravity of not -- of this, and most -- and in most cases, they would have -- students would have had an educated

137

decision, and they would have said, hey, where's our --

Q. Where's our what?

A. We don't have enough.

Q. Where's our what?

MR. SANDS: Where's our what?

BY MR. CARINI:

Q. You broke up.

A. They didn't have enough eye care.

You had the -- you had the, quote, safety officer going through the course without safety glasses.

They did not discuss the items in this, because if they did, they would have all had safety glasses on.

Q. Who?

A. The employee -- the -- the safety officers in the course.

It says right here that safety glasses and safety goggles and face shields are required.

Q. And what testimony do you have as to whether anyone was or was not wearing --

A. Mr. Cox himself says he didn't -- it

138

doesn't apply.

Q. Mr. Cox was asked about the safety observers, and whether they needed to wear safety glasses or not?

A. He -- he said right in the testimony, yeah, that doesn't apply to this when you were going through the bullet points of the -- of the material.

Q. All right. I'm not sure what you're referring to, but be that as it may, you would agree with me that the people who are participating in the class were not going to wear glasses for the people in the class, right?

A. Wrong. The individual getting sprayed would not get -- everyone else should.

Q. Okay. And again, the purpose of -- the criticism you have is that if this was explained more thoroughly, then you believe that the participants may have taken a different course of action in response to that information?

A. And the instructor would have, yes.

He bypassed all the safety mechanisms that are in place set forth by the -- by the organization.

139

Q. Right. Again, because he didn't have enough hoses, and he didn't have enough time?

A. And he didn't -- and he didn't require safety glasses.

Q. Okay. How is the lack of safety glasses in any way correlated to the injuries claimed by Mr. Badagliacco?

A. It's not, but we could have prevented additional -- we could have -- it would have reduced the potential of further injury by other employees.

Again, this goes back to an adequate hazard assessment of the training program.

Q. Okay. Now, do you have any opinion as to whether or not Mr. Badagliacco knew before he was exposed to spray on the day of this indent, that he should avoid breathing in these vapors?

MR. SANDS: Objection, same objection, calls for speculation, and lacks foundation.

Go ahead, if you can, sir.

THE WITNESS: I have not -- I have nothing, but it's immaterial, because this training is supposed to train them on the proper use of the material, and they did not --

140

BY MR. CARINI:

Q. No, I get it. I get it now.

So you can say in confidence that the lack of this effected what Mr. Badagliacco knew, but your attorney won't let you opine on what he knew, is that right?

A. It's immaterial why --

MR. SANDS: Objection, it's argumentative.

Go ahead, if you can.

THE WITNESS: This training session basically says you will -- it's training you on the proper way to do it, not what you had in the past.

MR. SANDS: And I'm not his attorney, Joe, just for the record.

BY MR. CARINI:

Q. So are you critical of the fact that in your opinion, based upon what you've reviewed in this case, and the testimony you're relying upon to form these opinions, that Mr. Badagliacco wasn't trained the proper way to train other people if Mr. Cox didn't pull out this SDS sheet and go through it with him?

141

A. Correct.

Q. Okay. You would agree with me that it's an employer's responsibility to review SDS sheets with their employees; true?

MR. SANDS: I'm going to object to the question as vague.

I don't know the circumstances we're talking about.

THE WITNESS: Mr. Cox went to this training session to become knowledgeable, and to be able to do the training.

If he went -- it's immaterial what he knew beforehand.

It's imperative that your organization basically said, you come here, we will train him to be a trainer, and you failed that.

BY MR. CARINI:

Q. Okay. And let me ask you this.

Do you have an opinion that it was failed as to all of the presumed 26 participants?

A. Absolutely.

Q. Okay. And the basis for that is because it failed Mr. Badagliacco?

1 2

A. No. It's trained on basis of the - if you review the material that he covered, he didn't cover anything that was -- I'm going off the training component, and only the training component.

Q. Okay.

A. You look at that training presentation, and then you -- and it does not state the hazards associated with it, and, you know, I have no idea what he talked about.

He pushed -- he jammed six hours of training into three hours.

The course was well -- was designed with specific timeframes and specific topics to be covered, and through his own deposition, he didn't follow those standards.

Q. Let me ask you this question.

Do you believe that, and is it your opinion that every person that went through the decontamination station should have decontaminated for 15 minutes, whether that person personally believed they needed it or not?

A. Repeat the last half of that question,

143

please.

MR. CARINI: Could you read that back for me, Kiki, the whole thing?

(Whereupon, the record was read as requested.)

THE WITNESS: Fifteen minutes is what is the general accepted standard for eye wash.

You may not need it, however, your own -- I believe, your SDS sheet says so. Most do say -- most SDS sheets say right in there flush your eyes for 15 minutes.

Q. Do you believe that every participant should have flushed for 15 minutes whether that participant personally believed they needed to or not?

A. I don't know, because I don't know the hazards associated with it, however, the standard is straight forward. It says you must have that opportunity.

Q. Okay. So the reason that I'm asking --

A. Hold on. Let me grab it here.

Pull up the SDS sheet for me.

Q. This one that we're talking about, right?

144

A. Yes, please.

Q. Okay. So tell me what section.

A. Hold on. Go up slowly. A little bit more. Stop right there. Keep going. Keep going, keep going. There's that safety glasses, and keep going. Stop. Keep going.

Q. Actually, I think I know where it is. Hold on a minute. Maybe I'm wrong, but you can tell me if I am.

A. Yeah, you just passed it.

Q. Wash thoroughly after handling?

A. No. Keep going. About skin, inhaled -- skin irritation, keep going down. First page. There you go. Keep going down. Eye contact, remove lenses -- in this space it's saying for several minutes.

Most SDS sheets say it's for 15 minutes.

Q. So in any event, is it up to the person who's decontaminating when to stop decontaminating?

A. In this case, yes, it says rinse for several minutes under running water, but the thing of it is, is the running water that was

145

provided -- provided in this case was not acceptable, because the student had to hold the -- had to hold the hose while flushing his or her own eye.

An eye wash station should be to where it's coming up, and you can actually -- because the idea is, is in an -- when we utilize -- when we're flushing the eye, we need to be able to pull the eyelids up and down, because we want that -- we want that water to go behind the eyeball, and we want it -- we want copious amounts of water to flush that entire socket out, and we can't do that if you're holding one -- holding the hose, and one eye trying to hold the bottom lid, and the top lid opened at the same time. It's physically impossible.

Q. Okay. Did Mr. Badagliacco say that he didn't feel like he could adequately clear his eye out, or that he didn't have time to stay there long enough to adequately clear his eye out?

A. He was rushed.

Q. Okay. So he didn't say I couldn't do it, because it was physically impossible; he

146

said he couldn't do it, because I didn't have time to do it?

A. Was he -- I don't show that you properly -- your documentation, the training records didn't show how to properly decontaminate your eye

Q. Did he --

A. You didn't do that -- you didn't do that adequate training in your course.

Q. Okay. So it's your opinion that Mr. Badagliacco did not know how to adequately decontaminate?

A. Correct.

Q. Okay.

A. He didn't teach them.

Oh, there's some water over there, use what you need, blot it -- you know, you didn't teach -- you did not articulate the proper ways to decontaminate.

Q. Okay. And because of that, it's your opinion Mr. Badagliacco didn't know how to decontaminate properly?

A. Because you didn't train him.

Q. That's right, right? It's a yes or no.

147

A. Correct, you didn't train him.

Q. Okay. Did you see any testimony from Mr. Badagliacco that he felt he didn't know how to decontaminate?

A. No.

Q. I want to go to the Section 11 on this thing, the toxicological information.

A. Okay.

Q. LD50 oral 3,000, and LD50 dermal, greater than 2,500 for rat and mouse; what does that mean?

A. That's the lethal dose of 50 percent of the population.

So in this case for this product, we -- for oral, we fed it to rats, at which point in time, 50 percent of the rat population died. So the milligram per kilogram, if you're -- if you're not metric, you're not a metric wiz, that's equivalent to like ounces to pounds.

So it's milligrams of product to milligrams of body weight, or in other words, ounces of product to pounds of body weight.

Q. So this exposure, the lethal dose of 50 percent of a population of mice would be

148

greater than 2,500 milligrams per kilogram?

A. That is correct.

Q. Okay.

A. That comes into -- that falls in -- according to Pennsylvania department -- University of Pennsylvania, falls into Category 3.

It's right -- it's right on the borderline. They cut off -- I believe it's a category -- one says 3, one says 4, but it's right on the borderline, it's 2,000 to 5,000, so it's the more --

Q. And when you're referring to that -- and I want to make sure I have the right one up here -- that goes back to that hierarchy of one through four that we were discussing?

A. Where are you looking? I'm lost here.

Q. You said that --

A. When we were talking one through four, yes.

Q. When you referred to a three, you were talking on that same scale?

A. That's the one, you are correct.

Q. Okay. Bear with me here.

149

Was there any indication in any of the testimony you reviewed that Mr. Badagliacco sought any medical attention?

A. No.

Q. And, in fact, he finished the course the next three days, right?

A. Correct, but if you go back to the SDS sheet, your actions compounded the problem, because the -- because it flat out says -- and this should have been articulated in the training -- is that you need to remove your clothing. He didn't remove his clothing.

Q. Do you have an opinion, sir, that somehow he got this on his clothes, and that irritated his eye?

A. Well, if it's on his clothes, and you go like this multiple times, it's going to -- I have no documentation, but is it feasible? Absolutely.

Q. Has there been any testimony in this case that Mr. Badagliacco wiped his clothes on his eye?

A. No.

Q. So it's completely speculative that he

150

had it on his clothes in the first place; true?

A. Okay.

Q. And it's speculative that he somehow injured his eye by not changing his clothes?

A. I didn't say that.

It could have -- it could have been a contributing factor.

Q. You don't know as you sit here?

A. That is correct.

Q. And you believe that the better way to clean -- decontaminate rather -- from this sort of pepper spray exposure that Mr. Badagliacco underwent on April 16th, 2019 should include using soap in the eye?

A. I believe -- the reason I'm laughing is because your own Safariland procedures calls for baby soap, baby soap, and even their competitor's documentation shows that you need to wash and clean with soap and water.

Soap actually is a -- has a -- the composition actually helps remove -- remove those oils or de -- or reduce those oils.

So the reason they said baby soap is because it doesn't have that tearing, you know,

151

that burning effect on the eyes, that's a component of baby soap versus regular soap that, you know, shampoo that we would use.

Q. Right.

A. You get it in the eye, it burns.

So with that, you know, basically, what you're -- what happened here is Mr. Cox disregarded experts at Safariland, and did his own thing.

Q. So again, my question was, you believe that they should have been provided soap, and decontaminated with soap in addition to water?

A. Absolutely. That's what -- that's what the chemist -- Mr. Cox -- that's what the chemist says to do.

Do you argue with a chemist? No.

Your own documentation says you're supposed to use soap and water.

Q. Okay. And that's in the documents that were provided to you as part of your file review?

A. Absolutely, yes.

Q. Okay. Now, on this next -- Paragraph 14, you say that eye station shown in

152



the photos was not used at this location, and it should be noted that that does not meet the minimum standards for approved eye wash station.

So the one where there's a plastic tube with water sprouting out of it, you don't think that should have been used either, correct?

A.   That doesn't meet the standards, that is correct.

Q.   So the fact --

A.   You could have -- you could have very easily used that same style, and built one very reasonable, that would meet that standard.

Q.   But the one in the -- in the documents did not meet the standard?

A.   That is correct.

Q.   And you have no criticism of it not being used?

A.   I do not, because it was -- the standard says that both eyes must be cleaned at the same -- that was just kind of -- oh, here's a little stream -- he did not provide copious amounts of water needed.

Q.   Okay.  Do you know how the volume of water --

153

A.   Now, wait a second.

That would have been better than what you had, but it wasn't -- it still doesn't meet the minimum requirements.

Q.   Do you know how much water volume was supplied through the hose, or hoses, if there were more than one?

A.   I'm not arguing the quantity.  I'm positive it -- it provided ample flow.  It did not provide ample temperature, and it did not provide ample -- and it -- but it did not provide free flowing water without holding the hose.

Q.   Okay.  I think -- correct me if I'm wrong -- we've talked about Section 15 of your report already, we went through the subsets of the SDS, itself, right?

A.   That is correct.

Q.   And your explanation of one through four we discussed, right, part of the hazard; one being the most, and four being the least, we've talked about that?

A.   Yes.

Q.   Okay.  And then under 16, I think, we

154

talked about the first aid measures?

A.   Absolutely.

Q.   Okay.  And you've already told me about your criticism and the lack of documentation of classroom audits, right?

A.   Absolutely.

You know, you've got to have a sign-in sheet even in college.  I have a sign-in sheet every day whether or not I teach courses at manufacturing facilities, I teach continuing education, I always have a sign-in sheet. Sometimes I have a sign-in sheet in the morning and night -- afternoon.

Q.   Is there any question that Mr. Badagliacco attended this course?

A.   No.

Q.   Do you have any question in your mind whether Mr. Orchard attended the course?

A.   No.

Q.   Do you have any question as to whether Officer Ranken or Officer Stein attended the course?

A.   No.  I do have a question on the other ones that you haven't interviewed, whether or

155

not they were, so I don't know if we had 26 students or not.

Q.   Okay.  Back to your opinions here, Page 6, Line 18, and that's under a heading of conclusion that's at the very bottom of 5, and you said, based upon my review, as discussed in this report, it's my opinion that Safariland did not provide the instructor with the tools to complete the training safely, and in that regard, the tools you're talking about are the hoses, or the water, the decontamination station?

A.   Decontamination station.  He didn't even know about some of the -- he didn't even have knowledge of the slides -- slide set.

Q.   Okay.  So it's your opinion that he didn't have the proper slides, and he didn't have the proper water?

A.   Correct, and he didn't have decontamination wipes, he didn't have -- and he - he was really rushed.

He was more concerned about going to the baseball game than he was teaching this class, getting free tickets to the baseball

156

game.

Q. That's your opinion?

A. That's my opinion.

Q. Okay. And then you also criticized the fact that he didn't have the sign-in sheets, we've talked about that.

A. Mm-hmm.

Q. And that he didn't ensure the safety of the overall -- this should be policies and procedures?

A. Yes.

Q. And we've talked about that?

A. He just didn't -- yeah, we talked about that already.

You want to rehash it? We can, but --

Q. All right. And then in 19, you say that someone who instructs less than ten classes per year was rushed, and didn't provide adequate training to the safety team?

A. What we're doing here is there was no safety team. He didn't follow Safariland s procedures. There was no safety person at each station.

What he did -- what he did is in the

157

e-mail he said, does your points department have a copy of EMTs or paramedics on staff?

He never -- he didn't ask for them to be present that day. There was no --

Q. Do you have --

A. What?

Q. Do you have any evidence in this case whether they were or were not --

A. There was no safety team there at the decontamination station.

Q. According to who?

A. All the -- all the -- he never discussed in any of the depositions. Nobody was there. It was - it was a free for all.

Q. So it there -- if there's testimony to the contrary, it's not something that's on your radar; is that fair to say?

A. That is correct.

Q. Okay.

A. And I read through it, I didn't see it, and if I -- and I'm confident I didn't read it.

Q. And in terms of -- do you know what first aid training any of the police officers that attended this class had?

158

A. No.

Q. Do you have any idea whether it's custom and practice for police officers as part of their training to be trained --

A. It is not.

Q. -- to be trained in first aid?

A. I've got a lot of police officers that don't have first aid training.

Q. Okay. So is it your opinion --

A. So it's my opinion that they did not have adequate first aid. They didn't have someone watching that decontamination. They didn't have a safety officer at each one of the locations. They only had another student walking them through.

They failed to set the course up properly.

Q. Okay.

A. According to your own policies and procedures.

Q. And according to your interpretation of the testimony that there weren't EMT or paramedic staff assigned to the safety of the students?

159

A. That is correct.

Q. Now, let me ask you this.

Was there anything that prevented Mr. Badagliacco after completing this course from asking for assistance for something if he felt the need for assistance?

A. I have no -- I can't answer that.

Q. Okay. Do you have any -- is there any indication that he did ask anyone for anything?

A. I can't answer that.

Q. Did you see any testimony that he did ask anyone for anything?

A. I did not.

Q. And then let me ask you this.

Did you see any evidence that Mr. Badagliacco complained that his eyes were bothering him after he finished the exposure portion of the course to anybody associated with the course?

A. I don't recall.

Q. You don't recall seeing that testimony?

A. No.

Q. Tell me then, sir, how would an EMT or paramedic on staff have impacted the incident

160

with Mr. Badagliacco?

A. They would have held the hose so they could actually have done a proper flushing.

Q. Do you need to have an EMT to hold the hose?

A. They had nobody.

Q. Do you need to have an EMT to hold a hose?

A. No.

Q. Do you need a paramedic --

A. They had nobody.

Q. Do you need to have a paramedic to hold a hose?

A. No, but they had nobody.

Q. If Mr. Badagliacco asked Mr. Orchard to hold the hose for him, would that have been okay?

A. Yeah.

Q. Okay.

A. I guess, but you still -- but they -- the process required -- but the procedures in place by Safariland calls for those medics to be there. They weren't. They failed to follow their own protocols.

161

Q. I appreciate that. Now, do you know whether --

A. You're welcome.

Q. -- the EMTs and paramedics on staff are there in the event of an emergency so that they can lend medical care and treatment to someone that's having an issue?

A. Okay.

Q. Do they --

A. And they could -- and they could have ensured that they all stayed at that -- at that decontamination station for an acceptable period of time.

Q. My question is this.

Do you know whether the intent of having an EMT or a paramedic on staff is to lend medical care or treatment that someone needs?

A. Say that again.

Q. Do you know whether the intent of having an EMT or a paramedic present in the decontamination station, or as you said, throughout the course, is there to lend aid in the event of an emergency?

A. I would assume that was -- is the case.

162

Q. Is there any other reason for them to be there?

A. No.

Q. Okay. Was there any emergency that needed the attention of an EMT or paramedic that afternoon?

A. I don't know.

Q. Did Mr. Badagliacco ask for the care and treatment of an EMT or paramedic?

A. There was not one there.

Q. Did he ask for help?

A. I can't answer that.

Q. Okay. So whether there's an EMT or paramedic on staff, you can't say had one impact or another on Mr. Badagliacco's claims in this case?

A. In this case it would have been -- they would have -- a common practice would be to ensure him to assist in the decontamination.

I've done plenty of decontaminations in my life.

Q. Okay. My question is a little different.

Do you have any opinion -- strike that.

163

Can you say that the lack of an EMT or paramedic on this -- strike that.

If we assume you're right, and there was no EMT or paramedic manning the decontamination station; if you assume that would be true, because that's part of your opinion, is it your opinion that that somehow impacted Mr. Badagliacco's injuries in this case?

A. Yes.

Q. All right. How so?

A. Because that EMT/paramedic would have assisted in getting him appropriate treatment in terms of flushing the eyes.

Q. Okay. So you're saying that because an EMT and paramedic was not there, that's why Mr. Badagliacco didn't rinse his eyes properly?

A. That increased -- that increased the exposure, yes.

Q. When you say increased the exposure, what do you mean?

A. Because he had to hold the hose, and try and get his eyes open.

If he would have had an attendant there

164

holding the hose, he could have used both hands to open the eye properly and properly decontaminat .

Q. Do you have an opinion as to whether use of the shower or sink in the locker room would have afforded him the opportunity to spend more time under water, and use both hands to decontaminate?

A. Actually it would have --

MR. SANDS: Objection, calls for speculation, lacks foundation.

Go ahead, if you can, sir.

THE WITNESS: It would probably -- a sink doesn't have running water. It comes up, it goes down, so how are you going to use a sink to rinse your head -- your eye?

Q. Is it your opinion that a sink would not have afforded him an opportunity to continue flushing his eye out?

A. It would have, but I don't know how you would have used it. You'd have to kind of toss it up with, you know -- it's not the best situation.

Q. Okay. Then you say here -- have we

165

covered -- have we covered 19 and your criticisms of 19?

A. Yeah, we talked about that, I believe.

Q. And then 20, you already told me that you feel like Mr. Cox didn't explain the contents of the waiver before it was signed to the --

A. Yeah, because it didn't address the hazards.

And the part that really bothers me about this waiver is, was it just -- it was changed ten months before this training. I don't even know if Mr. Cox was even trained on the new form.

Q. Was there any indication to you that David Badagliacco, the plaintiff in this case, was not capable of reading and understanding what he signed?

A. No.

Q. Okay. You've been patient with me. I appreciate that. I don't have any other questions.

Have we covered all of your opinions now, and the basis for your opinions?

166

A. I believe so.

Q. Okay. That's all I have.

A. We had a nice -- we had a nice conversation.

EXAMINATION

BY MR. SANDS:

Q. Pat, just a couple of topics, sir.

With respect to the water that was provided, is it the standard that the water should actually run up?

A. It is. You know, it comes up, so you can actually come up and hit your eye.

I mean, it should be -- ideally, it would be between 60 and 100 degrees. Ground water is at about -- regular tap water is about 50 degrees after a little bit of flow.

Q. What's meant by the water should be crescent or in a half-circle, what is meant by that?

A. So when the water comes up, it should actually come up as -- come together at the top kind of like a half-moon or crescent where it comes up, and touches together, so when you put your eyes there, when it comes in, it's going to

167

be directly at your eyes, so as you go down, you're going to get adjusted to the right width of your eyes.

Q. All right. If you hold your upper eyelid up with one hand, and your lower eyelid with the other hand --

A. Lower and get -- yeah, it provides adequate flushing with the aeration of that -- of those nozzles in an appropriate eye wash provides enough aerobic air within it to aerate it, so it's a soft -- it's not like a hose coming right after you. It's more of a soft, gentle water flow.

Q. And water flowing from either a sink or from a showerhead, does not provide that upward water flow; would that be fair?

A. That is correct.

Q. So water from a sink or from a showerhead would not meet that standard of providing water that flows upward toward the eye; would that be fair?

A. That is correct.

Q. Secondly, with respect to the waiver, you mentioned just a moment ago that the waiver

168

did not address the hazards, or certain hazards, that Mr. Badagliacco was, as it turned out, was exposed to.

Can you -- can you expound on those hazards, and amplify those hazards that you're talking about, sir, that Mr. Badagliacco was exposed to that was not articulated or not expressed in the waiver that he signed?

A.    Yeah.  Joe, can you pull up the waiver again, please?

MR. CARINI:  That was Cox Exhibit No. 19.

THE WITNESS:  I might have it here.

MR. CARINI:  I have it.  That's fine.

THE WITNESS:  Go down.  Start there.

You know, the concern I have here was it talked about heart conditions, but it did not talk about respiratory concerns, and my other concern is that it basically said, if I took an aspirin, I'm disqualified from this course, so it's promoting -- it's promoting something that's impossible.

There's no grounds for some of the questions, and it misses other areas.

169

BY MR. SANDS:

Q.    From your report in Paragraph 20 on Page 6, you state that the instructor, Steven Cox, did not explain the hazards completely before requiring students to sign the waiver, which did not address all of the hazards outlined in Sections 15 and 16 above, and can you amplify for us the hazards outlined in Sections 15 and 16 that you are referring to there with respect to the waiver?

A.    Yeah, that's basically -- well, 15 and 16 deal with the hazards and the precaution statements that are outlined in the SDS sheet.

None of these precaution statements were listed in the PowerPoint presentation.

Q.    All right.  Anything else you want to -- you want to mention in that regard on that subject?

A.    I think we got it.

Q.    All right.  Sir, that's all the questions I have.  Thank you.

Joe, do you have anything further?

MR. CARINI:  I think so.  Bear with me one second.

170

FURTHER EXAMINATION

BY MR. CARINI:

Q.    This document he signed indicated that he was going to look out, and be responsible for the safety of others, and that they were going to watch out for each other, right?

A.    That's -- and you know what -- where in this -- where in the training did it discuss that in detail?

Q.    Okay.  So you don't know whether that was discussed or not, you didn't see it?

A.    I don't, and in the -- and, you know, you can't push safety off on the students.  It's the instructor's responsibility to ensure the safety of the course.

A fee was paid for attendance.  That means that your instructor was responsible for the safety of every student in that curriculum, period.

Q.    Let me ask you this under No. 3.

Do you think that Mr. Badagliacco needed to be discussed in a PowerPoint presentation, the fact that he agreed to report all injuries immediately to the instructor?

171

A.    I believe you need -- what should have been articulated is what type of injuries could have occurred.

He may have not known the ramifications of the eye injuries of the eye.  He may not have known what the pre -- what would happen four -- three hours after the training session adjourned.

Those are the -- those are the types of concerns that should have been articulated in this training course.

Q.    Okay.  And again, based upon the documents that you've reviewed, you didn't see that those specific hazards were discussed?

A.    That is correct.

Q.    All right.  I don't have anything else.

I appreciate your time here today, your patience with me.

Thanks, Scott.

I ll order this, Kiki.

(Whereupon, a discussion was had off the record.)

(FURTHER DEPONENT SAITH NOT.)

(Deposition concluded at 4:43 p.m.)

172



STATE OF ILLINOIS )

SS:

COUNTY OF C O O K

I, MARY KAY ANDRIOPOULOS, CSR, an Officer of the Court, within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on November 13, 2024, personally appeared before me, via Zoom videoconference, PATRICK SCHUERMAN, in a cause now pending and undetermined in the United States District Court for  the Northern District of Illinois, Eastern Division, wherein DAVID N. BADAGLIACCO is the Plaintiff, and SAFARILAND, LLC, a Limited Liability Company is the Defendant.

I further certify that the said PATRICK SCHUERMAN was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness  and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript

173

of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to notice and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF:  I have hereunto set my verified digital signature this 17th day of December, 2024.

_ ___ _____ ___ _____

M RY K   AN RIO OULOS, C R

LICENSE NO. 084-002248

174



**Exhibits**

**Exhibit 1**
3:13 6:15 7:23 17:11
51:10,11 65:4 82:12
89:16 96:20
**Exhibit 2**
3:14 9:8
**Exhibit 4**
3:16 131:14,24

**-**

**---is**
13:1
**-it**
13:23

**1**

**1**
6:15 7:23 17:11
51:11 65:4 82:12
89:16 96:20 117:8
131:16
**1.5**
56:12 59:19
**1.7**
107:1 110:15
**1.9**
111:21
**10**
22:9 43:19 51:12
111:19 118:14 119:4
**10-hour**
39:5,8 40:5 43:13
**100**
39:20 115:7,8
167:14
**10th**
66:4
**11**
108:19 109:8 113:19
133:9 148:6
**12**
65:11
**12-page**
7:23 17:11 65:5
**12th**
6:6
**13**
129:19 132:5
**14**
152:24
**15**
20:23 47:2 56:13
59:19 110:9,12
111:3 112:2 126:10
143:21 144:11,13
145:18 154:15
170:7,9,11
**16**
154:24 170:7,9,12
**16th**
151:13
**17**
20:23
**18**
128:3,16 156:4
**19**
157:16 166:1,2
169:12
**1903**
33:22
**1910**
8:10,18,21 9:16
33:21 34:2 50:16
52:9 55:23 119:13

**1910(a)**
51:22
**1910.151**
58:11 67:20 118:15
**1910.151(a)**
51:24 52:3
**1910.151(c)**
51:13,16 53:2 80:19
**1926**
33:21,24
**1965**
6:6
**1992**
64:11
**1:00**
110:9

**2**

**2**
6:22 9:8 65:11
116:21,22 126:16,
18,24 127:17 131:18
132:3 133:6,9
**2,000**
149:11
**2,500**
148:10 149:1
**20**
21:21 76:5 111:2
112:2 166:4 170:2
**20/20**
61:5
**200**
108:21
**2006**
64:11
**2007**
23:20 89:23 90:6,9,
17 92:5 97:22
**2012**
38:8 42:11,14
**2013**
38:8
**2017**
20:23
**2019**
30:23 38:2 42:11,14
84:22 90:18 93:12
151:13
**2020**
10:15
**2021**
16:16
**2024**
15:17 16:5,19 66:4
93:12
**208**
5:22
**21**
105:12,23
**210**
106:7
**22**
20:4,10,19
**24**
94:15,23 96:5,22
**250-page**
39:7
**26**
17:13 65:4,5 104:15
105:3,17 107:18
108:20 109:4 110:13
111:20 113:4,5
115:6,20,24 116:5,
21 117:3,8 131:15
142:20 156:1
**26(a)**
6:16

**280**
110:1
**286**
106:23 107:17
108:21
**29**
51:13,23
**2:00**
110:6,7
**2:20**
63:22
**2:30**
64:2
**2A**
133:6

**3**

**3**
54:22 89:17 115:6,7,
8,15 127:13 131:20
133:7 149:7,10
171:20
**3,000**
148:9
**30-hour**
22:9 43:13,20
**300**
115:9
**358.1**
8:22

**4**

**4**
127:13 131:14,24
149:10
**40**
111:18
**45**
24:9 106:5,24
110:12 115:13,14
**45000**
24:9
**4:43**
172:24

**5**

**5**
55:19 89:21 93:18
94:15,17,23 96:22
156:5
**5,000**
149:11
**50**
111:18,19,20
116:20,21 148:12,
16,24 167:16
**500**
22:16
**501**
22:18
**506**
22:18
**510**
22:18
**544**
128:12
**56185**
130:5,10 132:2

**6**

**6**
55:2 76:5 96:20
98:12 103:1 156:4
170:3
**60**
111:17 167:14

**7**

**7**
104:13
**7th**
16:5

**8**

**8**
15:17 94:21,23 95:4
96:4 106:6,18
108:18 109:21
**800-minute**
39:22
**88**
94:18,23,24
**89**
94:15,16 96:19,22,
23,24 97:1

**9**

**9**
54:21 118:14,24
119:6,7
**9:00**
95:10,11

**A**

**AASE**
21:14
**abatement**
40:11
**absolutely**
34:9 83:21 114:12
117:6 125:5,11
126:13 142:22
150:19 152:13,22
155:2,6
**AC**
134:6
**academy**
36:11
**accept**
72:5 100:22
**acceptable**
57:23 71:16 146:2
162:12
**accepted**
57:24 144:7
**accessible**
60:24 119:4 122:3
**accident**
29:2,6,20 32:15
**accidents**
43:2 102:16,23
**account**
117:7
**accredited**
80:11,13 81:2 90:22
**acidic**
69:12
**action**
139:20
**actions**
150:8
**actual**
65:9
**add**
113:17,19
**adding**
69:20
**addition**
32:13 38:5 40:4,10
46:10 152:12
**additional**
140:9

**address**
6:24 166:8 169:1
170:6
**adequate**
49:19 50:2 114:3
140:12 147:9 157:18
159:11 168:8
**adequately**
137:12,15,16
146:18,24 147:11
**adjourned**
172:8
**adjusted**
168:2
**adopted**
33:22 56:6 68:15
**advancement**
40:22
**advice**
37:7 43:1 52:5
**aerate**
168:10
**aeration**
168:8
**aerobic**
168:10
**aerosol**
130:5 132:3
**afford**
57:13
**afforded**
165:6,18
**afraid**
78:10
**afternoon**
6:3 155:13 163:6
**agencies**
33:6
**agency**
31:9 35:15 123:16
**agenda**
106:6
**agent**
123:13
**agree**
51:21,23 73:4,6
114:22 136:14
139:11 142:2
**agreed**
72:12 171:23
**agribusiness**
23:2
**ah-huh**
5:9
**ahead**
11:13 17:17,18
54:18 55:5 73:14
80:7 99:24 115:1
116:11 118:19,21
120:11 124:20 125:8
129:21 137:1 140:20
141:10 165:12
**aid**
120:14 155:1 158:23
159:6,8,11 162:22
**air**
26:17 114:20 168:10
**allowed**
108:17 111:12
**alluding**
94:2
**amount**
110:20
**amounts**
146:12 153:22
**ample**
154:9,10,11
**amplify**
169:5 170:8

**analysis**
72:9 81:24 82:1
**Andrew**
118:4
**Anesi**
13:13
**ANSI**
8:12,15,21 9:17 24:9
46:23 53:24 54:7,10,
12,15,19 56:4,9,24
58:4 68:7,15,22 69:9
70:7
**answers**
5:8 7:6 86:22
**antidote**
66:16 67:2,10 68:18,
23 69:3,21 72:3
81:8,20
**anymore**
21:2,8
**apologies**
103:24
**apparent**
84:14 92:19
**appears**
79:20 96:21
**applicable**
4:16 54:8
**application**
60:1
**applied**
33:6
**applies**
50:13 51:24 55:17,
19
**apply**
51:16 80:20 122:7,
22 123:14 139:1,6
**applying**
58:12
**apprehending**
119:10 120:4
**approved**
34:14 153:3
**approximately**
90:14 111:2
**April**
84:22 151:13
**area**
26:24 34:7,14,19,20
52:16 63:7 80:3
87:13 98:15 103:4
104:5 111:7,12
112:3
**areas**
169:24
**argue**
152:16
**arguing**
154:8
**argument**
120:3
**argumentative**
71:8 101:15 102:5
114:24 141:9
**arrived**
109:2
**article**
19:14
**articles**
18:15 19:11
**articulate**
135:23 147:18
**articulated**
134:21 150:10 169:7
172:2,10
**asks**
137:3
**aspirin**
75:2 169:20



**ASSE**
21:13
**assess**
27:10
**assessed**
70:14
**assessment**
26:6 27:22 70:16,17,
21 71:1 81:12
140:13
**assessments**
25:12,14 26:13,22
27:1
**assigned**
32:22 159:23
**assist**
163:19
**assistance**
14:1 160:5,6
**assistant**
131:13
**assisted**
164:13
**associate's**
22:24
**association**
21:15 22:4
**associations**
21:1,9
**assume**
5:16 49:1,7 71:3,6
90:5 92:12,13 97:22
119:9 120:2 162:24
164:3,5
**assumed**
109:20 132:8
**assuming**
85:11,14
**assumption**
82:6,7 109:4,5
**attached**
7:15 8:1 17:11 51:11
65:6,22 66:1
**attain**
20:15
**attempted**
11:13
**attend**
89:18
**attendance**
104:19,21 105:10
171:16
**attendances**
104:17
**attendant**
164:24
**attended**
104:20,22,23
155:15,18,21 158:24
**attendees**
60:24 61:12 91:16
**attention**
150:3 163:5
**attorney**
97:10 141:5,15
**attorneys**
14:21
**audits**
155:5
**August**
16:5,19
**authored**
19:6
**automobile**
29:2,6
**availability**
52:5
**avenue**
27:15

**average**
40:13 102:21
115:14,16
**avoid**
140:17
**aware**
58:2 134:5

_____

**B**

**baby**
151:17,23 152:2
**bachelor**
23:1
**back**
8:6 10:15 14:3,13
18:23 20:22 23:4
28:6 40:7 41:7 44:22
45:5 49:8 51:6,9
54:5 64:9 65:3 66:22
73:16 74:19 78:21
82:12 84:6 86:11
114:6 122:1,2
125:15 128:21
129:13 130:8 133:10
140:12 144:2 149:15
150:7 156:3
**backed**
103:8
**background**
22:9
**Badagliacco**
4:15 36:14 73:8
74:10 76:9 78:5,9,24
79:8,12 84:11,19,24
86:4,12 93:2 101:4,9
104:4 112:22 113:6,
13 119:10,16 120:3
122:24 123:11,19
124:11,24 125:3,12,
18 134:5,13,24
135:7 140:7,15
141:4,21 142:24
146:17 147:11,21
148:3 150:2,21
151:12 155:15
160:4,16 161:1,15
163:8 164:17 166:16
169:2,6 171:21
**Badagliacco's**
75:12 163:15 164:8
**balance**
90:22
**base**
38:20
**baseball**
156:23,24
**based**
24:6 71:5 98:16
99:24 101:10
107:17,19,21,23
109:3,5 110:24
111:1 114:10 117:2
127:17 132:4,11
136:11,19 137:10
141:19 156:6 172:12
**bases**
66:7
**basic**
92:24 93:2
**basically**
9:16 11:16 24:5
29:14 31:1 38:20
40:22 64:12 74:2,3,5
141:12 142:15 152:6
169:19 170:11
**basis**
32:10 36:16 57:1
65:13 66:9 69:7
83:11 142:23 143:1
166:24

**bear**
8:7 129:17,18
149:24 170:23
**bearing**
121:5,8,21
**beginning**
17:3 78:22
**behalf**
25:3
**believable**
101:21
**believed**
143:22 144:14
**believing**
100:19 101:3
**belt**
49:16
**bending**
44:16
**benefits**
47:9
**billed**
17:7
**billing**
15:15
**birth**
6:4
**bit**
32:16 47:15 130:1
133:14 145:3 167:16
**blot**
147:17
**board**
22:3
**body**
52:12,15 148:21,22
**boilerplates**
41:5
**book**
8:18 23:12,16
**borderline**
149:9,11
**boss**
74:20 75:8 76:10
78:10
**bother**
23:15
**bothering**
160:17
**bothers**
95:5,6 110:4 166:10
**bottle**
120:18
**bottles**
46:21
**bottom**
6:21 146:15 156:5
**brand**
47:5
**break**
63:23 76:24 95:9
131:8 136:2
**breathing**
140:17
**bring**
81:22
**broad**
59:24
**broke**
138:8
**brought**
75:17
**building**
28:8
**buildings**
32:21 33:19
**built**
63:17 153:11
**built-in**
47:21 49:9

**bullet**
139:7
**bullshit**
123:15
**bunch**
94:11
**burning**
152:1
**burns**
152:5
**business**
64:12
**buy**
46:12 47:4 122:15
**bypassed**
139:22

_____

**C**

**call**
17:12 35:15 37:9
40:24 83:7 87:16
**called**
6:16 14:13 32:14
69:21
**calls**
57:6 72:15,21 80:6
106:7 123:4 124:18
125:6 134:8 140:19
151:16 161:22
165:10
**camaraderie**
21:12
**capable**
53:21 56:11 59:17
166:17
**capacity**
27:24 58:23
**car**
32:17
**carbon**
9:12
**card**
39:5
**care**
47:1 138:9 162:6,17
163:8
**career**
13:10 34:17
**CARINI**
4:7 7:24 8:3 9:7,13
17:19,23 18:2,6,8,
19,23 19:5 21:7 57:8
58:1 64:1,5 67:7
71:10,18 72:6,18
73:3 75:21 76:6,14
77:2,11,14,21 78:3
80:8 94:19,22 95:3
100:9 101:16 102:6
103:17 105:23 106:1
107:7 109:17 110:17
115:5 116:23 118:1
119:7,8,22 120:1,16
121:6,16 122:8
123:2,6,9,15 124:2,
8,23 125:9 126:8
127:16 129:2,23
130:13,18,23 131:9,
12 134:11,12 135:3
138:7 141:1,17
142:17 144:2
169:11,14 170:23
171:2
**Carnegie**
23:5
**carriers**
12:6 19:13 25:3
42:21
**carry**
49:4

**cars**
120:13,22
**case**
4:15 6:9 11:24 15:2,
16,21 16:4,18,24
30:5,19 35:23 36:9
43:20 47:17 48:12
49:23 54:7 65:7 74:9
78:23 86:17 101:13
102:1 115:10,12
121:5,8 122:7
132:10 141:20
145:22 146:1 148:14
150:21 158:7 162:24
163:16,17 164:9
166:16
**cases**
9:20 10:5 13:5 43:21
137:23
**category**
127:13,23 149:7,10
**caught**
25:4
**caution**
104:12
**cells**
30:3
**census**
35:7
**Center**
102:11
**certificate**
24:2 83:8
**certificates**
43:18
**certification**
20:18 21:12 39:1
40:5 43:14
**certified**
21:18 40:5
**cetera**
27:13 35:12 41:16
**CFR**
51:13,24
**change**
82:20
**changed**
61:9 166:12
**changing**
60:23 151:4
**checklist**
88:2,7,13,18,21
**checks**
90:21
**chemical**
25:12 26:6,13 28:14
48:11,16,20,21
137:21
**chemicals**
25:18,21 26:7 69:11
**chemist**
152:14,15,16
**Chicago**
32:4
**choice**
74:5
**Cintas**
64:16,20
**circumstance**
29:12
**circumstances**
29:11 30:8 142:7
**citable**
34:20
**citation**
86:16
**citations**
34:10 40:14 41:13,
15

**cite**
34:21 51:13 54:16
56:3
**cited**
41:23 49:21 55:23
56:1 68:7,21 80:23
**civil**
4:17 56:24
**claimed**
112:22 113:1 140:7
**claims**
163:15
**class**
23:7,8,11 39:15,19
61:1 62:13 72:12,14
75:4 79:9 80:11,15,
16,21 81:10,22
82:19 84:6 95:7
104:16,20 105:3
106:8 115:21 126:16
134:19,20 135:15
139:12,13 156:24
158:24
**classes**
22:15 90:11 157:17
**classroom**
63:4 155:5
**clause**
68:6
**clean**
5:11 89:8 151:11,19
**cleaned**
153:19
**cleansing**
67:3
**clear**
80:19 146:18,20
**client**
42:17 51:2 70:15
71:3 81:12 92:21
135:23
**clinical**
24:18 25:13
**clocked**
108:5
**close**
45:19,20 131:2
**clothes**
61:9 150:14,16,21
151:1,4
**clothing**
150:12
**coast**
33:14
**code**
4:17 46:4
**college**
38:7 42:14 80:15
91:3 155:8
**comment**
57:13
**commentary**
76:18
**commented**
117:19
**common**
67:2 69:17,22,24
70:1,2,8,22 163:18
**communication**
5:1 16:6
**Community**
38:7 42:14 91:3
**companies**
12:7 41:13 42:21
43:12,16,23
**company**
24:24 25:17 41:2
42:23,24 43:1,5,7,9
64:16,20
**company's**
43:2,8



Patrick Schuerman 11/13/2024

compare
133:1
compelled
76:7 77:23 78:5
competitor
67:11
competitor's
151:18
complained
160:16
complaint
32:14
complete
71:23 109:8,20
110:15 113:23 156:9
completed
43:18
completely
150:24 170:4
completing
160:4
completion
38:23
compliance
40:11 41:9
comply
55:24 56:4 57:5,15,
17 58:3
component
143:4,5 152:2
components
93:15 126:13 127:4,
7
composed
15:5
composition
151:21
compound
76:23 77:10,13
compounded
150:8
computer
32:23
concentrated
51:3
concept
48:15
concepts
93:1,3
concern
91:20,24 135:19
169:16,19
concerned
156:22
concerns
169:18 172:10
concluded
172:24
conclusion
39:24 57:7 72:22
80:6 87:17 104:1,5
123:5 156:5
conclusions
29:20
condition
137:4
conditions
169:17
conduct
102:12 110:13
conducted
114:11
confidence
141:3
confident
158:21
confirm
55:21
confusion
130:21

connection
10:21
considered
7:5 50:24 51:3
54:10,11 55:13,14
70:3 89:23 126:19,
22 127:2 129:18
consistent
60:12
construction
33:24 34:1 65:18
construction/site
65:19
consult
13:23
consultant
10:22 12:5 42:18,22
Consultants
24:21,23 25:5 28:7
42:10,19
consultation
11:24 12:3 52:6
consulting
11:18 12:14,15 13:5,
10 25:2 40:21 42:9
43:7 45:9 46:8
contact
145:15
contacted
13:20
contained
54:21 66:7,10 108:9
118:3,23 135:12
contaminated
120:5
contamination
108:18
contended
117:8
content
76:8
contents
166:6
continue
75:10 131:3 165:18
continues
74:7
continuing
155:10
continuous
46:24 47:3
contrary
158:16
contributing
151:7
control
25:15 42:9,18 82:15
83:2
controlled
49:24 82:16
controlling
25:20 82:21
controls
68:2
conversation
16:13 35:5 120:23
167:4
conversations
14:10 16:2,9 17:3
copious
146:11 153:21
copy
17:12 18:4,6 132:2
158:2
core
73:17
corner
95:1
Corporation
64:17,20

correct
7:2,12 8:15,23 9:24
10:8,12 13:12 15:17
17:9 18:9,11,19
20:12 21:17 22:6,7,
10 24:11 25:22
26:11 27:3 32:19
33:20 34:5 36:13,18
37:5,22,23 40:3,6
43:3 44:24 45:8
47:18,19,22 51:20
52:1,2,7,8,11,18
53:5,7,15,18,19
54:13,14 55:4,12
56:5,8,13,14,18 57:9
58:9 60:21 62:24
63:5,9,15 64:14
66:4,5 67:24 68:4,
12,15,16,19,20,24
69:1 72:10 75:13,24
76:1 78:6,7,11,12,
16,17 79:2,9,11,16
81:10 82:3,4 83:5
84:22 85:4,7,8,10,
14,21,22 87:22
88:10,11 90:3,7,10
91:19,21,23 92:2,6,8
93:24 94:1,5 97:23,
24 98:5,11,15,16
99:7,16,17,20
100:20,21 101:1,2,5,
6,9,10 102:17 103:6,
9 104:6,7,11 106:11,
16,22 112:13,14,20,
21,24 113:9 114:4,5
115:10 117:16,17,
20,23 118:11 124:13
126:17,20 128:18
129:8 133:4,7,8
135:5,8,9,12 137:13
142:1 147:13 148:1
149:2,23 150:7
151:9 153:6,8,15
154:14,18 156:19
158:18 160:1
168:17,22 172:15
corrections
44:8
correctly
38:1 90:2 100:5,6
correlated
140:6
corrosive
48:22,23 50:14,15,
18,22,24 51:4,18
52:13 53:1 58:12,16
67:23 68:3,11 80:1
126:19,22 127:3,4,6
corrosives
60:2
counsel
11:12 16:6
couple
20:18 33:13 39:13
64:17 130:3 167:7
courses
22:10 35:22 90:24
92:4 155:9
court
18:17 56:23,24 59:7
77:6 116:12
cover
58:18 95:11 143:3
covered
9:3 68:14 118:16
143:2,15 166:1,23
covers
9:16
Cox
77:23 78:2 83:20
89:22 90:1,11 91:15
93:18 97:21 98:1,7,

9,18 99:2,6 101:8
103:2,7 104:3
105:10,22 110:11
114:13 117:20
122:23 123:19
124:1,3,5,7,17
125:2,13,15 128:3
129:19 132:4 134:2
135:16,19 138:24
139:2 141:23 142:9
152:7,14 166:5,13
169:11 170:4
Cox's
100:19 105:13
128:16 130:17
create
96:8
credibility
101:7 102:1,9
credited
80:16
crescent
167:18,22
criminal
56:22 119:10,12,17
120:4
criminals
49:5
critical
94:3 141:18
criticism
135:10 139:17
153:16 155:4
criticisms
137:10 166:2
criticized
157:4
crowds
49:6
current
47:6
curriculum
20:17 24:6 39:6,9,22
82:18 83:1,3 97:19
107:17 171:18
custody
37:15,16
custom
56:10 159:3
Customarily
31:19
cut
59:8 149:9
CV
8:2 12:12 17:12
24:22 40:8 65:6

─────────────
D
─────────────

Dale
23:5
dang
75:9
danger
133:17
data
7:4 48:24 132:2
database
42:7
date
6:4 15:12 16:7 80:21
dated
15:17 66:4 129:4
daughter
122:15
David
166:16
day
98:8,10,24 99:5
104:22,23 105:11

110:22 124:12
140:16 155:9 158:4
days
88:9 104:24 150:6
de
151:22
deal
37:14 73:16 170:12
dealing
44:8 73:17
deals
60:2
dean
91:6,7
death
28:22 29:21
deaths
28:19,20
decide
71:5 101:18 121:8
decides
59:1
deciding
101:7
decision
138:1
decon
98:14 103:4 104:5,
10 106:10 110:15
decontaminate
112:16,19 113:2,13,
23 114:4 115:21
116:2,7,22 117:5,10
119:17 120:8 147:6,
12,19,22 148:4
151:11 165:3,8
decontaminated
143:21 152:12
decontaminating
145:20,21
decontamination
61:18 68:23 69:3,20
103:13 106:21
107:16 108:14,15
109:21 110:14,16
111:12,22 112:3
118:6 143:20
156:11,13,20 158:10
159:12 162:12,21
163:19 164:5
decontaminations
163:20
deemed
133:20
defendant
67:1
defendants
82:14 86:24
defense
81:1
deficiencies
78:14
define
54:3
degree
22:24 23:1,18,23
degrees
167:14,16
deliberately
36:5
delivering
56:12 59:18
demonstration
67:18
dep
97:10 128:16
department
20:8 27:22 28:3,8,
17,23 29:7,19 30:2,
22 32:7 34:4 37:7
40:8 41:24 47:21

73:19,20 79:19,22
80:20,24 81:8 84:8,
13,20 85:2,6 86:6
89:19 99:16 100:8
106:19 120:21
123:24 124:7 149:5
158:1
departments
28:2 31:8 35:10
depending
127:23
depends
26:16 48:23
DEPONENT
172:23
deposition
4:14,19 5:20 7:7,8,
10 9:1,5,9,10 10:5,
18,21 15:15 47:16
65:24 83:13 86:20
88:23 89:6 91:22
93:11,21 105:13
118:3 129:18 130:17
143:15 172:24
depositions
10:10 11:20 14:12
83:14 89:1,8 92:19
98:17 158:13
Deputy
112:8
Derek
118:4
derived
105:17
deriving
74:14
dermal
148:9
describe
39:13
description
40:17
design
28:8,12 47:9
designed
143:13
designing
44:5
detail
171:9
detailed
67:19
details
93:12,13
determination
101:12
determine
11:11 12:7 104:16
determining
11:7
develop
70:22
developed
54:5
devest
64:21
diagram
62:5
dictated
32:20
dictates
68:2,9
died
148:16
differences
34:23
differentiation
52:19
difficult
104:16



Patrick Schuerman 11/13/2024

**dimensions**
111:4
**directing**
30:12
**direction**
11:6 35:10 37:6
**directly**
168:1
**director**
34:7,14,19,20 91:6
**dirt**
58:18,21 59:2
**disagree**
71:18 72:16 73:1,10,
15
**disclosed**
65:18 89:24
**disclosure**
17:13 65:4,5 71:21
75:15 131:16
**Disclosures**
6:17
**discovery**
65:23
**discuss**
38:16,17 50:4 63:11
76:4 138:13 171:8
**discussed**
75:11 118:24 119:1
136:9,13,18 137:12,
14,15,16 154:20
156:6 158:13
171:11,22 172:14
**discussing**
121:21 149:16
**discussion**
58:10 110:10 128:22
135:15 137:18
172:21
**dish**
127:22
**disinfect**
111:23
**dispersing**
49:6
**disqualified**
169:20
**disregarded**
152:8
**disseminate**
102:17
**disseminated**
105:1
**distributed**
91:15
**divided**
111:20 116:21
**division**
33:10
**document**
6:16 7:14,23 8:4
17:11 65:10 79:1
96:7,8 97:9 128:2
132:11,17 135:20
171:3
**documentation**
6:9 11:16 14:3 16:4
26:14 70:20 88:13
93:20 104:14 112:1
147:4 150:18 151:18
152:17 155:4
**documented**
98:13,21
**documents**
8:8 9:15 11:10,13
15:10,13,19,20
83:12 98:3 152:19
153:13 172:13
**dollar**
31:10

**dormant**
25:7
**dose**
148:12,23
**DOT**
20:17
**download**
131:20
**downtown**
32:3
**drenching**
52:14 53:3,13
**drill**
108:13
**driving**
29:1,15
**drove**
74:1
**due**
29:4 114:20
**duly**
4:1,4
**duress**
74:16
**dust**
24:18 26:22,23
**duties**
30:24 36:21
**duty**
68:6,7 79:22
**DVD**
84:3,9 85:9,13 96:13

**E**

**e-mail**
26:19 40:24 158:1
**early**
11:6,9 13:20 14:7
**earplugs**
27:13
**easier**
44:21
**easily**
153:11
**east**
33:13
**economics**
23:2
**educated**
137:24
**education**
101:23 155:11
**educational**
22:8
**effect**
152:1
**effected**
141:4
**effects**
67:3,12
**eight-hour**
95:7
**eight-week**
39:14,15
**eighties**
23:4
**Either/or**
127:8
**elaborate**
47:14
**elements**
127:7,8,10
**Elgin**
47:20 60:17,19
99:16,19 100:7
106:19 110:22
129:15
**emergency**
52:16 60:3 61:21

80:3 87:23 162:5,23
163:4
**emphasis**
38:10 90:21
**employ**
123:19
**employee**
25:20 28:24 29:1,5
30:4 38:21 52:22
73:19,23 79:18
81:18 138:17
**employee's**
70:12
**employees**
26:9 35:11 43:6,12,
19 51:17 52:19,24
62:17 79:23 81:9
84:12 85:3 86:5
140:11 142:4
**employer**
30:5 41:8 49:21
52:4,17,19,22 53:2
55:23 57:14 67:20
73:9 74:12 79:21
80:10,24 81:1,5,7,17
89:18 119:13,15
120:6 121:10
122:19,23 123:11,23
134:1
**employer's**
142:3
**employers**
40:12,24 41:20 42:4
51:24 52:10 57:17
58:3
**employment**
22:6 38:1 42:12
**EMT**
20:3,4,9,13,16
159:22 160:23
161:4,7 162:16,20
163:5,9,13 164:1,4,
16
**EMT/PARAMEDIC**
164:12
**EMTS**
158:2 162:4
**end**
8:1 38:22 66:3 75:19
**enforce**
30:7
**enforcement**
33:10,15,18 40:20
**engaged**
16:18
**engagement**
45:6
**engineer**
18:10,12 27:17
**engineering**
43:23
**Engineers**
21:16
**enlarge**
15:19
**enroll**
39:11
**ensure**
52:4 83:9 157:8
163:19 171:14
**ensured**
162:11
**entail**
23:22
**entire**
131:19 146:12
**entities**
33:11
**entitled**
101:12

**entrusted**
123:24 124:7
**environment**
12:9 40:2 49:24
80:17 82:16,18
**equipment**
29:4 43:24 44:3,5
45:2,7 64:13,15
**equivalent**
148:19
**ergonomics**
24:7 38:15 44:8,10,
13,14
**err**
104:11
**erratically**
29:15
**espoused**
135:11
**estimate**
10:17 108:11
**evaluate**
41:2
**evaluated**
90:24
**evaluates**
91:5
**evaluating**
26:2
**evaluations**
24:18 28:1
**event**
145:19 162:5,23
**evidence**
55:10 70:24 78:23
114:2 158:7 160:15
**exact**
62:11
**EXAMINATION**
4:6 167:5 171:1
**examined**
4:4
**excluded**
75:4
**excludes**
74:4
**Excuse**
59:7 116:12
**exercise**
67:17
**exhibit**
6:15 7:23 9:8 17:11,
12 51:9,10,11 55:3
65:4,22 66:1 82:12
89:16 96:20 105:12,
21 128:3,16 129:4
131:4,14,24 169:11
**exhibits**
7:8 105:14 129:18
**existence**
25:6
**expand**
26:4 73:13
**expanded**
39:4,5,8
**expect**
80:16
**expected**
65:20
**experience**
101:23 102:16
**expert**
65:19
**expertise**
13:1 57:12
**experts**
152:8
**explain**
29:10 44:12 53:8
84:16 95:16 111:19

134:2 136:4,22
137:2 166:5 170:4
**explained**
25:8 135:16 139:17
**explanation**
154:19
**explore**
122:14
**exposed**
36:5,12,15,22 37:4
51:18 52:13 53:1
67:22 79:24 80:21
119:16 124:12 125:1
135:24 140:16
169:3,7
**exposure**
25:15,21 27:10
28:24 29:1 36:2
37:19 38:17 48:5,11,
16 49:18,23 61:15
63:8 68:3,5 70:11,
12,13 72:13 73:5,9
81:10,19 90:12
106:20 108:12 118:7
124:15 134:6 136:10
148:23 151:12
160:17 164:19,20
**exposures**
12:7 14:8 38:17,18
106:14 134:14
**expound**
169:4
**express**
65:13
**expressed**
169:8
**eye**
45:10,16 46:3,22
47:21 48:3,17 49:10,
19 50:1,10,16 51:5
53:17 56:11 58:21,
22 59:2,14,16,17,21
60:3,5,7,12,19
61:17,19,21 63:12
64:24 68:10 119:3
120:15,17,18,21
121:11 122:4,5,17
132:20 133:23
135:1,17 136:8
138:9 144:7 145:14
146:4,5,8,14,19,20
147:6 150:15,22
151:4,14 152:5,24
153:3 165:2,16,19
167:12 168:9,21
172:5
**eyeball**
146:11
**eyelid**
168:5
**eyelids**
146:9
**eyes**
52:12,15 53:4,14
54:3 56:16 58:19
59:18 60:6 63:14,20
67:22 80:2 144:11
152:1 153:19 160:16
164:14,17,23 167:24
168:1,3

**F**

**face**
112:11 122:16
138:20
**facilities**
28:12,13,14 31:3,5,6
32:9 33:19 34:11
35:10 41:23 43:23,
24 44:4,6,19 52:14
53:3,7,9,11 60:23

62:12 63:3 67:21
68:10 80:2 155:10
**facility**
25:17,18,19 26:1,7
27:9,12 28:11 31:10
43:2,8 44:1 45:10,
11,23 46:2 47:22
49:10 54:2 63:13,14,
19
**fact**
49:22 52:9 61:4,13
63:11 68:14 75:14
90:4 111:16 116:19
134:5 141:18 150:5
153:9 157:5 171:23
**factor**
151:7
**factors**
44:17 82:8
**facts**
50:5 65:21 71:5
82:24
**fade**
5:2
**fail**
86:24
**failed**
30:2 49:24 50:2
66:16 67:1 70:15
81:3,12 83:2 87:3,
14,16 135:19
142:16,20,24 159:16
161:23
**failing**
56:3
**failure**
30:7 55:23
**fair**
5:6 13:11 16:20
50:10 69:18 158:17
168:16,21
**fairly**
67:19
**fairness**
7:13
**falls**
38:13 60:3 149:4,6
**false**
80:5,9,22
**familiar**
17:17 41:12 54:18
**farm**
22:24
**fast**
38:19 106:24 131:7
**fatalities**
28:4 102:13
**feasible**
115:20 150:18
**February**
17:4
**fed**
148:15
**federal**
4:17 24:8 33:8,23
41:12 42:2,3 46:23
58:5
**fee**
171:16
**feel**
101:11 113:1,7
114:3 124:16 146:18
166:5
**fell**
25:9
**felt**
74:10 78:14 112:23
148:3 160:5
**field**
119:13



Patrick Schuerman 11/13/2024

**Fifteen**
144:6
**fight**
106:20 108:12
**figure**
40:16
**file**
6:9 7:10 8:20 9:12
14:24 16:19 89:7
105:14,15 108:9
128:2 129:10 130:19
131:20 152:20
**filed**
16:15
**files**
85:12
**find**
11:14 14:4 42:1
46:17 103:24 128:19
129:11 130:19
131:23
**fine**
14:15 15:8 17:21
169:14
**fines**
41:14
**fingertips**
18:5
**finish**
64:8 107:4
**finished**
15:22 150:5 160:17
**fire**
20:8 31:7
**firm**
13:14
**five-minute**
63:23
**flat**
95:20 150:9
**flow**
26:17 46:24 154:9
167:16 168:13,16
**flowing**
154:12 168:14
**flows**
168:20
**fluid**
56:12 59:18
**flush**
47:3 53:17 58:22
60:6 144:10 146:12
**flushed**
144:13
**flushing**
50:2 52:15 53:3,13
54:3 56:12,16 59:18
63:14,19 67:22
68:10 80:2 146:3,8
161:3 164:14 165:19
168:8
**flying**
91:10
**focused**
31:12
**follow**
79:4 143:16 157:21
161:23
**force**
73:5
**forced**
73:9 79:8
**foreign**
58:19 59:13,15
**forgot**
93:10
**form**
5:8 7:5 63:18 104:17
114:23 135:12
141:21 166:14

**formal**
70:21
**formalize**
11:15
**format**
26:24
**forward**
14:16,18 16:24
144:18
**forwarded**
128:24
**found**
11:13
**foundation**
99:24 103:15 124:19
125:7 134:9 140:19
165:11
**fourth**
132:20
**free**
154:12 156:24
158:14
**frequently**
39:16
**Friends**
23:12
**front**
15:7 74:3
**frozen**
18:20,24 19:1
**full**
4:8 71:23 103:4
104:5,10
**fun**
23:7
**funded**
31:6,10

---
**G**
---

**gain**
43:13
**game**
156:23 157:1
**garden**
87:8,9 98:14
**gas**
106:14 133:22
**gave**
11:21 13:24 20:22
29:24 108:7
**general**
50:7 68:6,7 144:7
**generally**
41:12 57:24
**gentle**
168:13
**geographical**
31:11
**GHS**
127:20
**give**
26:15 28:21 29:10
30:8 38:12 41:5
43:1,17 45:13,15
46:14
**giving**
5:20 20:22 35:9
91:19
**glasses**
138:12,15,19 139:4,
13 140:4,6 145:5
**gloves**
69:13
**goal**
39:24 41:10
**goggles**
138:20
**good**
18:7 32:5 56:10 69:5

72:4 92:23 118:18
125:22
**govern**
52:10
**government**
31:5 33:8,11 41:16
58:5
**governmental**
33:6
**grab**
144:21
**grade**
47:1
**grass**
111:7
**gravity**
137:22
**great**
23:16 72:5
**greater**
148:10 149:1
**Ground**
167:14
**grounds**
169:23
**guarantee**
115:17
**guard**
45:3
**guarding**
44:9 45:1
**guess**
73:21 106:23 122:21
161:20
**guidelines**
56:9
**guiding**
16:22
**guy**
122:18
**guys**
46:2

---
**H**
---

**half**
143:24
**half-circle**
167:18
**half-moon**
167:22
**hand**
82:24 92:18 168:5,6
**handle**
37:15
**handling**
145:11
**hands**
165:1,7
**handy**
94:12
**Hang**
96:3 127:1
**happen**
46:7 71:6 99:4 172:6
**happened**
29:21 35:4 45:20,21
134:18 152:7
**happy**
17:16 100:16
**hard**
26:18 119:19
**hazard**
49:21 62:1 70:15
71:1 72:9 81:11,24
82:1 127:20 132:16,
19 133:18,19,20
140:13 154:20
**hazards**
70:17,21 125:24

126:3,5 134:21
135:23 136:4,8
143:9 144:17 166:9
169:1,5 170:4,6,8,12
172:14
**head**
165:16
**headache**
75:3
**heading**
65:12 156:4
**headphones**
27:13
**health**
23:19 24:3 52:6
**hear**
57:20 59:8 72:19
101:19,20
**heard**
5:17 113:11
**heart**
74:24 137:4 169:17
**heavy**
40:19
**held**
161:2
**helps**
151:21
**hereto**
65:22
**hey**
13:24 14:1,13 41:1
46:2 73:20 138:1
**hierarchy**
149:15
**higher**
50:23 51:1,2
**highlighted**
30:17 89:12
**Hindsight**
61:4
**hire**
42:17 43:17
**hired**
15:2 25:17 43:4
**history**
101:23
**hit**
29:16 32:17 167:12
**hitter**
40:19
**hold**
50:21 55:2 81:14
96:15 99:11 100:12
109:14 116:4,14
123:10 130:3,14
134:17 144:21
145:3,8 146:2,3,14
161:4,7,12,16
164:22 168:4
**holding**
28:9 146:13,14
154:12 165:1
**home**
5:21 6:2,24 12:11
32:1 69:12 74:6,11
**honest**
75:6
**honestly**
75:5,6
**hope**
102:24
**horse**
97:17
**hose**
87:8,9,18,20 107:22
112:9 120:19 146:3,
14 154:6,13 161:2,5,
8,13,16 164:22
165:1 168:11

**hoses**
55:19 98:14,19 99:7,
19 100:20,23 101:4
111:14,15 140:2
154:6 156:11
**hours**
39:19 95:11,12
143:11,12 172:7
**hurt**
44:22
**hydroplaned**
29:16
**hygiene**
24:6,24
**hygienics**
25:10
**hygienist**
24:10,16
**hygienist-type**
25:10
**hyphen**
40:13
**hypothetical**
119:21,22,24 120:10
121:15

---
**I**
---

**idea**
13:22 40:18 48:8
85:5 91:18 143:10
146:7 159:2
**ideally**
167:13
**ideas**
80:22
**identified**
62:16 81:13
**identifiers**
132:19
**identify**
62:17 128:2
**identifying**
46:11
**ii**
7:4
**Illinois**
5:23 12:20 20:11
28:2,17 29:18 30:22
31:2,20 32:7 33:10,
13,17,18 34:11 38:6
40:8 41:21,23 42:4,
13 48:3 49:4 58:6
60:11 91:3
**immaterial**
120:23 121:20
134:19 140:22 141:7
142:12
**immediately**
171:24
**impact**
163:14
**impacted**
160:24 164:8
**impacting**
118:9
**impartial**
100:3
**imperative**
142:14
**implement**
41:6
**important**
133:20
**imposed**
58:3
**impossible**
146:16,24 169:22
**improper**
29:4,24 119:20,23

120:9 121:14
**inadequate**
90:18 113:12
**incident**
29:24 160:24
**include**
7:4,6 15:24 46:1
151:13
**included**
8:21
**includes**
7:24 8:1,2
**including**
119:11
**income**
13:9
**incomplete**
76:13
**incorporated**
54:13 65:23
**incorrect**
128:8 135:13
**increased**
164:18,20
**indent**
140:16
**indication**
150:1 160:9 166:15
**individual**
131:21 139:14
**individuals**
113:22
**industrial**
23:18,23 24:1,6,10,
15,24 25:10 38:9,10,
13
**industry**
31:4 34:2 55:14
56:21 57:24
**Influence**
23:12
**information**
8:20 16:3 85:16
92:20 139:20 148:7
**informed**
61:6,13 124:16
125:16 126:2
**informing**
61:17
**inhaled**
145:12
**initial**
13:23
**initially**
13:19
**injured**
30:4,6 117:9,15
151:4
**injuries**
28:5,20 41:11 44:18
140:6 164:8 171:24
172:2,5
**injurious**
51:18 52:13 79:24
**injury**
29:3,24 32:15
140:10
**inmate**
30:4
**insights**
37:10
**inspect**
31:3 86:24 87:1,3,
11,15,17
**inspected**
88:3
**inspecting**
32:7
**inspection**
40:14



**inspections**
32:10,21 40:9
120:13
**inspector**
30:21 31:2 34:6 35:9
38:4 41:15
**install**
46:13
**instance**
33:16
**instruction**
43:12 82:19
**instructor**
22:11,22 38:6,7 61:6
89:24 92:24 98:13
110:2 114:11,17
139:21 156:8 170:3
171:17,24
**instructor's**
171:14
**instructors**
93:5
**instructs**
157:17
**insufficient**
76:8
**insurance**
12:6 19:12 25:3
42:20,23
**insure**
42:24
**intent**
162:15,19
**interpretation**
95:18 96:16,18 97:8
127:18 159:21
**Interrogatories**
7:6
**Interrogatory**
71:22
**interrupt**
7:22 66:20
**interview**
102:12 113:5 117:13
**interviewed**
155:24
**introductions**
95:10
**investigate**
28:19,22 29:20
102:12,23
**investigated**
28:3
**investigating**
32:16 102:16
**invoice**
15:11,15,17 129:14
**involved**
43:22 44:4 45:9
**involvement**
45:16
**irrelevant**
120:10 121:15
**irritant**
132:21
**irritated**
150:15
**irritation**
132:23 133:22,23,24
134:7,15 135:1,8,18
136:8,9 145:13
**ISO**
24:9
**issue**
34:10 43:18 73:7
76:6 111:11 114:6
162:7
**issued**
34:15 41:13,15 68:6
83:7

**issues**
14:22,23 103:12
**item**
40:7 132:2
**itemization**
41:22
**items**
76:4 138:13

---

**J**

**jail**
30:3
**jammed**
143:11
**January**
17:4
**Jim**
99:13,15
**job**
28:2 30:24 36:21
43:5,6 70:16 71:4
**Joe**
7:21 17:24 19:3
66:19 71:16 75:19,
20,24 77:10,19 78:1
94:18 119:6 127:6
130:16 131:7 141:16
169:9 170:22
**Johnson**
5:22
**journal**
19:10
**judge**
101:24 102:8,20
121:7
**July**
6:6
**juror**
102:2,9
**jury**
101:11,18 102:10,15
**jury's**
71:4

---

**K**

**key**
93:15
**kicked**
6:3
**Kiki**
77:5 144:3 172:20
**killed**
29:2,5,14,16
**kilogram**
148:17 149:1
**kind**
13:24 18:16 26:23
40:15 153:20 165:21
167:22
**kits**
120:14
**knew**
62:17 64:19 125:7
134:10,13,24 135:7
140:15 141:4,6
142:13
**knowing**
75:8 79:13 81:9,18
**knowledge**
68:16 124:9 156:15
**knowledgeable**
142:10

---

**L**

**Labor**
28:3,17 29:19 30:22
32:7 40:9 41:24

**lack**
140:5 141:4 155:4
164:1
**lacks**
124:19 125:7 134:9
140:19 165:11
**Lalley**
99:13,15 101:8
**Lalley's**
100:22
**lapse**
20:20
**laughing**
151:15
**lawsuit**
16:15 36:16
**lawyer**
57:11
**layout**
62:4
**LD50**
148:9
**learned**
84:22
**leaving**
110:7
**left**
40:20,21 97:1
**legal**
57:4,7 72:21 80:6
123:4
**legally**
57:14
**lend**
162:6,16,22
**lenses**
145:15
**lethal**
35:22 84:21 85:3,7
110:21 119:11
148:12,23
**letter**
7:4 10:4 15:1 65:12
**level**
47:3 127:19 132:16,
17
**levels**
133:1
**liability**
12:10 13:2 100:7
**libraries**
31:9
**licensed**
18:10
**lid**
146:15
**lie**
115:4,11
**life**
163:21
**limit**
43:2
**limited**
37:18
**lined**
133:6
**Lines**
94:15 96:22
**list**
9:20 10:4,13 32:23
33:2 105:2
**listed**
7:7 10:7 170:15
**listening**
23:9
**lists**
6:23
**liters**
56:12 59:19

**litigated**
10:23 11:19 12:14
**litigation**
11:4,24 12:3,17,23
13:5,10
**LLC**
25:6
**local**
20:5,6,8 41:16
**located**
62:18
**location**
31:12 153:1
**locations**
159:14
**locker**
61:3,6,10,14 62:16,
18,22 63:2,18 165:5
**long**
66:2 108:11 111:2
112:15,18 115:22
146:20
**longer**
25:6 109:23
**looked**
89:7 113:15,16
**loss**
38:16 42:9,18
**lost**
18:17 149:17
**lot**
12:23 16:1 25:1,2
35:1 39:9 40:23
47:16 88:9 93:10
129:10 159:7
**loud**
5:8
**low**
40:15 126:17 127:14
**lower**
95:1 168:5,7
**lowest**
127:14
**lunch**
110:9
**lung**
38:17

---

**M**

**M6185**
132:5
**machine**
44:9
**made**
11:12 34:18 40:9
114:21 132:10
**maintain**
22:21 30:3 82:17
**maintenance**
29:4 30:1
**make**
25:19 26:8 27:12
36:19 44:7 47:13
51:7 68:22 79:23
80:19 86:16 88:14,
24 90:16 101:12
104:1 108:23 129:11
137:21 149:14
**makes**
17:15
**management**
12:6 23:1,18,24 24:1
**mandate**
68:17
**manning**
164:4
**manufactured**
63:12 133:21

**manufactures**
67:11
**manufacturing**
28:13 155:10
**mark**
131:13,19,23
**marked**
6:15 9:7 129:4
131:15,17
**master**
83:8 89:23
**master's**
23:18,23
**material**
53:1 67:23 68:11
83:20 84:3 95:12
139:8 140:24 143:2
**materials**
7:10 50:15 51:19
52:13 58:13,16 68:4
80:1 85:23 108:9
129:10
**math**
105:6,7 109:1
114:10,16,18,20
115:4,11
**matter**
10:23 11:24 65:21
**matters**
11:19 12:4,14 52:6
**meaning**
12:18
**means**
171:17
**meant**
167:17,18
**measures**
87:4 155:1
**mechanism**
88:12
**mechanisms**
80:14 139:22
**medical**
52:5 150:3 162:6,17
**medication**
74:23,24 75:1,2
**medications**
78:16
**medics**
161:22
**meet**
39:16 46:22 47:5,6
122:6 153:2,7,12,14
154:3 168:19
**member**
20:24 21:10
**memory**
98:24
**mention**
22:8 75:21 77:22
78:4,8,13 170:17
**mentioned**
17:10 63:10 132:4
168:24
**mess**
81:6
**met**
61:16
**method**
59:20
**methods**
27:14
**metric**
148:18
**mice**
148:24
**middle**
27:5
**Midwest**
24:21,23 25:5 27:23

**military**
19:21
**milligram**
148:17
**milligrams**
148:20,21 149:1
**mind**
63:23 155:17
**minimal**
12:16,17
**minimizes**
70:12
**minimum**
47:6 122:6 153:3
154:4
**minuscule**
74:21
**minute**
56:13 59:19 81:14
99:11 100:12 108:4
111:24 130:15 145:8
**minutes**
39:20 47:2 56:13
59:19 105:4,6 106:5,
7,23,24 107:1,14,15,
17 108:1,2,3,7,8,18,
19,21 109:8,20,21
110:1,9,12,15,23
111:17,18,19,20,21
112:2 113:19,24
115:15 116:20,21,22
143:21 144:6,11,13
145:16,18,23
**misses**
169:24
**missing**
85:16
**misspoke**
78:1
**mitigate**
12:8
**MK**
132:3
**Mm-hmm**
157:7
**model**
47:5
**modules**
97:4,9
**moist**
27:5,6
**moisture**
27:5
**moment**
6:12 8:5 17:14
168:24
**moments**
19:2
**money**
40:23
**month**
12:20 15:5 30:23
38:2 90:14,15
**months**
13:23 166:12
**morning**
155:12
**motives**
101:1
**mouse**
148:10
**move**
16:24 64:9 107:20
**moved**
14:15
**moving**
38:19 52:21
**multi-facet**
45:18

28:7 42:10,18



**multiple**
93:5,6 98:14,18
99:7,19 100:20,23
101:4 104:16,19
111:14 150:17
**multiply**
108:20
**municipal**
37:20
**munitions**
37:12,21 106:13
**musculoskeletal**
44:15,17

**N**

**national**
21:11 97:18 102:11
**nearby**
122:18
**necessarily**
53:16 96:12
**needed**
11:7 14:7 16:23
46:12 139:3 143:22
144:14 153:22 163:5
171:22
**negligent**
29:14
**negotiate**
35:6
**neutralize**
67:3,12
**neutralized**
69:15
**Newark**
5:23 20:11 32:1
**newer**
131:5
**newsletters**
19:12
**nice**
167:3
**night**
23:8 39:18 155:13
**noise**
24:18 27:6,7,8,11,17
38:16
**North**
5:22
**northern**
24:4 31:19
**note**
40:10
**noted**
153:2
**notes**
88:24 89:11
**nozzles**
168:9
**number**
6:24 42:20 93:21
108:8 111:1 113:22
114:9 130:6 132:18,
21,24
**numbers**
28:4 112:5 114:19
115:17 117:1
**numerous**
28:4
**nursing**
12:11

**O**

**OAC**
79:9
**object**
59:13,16 76:22
114:23 120:9 142:5

**objection**
57:6 71:7 72:15,21
77:9 80:4 99:22,23
101:14 102:4 116:8,
15 117:21 121:24
123:1 124:18 125:4
134:8 140:18 141:8
165:10
**objections**
103:14,15 121:2,14
135:2
**obligation**
32:9 57:4 58:3 61:16
67:20
**observe**
43:6
**observers**
139:3
**obstacle**
105:5
**obtain**
14:7
**OC**
36:2 72:13 73:5,8
79:14 80:21 81:10,
19 88:10 90:12
106:10,19 126:15
128:4 132:3
**occasion**
36:16
**occasions**
34:17
**occupational**
23:19 24:3
**occur**
103:5 104:2
**occurred**
63:8 106:21 172:3
**October**
15:17 30:23
**offered**
61:3 62:21 132:10
**offering**
78:19
**offers**
67:15
**office**
5:21 32:3 74:20
**officer**
19:24 29:9,13 30:6,
11 32:17 49:19
58:21 59:2,13,15
103:11 118:4 138:11
155:21 159:13
**officers**
36:9 37:18 49:2,8
58:23 138:18 158:23
159:3,7
**oils**
151:22
**one-day**
104:15
**onerous**
85:18
**online**
122:15
**onset**
14:9
**open**
13:5 131:6 164:23
165:2
**opened**
146:15
**operation**
44:20
**opine**
141:5
**opinion**
34:23 51:16 56:10
58:20 69:2,18 72:2
80:18 83:19 86:18

**opinions**
7:5 50:5 65:13,21
66:6,9,10 118:16,22
132:10 141:21 156:3
166:23,24
**opportunity**
57:13 144:19 165:6,
18
**oral**
148:9,15
**Orchard**
101:3,8 103:22
104:4 113:14 155:18
161:15
**order**
172:20
**organization**
96:20 97:5 139:24
142:14
**original**
128:6
**originally**
128:8
**OSHA**
8:9,21 22:10 31:1
33:5,17 34:11 39:5
40:5 41:13,21 43:13,
17 48:22 51:13 52:9
53:6 54:1,2,4,13
55:11,22 56:6,23
60:1 63:11 68:2,5,9,
14,17 69:9 70:7
102:11
**OSHA's**
80:22
**ounces**
148:19,22
**outdoor**
106:18
**outlined**
170:7,8,13
**outright**
111:8
**Ozmon**
13:13

**P**

**p.m.**
172:24
**pages**
66:2
**paid**
171:16
**paper**
112:10
**Paragraph**
51:12 54:21 76:5
89:21 94:17,23
98:12 104:13
118:14,24 119:6,7
152:24 170:2
**paramedic**
20:3,9 159:23
160:24 161:10,12
162:16,20 163:5,9,
14 164:2,4,16
**paramedics**
158:2 162:4
**part**
8:19,20 14:24 21:15
29:18 33:20 36:10,

21 39:3 46:5 55:10,
22 89:7 95:5,6
105:13,14 107:11,
12,13 130:6 135:15
152:20 154:20 159:3
164:6 166:10
**participant**
72:11 144:12,14
**participants**
61:17 62:13,22
91:15 112:19 113:12
117:19 134:22
135:16 139:19
142:21
**participate**
72:12 73:5 79:9
**participated**
72:13 73:8 79:17
91:12
**participating**
139:12
**participation**
83:1,3
**parts**
107:10
**pass**
22:13
**passed**
145:10
**past**
10:15 11:21 35:14
141:14
**Pat**
4:8 9:3,9 18:9 19:1
72:1,24 75:6 76:11
114:20 115:9
116:11,14 118:16
167:7
**path**
14:2 37:9
**paths**
122:11
**patience**
172:18
**patient**
166:20
**Patrick**
4:3,11,14
**paycheck**
64:18
**PD**
123:14
**PE**
18:13
**peer**
19:14
**pending**
13:5 79:3
**Pennsylvania**
149:5,6
**people**
23:13,14 46:8 87:19
115:24 116:5 117:3,
8 139:11,13 141:23
**pepper**
35:19 36:2,6,12,15,
23 37:21 49:4 50:19,
21 64:22 65:1 67:4,
12 105:18 119:12
120:5 124:12,15
125:1 135:17 151:12
**percent**
126:16,18,24 127:17
132:3 148:12,16,24
**percentage**
12:13 126:15
**percentages**
50:24 51:1
**Perfect**
133:13,15

**perform**
43:7
**period**
15:23 162:12 171:19
**permits**
32:24
**person**
44:22 49:5,15 52:12
102:22 113:19
143:19,22 145:19
157:22
**person's**
70:12
**personally**
143:22 144:14
**personnel**
37:8,12 52:5
**pertinent**
85:16 93:20 98:3
**phone**
6:24 16:14
**photos**
153:1
**physically**
146:16,24
**pick**
47:10
**picturing**
42:22
**piece**
45:6
**pieces**
43:24
**place**
41:4 48:17 80:14
81:4 82:8 88:14
90:1,22 139:23
151:1 161:22
**plaintiff**
35:23 66:16 79:22
89:17 166:16
**Plaintiff's**
6:16
**plant**
52:6
**plastic**
153:4
**play**
27:21 53:24
**plenty**
163:20
**plug**
115:16
**point**
14:14 63:21 127:13
148:15
**points**
139:7 158:1
**police**
19:23 27:22 28:1,8,
18,22 29:7,8,9,12
30:2,5 31:8 32:17
34:4 35:10 36:9,11
37:7,12,18 47:21
48:2,8 49:2,3,8,9
50:9,13 52:24 58:20,
21,23 59:1,3,16
60:11,13,14,15 62:5
73:19,20 79:19,22
80:20,23 81:7 84:8,
13,20 85:2,6 86:5
89:19 99:16 100:7
106:19 120:13,21
123:24 124:6 158:23
159:3,7
**policies**
33:18 157:9 159:19
**poor**
82:8 93:14
**population**
148:13,16,24

**portable**
120:15,17,21 121:11
122:5
**portion**
79:14 105:18 106:7,
9,10,12,13 110:8
160:18
**position**
101:17,24 102:8
**positive**
154:9
**possibility**
49:20
**possibly**
100:5 111:23 124:20
**potential**
108:6 122:16 140:10
**pounds**
148:19,22
**Powerpoint**
84:17 95:15,16,22,
23 96:11,14 136:12,
19 170:15 171:22
**powers**
20:19
**PPE**
25:14,20 26:9 30:7,
11,15 38:16
**practice**
54:11 55:10,16
56:10 57:16 69:6,8,
16,23 70:3,5,9,10
72:2 159:3 163:18
**practices**
24:7 55:13,15 56:21
57:3 68:21
**pre**
172:6
**precaution**
170:12,14
**precedes**
10:14
**predator**
122:16
**predominantly**
33:24
**preferred**
112:10
**premise**
51:15 58:15,16 79:7
107:21,24 110:18
123:20
**preparation**
7:9 9:4 106:4
**prepare**
6:7 7:17
**preparing**
47:17
**presence**
30:18
**present**
158:4 162:20
**presentation**
86:13 95:15,16,22,
23 98:3 136:12,19
143:7 170:15 171:23
**presented**
71:5 83:16 85:12
96:14
**presently**
5:19 22:21
**presumed**
142:20
**pretty**
9:6 14:18 17:17 45:1
119:1 123:20 131:2
**prevented**
140:8 160:3
**prior**
9:1 11:19 13:24
15:12 16:2,6 19:17



36:15 61:15 134:6, 14,18 136:9
**prisoners** 37:15,16
**private** 12:7 31:4 41:2,13 42:21
**problem** 150:8
**Procedure** 4:17
**procedures** 41:6 151:16 157:10, 22 159:20 161:21
**proceeding** 86:14
**process** 40:11 44:20 70:10, 11 118:5 161:21
**processes** 40:11
**produce** 105:15 131:18
**produced** 15:10,13
**product** 67:16,18 126:3,6 129:15 132:5 148:14,20,22
**professional** 18:12 21:1,19
**proficient** 40:1 90:16
**profile** 14:21
**program** 39:6 40:13 70:23 80:13 81:2 140:13
**promoting** 169:21
**proper** 30:11 38:16 50:1 140:23 141:13,22 147:18 156:17,18 161:3
**properly** 30:3 86:24 87:3,15, 17 97:14,15 107:17 115:21 116:1,6 117:4,10 137:20 147:4,5,22 159:17 164:17 165:2
**propositioned** 87:7
**protect** 45:5
**protecting** 26:9
**protection** 69:13
**protocols** 161:24
**prove** 88:3
**proven** 115:18
**provide** 43:11 53:3 56:15 66:16 67:2 98:14 121:11 153:21 154:10,11,12 156:8 157:18 168:15
**provided** 8:9,15,18 9:18 37:7 38:24 52:15 69:4,22 81:8,19 88:18 104:15 128:7,8 130:16 146:1 152:11,20 154:9 167:9

**providing** 6:22 53:21 67:21 68:9 168:20
**provision** 121:1
**proximity** 45:19,20
**public** 23:8 30:21 31:3,8 32:6,21 33:18 34:6 35:9 38:3 40:9 41:14,22 42:4
**publication** 19:17
**publications** 18:15 19:6
**published** 19:9,11
**Puerto** 33:14
**pull** 129:14 131:3 141:23 144:22 146:9 169:9
**pulled** 108:2,6 114:19
**pulling** 130:6
**purchase** 46:16
**purpose** 137:17 139:16
**pursuant** 4:16 53:2
**purview** 38:13
**push** 171:13
**pushed** 143:11
**pushes** 100:7
**pushing** 59:22
**put** 15:21 17:7,15 18:2 41:4 65:7 82:13 90:20 105:9,12 117:20 128:1,10 129:3 133:14 167:23
**puts** 100:4 101:23 102:8
**putting** 132:1

**Q**

**quality** 83:10
**quantity** 154:8
**question** 5:3,15 11:19 19:4 26:4 45:18 49:2,14 62:19 64:22 68:8 71:9,11,14,16 74:13 75:19 76:15,17,22 77:3,5,10,12,13,16, 20 79:3,7 81:15,16, 17 84:1,18 85:19 86:7,8,11 98:8,10 99:24 109:15,19 110:18 114:24 116:24 117:14 121:10,20 123:18 124:22 125:16,17 136:3 142:6 143:17, 24 152:10 155:14, 17,20,23 162:14 163:22
**questions** 11:5 48:7 60:10

71:24 78:24 100:14 166:22 169:24 170:21
**quick** 52:14 53:13 63:14, 19 80:2
**quote** 138:10

**R**

**radar** 158:17
**raised** 103:16 116:15
**ramifications** 172:4
**ran** 106:23
**randomly** 111:9
**range** 106:7,9,12,13,17,18 107:14 110:8,11 111:19,22
**Ranken** 103:11 112:9 118:4 155:21
**rarely** 32:3
**rat** 148:10,16
**rats** 148:15
**reach** 29:20 119:4
**reached** 87:18
**read** 23:13 66:21,23 77:7, 17 89:1 90:2 93:8 96:1,9 101:10 103:23 112:4 144:2, 4 158:20,21
**readily** 52:4
**reading** 103:10,18 110:5 132:6 166:17
**ready** 52:4
**reask** 19:3
**reason** 18:1 60:9 127:2 144:20 151:15,23 163:1
**reasonable** 153:12
**reasons** 65:14
**rec** 57:23
**recall** 14:19 93:9 112:8 118:2 160:20,21
**receive** 39:4
**received** 104:21
**recent** 128:12
**recently** 17:1 130:17
**recess** 18:21 64:3 131:10
**recollection** 103:11,18
**recommend** 45:4

**recommendation** 34:18 46:14
**recommendations** 25:20 26:8 27:12 44:7 56:19
**record** 4:10,13 5:11 7:21,22 66:23 77:7,17 128:23 141:16 144:4 172:22
**recordkeeping** 38:18
**records** 147:5
**redesigning** 43:22 44:5
**reduce** 151:22
**reduced** 140:10
**reduces** 70:11
**reducing** 41:10 44:16
**refer** 96:23 106:17
**reference** 6:22 8:9,12 9:15 54:19 56:2 58:11 65:14 68:22
**referenced** 8:19 54:20
**referencing** 7:11
**referred** 11:18 22:17 93:20 149:21
**referring** 20:7 88:22 96:1 139:10 149:13 170:9
**refers** 8:5 53:6
**reflect** 4:13
**reflective** 30:16
**reflects** 24:8
**regard** 156:10 170:17
**regular** 61:22 152:2 167:15
**regulation** 68:2 120:7 121:13, 18
**rehash** 118:17 157:15
**related** 29:6
**relates** 25:14 45:10,16
**release** 77:23
**relevant** 123:14
**relying** 141:20
**remember** 58:13 93:13 98:23, 24 99:5 103:10,20
**remembers** 99:3
**remove** 145:15 150:11,12 151:21
**repeat** 36:3 59:9 77:4,16 124:21,22 143:24
**rephrase** 77:20

**report** 6:23 7:16,17 8:1 11:17 15:5,22 34:7 47:17 50:4 51:12 53:6,10 54:16,20,22, 24 55:7 64:9 65:5,8, 22 66:2,7,10 69:19 71:21,23 75:22 76:11,19 77:22 78:4, 8,13 83:18 89:15 94:20 107:11,13,21 123:20 126:10 131:3 133:2 154:16 156:7 170:2 171:23
**REPORTER** 18:17 59:7 77:6 116:12
**request** 9:19 105:15 131:18
**requested** 16:12 66:24 77:8,18 144:5
**require** 140:3
**required** 36:22 50:15 51:4 138:21 161:21
**requirement** 52:21 68:1 81:21
**requirements** 24:8 25:14 154:4
**requires** 48:11
**requiring** 170:5
**resigned** 12:21
**respect** 44:3 61:16 67:21 104:13 114:20 167:8 168:23 170:10
**respiratory** 75:1 132:23 133:24 135:7,17 136:9 137:5 169:18
**respond** 32:14
**response** 9:9,19 15:14 21:4 72:23 105:15 139:20
**responsibilities** 30:24 36:21
**responsibility** 82:17 142:3 171:14
**responsible** 57:14 171:4,17
**restroom** 63:24
**result** 90:4 93:14 117:9
**resulted** 30:1
**resulting** 29:3
**resume** 42:8 64:8
**retain** 14:15 82:14 83:2 92:20,22,24 93:2
**retained** 10:22 13:13 20:18
**retention** 15:1
**retrained** 97:22
**retraining** 90:1
**review** 6:7 7:17 8:14 16:4 91:18 132:4 135:20 142:3 143:2 152:21

156:6
**reviewed** 6:9 7:10 9:1,4 11:16 19:15 47:16 92:8 136:20 137:10,20 141:19 150:2 172:13
**reviewing** 136:12
**reviews** 38:15 91:10,24 92:3 117:19
**Rico** 33:14
**ride** 97:17
**rider** 9:9 15:14
**right-hand** 95:1
**rinse** 145:22 164:17 165:16
**rinsing** 50:1
**risk** 12:5
**road** 121:4
**roadway** 30:18
**role** 11:3,23 27:21 28:7, 16 32:8 35:8 38:3 46:1
**roles** 64:23
**room** 6:1 61:14 62:22 63:2 165:5
**rooms** 61:3,7,10 62:16,18 63:18
**routine** 32:10,20
**rule** 6:16 17:13 50:9,12, 13 60:11 65:4,5 68:1 120:7 121:13,17
**rules** 4:16 52:10
**run** 34:13 99:6 108:5 167:10
**running** 103:3 145:23,24 165:14
**rushed** 110:3 112:23 114:11,13 146:22 156:21 157:18

**S**

**S-C-H-U-E-R-M-A-N** 4:11
**Safariland** 4:15 67:15 73:4 82:16 83:6 88:19 89:22 133:21 134:2 151:16 152:8 156:7 161:22
**Safariland's** 157:21
**safe** 16:17 80:17 82:17
**safeguards** 81:3
**safely** 156:9



Patrick Schuerman 11/13/2024

**safety**
12:11 14:22,23 21:15,18 23:19 24:4, 7,21,23 25:5 27:23 28:7 30:7,21 32:6 34:6 35:9,12 38:3,9, 10,13 40:2,9,13 41:15 42:10,18 48:24 64:13,15 65:18,19 80:14 87:4 124:1,7 132:2 138:11,12,15,17,19, 20 139:2,4,22 140:4, 5 145:5 157:8,19,21, 22 158:9 159:13,23 171:5,13,15,18

**SAITH**
172:23

**sake**
49:1 120:2

**sales**
64:12,14,21

**sampling**
24:18,19

**Sands**
7:21 13:16 17:21,24 18:4 19:1 21:3,6 57:6,19 66:19 71:7, 12,15 72:15,19 75:18,24 76:5,12,22 77:4,9,13 78:1 80:4, 6 94:17,20 99:21 101:14 102:4 103:14 105:21,24 107:4 109:14 114:23 116:8,11,14 117:21 119:6,20,23 120:9 121:2,14,24 123:1,4, 13 124:5,18 125:4,6 126:4,7 127:6,10 129:20 130:10,16 131:7 134:8 135:2 138:6 140:18 141:8, 15 142:5 165:10 167:6 170:1

**sat**
91:8

**satisfaction**
112:20 136:22

**satisfactorily**
136:16,18

**scale**
127:14 149:22

**scenario**
109:24

**schools**
31:9

**Schuerman**
4:3,11,14,18 65:17

**Schuerman's**
9:10

**science**
23:1

**Scott**
9:7 13:16 17:19 71:19 76:15 79:4 123:15 128:15 131:20 172:19

**screen**
6:14,18 9:8 15:9 17:15,20 18:1 54:17 65:7 94:9 132:13

**script**
71:20

**scroll**
97:2 129:22

**SDS**
14:8 60:5 61:8 126:11 127:12,18 128:5 130:8 136:5 141:23 142:3 144:9, 10,22 145:17 150:7

154:17 170:13

**seatbelt**
29:17

**seconds**
61:24 62:9 63:3,7 115:13,14 119:4,18 120:8

**section**
8:10,21 42:9 55:19 82:10 106:18 118:12,22 119:3 126:9,10 145:2 148:6 154:15

**sections**
7:3 170:7,9

**sector**
37:20 42:4

**selected**
111:9 113:18

**self-evident**
45:2

**self-serving**
101:1

**sell**
64:22

**semester**
39:12 91:9

**sending**
81:9,18

**sense**
47:13 69:17,22,24 70:1,2,8,22 108:23

**separate**
89:11

**September**
66:4

**Sergeant**
99:12,15 100:22

**series**
22:16

**served**
19:21,23

**service**
20:5,6

**services**
16:12 25:1 42:17 43:7

**session**
89:18 141:11 142:10 172:7

**set**
65:21 96:21 97:4 98:7,9 113:15 139:23 156:15 159:16

**sets**
15:1

**setting**
26:1

**seventies**
54:6

**severe**
127:22 133:17

**shampoo**
152:3

**share**
6:14 15:9 17:16 94:9

**sheet**
78:15 104:19,21 105:11,16 128:4,5 130:8 132:2 141:23 144:9,22 150:8 155:8,11,12 170:13

**sheets**
14:8 48:24 60:6 61:8 127:13 142:4 144:10 145:17 157:5

**shields**
138:20

**shipped**
129:15

**shipping**
129:14

**short**
18:21 64:3 131:10

**shorter**
109:24

**shortly**
15:4 16:18

**shot**
99:1

**shoulder**
44:23

**show**
8:5 70:19 71:2 74:2 82:1 87:7 88:21 92:9 115:19 128:10 147:3,5

**showed**
62:15

**shower**
61:20,22 63:2 165:5

**showerhead**
168:15,19

**showers**
60:22 61:14 62:23 63:18

**showing**
94:15 116:18 136:5

**shown**
97:10 152:24

**shows**
73:23 126:11 151:18

**side**
40:21 104:9,11

**sidetracked**
64:6,7

**sign**
73:22 74:5,11,19 75:9 77:23 78:5 84:6 170:5

**sign-in**
155:7,8,11,12 157:5

**signal**
133:16

**signature**
66:3

**signed**
76:9 78:9 79:1 91:16 134:3 166:6,18 169:8 171:3

**signing**
74:6,15

**signs**
74:7

**similar**
36:20

**simple**
85:19 123:20

**simultaneously**
56:16,17

**single**
60:13

**sink**
165:5,14,15,17 168:14,18

**sinks**
60:23 61:14 62:23 63:2,18

**sir**
80:7 100:1 107:5 115:1 120:11 124:20 125:8 140:20 150:13 160:23 165:12 167:7 169:6 170:20

**sit**
60:18 62:20 63:1 82:2 91:7 113:10 134:4 151:8

**site**
43:5,6 65:18 83:4 87:13,15

**situation**
165:23

**sixties**
54:5

**skills**
23:9

**skin**
132:21 133:22 134:7,14 135:17 136:8 145:12,13

**Skokie**
73:19,20 79:18,22 80:20,23 81:7 84:7, 12,20 85:2,6 86:5 89:19 120:20 123:13,24 124:6

**slide**
86:13 98:3,7,9 156:15

**slides**
83:15 84:17 156:15, 17

**slowly**
145:3

**small**
7:4 65:11

**soap**
127:22 151:14,17, 19,20,23 152:2,11, 12,18

**socket**
146:12

**soft**
168:11,12

**sold**
64:16,19

**sole**
13:9 38:1 42:12

**solution**
67:3 120:18 126:18 127:17

**solutions**
50:2

**someone's**
45:3

**sort**
10:22 25:9 27:2 30:16 35:21 37:6,19 38:24 41:22 44:23 49:4 58:22 151:11

**sought**
150:3

**sounds**
72:1

**source**
13:9 120:19

**southern**
80:12

**space**
145:15

**speaking**
5:5 23:9

**specialty**
23:19,24

**specific**
49:10 53:17 68:9 78:16 86:16 93:12, 21 101:22 102:7 143:14 172:14

**specifically**
14:6 52:9 63:11

**speculation**
124:19 125:6 134:9 140:19 165:11

**speculative**
150:24 151:3

**spell**
4:9

**spend**
39:9 107:15 165:6

**spent**
12:14 15:16,24 95:8 110:9 113:16

**spot**
130:4

**spray**
35:19 36:2,6,12,15, 23 37:21 49:4 50:19, 21 64:23 65:1 67:4, 13 79:14 81:10 105:18 119:12 120:5 122:15,16 124:12,15 125:1 126:15 134:6 135:17 140:16 151:12

**sprayed**
139:14

**spraying**
119:12

**sprays**
120:4

**sprouting**
153:5

**staff**
158:2 159:23 160:24 162:4,16 163:14

**stamp**
18:13

**stand**
67:5

**standard**
8:13,16 9:17 47:7 50:16 53:24 54:7,11, 12,15,19 56:22 57:22,23,24 59:22 60:1 68:7,9 144:7,18 153:12,14,19 167:9 168:19

**standards**
33:23 34:3 46:23 54:4 56:23,24 59:23 96:21 122:6,21 143:16 153:3,7

**start**
6:21 44:1 64:2 116:14,15 123:16 169:15

**started**
16:19 17:3 58:10 79:7,10 102:14 110:8

**starting**
16:4

**state**
4:8 12:19 24:8 31:2, 15,18,23 33:9,14,17 41:16 46:22 48:3 49:3 58:6 60:6 86:23 98:1 143:8 170:3

**stated**
36:10 71:22 73:11 74:10 93:17 98:18

**statement**
16:21 65:12 72:17 73:2

**statements**
102:18,21 133:18, 19,20 170:13,14

**states**
33:12 40:10

**station**
29:8 46:3 47:22 48:2,4,9,18 49:9,10, 17 50:1,13,16 51:5 52:24 53:18 58:22 59:3,16,17 60:3,7, 13,20 61:21 62:5 63:17 103:13 104:10 108:14,15,18 109:22

110:16 120:8 121:11 122:17 143:20 146:5 152:24 153:3 156:12,13 157:23 158:10 162:12,21 164:5

**stations**
28:18 45:10,17 49:3 50:9,10 56:11 60:11, 12,14,15 64:24 111:8

**status**
20:16 22:22

**stay**
146:19

**stayed**
162:11

**steady**
53:21

**Stein**
118:4 155:21

**Steven**
170:3

**stop**
103:4 129:24 130:1 145:4,6,20

**straight**
14:18 144:18

**straight-up**
123:18

**strain**
44:22

**stream**
53:22 132:3 153:21

**Street**
5:22

**strengthen**
40:12

**strike**
7:14 11:1 13:20 20:13 24:13 44:11 45:14 51:22 65:2 109:6 118:13 119:14 124:10 163:24 164:2

**strong**
49:20

**struck**
30:13

**student**
84:7 97:14 107:1 109:6,7 110:14,21 111:21 146:2 159:14 171:18

**students**
38:11,23 91:9 93:6 103:3 104:15 105:3, 17 107:18 109:4 110:13 111:21 113:3,4,5 115:20 134:13 137:24 156:2 159:24 170:5 171:13

**stuff**
71:24 78:18 128:20

**style**
45:21 47:8 153:11

**subduing**
49:5 119:17

**subject**
65:20 170:18

**submitted**
9:12 84:15

**subsets**
154:16

**substance**
58:19

**sudden**
130:22

**suggestions**
11:12

**suitable**
52:14 53:7,9,11 54:2



Patrick Schuerman 11/13/2024

63:13,19 67:21
68:10 80:1
**sun**
74:4
**supplied**
154:6
**supply**
53:11 68:18
**supports**
86:17
**supposed**
97:13,14 99:4
135:23 140:23
152:18
**survey**
91:9
**surveys**
91:11,14
**sworn**
4:2,4
**system**
26:17 90:22

— **T** —

**tactics**
85:3
**takes**
105:4 107:13 108:1
111:10 115:13
**taking**
4:23 37:15 45:3
74:22,24 75:1 104:9
**talk**
38:18 50:6 61:10
78:15 137:4 169:18
**talked**
38:14 67:19 75:15,
16,18 118:14,19,20
143:10 154:15,22
155:1 157:6,12,13
166:3 169:17
**talking**
16:23 17:1 32:8
44:19 50:6 62:3 76:7
82:15 87:2,11
106:10 116:13
123:16 126:10,23,24
128:16 132:15
137:6,7 142:8
144:23 149:19,22
156:10 169:6
**talks**
38:15,16 40:8 55:18
137:2
**tap**
167:15
**taught**
35:18,21,23 37:3
90:12 92:4 97:15
99:19 102:22
**tax**
31:10
**taxpayer**
31:6,10
**teach**
37:11 38:9,10 39:18
91:1,2,4 96:11,14
97:3,4,7,8,14
147:15,18 155:9,10
**teaching**
42:13 85:5,6 97:18
156:23
**team**
157:19,21 158:9
**tearing**
151:24
**techniques**
119:11
**telling**
113:21

**tells**
92:23
**temperature**
154:10
**ten**
19:7 61:24 62:9
63:3,7 64:2 119:18
120:8 157:17 166:12
**ten-minute**
16:9
**tendency**
5:1
**term**
44:12 70:4 87:10,12
**terminology**
93:19 98:2
**terms**
16:23 29:5 30:20
32:6 35:8 37:6,14
95:21 96:1,5 158:22
164:14
**test**
21:20
**testified**
4:5 9:21,24 36:9
99:6
**testify**
65:20 114:13
**testimonies**
14:12
**testimony**
4:14,19,21,24 6:8
10:6,13 47:17 74:9
75:12 78:19 86:17
93:22 95:7 99:12
100:20,23 103:10,16
104:3,4,8 110:5
112:8 113:11 118:3,
10 138:22 139:5
141:20 148:2 150:2,
20 158:15 159:22
160:11,21
**textbook**
39:7,8
**thin**
114:20
**thing**
44:23 74:15 75:9
82:22 83:6,23 97:6,
13 111:16 131:21
144:3 145:24 148:7
152:9
**things**
14:6 25:8 26:22
37:21 44:10 46:13
64:8 135:11 136:1
**third-party**
9:15
**thought**
25:11 26:21 34:19
**threw**
89:5
**throw**
74:3
**throwing**
76:18
**tickets**
156:24
**time**
5:5 12:13 15:21,22,
23,24 16:1 17:7
28:18 31:24 32:24
39:9 49:8 79:17
107:24 108:5 110:20
111:9,11 113:2,7,12,
16,17,18 114:3,7
116:6,10,17,19
117:4,10 140:2
146:16,19 147:2
148:16 162:13 165:7
172:17

**timeframes**
143:14
**times**
10:17 20:18 35:4
45:12 108:20 115:6,
7,8 150:17
**timing**
114:6
**tissue**
69:15
**title**
8:18
**today**
4:24 5:15 6:8 7:18
9:1,5 60:18 62:20
63:1 69:20 78:19
106:4 113:10 134:4
172:17
**told**
9:23 14:7 74:2
115:12,15 125:2,13,
23 155:3 166:4
**tools**
156:8,10
**top**
97:1 116:13 133:15
146:15 167:21
**topics**
39:10 136:23 137:11
143:14 167:7
**toss**
165:21
**total**
107:16 108:19
**touches**
38:20 167:23
**tour**
45:22
**touring**
46:1
**towels**
112:10
**toxicological**
148:7
**track**
42:3
**trades**
38:11
**traffic**
30:12 75:4
**train**
22:13 85:2 140:23
141:22 142:15
147:23 148:1
**trained**
20:2 84:7 88:8,10
90:5,6 141:22 143:1
159:4,6 166:13
**trainer**
22:13 83:8 84:5 85:1
142:16
**training**
20:15 35:11 36:10,
22 37:20 41:7,8
43:17 60:24 67:17
70:16,18,23 73:21,
22,24 79:13 81:2
82:9 83:4 84:12,19,
20 85:7,24 86:5,12
87:13,15 88:6,9,12,
13 89:18,23 90:9
93:14,16 98:8,10
101:22 102:7,10,11
106:19 110:6,13,15,
21 134:20 137:7
140:13,23 141:11,12
142:10,11 143:4,7,
12 147:4,9 150:11
156:9 157:19 158:23
159:4,8 166:12
171:8 172:7,11

**trains**
84:21
**transcript**
94:16
**transcripts**
7:7,8 62:15 89:6
93:9
**treatment**
162:6,17 163:9
164:13
**tree**
29:16
**trial**
4:21 9:21,24
**triangles**
133:14
**trouble**
74:12
**true**
10:2,7 16:20 18:14
33:7 37:1 49:7
52:10,17 55:24 58:8
60:20 77:24 78:19,
20 79:15,19,20 80:3
81:20,21,24 85:24
90:12 98:4,10,19
102:16 103:8
112:16,23 118:10,15
142:4 151:1 164:6
**trunk**
120:14
**truth**
102:18,21
**tube**
153:4
**turned**
169:2
**twisting**
44:15,16,18
**type**
12:2,15 24:16 25:18
26:17 27:10 28:21
45:21 91:18 172:2
**types**
11:20 172:9
**typical**
42:16
**typically**
42:16

— **U** —

**uh-huh**
5:9
**ultimate**
41:10
**umbrella**
25:9
**unaware**
93:19 98:2
**undergo**
20:15 22:13
**understand**
5:13,14 26:3 37:24
47:20 51:7 59:10
83:15,20 86:13
95:17 104:14
**understanding**
33:4 40:1 50:7 95:13
126:14 166:17
**understood**
5:17 36:8 72:11
79:12 83:24 84:24
137:21,22
**underwent**
151:13
**unique**
40:22
**university**
80:12 149:6

**unknown**
44:14
**updated**
54:6
**upper**
168:4
**upward**
168:15,20
**utilize**
146:7
**utilized**
49:11,12

— **V** —

**vague**
114:24 142:6
**Valley**
38:6 42:13 91:3
**vapors**
140:17
**vehicle**
30:13
**vehicles**
121:12
**ventilation**
26:17
**verbal**
5:8
**versions**
51:3
**versus**
4:15 12:14 45:20
152:2
**vest**
30:17
**violation**
119:13,15 120:6
121:1,12,17,23
**visit**
32:9
**visited**
28:18
**volume**
127:3 153:23 154:5
**voluntarily**
72:13 73:8
**voluntary**
74:1
**volunteer**
20:8

— **W** —

**wait**
5:3 87:9 103:21
123:7 125:14 127:1
154:1
**waiting**
87:20
**waiver**
73:18 74:3,7,21
75:22 76:4 78:6,9,15
84:6 134:1 135:12
137:2,6 166:6,11
168:23,24 169:8,9
170:5,10
**waivers**
134:3
**walk**
110:10
**walking**
159:15
**wall**
46:21
**warning**
133:16
**wash**
45:10,16 46:3,22
47:22 48:3,17 49:10,

20 50:1,10,16 51:5
56:11 59:17 60:3,5,
7,12,19 61:17,19,21
63:12 64:24 119:3
120:15,17,18 121:11
122:5,17 144:7
145:11 146:5 151:19
153:3 168:9
**washes**
120:21
**washing**
59:20
**watch**
103:2 171:6
**watching**
159:12
**water**
87:24 120:19
145:23,24 146:10,12
147:16 151:19
152:12,18 153:5,22,
24 154:5,12 156:11,
18 165:7,14 167:8,9,
15,17,20 168:13,14,
16,18,20
**ways**
45:5 147:18
**wear**
49:15 139:3,13
**wearing**
29:17 30:6,10,11,16
138:23
**website**
41:21 42:2,3
**week**
39:17,18 73:21,22,
24 104:22
**weeks**
39:13
**weighing**
104:2,8
**weight**
148:21,22
**wet**
112:10
**Whichever**
47:10
**wide**
111:3
**width**
168:2
**Win**
23:12
**wipe**
67:12
**wiped**
150:21
**wipes**
66:17 67:2,10 68:18,
23 69:3,4,20,21 72:3
81:8,20 156:20
**witnesses**
101:8 102:1,9
117:12
**wiz**
148:18
**wondering**
70:5
**word**
29:13 126:4
**words**
25:24 46:20 110:2
136:23 148:21
**work**
12:2 13:2 14:20 17:6
24:16 25:10 30:21
31:4,12,24 40:2
44:17 49:2 50:12
52:16 57:21 80:3
82:15,18,21,23,24
86:24 87:1,3,11,12,



13,16 101:23
**worked**
13:16 14:20 24:20
40:12 42:20 64:17
**workers**
27:11 45:6
**working**
12:6,19 16:19 43:9
50:14 53:1 58:12,15
69:11 89:22
**workplace**
12:9,11 13:3 14:22
24:7 28:4 38:17
41:11 51:17,18
**workplaces**
25:2
**works**
31:9
**worst**
133:3
**worth**
95:12
**write**
89:9
**written**
6:23 18:15 19:10,11
**wrong**
33:5 114:18 130:12
139:14 145:8 154:15
**wrote**
23:11 67:6

---

**Y**

---

**yard**
111:6
**yards**
111:2,3
**year**
17:4 40:20 90:15,17
92:4 157:18
**years**
9:22 10:6,11,14
12:19 13:8 19:7
20:4,10,19 21:21
64:18
**yell**
75:9
**yelled**
74:6,20 76:10 78:10
**yesterday**
110:5
**York**
33:13

---

**Z**

---

**Z358**
57:15 60:12
**Z358.1**
55:3,24 56:4 58:4,
16,18,23 68:15,22
118:15,23 119:15
**zoom**
4:24 96:4





EXHIBIT E

A N S I / I S E A    Z358.1-2014 (R2020)

# American National Standard for Emergency Eyewash and Shower Equipment

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

**ANSI/ISEA Z358.1-2014 (R2020)**
**Revision of**
ANSI/ISEA Z358.1-2009

# American National Standard for

# Emergency Eyewash and Shower Equipment

Secretariat

**International Safety Equipment Association**

Approved January 8, 2015 (Reaffirmed October 29, 2020)
**American National Standards Institute, Inc.**

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

**American**

**National**

**Standard**

Approval of an American National Standard requires verification by ANSI that the requirements for due process, consensus, and other criteria for approval have been met by the standards developer.  Consensus is established when, in the judgment of the ANSI Board of Standards Review, substantial agreement has been reached by directly and materially affected interests.  Substantial agreement means much more than a simple majority, but not necessarily unanimity. Consensus requires that all views and objections be considered, and that a concerted effort be made toward their resolution.  The use of American National Standards is completely voluntary; their existence does not in any respect preclude anyone, whether he/she has approved the standards or not, from manufacturing, marketing, purchasing, or using products, processes, or procedures not conforming to the standards.  The American National Standards Institute does not develop standards and will in no circumstance give an interpretation of any American National Standard.  Moreover, no person shall have the right or authority to issue an interpretation of an American National Standard in the name of the American National Standards Institute. Requests for interpretation should be addressed to the secretariat or sponsor whose name appears on the title page of this standard.

CAUTION NOTICE: This American National Standard may be revised or withdrawn at any time.  The procedures of the American National Standards Institute require that action be taken to reaffirm, revise, or withdraw this standard no later than five years from the date of publication.  Purchasers of American National Standards may receive current information on all standards by calling or writing the American National Standards Institute.

Published by

**International Safety Equipment Association**
**1901 North Moore Street, Suite 808, Arlington, Virginia 22209**

Copyright by ISEA

All rights reserved.

No part of this publication may be reproduced in any form, in an electronic retrieval system or otherwise, without the prior written permission of the publisher.

Printed in the United States of America

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

**Foreword** (This Foreword is not part of American National Standard ANSI/ISEA Z358.1-2014)

This revision updates ANSI Z358.1-2009 and was prepared by the Emergency Eyewash and Shower Group of the International Safety Equipment Association, whose members are thoroughly knowledgeable in the design, installation, and use of this important safety equipment. The following companies were members of the group at the time of the approval of the standard: Bradley Corporation, Encon Safety Products, FSI International, Guardian Equipment, Honeywell Safety Products, Hughes Safety Showers, Prevor, Inc., Sellstrom Manufacturing, Speakman Company, and VisionAid.

Updates to the 2009 version of the standard are reflected in this document, including improvement in language to emphasize that the location of the fluid flow and pattern delivery for emergency eyewashes and eye/face washes is the critical aspect in designing and installing these devices, rather than the positioning of the nozzles themselves. Additionally, illustrations have been updated to reflect contemporary design configurations that are known to meet the criteria in standard.

Suggestions for the improvement of this standard are welcome. They should be sent to the ISEA, 1901 N. Moore Street, Suite 808, Arlington, VA 22209 or isea@safetyequipment.org.

This standard was processed and approved using consensus procedures prescribed by the American National Standards Institute. The following organizations were contacted prior to the approval of this standard. Inclusion in this list does not necessarily imply that the organization concurred with the submittal of the proposed standard to ANSI.

Acorn Safety
APPA, Leadership in Educational Facilities
Alabama Power Company
Arts, Crafts & Theater Safety Inc.
Atlantic Health
Atlas Industrial Contractors, LLC
BASF Corporation
Baylor Scott & White Health
CalOSHA
Cardinal Health
County of Sacramento
Erdman
Green Conversion Systems
Haws Corporation
International Safety Equipment Association
Intertek

Lawler Manufacturing
Natural Resources Canada
North Carolina Department of Labor
Safety Equipment Institute
Special Graphic Imaging Association
State of Ohio Public Employment Risk
    Reduction Program
Syracuse Utilities
UL LLC
University of Georgia
University of Michigan
US Department of the Army
US Department of the Navy
Williams Energy

Licensed to Patrick Schuerman. ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

## Contents

SECTION                                                                                           PAGE

1.   Scope .................................................................................................................. 1

2    Purpose .............................................................................................................. 1

3.   Definitions ......................................................................................................... 1

4.   Emergency Showers .......................................................................................... 2

    4.1   Performance of Emergency Showers ...................................................... 2

    4.2   Performance of Control Valve .................................................................. 2

    4.3   Emergency Shower Enclosures ............................................................... 2

    4.4   Testing Procedures for Certification ........................................................ 2

    4.5   Installation .............................................................................................. 3

    4.6   Maintenance and Training ....................................................................... 4

5.   Eyewash Equipment .......................................................................................... 4

    5.1   Performance of Eyewashes .................................................................... 4

    5.2   Performance of Control Valve .................................................................. 4

    5.3   Testing Procedures for Certification ........................................................ 5

    5.4   Installation .............................................................................................. 5

    5.5   Maintenance and Training ....................................................................... 6

6.   Eye/Face Wash Equipment ............................................................................... 6

    6.1   Performance of Eye/Face Washes ......................................................... 6

    6.2   Performance of Control Valve .................................................................. 7

    6.3   Testing Procedures for Certification ........................................................ 7

    6.4   Installation .............................................................................................. 7

    6.5   Maintenance and Training ....................................................................... 8

7.   Combination Units ............................................................................................. 8

    7.1   Performance of Combination Units .......................................................... 8

    7.2   Performance of Control Valve .................................................................. 8

    7.3   Testing Procedures for Certification ........................................................ 8

    7.4   Installation .............................................................................................. 8

    7.5   Maintenance and Training ....................................................................... 9

8.   Supplemental Equipment ................................................................................... 9

    8.1   Personal Wash Units ............................................................................... 9

    8.2   Drench Hoses ......................................................................................... 10

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

SECTION                                                                                                    PAGE

ILLUSTRATIONS

Illustration 1      Emergency Shower – Overhead Type ................................................... 11

Illustration 2      Emergency Shower – Multi-Nozzle ....................................................... 12

Illustration 3      Emergency Shower – Multi-Nozzle with Overhead Fixture ................... 13

Illustration 4      Plumbed Eyewash ................................................................................ 14

Illustration 5      Nonpressurized Self-Contained Eyewash ............................................ 15

Illustration 6      Pressurized Self-Contained Eyewash .................................................. 15

Illustration 7      Typical Eyewash Gauge ....................................................................... 16

Illustration 8      Eye/Face Wash .................................................................................... 16

Illustration 9      Combination Unit .................................................................................. 17

Illustration 10     Personal Wash Units ............................................................................ 18

Illustration 11     Drench Hose ......................................................................................... 18

Illustration 12     Drench Hose with Eyewash Attachment ............................................... 18


APPENDICES

Appendix A – Safety Considerations ............................................................................. 19

Appendix B – Installation Considerations ...................................................................... 20


REFERENCES................................................................................................................ 22

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.



Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)

# American National Standard
# for Emergency Eyewash and Shower Equipment

## 1.      Scope

This standard establishes minimum performance and use requirements for eyewash and shower equipment for the emergency treatment of the eyes or body of a person who has been exposed to hazardous materials.  It covers the following types of equipment: emergency showers, eyewashes, eye/face washes, and combination units.

This standard also includes performance and use requirements for personal wash units and drench hoses, which are considered supplemental to emergency eyewash and shower equipment.

## 2.      Purpose

This standard is intended to provide uniform minimum requirements for the performance, use, installation, test procedures, maintenance and training of emergency eyewash and shower equipment.

## 3.      Definitions

For the purpose of this standard, the following terms apply as defined:

**certified**:  A system whereby a certification organization determines that a manufacturer has demonstrated the ability to produce a product that complies with the requirements of this standard, authorizes the manufacturer to use a label on listed products that comply with the requirements of this standard, and establishes a follow-up program conducted by the certification organization as a check on the methods the manufacturer uses to determine continued compliance of labeled and listed products with the requirements of this standard.

**certification organization**:  An independent third party organization that determines product compliance with the requirements of this standard with a labeling/listing/follow-up program.

**combination unit:**  An interconnected assembly of emergency equipment supplied by a single source of flushing fluid.

**drench hose:**  A supplemental device consisting of a flexible hose connected to a flushing fluid supply and used to provide fluid to irrigate and flush face and body areas.

**emergency shower:**  A device specifically designed and intended to deliver flushing fluid in sufficient volume to cause that fluid to cascade over the entire body.

**eye/face wash:**  A device used to provide fluid to irrigate and flush both the face and the eyes simultaneously.

**eyewash:**  A device used to provide fluid to irrigate and flush the eyes.

**flow pressure:**  The pressure in the water supply pipe near the water outlet while the faucet or outlet is fully open and flowing.

**flushing fluid:**  Potable water, preserved water, preserved buffered saline solution or other medically acceptable solution manufactured and labeled in accordance with applicable government regulations.

**flushing fluid column:**  The dispersion pattern of flushing fluid which is created by an emergency shower and meets the standard's prescribed coverage requirements. This pattern can be achieved by a variety of design configurations.

**freeze protected equipment:**  Equipment designed to allow the emergency device to operate under freezing conditions.

**freeze protection:**  A means to protect flushing fluid in an apparatus from freezing and rendering it inoperable.  This can be achieved through several means including mechanical valves and electrical heat tracing.

**hazardous material:**  Any substance or compound that has the capability of producing

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)

adverse effects on the health and safety of humans.

**personal wash:**  A supplementary device that supports plumbed and/or self-contained units, by delivering immediate flushing fluid to the eyes or body.

**plumbed:**  A term used to describe equipment that is connected to a continual source of potable water.

**potable water:**  Water that is suitable for drinking.

**self-closing valve:**  A valve that closes automatically when released by the user.

**self-contained:**  A term used to describe a stand-alone device containing flushing fluid.

**tepid**:  A flushing fluid temperature conducive to promoting a minimum 15 minute irrigation period.  A suitable range is 16 - 38º C (60 -100º F). (See Appendix B6).

**valve actuator:**  A device connected to the valve to facilitate its operation.

# 4.   Emergency Showers (See Illustrations 1, 2, 3)

## 4.1   Performance of Emergency Showers

4.1.1    A means shall be provided to ensure that a controlled flow of flushing fluid is provided at a velocity low enough to be non-injurious to the user.

4.1.2    Emergency showers shall be capable of delivering flushing fluid at a minimum of 75.7 liters per minute (20 gpm) for a minimum of 15 minutes.  If shut off valves are installed in the supply line for maintenance purposes, provisions shall be made to prevent unauthorized shut off.

4.1.3    Emergency showers shall provide a flushing fluid column that is at least 208.3 cm (82 in.) and not more than 243.8 cm (96 in.) in height from the surface on which the user stands.

4.1.4     The spray pattern shall have a minimum diameter of 50.8 cm (20 in.) at 152.4

cm (60 in.) above the surface on which the user stands, and the center of the spray pattern shall be located at least 40.6 cm (16 in.) from any obstruction.  The flushing fluid shall be substantially dispersed throughout the pattern.

4.1.5    Emergency showers shall be designed, manufactured and installed in such a manner that, once activated, they can be used without requiring the use of the operator's hands.

4.1.6    Emergency showers shall be constructed of materials that will not corrode in the presence of the flushing fluid.  Stored flushing fluid shall be protected against airborne contaminants.

## 4.2   Performance of Control Valve

The valve shall remain open without the use of the operator's hands until intentionally closed.  The valve shall be simple to operate and shall go from "off" to "on" in 1 second or less.  The valve shall be resistant to corrosion.  Manual or automatic actuators shall be easy to locate and readily accessible to the user.  Valve actuators shall be located not more than 173.3 cm (69 in.) above the level on which the user stands.

## 4.3   Emergency Shower Enclosures

If used, enclosures shall provide for a minimum unobstructed area of 86.4 cm (34 in.) in diameter.

## 4.4   Testing Procedures for Certification

### 4.4.1   Plumbed Emergency Showers

Plumbed emergency showers shall be certified as follows:

(1) Connect a flowmeter to the unit to be tested or provide other means of measuring flushing fluid flow.

(2) Connect the unit per the manufacturer's specifications to a flushing fluid supply at a flow pressure of 207 kPa +3.4 kPa -0 kPa (30 psi +0.5 psi -0 psi).

(3) Open the valve on the unit and verify that it fully opens in one second or less and that it stays open.

Page 2

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

(4) Determine that flushing fluid is substantially dispersed throughout the pattern.  The flushing fluid column pattern shall be at least 208 cm (82 in.) and no more than 243.8 cm (96 in.) from the surface on which the user stands.  Measure the diameter of the flushing fluid pattern 152.4 cm (60 in.) above the surface on which the user stands.  The diameter shall be a minimum of 50.8 cm (20 in.).  Throughout the 15-minute test, verify that the flow rate is a minimum of 75.7 liters per minute (20 gpm).

### 4.4.2    Self-contained Emergency Showers

Self-contained emergency showers shall be certified as follows:

(1)  Fill the unit with flushing solution.

(2) Connect a flowmeter to the unit to be tested or provide other means of measuring flushing fluid flow.

(3) Open the valve on the unit and verify that it fully opens in one second or less and that it stays open.

(4)  Determine that flushing fluid is substantially dispersed throughout the pattern.  The flushing fluid column pattern shall be at least 208 cm (82 in.) and not more than 243.8 cm (96 in.) from the surface on which the user stands.  Measure the diameter of the flushing fluid pattern 152.4 cm (60 in.) above the surface on which the user stands.  The diameter shall be a minimum of 50.8 cm (20 in.).  Throughout the 15-minute test, verify that the flow rate is a minimum of 75.7 liters per minute (20 gpm).

### 4.5     Installation

It is the installer's responsibility to ensure that emergency showers shall:

4.5.1    Be assembled and installed in accordance with the manufacturer's instructions, including flushing fluid delivery requirements.

4.5.2    Be in accessible locations that require no more than 10 seconds to reach.  The emergency shower shall be located on the same level as the hazard and the path of travel shall be free of obstructions that may inhibit its immediate use.  (See Appendix B5)

4.5.3    Be located in an area identified with a highly visible sign positioned so the sign shall be visible within the area served by the emergency shower.  The area around the emergency shower shall be well-lit.

4.5.4    Be positioned so that the shower pattern is dispersed such that the top of the flushing fluid column is at least 208.3 cm (82 in.) and not more than 243.8 cm (96 in.) from the surface on which the user stands.  The center of the spray shall be at least 40.6 cm (16 in.) from any obstruction.

4.5.5    Be connected to a supply of flushing fluid per the manufacturer's installation instructions to produce the required spray pattern for a minimum period of 15 minutes.  Where the possibility of freezing conditions exists, the emergency shower shall be protected from freezing or freeze-protected equipment shall be installed.  If shut off valves are installed in the shower line for maintenance purposes, provisions shall be made to prevent unauthorized shut off.

4.5.6    Deliver tepid flushing fluid.  In circumstances where chemical reaction is accelerated by flushing fluid temperature, a facilities safety/health advisor should be consulted for the optimum temperature for each application.

4.5.7    When the plumbed emergency shower is installed, its performance shall be verified in accordance with the following procedures:

(1) With the unit correctly connected to the flushing fluid source and the valve(s) closed, visually check the piping connections for leaks.

(2) Open the valve to the full open position.  The valve shall remain open without requiring further use of the operator's hands.

(3) With the valve in the fully opened position, measure the diameter of the spray pattern.  It shall be a minimum of 50.8 cm (20 in.) at 152.4 cm (60 in.) above the standing surface.  The flushing fluid shall be

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)

substantially dispersed throughout the pattern.

(4) Using the flowmeter or other means, determine that the rate of flow is at least 75.7 liters per minute (20 gpm).

(5) Using a temperature gauge or other means, determine that the flushing fluid is tepid.

4.5.8    When the self-contained emergency shower is installed, its installation shall be verified in accordance with manufacturer's instructions.

### 4.6    Maintenance and Training

4.6.1    Manufacturers shall provide operation, inspection and maintenance instructions with emergency shower equipment.  Instructions shall be readily accessible to maintenance and training personnel.

4.6.2    Plumbed emergency showers shall be activated weekly for a period long enough to verify operation and ensure that flushing fluid is available.  (See Appendix B7)

4.6.3    Self-contained emergency showers shall be visually checked weekly to determine if flushing fluid needs to be changed or supplemented.  Such inspection shall be conducted in accordance with manufacturer's instructions.

4.6.4    Employees who may be exposed to hazardous materials shall be instructed in the location and proper use of emergency showers.

4.6.5    All emergency showers shall be inspected annually to assure conformance with Section 4.5 requirements of this standard.

### 5.    Eyewash Equipment (See Illustrations 4, 5, 6)

### 5.1    Performance of Eyewashes

5.1.1    A means shall be provided to ensure that a controlled flow of flushing fluid is provided to both eyes simultaneously at a velocity low enough to be non-injurious to the user.

5.1.2    The eyewash shall be designed and positioned in such a way as to pose no hazard to the user.

5.1.3    Nozzles and flushing fluid units shall be protected from airborne contaminants. Whatever means is used to afford such protection, its removal shall not require a separate motion by the operator when activating the unit.

5.1.4    Eyewashes shall be designed, manufactured and installed in such a manner that, once activated, they can be used without requiring the use of the operator's hands.

5.1.5    Eyewashes shall be constructed of materials that will not corrode in the presence of the flushing fluid.

5.1.6    Eyewashes shall be capable of delivering flushing fluid to the eyes not less than 1.5 liters per minute (0.4 gpm) for 15 minutes.  If shut off valves are installed in the supply line for maintenance purposes, provisions shall be made to prevent unauthorized shut off.

5.1.7    Eyewashes shall be designed to provide enough room to allow the eyelids to be held open with the hands while the eyes are in the flushing fluid stream.

5.1.8    Eyewashes shall provide flushing fluid to both eyes simultaneously.  A test gauge for making determination of a suitable eyewash pattern shall be a minimum 10.16 cm (4 in.) in length with two sets of parallel lines equidistant from the center (See Illustration 7).  The interior set of lines shall be 3.18 cm (1.25 in.) apart and the exterior lines shall be 8.26 cm (3.25 in.) apart.  Place the gauge in the stream of the eyewash.  The flushing fluid shall cover the areas between the interior and exterior lines of the gauge at some point less than 20.3 cm (8 in.) above the eyewash nozzle(s).

### 5.2    Performance of Control Valve

The valve shall remain open without the use of the operator's hands until intentionally closed. The valve shall be simple to operate and shall go from "off" to "on" in 1 second or less.  The valve shall be resistant to corrosion.  Manual or automatic actuators shall be easy to locate and readily accessible to the user.

Page 4

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)

(8 in.) above the eyewash nozzle(s) (Illustration 7).

### 5.3    Testing Procedures for Certification

#### 5.3.1    Plumbed Eyewashes

Plumbed eyewashes shall be certified as follows:

(1) Connect a flowmeter to the unit to be tested, or provide other means of measuring flushing fluid flow.

(2)  Connect the unit to a flushing fluid supply per the manufacturer's instructions at a flow pressure of 207 kPa +3.4 kPa -0 kPa (30 psi +0.5 psi -0 psi).

(3) Open the valve on the eyewash and verify that it fully opens in one second or less and that it stays open.

(4) Throughout the 15 minute test, ensure that the unit is capable of delivering a minimum of 1.5 liters per minute (0.4 gpm) and that the flushing fluid covers the areas between the interior and exterior lines of the gauge at some point less than 20.3 cm (8 in.) above the eyewash nozzle(s) (Illustration 7).

#### 5.3.2    Self-contained Eyewashes

Self-contained eyewashes shall be certified as follows:

(1) Set up the unit per the manufacturer's instructions.

(2) Fill the unit with flushing fluid or with the pre-packaged fluid provided by the manufacturer.

(3) Activate the unit and verify that it can be activated in one second or less and that it stays activated.

(4) Throughout the 15 minute test, ensure that the eyewash is capable of delivering a minimum of 1.5 liters per minute (0.4 gpm) and that the flushing fluid covers the areas between the interior and exterior lines of the gauge at some point less than 20.3 cm

### 5.4    Installation

It is the installer's responsibility to ensure that eyewashes shall:

5.4.1    Be assembled and installed in accordance with the manufacturer's instructions, including flushing fluid delivery requirements.

5.4.2    Be in accessible locations that require no more than 10 seconds to reach.  The eyewash shall be located on the same level as the hazard and the path of travel shall be free of obstructions that may inhibit its immediate use. (See Appendix B5)

5.4.3    Be located in an area identified with a highly visible sign positioned so the sign shall be visible within the area served by the eyewash. The area around the eyewash shall be well-lit.

5.4.4    Be arranged such that the flushing fluid flow pattern as described in Section 5.1.8 is not less than 83.8 cm (33 in.) and no greater than 134.6 cm (53 in.) from the surface on which the user stands and 15.3 cm (6 in.) minimum from the wall or the nearest obstruction.

5.4.5    Be connected to a supply of flushing fluid per the manufacturer's installation instructions to produce the required spray pattern for a minimum period of 15 minutes. Where the possibility of freezing conditions exists, the eyewash shall be protected from freezing or freeze-protected equipment shall be installed.  If shut off valves are installed in the supply line for maintenance purposes, provisions shall be made to prevent unauthorized shut off.

5.4.6    Deliver tepid flushing fluid.  In circumstances where chemical reaction is accelerated by flushing fluid temperature, a facilities safety/health advisor should be consulted for the optimum temperature for each application.

5.4.7    When the plumbed eyewash is installed, its performance shall be verified in accordance with the following procedures:

Page 5

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)

(1) With the unit correctly connected to the flushing fluid source and the valve(s) closed, visually check the piping connections for leaks.

(2) Open the valve to the full open position. The valve shall remain open without requiring further use of the operator's hands.

(3) With the valve in the fully open position, make sure that both eyes will be washed simultaneously at a velocity low enough to be non-injurious to the user.

(4) Using the flowmeter or other means, determine that the rate of flow is at least 1.5 liters per minute (0.4 gpm). A test gauge similar to the one pictured in Illustration 7 can be used to verify minimum flow characteristics.

(5) Using a temperature gauge or other means, determine that the flushing fluid is tepid.

5.4.8    When the self-contained eyewash is installed, its installation shall be verified in accordance with manufacturer's instructions.

**5.5    Maintenance and Training**

5.5.1    Manufacturers shall provide operation, inspection and maintenance instructions with eyewashes.  Instructions shall be readily accessible to maintenance and inspection personnel.

5.5.2    Plumbed eyewashes shall be activated weekly for a period long enough to verify operation and ensure that flushing fluid is available.  (See Appendix B7)

5.5.3    Self-contained eyewashes shall be visually checked weekly to determine if flushing fluid needs to be changed or supplemented. Such inspection shall be conducted in accordance with manufacturer's instructions.

5.5.4    Employees who may be exposed to hazardous materials shall be instructed in the location and proper use of emergency eyewashes.

5.5.5    All eyewashes shall be inspected annually to assure conformance with Section 5.4 requirements of this standard.

Page 6

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

### 6. Eye/Face Wash Equipment (See Illustration 8)

#### 6.1 Performance of Eye/Face Washes

6.1.1    A means shall be provided to ensure that a controlled flow of flushing fluid is provided to both eyes and face simultaneously at a velocity low enough to be non-injurious to the user.

6.1.2    Eye/face washes shall be designed and positioned in such a way as to pose no hazard to the user.

6.1.3    Nozzles and flushing fluid units shall be protected from airborne contaminants. Whatever means is used to afford such protection, its removal shall not require a separate motion by the operator when activating the unit.

6.1.4    Eye/face washes shall be designed, manufactured and installed in such a manner that, once activated, they can be used without requiring the use of the operator's hands.

6.1.5    Eye/face washes shall be constructed of materials that will not corrode in the presence of the flushing fluid.

6.1.6    Eye/face washes shall be capable of delivering flushing fluid to the eyes and face not less than 11.4 liters per minute (3.0 gpm) for 15 minutes.  If shut off valves are installed in the line for maintenance purposes, provisions shall be made to prevent unauthorized shut off.

6.1.7    Eye/face washes shall be designed to provide enough room to allow the eyelids to be held open with the hands while the eyes and face are in the flushing fluid stream.

6.1.8    Eye/face washes shall provide flushing fluid to both eyes simultaneously.  A test gauge for making determination of a suitable eyewash pattern shall be a minimum 10.16 cm (4 in.) in length with two sets of parallel lines equidistant from the center (See Illustration 7).  The interior set of lines shall be 3.18 cm (1.25 in.) apart and the exterior lines shall be 8.26 cm (3.25 in.) apart.  Place the gauge in the stream of the eyewash.  The flushing fluid shall cover the areas between the interior and exterior lines of the gauge at some point less than 20.3 cm (8 in.) above the eye/face wash nozzle(s).

#### 6.2 Performance of Control Valve

The valve shall remain open without the use of the operator's hands until intentionally closed. The valve shall be simple to operate and shall go from "off" to "on" in 1 second or less.  The valve shall be resistant to corrosion.  Manual or automatic actuators shall be easy to locate and readily accessible to the user.

#### 6.3 Testing Procedures for Certification

#### 6.3.1 Plumbed Eye/Face Washes

Plumbed eye/face washes shall be certified as follows:

(1) Connect a flowmeter to the unit to be tested, or provide other means of measuring flushing fluid flow.

(2)  Connect the unit to a flushing fluid supply per the manufacturer's instructions at a flow pressure of 207 kPa +3.4 kPa -0 kPa (30 psi +0.5 psi -0 psi).

(3) Open the valve on the unit and verify that it opens in one second and stays open.

(4) Throughout the 15 minute test, ensure that the unit is capable of delivering a minimum of 11.4 liters per minute (3.0 gpm) and that the flushing fluid covers the areas between the interior and exterior lines of the gauge at some point less than 20.3 cm (8 in.) above the eye/face wash nozzle(s) (Illustration 7).

#### 6.3.2 Self-contained Eye/Face Washes

Self-contained eye/face washes shall be certified as follows:

(1) Set up the unit per the manufacturer's instructions.

(2)  Fill the unit with flushing fluid or with the pre-packaged fluid provided by the manufacturer.

(3) Activate the unit and verify that it can be activated in one second or less and that it stays activated.

(4) Throughout the 15 minute test, ensure that the unit is capable of delivering a

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)

minimum of 11.4 liters per minute (3.0 gpm) and that the flushing fluid covers the areas between the interior and exterior lines of the gauge at some point less than 20.3 cm (8 in.) above the eye/face wash nozzle(s) (Illustration 7).

**6.4      Installation**

It is the installer's responsibility to ensure that eye/face washes shall:

6.4.1      Be assembled and installed in accordance with the manufacturer's instructions, including flushing fluid delivery requirements.

6.4.2      Be in accessible locations that require no more than 10 seconds to reach. The eye/face wash shall be located on the same level as the hazard and the path of travel shall be free of obstructions that may inhibit the immediate use of the equipment.    (See Appendix B5)

6.4.3      Be located in an area identified with a highly visible sign positioned so the sign shall be visible within the area served by the eye/face wash.  The area around the eye/face wash shall be well-lit.

6.4.4      Be arranged such that the flushing fluid flow pattern as described in Section 6.1.8 is not less than 83.8 cm (33 in.) and no greater than 134.6 cm (53 in.) from the level on which the user stands and 15.3 cm (6 in.) minimum from the wall or nearest obstruction.

6.4.5      Be connected to a supply of flushing fluid per the manufacturer's installation instructions to produce the required spray pattern for a minimum period of 15 minutes. Where the possibility of freezing conditions exists, the eye/face wash shall be protected from freezing or freeze-protected equipment shall be installed.  If shut off valves are installed in the supply line for maintenance purposes, provisions shall be made to prevent unauthorized shut off.

6.4.6      Deliver tepid flushing fluid. In circumstances where chemical reaction is accelerated by flushing fluid temperature, a facilities safety/health advisor should be consulted for the optimum temperature for each application.  (See Appendix B6)

6.4.7      When the plumbed eye/face wash is installed, its performance shall be verified in accordance with the following procedures:

(1) With the unit correctly connected to the flushing fluid source and the valve(s) closed, visually check the piping connections for leaks.

(2) Open the valve to the full open position. The valve shall remain open without requiring further use of the operator's hands.

(3) With the valve in the fully opened position make sure that both eyes and face will be washed simultaneously at a velocity low enough to be non-injurious to the user.

(4) Using the flowmeter or other means, determine that the rate of flow is at least 11.4 liters per minute (3.0 gpm). A test gauge similar to the one pictured in Illustration 7 can be used to verify minimum flow characteristics.

(5) Using a temperature gauge or other means, determine that the flushing fluid is tepid.

6.4.8      When the self-contained eye/face wash is installed, its installation shall be verified in accordance with manufacturer's instructions.

**6.5      Maintenance and Training**

6.5.1      Manufacturers shall provide operation, inspection and maintenance instructions with eye/face washes.  Instructions shall be readily accessible to maintenance and inspection personnel.

6.5.2      Plumbed eye/face washes shall be activated weekly for a period long enough to verify operation and ensure that flushing fluid is available.  (See Appendix B7)

6.5.3      Self-contained eye/face washes shall be visually checked weekly to determine if flushing fluid needs to be changed or supplemented. Such inspection shall be conducted in accordance with manufacturer's instructions.

6.5.4      Employees who may be exposed to hazardous materials shall be instructed in the location and proper use of eye/face washes.

Page 8

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

6.5.5    All eye/face washes shall be inspected annually to assure conformance with Section 6.4 requirements of this standard.

# 7.    Combination Units (See Illustration 9)

## 7.1    Performance of Combination Units

Components of combination units shall operate individually and simultaneously in accordance with the following sections:

7.1.1    Emergency showers shall meet the performance requirements of Section 4.

7.1.2    Eyewashes shall meet the performance requirements of Section 5.

7.1.3    Eye/face washes shall meet the performance requirements of Section 6.

7.1.4    Drench hoses shall meet the performance requirements of Section 8.2 at the pressure and flow specified by the manufacturer.

NOTE:  The eyewash or eye/face wash section of a combination unit is not considered an "obstruction" in this context to allow for simultaneous use of emergency shower and eyewash equipment.

## 7.2    Performance of Control Valve

Each valve shall meet the applicable requirements of Sections 4, 5, 6, and 8.2.2, depending on which of the components listed in Section 7.1 are included.

## 7.3    Testing Procedures for Certification

Each part of the combination unit shall be certified individually and when activated simultaneously be in accordance with the procedures outlined in Sections 4, 5, 6 and 8.2, depending on which of the components listed in Section 7.1 are included.

## 7.4    Installation

It is the installer's responsibility to ensure that combination units shall:

7.4.1    Be assembled and installed in accordance with the manufacturer's instructions, including flushing fluid delivery requirements.

7.4.2    Be in accessible locations that require no more than 10 seconds to reach. The combination unit shall be located on the same level as the hazard and the path of travel shall be free of obstructions that may inhibit its immediate use.  (See Appendix B5)

7.4.3    Be located in an area identified with a highly visible sign positioned so the sign shall be visible within the area served by the combination unit.  The area around the combination unit shall be well-lit.

7.4.4    Be connected to a system capable of supplying adequate flushing fluid to meet the requirements of each component as outlined in Sections 4, 5, and 6 when all components are operated simultaneously.  Combination unit components shall be positioned so that components may be used simultaneously by the same user.  Where the possibility of freezing conditions exists, combination units shall be protected from freezing or freeze-protected equipment shall be installed.

7.4.5    Deliver tepid flushing fluid.  In circumstances where chemical reaction is accelerated by flushing fluid temperature, a facilities safety/health advisor should be consulted for the optimum temperature for each application. (See Appendix B6)

7.4.6    When the combination unit is installed, its performance shall be verified in accordance with the following procedures:

(1) With the unit correctly connected to the flushing fluid source and the valve(s) closed, visually check the piping connections for leaks.

(2) Open the emergency shower and eyewash or eye/face wash valves to the full open position.  The valves shall remain open without requiring further use of the operator's hands.

(3) Activate the valves and check the performance of the emergency shower, eyewash and eye/face wash valves as described in Sections 4.5.7, 5.4.7 and 6.4.7 respectively, while operating simultaneously.

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)

(4) Using a temperature gauge or other means, determine that the flushing fluid is tepid.

NOTE: Where hand-held drench hoses are part of the combination unit, the flow and pressure shall be specified by the manufacturer.

### 7.5 Maintenance and Training

7.5.1 Manufacturers shall provide operation, inspection and maintenance instructions with combination units. Instructions shall be readily accessible to maintenance and inspection personnel.

7.5.2 Plumbed combination units shall be activated weekly for a period long enough to verify operation and ensure that flushing fluid is available. (See Appendix B7)

7.5.3 Self-contained combination units shall be visually checked weekly to determine if flushing fluid needs to be changed or supplemented. Such inspection shall be conducted in accordance with manufacturer's instructions.

7.5.4 Employees who may be exposed to hazardous materials shall be instructed in the location and proper use of combination units.

7.5.5 All combination units shall be inspected annually to assure conformance with Section 7.4 requirements of this standard.

## 8. Supplemental Equipment

The supplemental equipment listed below shall provide immediate flushing to support plumbed and self-contained emergency eyewash and shower equipment but shall not replace them.

### 8.1. Personal Wash Units (See Illustration 10)

### 8.1.1 Performance of Personal Wash Units

8.1.1.1 Personal wash units shall have the capacity to deliver immediate flushing fluid without being injurious to the user. Personal wash units do not meet the criteria of plumbed or self-contained eyewash equipment.

8.1.1.2 In circumstances where chemical reaction is accelerated by flushing fluid temperature, a facilities safety/health advisor should be consulted for the optimum temperature for each application.
(See Appendix B6)

### 8.1.2 Installation

Personal wash units shall be protected from freezing and shall not be exposed to ambient temperatures exceeding 38 º C (100 º F).

### 8.1.3 Maintenance, Training and Storage

8.1.3.1 Manufacturers shall provide operation, inspection and maintenance instructions with personal wash units. Instructions shall be readily accessible to maintenance and inspection personnel.

8.1.3.2 All personal wash units shall be inspected and maintained in accordance with manufacturer's instructions and shall meet applicable regulatory requirements.

8.1.3.3 Employees shall be instructed in the location, proper use and application of personal wash units.

8.1.2.4 All personal wash units shall be inspected annually to assure conformance with Section 8.1 requirements of this standard.

### 8.2 Drench Hoses (See Illustrations 11, 12)

### 8.2.1 Performance of Drench Hoses

Drench hoses shall be designed to provide a controlled flow of flushing fluid to a portion of the body at a velocity low enough to be non-injurious to the user.

NOTE: A drench hose may be considered an eyewash or eye/face wash if the device meets the performance requirements of Section 5 and/or Section 6.

### 8.2.2 Performance of Control Valve

The valve shall be simple to operate and shall go from "off" to "on" in 1 second or less. The valve shall be resistant to corrosion. Manual or automatic actuators shall be easy to locate and be readily accessible to the user.

Page 10

Licensed to Patrick Schuerman. ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

### 8.2.3    Installation

It is the installer's responsibility to ensure that drench hoses shall:

8.2.3.1  Be assembled and installed in accordance with the manufacturer's instructions.

8.2.3.2  Be located in an area identified with a highly visible sign positioned so the sign shall be visible within the area served by the drench hose.  The area around the drench hose shall be well-lit, and free of debris that may inhibit its immediate use.

8.2.3.3  Be connected to a supply of flushing fluid.  Where the possibility of freezing conditions exists, drench hoses shall be protected from freezing or freeze-protected equipment shall be installed.  If shut off valves are installed in the supply line for maintenance purposes, provisions shall be made to prevent unauthorized shut off.

8.2.3.4  Deliver tepid flushing fluid.  In circumstances where chemical reaction is accelerated by flushing fluid temperature, a facilities safety/health advisor should be

consulted for the optimum temperature for each application.

### 8.2.4    Maintenance and Training

8.2.4.1  Manufacturers shall provide operation, inspection and maintenance instructions with drench hoses.  Instructions shall be readily accessible to maintenance and inspection personnel.

8.2.4.2  Plumbed drench hoses shall be activated weekly for a period long enough to verify operation and ensure that flushing fluid is available.

8.2.4.3  Self-contained drench hoses shall be visually checked weekly to determine if flushing fluid needs to be changed or supplemented.  Such inspection shall be conducted in accordance with manufacturer's instructions.

8.2.4.4  Employees who may be exposed to hazardous materials shall be instructed in the location and proper use of drench hoses.

8.2.4.5  All drench hoses shall be inspected annually to assure conformance with Section 8.2.3 requirements of this standard.

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)

## Illustrations

The illustrations included in ANSI/ISEA Z358.1-2014 are included as examples of configurations capable of meeting the criteria set forth in this standard.  Other configurations may be acceptable if they meet the performance criteria established in this standard.



Illustration 1
Emergency Shower – Overhead Type

Page 12

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)



Illustration 2
Emergency Shower – Multi-Nozzle

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)



Illustration 3
Emergency Shower – Multi-Nozzle with Overhead Fixture

Page 14

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)



Illustration 4
Plumbed Eyewash

Page 15

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)



Illustration 5
Non-Pressurized Self-Contained Eyewash



Illustration 6
Pressurized Self-Contained Eyewash

Page 16

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)



Illustration 7
Typical Eyewash Gauge



Illustration 8
Eye/Face Wash

Page 17

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)



Illustration 9
Combination Unit

Page 18

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)



Illustration 10
Personal Wash Units



Illustration 11
Drench Hose



Illustration 12
Drench Hose with Eyewash Attachment

Page 19

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)

# Appendices (The appendices are not part of ANSI/ISEA Z358.1-2014, but are included for information only.)

## APPENDIX A – SAFETY CONSIDERATIONS

### A1. Personal Wash Unit

The first seconds following an eye injury are often critical to keeping eye injury to a minimum. A personal wash unit may be kept in the immediate vicinity of employees working in a potentially hazardous area. The main purpose of these units is to supply immediate flushing. With this accomplished, the injured individual should then proceed to a plumbed or self-contained eyewash and flush the eyes for the required 15-minute period.

### A2. First Aid Practices

A physician or other appropriate professional should provide guidance on specific workplace hazards and should provide instruction on the use of emergency eyewash and shower equipment.

### A3. Waste Disposal

Consideration should be given to the proper disposal of waste flushing fluids from operating emergency eyewash and shower equipment. Freezing temperatures, drainage, elevated showers and pollutants are some, but not all, of the considerations. Consult authorities for assistance with applicable local, state and federal regulations.

### A4. Personal Protective Equipment

Emergency eyewash and shower equipment is not a substitute for proper primary protective devices. As a defense against flying solid particles and splashing injurious liquids, workers should wear personal protective equipment as needed.

Licensed to Patrick Schuerman. ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)

## APPENDIX B – INSTALLATION CONSIDERATIONS

**B1.    Supply Lines**

Installation procedures should be in accordance with proper plumbing practices and supply piping adequately sized to meet flow requirements.

**B2.    Water Capacity**

The ANSI/ISEA Z358.1-201x standard includes reference to a flow pressure of 207 kPa (30 psi) only in the certification-related sections for plumbed equipment.  This is to ensure that the testing for certification purposes is consistent and that reproducible results can be generated regardless of the laboratory conducting the testing.  It is the responsibility of the designer and owner to ensure proper flushing fluid delivery at possible low points of pressure in the plumbing system and to ensure that the plumbed equipment is installed in accordance with the flushing fluid delivery requirements specified by the equipment manufacturer.  The weekly activation of plumbed emergency eyewash and shower equipment is to be conducted at normal facility operating pressures.  Excess flow pressure can deliver water to the equipment at velocities that could injure the user or render the equipment inoperable.  Caution should be exercised with flow pressures over 0.552 kPa (80 psi).

**B3.    Valve Operation**

In the interest of safety, a control valve remaining open is most desirable to allow the user the use of both hands for disrobing or holding the eyes open.  However, a self-closing valve may be permitted in a school laboratory situation as a limited exception only where the enforcing authority is of the opinion that the hazard posed is not a serious threat.

**B4.    Alarm Devices**

In addition to the equipment identification required by ANSI/ISEA Z358.1-2014, users may also want to use audible alarms or warning lights to indicate that the unit is in operation.  These are particularly important in remote areas.  Many companies connect valves electrically to warning lights or buzzers in central dispatch areas to alert the appropriate authorities when the unit is in use.

**B5.    Placement of Emergency Eyewash and Shower Equipment**

Emergency eyewash and shower equipment should be available for immediate use, but in no instance should it take an individual longer than 10 seconds to reach the nearest facility.

There are several factors that might influence the location of emergency facilities.  It is recognized that the average person covers a distance of approximately 55 ft. (16.8 m) in 10 seconds when walking at a normal pace.  The physical and emotional state of a potential victim (visually impaired, with some level of discomfort/pain, and possibly in a state of panic) should be considered along with the likelihood of personnel in the immediate area to assist.  The installer should also consider other potential hazards that may be adjacent to the path of travel that might cause further injury.  A single step up into an enclosure where the equipment can be accessed is not considered to be an obstruction.  Additionally, installers should allow for adequate overhead clearance to accommodate the presence of cabinets over counter- or faucet- mounted emergency eyewashes, so as not to create an additional hazard that could be encountered when using the device.

A door is considered to be an obstruction.  Where the hazard is not corrosive, one intervening door can be present so long as it opens in the same direction of travel as the person attempting to reach the emergency eyewash and shower equipment and the door is equipped with a closing mechanism that cannot be locked to impede access to the equipment.

Page 21

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)

In situations that might warrant the placement of emergency eyewash and shower equipment close to the hazard, such as exposure to highly corrosive chemicals, the appropriate professional should be contacted for advice on the proper distances. Equipment should be located adjacent to the hazard, but situated in such a manner such that exposure to the splash hazard or other hazards (e.g., exposed electrical conductors) does not occur while using the eyewash.

**B6.      Delivered Flushing Fluid Temperature**

Continuous and timely irrigation of affected tissues for the recommended irrigation period are the principal factors in providing first aid. Providing flushing fluid at temperatures conducive to use for the recommended irrigation period is considered an integral part of providing suitable facilities. Medical recommendations suggest a flushing fluid at tepid temperatures be delivered to affected chemically-injured tissue. Temperatures in excess of 38°C (100°F) have proven to be harmful to the eyes and can enhance chemical interaction with the skin and eye tissue. Consideration should be given to the impact of isolated ambient temperature changes. Colder ambient temperature might require an enclosure for added protection. Warmer ambient temperature might require a re-evaluation of the water temperature.

While cold flushing fluid temperatures provide immediate cooling after chemical contact, prolonged exposure to cold fluids affect the ability to maintain adequate body temperature and can result in the premature cessation of first aid treatment. Recent information indicates that a temperature of 16°C (60°F) is suitable for the lower parameter for tepid flushing fluid without causing hypothermia to the equipment user.

**B7.      Weekly Activation for Plumbed Emergency Eyewash and Shower Equipment**

The intent of the weekly activation to be conducted on plumbed emergency eyewash and shower equipment is to ensure that there is a flushing fluid supply at the head of the device and to clear the supply line of any sediment build-up that could prevent fluid from being delivered to the head of the device and minimize microbial contamination due to stagnant water. The duration of this test is dependant on the volume of water contained in the unit itself and all sections of pipework that do not form part of a constant circulation system (also known as "dead leg" portions). Water in these sections is stagnant until a flow is activated by opening a valve. The goal is to flush out stagnant water in the dead leg completely. Where mixing valves are used, both the hot water and cold water supplies to the valve must be considered.

Page 22

Licensed to Patrick Schuerman. ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

ANSI/ISEA Z358.1-2014 (R2020)

REFERENCES

Independent study results:  Placement Dimension Verification, provided by Anthrotech, Yellow Springs, OH, 2002

*ASPE Plumbing Engineering Design Handbook* Vol. 4, Chapter 1*,* American Society of Plumbing Engineers, 2012

*Emergency Eyewash and Shower Equipment:  A Comprehensive Literature Review and Comparison,* American Society of Plumbing Engineers Research Foundation, 2008

*Clinical Ophthalmology*, Harper & Row, 1992, Vol. 2, Chapter 21

*Human Engineering Guide to Equipment Design*, Woodson, W. E. and Conover, D. W., Army, Navy, Air Force Steering Committee, United States Government, 1972

*Human Engineering Guide for Equipment Designers*, University of California Press, 1964, 2nd ed.

*United States Air Force Flight Surgeon's Manual*, Chapter 20, 1991,Third ed.

United States Coast Guard lifesaving and fire safety standards for commercial ships and recreational boats – Cold Water Survival

Licensed to Patrick Schuerman.  ANSI store order # X_1036376. Downloaded 08/23/2024. Single user license only. Copying and networking prohibited.

16777/PJB/CAT                                                    Attorney ID# 6298244

**IN THE UNITED STATES DISTRICT COURT** <span style="color:red">**EXHIBIT F**</span>
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID N. BADAGLIACCO | ) | |
| Plaintiff,) | | |
| vs. | ) | Case No.: 1:21-cv-02424 |
| SAFARILAND, LLC, a Limited Liability | ) | |
| Company, | ) | |
| Defendant.) | | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**PLAINTIFF DAVID N. BADAGLIACCO'S INITIAL DISCLOSURES PURSUANT TO**
**FEDERAL RULE 26(A)(1)**

NOW COMES the Plaintiff, DAVID M. BADAGLIACCO, by his attorneys, ANESI, OZMON, RODIN, NOVAK, & KOHEN, LTD., and for his Initial Disclosures pursuant to Federal Rule 26(a)(1), states as follows:

**(A) Individuals likely to have discoverable information:**

**David N. Badagliacco, 44 West Kenilworth Avenue, Villa Park, IL 60181**

Plaintiff David Badagliacco is expected to testify concerning the information, subject matter, and opinions set forth in his deposition, including the facts and circumstances surrounding the instant occurrence wherein Plaintiff attended an Aerosol Devices Instructor Course which was owned and operated by Defendant. He is also expected to testify to any conversations had prior and subsequent to the occurrence with Defendants and/or Defendants' agents and employees; what he was doing on the day of the subject occurrence; the description of the scene of the occurrence, including but not limited to any instructions, warning, training, disclosure or lack thereof regarding the training provide, the requirement for participants to be intentionally exposed to Oleoresin Capsicum spray and then required to complete an obstacle course before participants were provided any means to flush the spray from his eyes. He will give testimony relating to the length of time allowed to flush the spray, the manner and methodology, or lack thereof, he was provided to use to flush the spray. He will testify to comments and directives made by Defendant and its agents before, during and after they exposed him to the Oleoresin Capsicum spray. He will testify the only means he was provided was a hose to flush the spray and was only allowed to do so for less than what is recommended by Defendant and other manufactures of OC spray.

Plaintiff will also testify to the nature of the injuries and damages sustained as a result of the occurrence. He will testify to the eye injury he sustained as a result of Defendant's actions and inactions. He will testify to the physical symptoms and reactions he experienced as a result of the incident. He will testify to the medical treatment for his injuries, the expense

1

16777/PJB/CAT                                                   Attorney ID# 6298244

incurred as a result of the injures.   He will testify he suffered and continues to suffer the effects of the exposure by the defendant.  He will testify as to his medical treatment already experienced as well as his understanding of medical care required in the future.  He will testify as to his understand of the permanency of his injury. He will testify that his medical bills have been paid and they were incurred solely due to the subject incident.  He will testify to the nature of the pain and suffering experienced and expects to experience in the future. He will testify as to his vision, visual acuity and physical condition before and after the incident.

He will also testify as to how the incident affected his familial relationships, normal life, activity level, on a personal and professional level, and his physical condition prior and subsequent to the occurrence.  Mr. Badagliacco will testify with the facts and opinions consistent with his deposition.  He will further testify regarding: his personal background and work-life; his injuries, medical treatment, pain and suffering, and all other applicable damages suffered as a result of the occurrence.

This witness will further lay the foundation for and testify as to any photographs, any statements, any deposition exhibits marked at various depositions, and/or any documents which were a part of all parties' production responses, including all supplemental responses disclosed by any party.

**Unknown Employees and/or Agents of Defendant:**

These employees and/or agents are expected to testify as to the duties, responsibilities and authorities of various employees and parties to this lawsuit, and any observations and knowledge of policies and procedures at issue. Further, they will testify concerning any knowledge or information regarding the incident and/or injuries Plaintiff suffered from as a result of the occurrence identified in the complaint. Plaintiff reserves the right to supplement this disclosure during the course of discovery.

Plaintiff reserves the right to call any and all witnesses, including impeachment and rebuttal witnesses, disclosed by the Defendant, although they are not expressly mentioned herein. Plaintiff reserves the right to supplement its responses in accordance with the rules regarding discovery and as the court orders, as discovery is on-going.

**Plaintiff's Medical Providers:**

- **Dr. James Saul, 25 S. Villa Ave., Villa Park, IL 60181, (630) 832-6783**
- **Dr. Joshua Herz, NorthShore University Health System, Ophthalmology, 2050 Pfingsten Rd., #220, Glenview IL 60026, (224) 251-2020**
- **Dr. Ali Djalilian, Dr. Tu Elmer, UI Health, Eye and Ear Infirmary, 1855 W. Taylor St., FL 3, Chicago, IL 60612, (312) 996-8937**
- **Medical Professionals from University of Chicago Medical Center 5841 S. Maryland Ave., Chicago, IL 60637, (773) 702-1637**

The medical service providers are expected to testify as to the care and treatment provided to the Plaintiff; they will testify and give opinions consistent with the opinions and conclusions

2

16777/PJB/CAT                                                    Attorney ID# 6298244

contained in their medical records and reports.  They will testify as to the effects of the injuries have on the Plaintiff's ability to live a normal life, the nature of Plaintiff's pain and suffering as well as the disability the Plaintiff suffered and continues to suffer.  They will testify as to the loss of a normal life suffer by the Plaintiff and expected to experience in the future.  They will testify to the causal connection between the occurrence and the Plaintiff's injuries and the cost of the medical care provided to the Plaintiff.

The listed providers will testify Plaintiff has experience and will continue to experience pain, suffering, disability and the loss of a normal life.  They will testify that the is a causal connection between the subject incident and Plaintiff's injuries and the resulting pain, suffering, disability and loss of a normal life. The medical providers will testify to the existence of past medical care cost, future medical care cost and that Plaintiff was and continues to be restricted from any activities of daily living.  They will testify Plaintiff needs continued treatment and medication and their opinions of Plaintiff prognosis.  The basis of said conclusions and/opinions are the doctors' and therapists' knowledge, training and experience as well as their care and treatment of the Plaintiff and review of the medical records and any other diagnostic tests and reports.

**Investigation Continues**

The foregoing is a list of witnesses Plaintiff believes have knowledge related to the issues in this litigation. As discovery continues and after Plaintiff has had a reasonable opportunity to review all the documents related to this matter, including those that have yet to be produced, Plaintiff may provide an additional list of individuals who have knowledge related to issues in this litigation and may be called at the trial of this matter to testify regarding the various subjects stated above. Plaintiff is in the process of gathering additional information regarding any such witnesses and will make supplemental disclosures, as appropriate in the future. Plaintiff reserves the right to update this list as new information is obtained and received. In addition, all witness, including expert witnesses, will be identified in accordance with the Federal Rules of Civil Procedure and/or the Court's applicable scheduling order.

**(B). Description of documents that may be relevant to support Plaintiff's claims:**

- Safariland Training Academy Aerosol Device Instructor Course Student Workbook (PLAINTIFF'S DISCLOSURES 000001-000009);
- Medical Records and Medical Bills from the following medical providers:
  - Dr. James Saul, 25 S. Villa Ave., Villa Park, IL 60181 (630) 832-6783 (PLAINTIFF'S DISCLOSURES 000010-000014)
  - Dr. Joshua Herz, NorthShore University Health System, Ophthalmology, 2050 Pfingsten Rd., #220, Glenview IL 60026 (224) 251-2020
  - Dr. Ali Djalilian, Dr. Tu Elmer, UI Health, Eye and Ear Infirmary, 1855 W. Taylor St., FL 3, Chicago, IL 60612 (312) 996-8937 Medical Professionals from University of Chicago Medical Center 5841 S. Maryland Ave., Chicago, IL 60637 (773) 702-1637

16777/PJB/CAT                                                      Attorney ID# 6298244

**(C) Computation of Each Category of Categories of Damages:**

Past Medical Expenses:  As a result of the injuries sustained in the occurrence, Plaintiff required medical care and treatment. The chart below of known medical expenses incurred as a result of accident-related injuries along with calculation will be supplemented upon receipt of billing which has been previously requested from these providers.

| TREATER | DATE OF SERVICE | AMOUNT |
|---|---|---|
| **Dr. James Saul**<br>**25 S. Villa Ave., Villa Park, IL 60181** | **04/22/19** | **$43.00** |
| **NorthShore University Health System - Ophthalmology, Dr. Joshua Herz**<br>**2050 Pfingsten Rd., #220, Glenview IL 60026** | **Investigation continues** | **Investigation continues** |
| **UI Health, Eye and Ear Infirmary,**<br>**Dr. Ali Djalilian, Dr. Tu Elmer**<br>**1855 W. Taylor St., FL 3, Chicago, IL 60612** | **Investigation continues** | **Investigation continues** |
| **University of Chicago Medical Center**<br>**5841 S. Maryland Avenue**<br>**Chicago, IL 60637** | **Investigation continues** | **Investigation continues** |

Plaintiff is also making claims for future medical expenses, past and future pain and suffering, past and future loss of normal life as well as past and future wage loss.  The amounts of which are currently undetermined.

Plaintiff reserves the right to supplement its responses in accordance with the rules regarding discovery and as the court orders, as discovery is on-going.

Pursuant 26(g), I certify that to the best of my knowledge, information and belief; after reasonable inquiry, that the information provided in this disclosure is complete and correct as of the time it is made with respect to the responses provided herein, and documents attached hereto.

/s/Patrick J. Blum
Attorney for Plaintiff

Patrick J. Blum
**ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.**
161 North Clark Street - 21st Floor
Chicago, IL  60601
312/372-3822
pblum@anesilaw.com
Attorney ID# 6298244

4